# EXHIBIT A

## PART 1 OF 3

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 2 of 86 PageID #: 13

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

---

RISEBORO COMMUNITY PARTNERSHIP INC., formerly known as RIDGEWOOD BUSHWICK SENIOR CITIZENS COUNCIL, INC.,

                        Plaintiff,

       -against-

SUNAMERICA HOUSING FUND NO. 682, SLP HOUSING I, LLC, 420 STOCKHOLM STREET ASSOCIATES L.P.,

                        Defendants.

---

Index No.: _____

**SUMMONS**

Venue: Plaintiff chooses Kings County as the place of Venue since the action deals with real property located in Kings County

**TO THE ABOVE-NAMED DEFENDANTS:**

      **YOU ARE HEREBY SUMMONED** and required to answer the Complaint in this action and to serve a copy of your Answer on Plaintiff's attorneys within twenty (20) days after service of this summons, exclusive of the day of service, or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to appear or answer, judgment will be taken against you by default of the relief demanded in the Complaint.

Dated:  New York, New York
         November 14, 2018

                      **GOLDSTEIN HALL PLLC**

                      /S/ *Brian J. Markowitz*
      By:  **BRIAN J. MARKOWITZ, ESQ.**
            **DANIEL GOLDENBERG, ESQ.**
            Attorneys for Plaintiff
            *RISEBORO COMMUNITY PARTNERSHIP INC.*
            80 Broad Street, Suite 303
            New York, New York 10004
            Tel. (646) 768.4100

1

\#

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 3 of 86 PageID #: 14

Defendants' Addresses:

1. **SunAmerica Housing Fund No. 682**
   1 SunAmerica Center, Century City
   Los Angeles, California 90067-6022

2. **SLP Housing I, LLC**
   1 SunAmerica Center, Century City
   Los Angeles, California 90067-6022

3. **420 Stockholm Street Associates L.P.**
   217 Wyckoff Avenue
   Brooklyn, New York 11237

2

#

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
NYSCEF DOC. NO. 1

INDEX NO. 523152/2018
RECEIVED NYSCEF: 11/15/2018

INDEX NO.:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

RISEBORO COMMUNITY PARTNERSHIP INC., formerly known as
RIDGEWOOD BUSHWICK SENIOR CITIZENS COUNCIL, INC.,

Plaintiff,

-against-

SUNAMERICA HOUSING FUND NO. 682, SLP HOUSING I, LLC, 420
STOCKHOLM STREET ASSOCIATES L.P.,

Defendants.

## SUMMONS

To the best of my knowledge, information and belief, formed after an inquiry
reasonable under the circumstances, the presentation of these papers, or the
contentions therein, are not frivolous, as defined in subsection (c) of section 130-
1.1 of the Rules of the Chief Administrator (22 NYCRR).

GOLDSTEIN HALL PLLC
Brian J. Markowitz, Esq.
Daniel Goldenberg, Esq.
80 Broad Street, Suite 303
New York, New York 10004

Service of a copy of the within is hereby admitted
Dated: _____, 2018
Attorney(s) for _____

3 of 3

---

******************NOTICE OF ENTRY******************

Sir/Madam:

Please take notice that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court
on the _____ day of _____, 2018.

Dated: _____

Yours, etc.

GOLDSTEIN HALL PLLC
Attorney(s) for Plaintiff
80 Broad Street, Suite 303
New York, New York 10004

To: _____
Attorney(s) for _____

******************NOTICE OF SETTLEMENT******************

Sir/Madam:

Please take note that an _____ of which the within is a true copy
will be presented for settlement to the Hon. _____, one of the Justices
of the within named court at _____, on _____, 2018, at _____
A.M./P.M.

Dated: _____

Yours, etc.

GOLDSTEIN HALL PLLC
Attorney(s) for Plaintiff
80 Broad Street, Suite 303
New York, New York 10004

To: _____
Attorney(s) for _____

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 5 of 86 PageID #: 16

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

| | |
|---|---|
| RISEBORO COMMUNITY PARTNERSHIP INC., formerly known as RIDGEWOOD BUSHWICK SENIOR CITIZENS COUNCIL, INC.,<br><br>                               Plaintiff,<br><br>                    -against-<br><br>SUNAMERICA HOUSING FUND NO. 682, SLP HOUSING I, LLC, 420 STOCKHOLM STREET ASSOCIATES L.P.,<br><br>                               Defendants. | Index No.:   523152/2018<br><br>**NOTICE OF PENDENCY**<br><br><u>Venue:</u> Plaintiff chooses Kings County as the place of Venue since the action deals with real property located in Kings County<br><br><u>Premises:</u><br>**Block** 3261; **Lot** 20 |

**NOTICE IS HEREBY GIVEN,** that an action has been commenced and is pending in this Court upon a Complaint of the above-named Plaintiff against the above-named Defendants in relation to a dispute arising from Plaintiff's Right of First Refusal to purchase and Defendant's rejection thereof.

**AND NOTICE IS FURTHER GIVEN,** that the premises affected by said action were, at the time of the commencement of said action, and at the time of the filing of this notice, situated in Block 3261; Lot 20, on the land and tax map of the County of Kings, City of New York, and State of New York. Said premises are known as and by street number:

   420 Stockholm Street, Brooklyn, New York 11237

   The deed to the premises is currently held by 420 Stockholm Street Associates L.P. in accordance with the annexed hereto Operating Agreement of 420 Stockholm Street Associates L.P., which provides in its paragraph 12.03 that Riseboro Community Partnership Inc. has a right of first refusal which it can – and did – exercise after the end of the 15 year Compliance Period (December 23, 2015). A copy of the Operating Agreement is annexed hereto as Exhibit A, and

1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 6 of 86 PageID #: 17

paragraph 12.03 is page 93 or 192.

Together with all right, title and interest of the Defendant(s) in and to the land lying in the streets and roads in front of and adjoining said premises.

The Clerk of the County of Kings is directed to index this notice to the names of each of the Defendants SUNAMERICA HOUSING FUND NO. 682, SLP HOUSING I, LLC, 420 STOCKHOLM STREET ASSOCIATES L.P. and as against the premises situated in Block 3261; Lot 20, on the land and tax map of the County of Kings, City of New York, and State of New York.

Dated:  New York, New York
      November 19, 2018

GOLDSTEIN HALL PLLC

/S/ *Brian J. Markowitz*
By:   **BRIAN J. MARKOWITZ, ESQ.**
   **DANIEL GOLDENBERG, ESQ.**
   Attorneys for Plaintiff
   *RISEBORO COMMUNITY PARTNERSHIP INC.*
   80 Broad Street, Suite 303
   New York, New York 10004
   Tel. (646) 768.4100

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 7 of 86 PageID #: 18

AUG-14-2000 21:40            NIXON PEABODY LLP                    202 457 5355   P.02/09

# EXHIBIT A

## FIRST AMENDMENT TO
## AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
## OF
### 420 STOCKHOLM STREET ASSOCIATES L.P.,
#### a New York limited partnership

**THIS FIRST AMENDMENT** to the Amended and Restated Agreement of Limited Partnership of 420 Stockholm Street Associates L.P., (this "Amendment") is made and entered into as of the 14th day of August, 2000, by and among **420 STOCKHOLM CORP.**, a New York corporation (the "General Partner"); **420 STOCKHOLM HOUSING DEVELOPMENT FUND COMPANY, INC.**, a New York nonprofit corporation (the "Withdrawing General Partner"); **SUNAMERICA HOUSING FUND NO. 682, A NEVADA LIMITED PARTNERSHIP** ("SHF" or the "Investment Partnership"); and **SLP HOUSING I, LLC**, a Nevada limited liability company (the "Special Limited Partner").

### R E C I T A L S :

**WHEREAS**, on December 23, 1998, the Withdrawing General Partner executed a Certificate of Limited Partnership (the "Certificate") for the formation of 420 Stockholm Street Associates L.P. (the "Partnership") pursuant to the terms of the New York Revised Uniform Limited Partnership Act (the "Act"), which Certificate was filed with the Department of State of New York (the "State") on January 12, 1999; and

**WHEREAS**, as of December 23, 1998, the Withdrawing General Partner and the Investment Partnership executed an Agreement of Limited Partnership (the "Original Agreement") of the Partnership; and

**WHEREAS**, the Withdrawing General Partner, the Investment Partnership, and the Special Limited Partner executed that certain Amended and Restated Agreement of Limited Partnership of the Partnership dated as of May 1, 1999 (the "Partnership Agreement"). All capitalized terms not otherwise defined herein shall have the definitions accorded them in the Partnership Agreement; and

**WHEREAS**, the Partnership has been formed to own, rehabilitate, develop, maintain and operate a 35-unit multifamily apartment complex intended for rental to low and moderate income families and located in Brooklyn, New York (the "Apartment Complex"); and

**WHEREAS**, the parties hereto now desire to enter into this Amendment to (i) reflect the transfer of the Apartment Complex from the Withdrawing General Partner to the Partnership and all other actions which collectively constitute the Final Closing; (ii) admit the General Partner to the Partnership and reflect the withdrawal of the Withdrawing General Partner; (iii) further amend the Partnership Agreement as set forth in this Amendment; and (iv) continue the Partnership under the Act.

**NOW, THEREFORE**, in consideration of the foregoing, of mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereby agree to continue the Partnership pursuant to the Act, and to

W164431.1

AUG-14-2000  21:40    NIXON PEABODY LLP    202 457 5355    P.03/09

amend the Partnership Agreement as set forth in this Amendment, which reads in its entirety as follows:

1.    By its execution hereof, the General Partner hereby agrees to be bound by all terms and conditions set forth in the Partnership Agreement, as amended by this Amendment thereto, and is hereby admitted to the Partnership as the General Partner. The Withdrawing General Partner, the Investment Partnership, and the Special Limited Partner hereby Consent to the admission of the General Partner. Whenever the Partnership Agreement refers to the General Partner, it shall hereinafter be deemed to mean 420 Stockholm Corp., a New York corporation.

2.    Upon its execution hereof, the Withdrawing General Partner hereby withdraws from the Partnership, which withdrawal is hereby Consented to by the General Partner, the Investment Partnership, and the Special Limited Partner.

3.    The following definitions contained in Article II of the Partnership Agreement are hereby amended to read in their entirety as follows:

""Apartment Complex" means the Land and improvements thereon owned by the Partnership as of August 14, 2000, and located in Brooklyn, New York, consisting of a 35-unit rental housing development and other improvements rehabilitated by the Developer and to be operated by the Partnership and known as 420 Stockholm Street Apartments. A description of the Land on which the Apartment Complex is located is provided in Exhibit "B", attached hereto.

"General Partner" means 420 Stockholm Corp., a New York corporation, and any other Person admitted as a general partner pursuant to this Agreement, and their respective successors pursuant to this Agreement."

4.    Section 3.03 of the Partnership Agreement is hereby deleted in its entirety and the following is substituted therefore:

"3.03.  Overview of Financial Structure.

The Apartment Complex was purchased on December 23, 1998 by the General Partner.  The Developer completed rehabilitation of the Apartment Complex using the proceeds of the Construction Loan ($1,700,000), the Bridge Loan ($1,930,877) and the HFA Loan ($620,000) on or about July 11, 2000.

Upon said completion and the subsequent issuance of certificate(s) of occupancy, the Developer and the General Partner submitted the necessary documents evidencing completion of the rehabilitation and the meeting of the other requirements as specified in Section 5.01(c)(iii) hereof and in that certain 421-a Affordable Housing Program Agreement between the Withdrawing General Partner and the City of New York dated February 1, 1999 for the issuance of the 421-a Certificates. Following such issuance and the obtaining by RB of the Consents of all Authorities required for the Withdrawing General Partner to convey

the Apartment Complex to the Partnership, the sale of the 421-a Certificates occurred on August 7, 2000, and Final Closing took place on August 14, 2000.

At Final Closing, the following events occurred: (1) The Withdrawing General Partner used the proceeds from the sale of the 421-a Certificates ($2,143,750) to repay a portion of the Construction Loan ($1,161,981), to repay the HFA Loan ($620,000), to pay a portion of the Development Fee ($100,539), to pay the Additional Development Fee (in accordance with the terms of the Amended and Restated Development Agreement attached hereto as Exhibit A-1), to pay remaining development and construction costs, and to pay costs related to the Final Closing. (2) The Withdrawing General Partner contributed the Apartment Complex to the Partnership and received a Capital Account credit in the amount of the proceeds received for the 421-a Certificates. (3) The Investment Partnership made the First Additional Capital Contribution to the Partnership in the amount of $2,107,876, which was used to pay off the balance of the Construction Loan ($575,208) and the outstanding balance of the Bridge Loan ($1,532,668). (4) The Withdrawing General Partner withdrew from the Partnership and assigned all of its rights and interest in the Partnership to the General Partner.

Upon the issuance of the Form 8609 by the Agency and the satisfaction of the other conditions set forth in Section 5.01(c)(iv), the Investment Partnership will make the Second Additional Capital Contribution of $160,731, which will be used to pay a portion of the Development Fee.

Upon the attainment of 95% occupancy and the satisfaction of the other conditions set forth in Section 5.01(c)(v), the Investment Partnership will make the Third Additional Capital Contribution of $160,731, which will be used to pay the remainder of the Developer Fee.

In the event 95% occupancy is achieved prior the receipt of the Form 8609, the Third Additional Capital Contribution will be paid prior to the Second Additional Capital Contribution."

5.    Section 5.01(a) of the Partnership Agreement is hereby deleted in its entirety and the following is substituted therefore:

"5.01. Partners, Capital Contributions, Bridge Loan and Partnership Interests.

(a)    The General Partner, its principal address or place of business, its Capital Contribution and its Percentage Interest is as follows:

| | | |
|---|---|---|
| 420 Stockholm Corp. | $2,143,750 | 0.1%" |
| 217 Wyckoff Avenue, | | |
| Brooklyn, New York | | |
| 11237 | | |

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM          INDEX NO. 523152/2018
NYSCEF DOC. NO. 2    Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 10 of 86 PageID #: 21
                                                                       RECEIVED NYSCEF: 11/19/2018

AUG-14-2000  21:41              NIXON PEABODY LLP                    202 457 5355    P.05/09

6.      The last paragraph of Section 5.01(c)(iii) is hereby deleted in its entirety and the following is substituted therefor:

"The amount of the First Additional Capital Contribution shall be Two Million One Hundred Seven Thousand Eight Hundred Seventy-Six Dollars ($2,107,876). The funds contributed as the First Additional Capital Contribution shall be used to repay a portion of the Construction Loan and all amounts due under the Bridge Loan to the extent that same remain unpaid."

7.      This Amendment shall be effective as of August 14, 2000.

8.      Except as amended hereby, the Partnership Agreement remains unchanged and is hereby ratified and confirmed.

9.      This Amendment may be executed in several counterparts, each of which shall be deemed to be an original copy and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

10.     This Amendment shall be construed and enforced in accordance with the laws of the State of New York.

[REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK;
SIGNATURES BEGIN ON THE NEXT PAGE]

W164431.1

**4**

AUG-14-2000  21:41          NIXON PEABODY LLP                    202 457 5355   P.06/09

**IN WITNESS WHEREOF,** the parties have caused this Amendment to be duly executed as of the date first set forth above.

### GENERAL PARTNER:

420 STOCKHOLM CORP., a New York corporation

By: _Rubel Velos_
   _Rubel Velasquez, President_
   [name/title]

### INVESTMENT PARTNERSHIP:

SUNAMERICA HOUSING FUND 682,
A NEVADA LIMITED PARTNERSHIP

By:  SunAmerica Inc., its general partner

By: _____
   Michael L. Fowler
   Vice President

### SPECIAL LIMITED PARTNER:

SLP HOUSING I, LLC, a Nevada limited liability company

By: SunAmerica Investments, Inc., its sole member

By: _____
   Michael L. Fowler, Authorized Agent

### WITHDRAWING GENERAL PARTNER:

420 STOCKHOLM HOUSING DEVELOPMENT FUND COMPANY, INC., a New York nonprofit corporation

By: _Rubel Velos_
   _Rubel Velasquez, President_
   [name/title]

W1M431.1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM          INDEX NO. 523152/2018
NYSCEF DOC. Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 12 of 86 PageID #: 23
                                                                        RECEIVED NYSCEF: 11/19/2018

AUG-14-2000  21:41            NIXON PEABODY LLP              202 457 5355    P.07/09

**COUNTY OF** ~Kings~ )
                          : ss
**STATE OF NEW YORK** )

Before me, the undersigned Notary Public in and for the aforesaid County and State, personally appeared _Richard Velasquez_ , in his capacity as _President_ of 420 Stockholm Housing Development Fund Company, Inc., the Withdrawing General Partner of 420 Stockholm Street Associates L.P., and personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the foregoing First Amendment to the Amended and Restated Agreement of Limited Partnership.

                                    _____
                                    Notary Public

                                    GARY POLLARD
                               Notary Public, State of New York
                                       No. 01PO4622687
                                 Qualified in New York County
                             Commission Expires April 22, 20___

W16443.1

AUG-14-2000 21:42          NIXON PEABODY LLP                    202 457 5355    P.08/09

COUNTY OF _____ )
                  : SS
STATE OF NEW YORK )

Before me, the undersigned Notary Public in and for the aforesaid County and State, personally appeared __Kilburn Velazquez,__ , in his capacity as __President__ of 420 Stockholm Corp., the General Partner of 420 Stockholm Street Associates L.P., and personally know to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the foregoing First Amendment to the Amended and Restated Agreement of Limited Partnership.

Witness my hand and notarial seal this __14__ day of __August__, 2000.

Notary Public

GARY POLLARD
Notary Public, State of New York
No. 01PO4887901
Qualified in New York County
Commission Expires April 28, 2002

W16463.1

ii

COUNTY OF LOS ANGELES )

                                    : ss

STATE OF CALIFORNIA )

      Before me, the undersigned Notary Public in and for the aforesaid County and State, personally appeared Michael L. Fowler, in his capacity as Vice President of SunAmerica Inc., general partner of SunAmerica Housing Fund 682, A Nevada Limited Partnership, and as Authorized Agent of SunAmerica Investments, Inc., sole member of SLP Housing I, LLC, ~~and being duly sworn,~~ acknowledged the execution of the foregoing First Amendment to the Amended and Restated Agreement of Limited Partnership.

      Witness my hand and notarial seal this *14th* day of *August*, 2000.



Notary Public

My Commission Expires:  *11-6-03*

iv

W164431.1

Case 1:18-cv-07261-RJD-JRC Document 1-1 Filed 12/20/18 Page 15 of 86 PageID #: 26

# AMENDED AND RESTATED AGREEMENT

## 420 STOCKHOLM STREET ASSOCIATES L.P.

### AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

Dated as of May 1, 1999

THE LIMITED PARTNERSHIP INTERESTS EVIDENCED BY THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (THE "AGREEMENT") HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933 (THE "ACT") OR PURSUANT TO APPLICABLE STATE SECURITIES LAWS ("BLUE SKY LAWS"). ACCORDINGLY, THE LIMITED PARTNERSHIP INTERESTS CANNOT BE RESOLD OR TRANSFERRED BY ANY PURCHASER THEREOF WITHOUT REGISTRATION OF THE SAME UNDER THE ACT AND THE BLUE SKY LAWS OF SUCH STATE(S) AS MAY BE APPLICABLE, OR IN A TRANSACTION WHICH IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE BLUE SKY LAWS OR WHICH IS OTHERWISE IN COMPLIANCE THEREWITH. IN ADDITION, THE SALE OR TRANSFER OF SUCH LIMITED PARTNERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, THE RESTRICTIONS SET FORTH IN ARTICLE IX HEREOF.

WAS: 100871_1
420 Stockholm St. Limited Partnership Agmt.

# 420 STOCKHOLM STREET ASSOCIATES L.P.
## AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

This Amended and Restated Agreement of Limited Partnership is made and entered into as of May 1, 1999 by and among the undersigned parties.

WHEREAS, on December 21, 1998, 420 Stockholm Housing Development Fund Company, Inc., a New York nonprofit corporation, as the general partner (the "General Partner"), executed a Certificate of Limited Partnership (the "Certificate") for the formation of 420 Stockholm Street Associates L.P. (the "Partnership") pursuant to the terms of the New York Revised Uniform Limited Partnership Act (the "Act"), which Certificate was filed with the Department of State of New York (the "State") on January 12, 1999; and

WHEREAS, as of December 21, 1998, the General Partner and SunAmerica Housing Fund 682, a Nevada Limited Partnership, as the limited partner ("SHF" or the "Investment Partnership") executed an Agreement of Limited Partnership (the "Original Agreement") of the Partnership; and

WHEREAS, the General Partner, SLP Housing I, LLC, a Nevada limited liability company (the "Special Limited Partner"), and the Investment Partnership wish to continue the Partnership pursuant to the Act; and

WHEREAS, the Partnership has been formed to own, rehabilitate, develop, maintain and operate a 35-unit multifamily apartment complex intended for rental to low and moderate income families and to be located in Brooklyn, New York (the "Apartment Complex"); and

WHEREAS, the parties hereto now desire to enter into this Amended and Restated Agreement of Limited Partnership to (i) continue the Partnership under the Act; (ii) admit the Special Limited Partner to the Partnership as a Limited Partner; and (iii) set forth all of the provisions governing the Partnership.

NOW, THEREFORE, in consideration of the foregoing, of mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereby agree to continue the Partnership pursuant to the Act, as set forth in this Amended and Restated Agreement of Limited Partnership, which reads in its entirety as follows:

WAS: 100871_1
420 Stockholm St. Limited Partnership Agmt.

TABLE OF CONTENTS

Page

ARTICLE I......................................................................................................1
CONTINUATION OF PARTNERSHIP...........................................................1
  1.01. Continuation ...........................................................................................1
  1.02. Name ......................................................................................................1
  1.03. Principal Executive Offices; Agent for Service of Process ....................1
  1.04. Withdrawal of Initial Limited Partner ....................................................1
  1.05. Term .......................................................................................................1
  1.06. Recording of Certificate .........................................................................1

ARTICLE II ...................................................................................................2
DEFINED TERMS ..........................................................................................2

ARTICLE III...................................................................................................14
PURPOSE AND BUSINESS OF THE PARTNERSHIP.................................14
  3.01. Purpose of the Partnership ....................................................................14
  3.02. Authority of the Partnership ..................................................................14

ARTICLE IV...................................................................................................17
REPRESENTATIONS, WARRANTIES AND COVENANTS; ......................17
DUTIES AND OBLIGATIONS ......................................................................17
  4.01. Representations, Warranties and Covenants Relating to the Apartment
         Complex and the Partnership ................................................................17
  4.02. Duties and Obligations Relating to the Apartment Complex and the
         Partnership ............................................................................................22
  4.03. Special Purpose Entity ..........................................................................24

ARTICLE V. ...................................................................................................26
PARTNERS, PARTNERSHIP INTERESTS ..................................................26
AND OBLIGATIONS OF THE PARTNERSHIP ...........................................26
  5.01. Partners, Capital Contributions, Bridge Loan and Partnership Interests..............26
  5.02. Return of Capital Contribution ..............................................................37
  5.03. Withholding of Capital Contribution Upon Default ...............................37
  5.04. Legal Opinions ......................................................................................38
  5.05. Repurchase Obligation ..........................................................................39
  5.06. Guaranteed Payments ............................................................................40
  5.07. IP Loans and GP Loans .........................................................................41

ARTICLE VI. ..................................................................................................44
CHANGES IN PARTNERS .............................................................................44
  6.01. Withdrawal of the General Partner .........................................................44
  6.02. Admission of a Successor or Additional General Partner .......................44
  6.03. Effect of Bankruptcy, Death, Withdrawal, Dissolution or Incompetence
         of a General Partner ..............................................................................45

- i -

TABLE OF CONTENTS

Page

ARTICLE VII...................................................................................... 47
ASSIGNMENT TO THE PARTNERSHIP .............................................. 47

ARTICLE VIII. ................................................................................... 48
RIGHTS, OBLIGATIONS AND POWERS ............................................ 48
OF THE GENERAL PARTNER ........................................................... 48
  8.01. Management of the Partnership ................................................ 48
  8.02. Limitations Upon the Authority of the General Partner .............. 48
  8.03. Management Purposes ............................................................. 51
  8.04. Delegation of Authority ........................................................... 51
  8.05. General Partner or Affiliates Dealing with Partnership.............. 51
  8.06. Other Activities ...................................................................... 52
  8.07. Liability for Acts and Omissions .............................................. 52
  8.08. Net Worth of Sole Corporate General Partner ........................... 52
  8.09. Construction of the Apartment Complex, Construction Cost Overruns,
       Operating Deficits; Other General Partner Guarantees.................... 53
  8.10. Reserve For Replacements ....................................................... 56
  8.11. Development Fee ..................................................................... 56
  8.12. Incentive Partnership Management Fee ..................................... 56
  8.13. Withholding of Fee Payments .................................................. 56
  8.13. Construction Advisory Services Fee and Environmental Assessment
       Consultant's Fee... .................................................................... 57
  8.15. GP Pledged Payments ............................................................. 57
  8.16. Removal of the General Partner ............................................... 58
  8.17. Selection of Property Manager; Management Agreement............. 60
  8.18. Removal of the Property Manager ............................................ 61
  8.19. Loans to the Partnership.......................................................... 61
  8.20. Unconditional Guaranty........................................................... 62
  8.21. Operating and Capital Budgets ................................................ 62

ARTICLE IX. ..................................................................................... 63
TRANSFERS OF, AND RESTRICTIONS ON TRANSFERS .................... 63
OF INTERESTS OF LIMITED PARTNERS ........................................... 63
  9.01. [Reserved.] ............................................................................ 63
  9.02. Restrictions on Transfer of Limited Partners' Interests .............. 63
  9.03. Admission of Substitute Limited Partners ................................. 63
  9.04. Rights of Assignee of Partnership Interest................................. 64

ARTICLE X. ...................................................................................... 65
RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS ...................... 65
  10.01. Management of the Partnership .............................................. 65
  10.02. Limitation on Liability of Limited Partners ............................. 65
  10.03. Other Activities.................................................................... 65

- ii -

## TABLE OF CONTENTS

Page

ARTICLE XI. .................................................................................................. 66
PROFITS, LOSSES AND DISTRIBUTIONS ................................................ 66
  11.01. Allocation of Profits, Losses, Credits and Cash Distributions ............. 66
  11.02. Determination of Profits, Losses and Credits ...................................... 68
  11.03. Allocation of Gains and Losses ............................................................ 68
  11.04. Distribution of Proceeds from Sale and Liquidation of Partnership Property ....... 69
  11.05. Capital Accounts .................................................................................. 70
  11.06. Authority of the General Partner to Vary Allocations to Preserve and Protect
       Partners' Intent .................................................................................... 71
  11.08. Designation of Tax Matters Partner ...................................................... 72
  11.08. Rights and Obligations of Tax Matters Partner .................................... 73
  11.09  Expenses of Tax Matters Partner .......................................................... 74
  11.10. Minimum Gain Provisions .................................................................... 74

ARTICLE XII. ................................................................................................. 77
SALE, DISSOLUTION AND LIQUIDATION .............................................. 77
  12.01. Dissolution of the Partnership .............................................................. 77
  12.02. Winding Up and Distribution ................................................................ 77

ARTICLE XIII. ................................................................................................ 79
BOOKS AND RECORDS, ACCOUNTING TAX ELECTIONS, ETC. ................... 79
  13.01. Books and Records ................................................................................ 79
  13.02. Bank Accounts ...................................................................................... 79
  13.03. Accountants ........................................................................................... 79
  13.04. Reports to Partners ................................................................................ 79
  13.05. Section 754 Elections ............................................................................ 82
  13.06. Fiscal Year and Accounting Method ..................................................... 83

ARTICLE XIV. ............................................................................................... 84
AMENDMENTS ............................................................................................. 84
  14.01. Proposal and Adoption of Amendments ............................................... 84

ARTICLE XV. ................................................................................................ 85
CONSENTS, VOTING AND MEETINGS ..................................................... 85
  15.01. Method of Giving Consent .................................................................... 85
  15.02. Submissions to Limited Partners ........................................................... 85
  15.03. Meetings; Submission of Matter for Voting ......................................... 85

ARTICLE XVI. ............................................................................................... 86
GENERAL PROVISIONS .............................................................................. 86
  16.01. Burden and Benefit ............................................................................... 86
  16.02. Applicable Law ..................................................................................... 86
  16.03. Counterparts .......................................................................................... 86
  16.04. Separability of Provisions ..................................................................... 86
  16.05. Entire Agreement .................................................................................. 86

- iii -

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
NYSCEF DOC. NO. 2
INDEX NO. 523152/2018
RECEIVED NYSCEF: 11/19/2018

## TABLE OF CONTENTS

<u>Page</u>

16.06. Liability of the Investment Partnership ................................................................. 86
16.07. Environmental Protection ...................................................................................... 87
16.08. Notices ..................................................................................................................... 89
16.09. No Continuing Waiver ........................................................................................... 90

- iv -

## ARTICLE I.
## CONTINUATION OF PARTNERSHIP

1.01.   Continuation.  The undersigned hereby continue the Partnership as a limited partnership under the Act.

1.02.   Name.  The name of the Partnership is 420 Stockholm Street Associates L.P..

1.03.   Principal Executive Offices; Agent for Service of Process.  The principal executive office of the Partnership shall be 217 Wyckoff Avenue, Brooklyn, New York.  The Partnership may change the location of its principal executive office to such other place or places as may hereafter be determined by the General Partner.  The General Partner shall promptly notify all other Partners of any change in the principal executive office.  The Partnership may maintain such other offices at such other place or places as the General Partner may from time to time deem advisable.

The name and address of the Agent for service of process shall be determined by the General Partner, in its sole and absolute discretion subject to applicable law.

1.04.   [intentionally omitted]

1.05.   Term.  The term of the Partnership shall commence as of the date of the filing of the Certificate with the Secretary of State of the State, and shall continue until December 31, 2048, unless the Partnership is sooner dissolved in accordance with the provisions of this Agreement.

1.06.   Recording of Certificate.  Upon the execution of this Amended and Restated Agreement of Limited Partnership by the parties hereto, the General Partner shall take all actions necessary to assure the prompt filing of an amendment to the Certificate as required by the Act, including filing with the Secretary of State of the State.  All fees for filing shall be paid out of the Partnership's assets.  The General Partner shall take all other necessary action required by law to perfect and maintain the Partnership as a limited partnership under the laws of the State, and shall register the Partnership under any assumed or fictitious name statute or similar law in force and effect in the State.

- 1 -

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 23 of 86 PageID #: 34

## ARTICLE II.
### DEFINED TERMS

In addition to the abbreviations of the parties set forth in the preamble to this Agreement, the following defined terms used in this Agreement shall have the meanings specified below:

"Accountants" means KPMG Peat Marwick, of Columbus, Ohio, or such other firm of independent certified public accountants as may be engaged by the General Partner, with the Consent of the Special Limited Partner, to prepare the Partnership income tax returns.

"Act" means the Revised Uniform Limited Partnership Act of the State, as may be amended from time to time during the term of the Partnership.

"Actual Credits" means as of any point in time, the total amount of the Tax Credits allocated by the Partnership to the Investment Partnership, representing ninety-nine and nine/tenths per cent (99.9%) of the Tax Credits reported and claimed by the Partnership and its Partners on their respective Federal information and income tax returns, and not disallowed by any taxing authority.

"Additional Capital Contributions" means the First Additional Capital Contribution, the Second Additional Capital Contribution and the Third Additional Capital Contribution of the Investment Partnership paid or payable to the Partnership pursuant to Sections 5.01(c)(iii), (iv) and (v).

"Adjusted Capital Account" means, with respect to any Partner, such Partner's Capital Account as of the end of the relevant taxable year, after crediting to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Section 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations.

"Affiliate" means any Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the General Partner, or with another designated Person, as the context may require.

"Affiliated Partnership" means a limited partnership in which the General Partner or an Affiliate thereof is a general partner, and in which an Affiliate of the Investment Partnership is a limited partner.

"AFR" means the long-term applicable Federal rate (as defined in Section 1274(d) of the Code).

- 2 -

WAS: 100871_1

"Agency" means the New York State Housing Finance Agency, in its capacity as the designated agency of the State to allocate Low-Income Housing Tax Credits, acting through any authorized representative.

"Agreement" or "Partnership Agreement" means this Amended and Restated Agreement of Limited Partnership, as amended from time to time.

"Apartment Complex" means the Land and improvements thereon currently owned by the General Partner (to be contributed to the Partnership by the General Partner as set forth herein) in Brooklyn, New York, consisting of a 35-unit rental housing development and other improvements to be rehabilitated by the Developer and to be owned and operated by the Partnership and known as 420 Stockholm Street Apartments. A description of the Land on which the Apartment Complex is located is provided in Exhibit "B", attached hereto.

"Architect" means Castro-Blanco Piscioneri and Associates Architects P.C. of New York, New York.

"Authority" or "Authorities" means any nation or government, any state or other political subdivision thereof, and any entity exercising its executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including but not limited to, any federal, state or municipal department, commission, board, bureau, agency, court, tribunal or instrumentality.

"Bankruptcy" or "Bankrupt" as to any Person means the filing of a petition for relief as to any such Person as debtor or bankrupt under the Bankruptcy Act of 1898 or the Bankruptcy Code of 1978 or like provision of law (except if such petition is contested by such Person and has been dismissed within 60 days); insolvency of such Person as finally determined by a court proceeding; filing by such Person of a petition or application to accomplish the same or for the appointment of a receiver or a trustee for such Person or a substantial part of his assets; commencement of any proceedings relating to such Person under any other reorganization, arrangement, insolvency, adjustment of debt or liquidation law of any jurisdiction, whether now in existence or hereinafter in effect, either by such Person or by another, provided that if such proceeding is commenced by another, such Person indicates his approval of such proceeding, consents thereto or acquiesces therein, or such proceeding is contested by such Person and has not been finally dismissed within 60 days.

"Breakeven Operations" means the date upon which the income from the normal operation of the Apartment Complex received on a cash basis (including all public subsidy payments due and payable at such time but not yet received by the Partnership) for a period of three consecutive calendar months equals or exceeds all accrued operational costs of the Apartment Complex, including, but not limited to, taxes, assessments, Reserve Fund for Replacement deposits and debt service payments, and a ratable portion of the annual

- 3 -

WAS: 100871_1

amount (as reasonably estimated by the General Partner) of those seasonal and/or periodic expenses (such as utilities, maintenance expenses and real estate taxes or service charges in lieu of real estate taxes) which might reasonably be expected to be incurred on an unequal basis during a full annual period of operation, for such period of twelve (12) consecutive calendar months on an annualized basis (based on projections of the Partnership), as evidenced by a certification of the General Partner with an accompanying unaudited balance sheet of the Partnership indicating that all trade payables have been satisfied, all as shall be subject to the approval of the Special Limited Partner.

"Bridge Loan" means the recourse loan to be made by the Investment Partnership to the General Partner, as provided in Section 5.01(c)(ii) of this Agreement.

"Bridge Loan Maturity Date" means the date on which the Bridge Loan matures, which is the earlier of December 31, 2000, or the due date of the First Additional Capital Contribution.

"Capital Account" means the capital account of a Partner as described in Section 11.05.

"Capital Contribution" means the total amount of money or other property contributed or agreed to be contributed, as the context requires, to the Partnership by each Partner pursuant to the terms of this Agreement. Any reference to the Capital Contribution of a Partner shall include the Capital Contribution made by a predecessor holder of the Interest of such Partner.

"Capital Transaction" means any transaction the proceeds of which are not includable in determining Net Cash Flow, including without limitation the disposition, whether by partial sale (except when such sale proceeds are to be used pursuant to a plan or budget approved by all of the Partners), casualty (where the proceeds are not to be used for reconstruction), condemnation, refinancing or similar event of any part of the Apartment Complex, prior to the sale of the Apartment Complex, where the gross proceeds from such transaction exceed $50,000.

"Certificate" means the Partnership's Certificate of Limited Partnership or any certificate of limited partnership or any other instrument or document which is required under the laws of the State to be signed and sworn to by the Partners of the Partnership and filed in the appropriate public offices within the State to perfect or maintain the Partnership as a limited partnership under the laws of the State, to effect the admission, withdrawal or substitution of any Partner of the Partnership, or to protect the limited liability of the Limited Partners as limited partners under the laws of the State.

"Certified Credits" means ninety-nine and nine/tenths percent (99.9%) of the annual Tax Credits that the Accountants certify in writing to the Partnership that the Partnership will be able to claim during each full fiscal year during the Credit Period for all buildings in

- 4 -

WAS: 100871_1

the Project assuming full compliance with the rent restrictions and income limitations of Section 42 of the Code. The calculation of the Certified Credits shall be based, among other things, on the Forms 8609s issued by the Agency for all the buildings comprising the Project and on the cost certification prepared in connection with the application by the Partnership for Forms 8609s and a determination of the applicable fraction and qualified basis of the Apartment Complex as defined in Section 42 of the Code. Once the Certified Credits are determined, they shall not be adjusted during the term of this Agreement; provided, however, if with respect to a Tax Credit Recapture Event the General Partner makes a payment under clause (E) of Section 8.09(d)(ii), then the Certified Credits shall be reduced prospectively by the annual reduction in Tax Credits attributable to such Tax Credit Recapture Event.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of succeeding law.

"Compliance Period" means the compliance period (as defined in Section 42(i)(1) of the Code) applicable to the Apartment Complex.

"Consent" means the prior written consent or approval of the Special Limited Partner and/or any other Partner, as the context may require, to do the act or thing for which the consent is solicited.

"Construction Contract" means the construction contract in the amount of $2,715,490.00 (including all exhibits and attachments thereto) entered into between the Developer on behalf of the General Partner and the Contractor, pursuant to which the Apartment Complex is to be constructed.

"Construction Lender" means SunAmerica Investments, Inc. or an Affiliate thereof, in its capacity as the maker of the Construction Loan, or its successor and assigns in such capacity.

"Construction Loan" means the construction loan in the anticipated principal amount of $1,700,000 to be made to the General Partner by the Construction Lender at the Initial Closing, which is to be evidenced by the promissory note given by the General Partner to the Construction Lender at the Initial Closing, and which is to be secured by the Construction Mortgage and other related security documents and financing statements.

"Construction Loan Agreement" means that certain agreement among the General Partner, the Construction Lender, and the Developer, as Guarantor thereunder, governing the Construction Loan.

"Construction Mortgage" means the mortgage or deed of trust to be given by the General Partner at the Initial Closing in favor of the Construction Lender.

- 5 -

WAS: 100871_1

"<u>Contractor</u>" means Sparrow Construction Corporation, a New York corporation, which is the general construction contractor for the Apartment Complex.

"<u>Counsel</u>" or "<u>Counsel for the Partnership</u>" shall mean Gerard A. Walters, Esq., of New York, New York, or such other attorney or law firm upon which the Special Limited Partner and the General Partner shall agree; provided, however, that if any section of this Agreement either (i) designates particular counsel for the purpose described therein, or (ii) provides that counsel for the purpose described therein shall be chosen by another method or by another Person, then such designation or provision shall prevail over this general definition.

"<u>Credit Period</u>" means the "credit period" with respect to the Apartment Complex, as defined in Section 42(f) of the Code.

"<u>Default IP Loans</u>" means IP Loans (or portions thereof) that arise from a default by the General Partner in its obligations to the Partnership under this Agreement from and after the date the Partnership acquires title to the Apartment Complex. For example, an IP Loan made to fund Operating Deficits that the General Partner failed to fund in breach of its Operating Deficit Guaranty shall constitute a Default IP Loan.

"<u>Developer</u>" means Sparrow Industries, Inc., a New York corporation.

"<u>Development Agreement</u>" means the Amended and Restated Agreement between the Partnership, the General Partner, RB, and the Developer as of even date herewith relating to the development of the Apartment Complex and providing for the payment of the Development Fee, in the form set forth in <u>Exhibit A-1</u>.

"<u>Development Budget</u>" means the projected costs and expenses of rehabilitating and developing the Apartment Complex as shown on Exhibit A-2 hereto.

"<u>Development Costs</u>" means all of the following: (i) all direct or indirect costs paid or accrued by the General Partner related to the acquisition of the Land and the development and construction of the Project, including payment of the Development Fee, amounts due under the Construction Contract, any construction cost overruns, the cost of any change orders and all other costs necessary to achieve Substantial Completion; (ii) all costs paid or accrued by the General Partner to achieve Initial Closing and Final Closing, effect repayment in full of the Construction Loan and the Bridge Loan, and satisfy any escrow deposit requirements which are conditions to the Final Closing, including any amounts necessary for local taxes, utilities, mortgage insurance premiums, casualty and liability insurance premiums, and other amounts which are required pursuant to the Construction Loan, and any applicable loan fees, discounts or other expenses; (iii) all costs and expenses relating to remedying any environmental problem or condition or Hazardous Materials that existed on or prior to Initial Closing.

- 6 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 28 of 86 PageID #: 39

"Development Fee" means the fee payable by the Partnership to the Developer pursuant to Section 8.11 of this Agreement and the Development Agreement.

"Excess Development Costs" means all Development Costs that at any time are in excess of the aggregate scheduled Development Costs as shown on the Development Budget.

"Excess GP Loan Amount" means the amount, if any, by which the outstanding balance of all GP Loans, including principal and accrued interest, exceeds the outstanding balance of all IP Loans, including principal and accrued interest.

"Excess IP Loan Amount" means the amount, if any, by which the outstanding balance of all IP Loans, including principal and accrued interest exceeds the outstanding balance of all GP Loans, including principal and accrued interest.

"Extended Use Agreement" means the extended low-income housing commitment executed or to be executed by the General Partner and the Agency and properly recorded in the appropriate land records for the jurisdiction in which the Apartment Complex is located, setting forth certain terms and conditions under which the Apartment Complex is to be operated and which shall meet the requirements of Code Section 42(h)(6)(B).

"Final Closing" means the date as of which the Bridge Loan, the Construction Loan, and the HFA Loan are paid in full and the Partnership acquires fee title to the Apartment Complex.

"40-60 Set-Aside Test" means the Minimum Set-Aside Test whereby at least 40% of the units in the Apartment Complex must be occupied by individuals with incomes of 60% or less of area median income, as adjusted for family size.

"421-a Certificates" mean the negotiable certificates to be issued by the Department of Housing Preservation and Development of the City of New York in accordance with the terms of that certain 421-a Affordable Housing Program Agreement dated February 1, 1999 between said Department and the General Partner.

"GP Loans" means the loans which may be made by the General Partner to the Partnership pursuant to Section 5.07(a) hereof.  Operating Deficit Loans shall not constitute GP Loans.

"General Partner" means 420 Stockholm Street Housing Development Fund Company, Inc., a New York nonprofit corporation, and any other Person admitted as a general partner pursuant to this Agreement, and their respective successors pursuant to this Agreement.

- 7 -

WAS: 100871_1

"General Partner's Special Capital Contribution" has the meaning set forth in Section 5.01(a).

"GP Pledged Payments" shall have the definition given it in Section 8.15.

"Guarantor" means the General Partner.

"HFA Lender" means the New York Housing Finance Agency, as the lender of the HFA Loan.

"HFA Loan" means the subordinated construction loan to be made to the General Partner by the Agency in the amount of $620,000, which loan will not bear interest.

"Incentive Partnership Management Fee" means the fee payable by the Partnership to the General Partner pursuant to Section 8.11 of this Agreement.

"Initial Closing" means the date upon which the Construction Loan, is closed and the initial disbursement is made thereunder; Initial Closing is anticipated to occur in May 1999.

"Interest" or "Partnership Interest" means the ownership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which such Partner may be entitled as provided in this Agreement and in the Act, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement and of said Act. Such Interest of each Partner shall, except as otherwise specifically provided herein, be that percentage of the aggregate of such benefit or obligation specified by Section 5.01 as such Partner's Percentage Interest.

"Investment Partnership" means SunAmerica Housing Fund 682, A Nevada Limited Partnership.

"IP Loans" means the loans which may be made by the Investment Partnership to the Partnership pursuant to Section 5.07(b) hereof.

"Land" means the tract of land currently owned by the General Partner, to be transferred and contributed to the Partnership and upon which the Apartment Complex is located, as more particularly described in Exhibit B.

"Limited Partner(s)" means the Investment Partnership, the Special Limited Partner, or any other Limited Partner in such Person's capacity as a limited partner of the Partnership.

"Liquidator" means the General Partner or, if there is none at the time in question, such other Person who may be appointed in accordance with applicable law and who shall

- 8 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 30 of 86 PageID #: 41

be responsible for taking all action necessary or appropriate to wind up the affairs of, and distribute the assets of, the Partnership upon its dissolution.

"Low-Income Housing Tax Credit" means the low-income housing tax credit allowed for low-income housing projects pursuant to Section 42 of the Code.

"Management Agreement" means the agreement between the Partnership, the General Partner and the Property Manager providing for the marketing and management of the Apartment Complex by the Property Manager.

"Minimum Set-Aside Test" means the set-aside test selected by the Partnership pursuant to Section 42(g) of the Code with respect to the percentage of units in its Apartment Complex to be occupied by tenants with incomes equal to no more than a certain percentage of area median income. The Partnership has selected or will select the 40-60 Set-Aside Test as the Minimum Set-Aside Test.

"Net Cash Flow" means the sum of the following with respect to the period following Final Closing:  (i) all cash received from rents, lease payments and all other sources, but excluding (A) tenant security or other deposits, (B) Capital Contributions and interest thereon (other than if used to pay for an item deducted below in determining Net Cash Flow), (C) proceeds from Capital Transactions and (D) interest on reserves not available for distribution and (E) proceeds from Operating Deficit Loans, IP Loans and GP Loans; plus, (ii) the net proceeds of any insurance, other than fire and extended coverage and title insurance, to the extent not reinvested, plus (iii) any other funds deemed available for distribution by the General Partner with the approval of the Special Limited Partner, minus (iv) all cash expenditures, and all expenses unpaid but properly accrued, which have been incurred in the operation of the Partnership's business (whether or not such expenditure is deducted, amortized or capitalized for tax purposes) including the management fee to the Property Manager, (v) all payments on account of any loans made to the Partnership, but not including any amounts to be paid pursuant to the Development Agreement, IP Loans, GP Loans and Operating Deficit Loans; minus (vi) any cash reserves for working capital, capital expenditures, repairs, replacements and anticipated expenditures, in such amounts as may be required by the Special Limited Partner or may be determined from time to time by the General Partner with the approval of the Special Limited Partner, if required, to be advisable for the operation of the Partnership, minus (vii) the fee to SAHP (or its designee pursuant to Section 13.04(h)(iii).

Net Cash Flow shall be determined separately for each fiscal year or portion thereof commencing on the day after Final Closing and shall not be cumulative.  Wherever there is a reference to the distribution of Net Cash Flow pursuant to the provisions of this Agreement, Net Cash Flow shall be deemed to be limited to Surplus Cash available for distribution.  Income received by the Partnership prior to Final Closing ("Net Interim Income") shall not be distributed during such period and shall be treated as Net Cash Flow with respect to the first Payment Date following Final Closing.

- 9 -

WAS: 100871_1

"<u>Notice</u>" means a writing containing the information required by this Agreement to be communicated to a Partner and sent by express courier or telephone facsimile transmission, or by registered or certified mail, with postage prepaid and return receipt requested, to such Partner at such Partner's address as specified pursuant to Section 16.08, the date of receipt thereof (or the next business day if the date of receipt is not a business day) (or, in the case of registered or certified mail, the date of registry thereof or the date of the certification receipt, as applicable) being deemed the date of such Notice; provided, however, that any written communication containing such information sent to such Partner actually received by such Partner shall constitute Notice for all purposes of this Agreement.

"<u>Operating Deficit</u>" means with respect to the period after Final Closing the amount by which the income of the Partnership from rental payments made by tenants of the Apartment Complex, and all other income of the Partnership (other than proceeds of any loans to the Partnership and investment earnings on funds on deposit in the Reserve Fund for Replacements, and other such reserve or escrow funds or accounts) for a particular period of time, is exceeded by the sum of all the operating expenses, including all debt service, operating and maintenance expenses, required deposits into the Reserve Fund for Replacements, any fees to the lenders and/or any applicable mortgage insurance premium payments and all other Partnership obligations or expenditures, excluding payments for construction of the Apartment Complex and fees and other expenses and obligations of the Partnership to be paid from the Capital Contributions of the Investment Partnership to the Partnership pursuant to this Agreement, during the same period of time.

"<u>Operating Deficit Loan</u>" shall have the meaning set forth in Section 8.09(b) of this Agreement.

"<u>Partner</u>" means any General Partner and any Limited Partner.

"<u>Partner Loans</u>" means collectively the IP Loans and the GP Loans.

"<u>Partnership</u>" means 420 Stockholm Street Associates L.P., a New York limited partnership.

"<u>Payment Date</u>" means the date which is ninety (90) days after the end of the Partnership's fiscal year with respect to the preceding fiscal year.

"<u>Percentage Interest</u>" means the percentage Interest of each Partner as set forth in Section 5.01.

"<u>Person</u>" means any individual, partnership, corporation, trust, limited liability company or other entity.

- 10 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC Document 1-1 Filed 12/20/18 Page 32 of 86 PageID #: 43

"Plans and Specifications" means the plans and specifications for the Apartment Complex prepared by the Architect, as the same may be amended from time to time with the approval of the Special Limited Partner.

"Prime Rate" means the prime commercial lending rate as published from time to time by Chase Manhattan Bank of New York.

"Project Documents" means and includes the Construction Mortgage, the Note, the Construction Loan Agreement, the Regulatory Agreement, the Extended Use Agreement, the Management Agreement and all other instruments delivered to (or required by) the HFA Lender, or the Agency and all other documents relating to the Apartment Complex and by which the General Partner is bound, as amended or supplemented from time to time.

"Projected Credit" means Low-Income Housing Tax Credits in the amount of $82,500 for 2000, $330,000 per year for each of the years 2001 through 2009, and $247,500 for 2010, which the General Partner has projected to be the total amount of the Tax Credits which will be allocated to the Investment Partnership Limited Partners by the Partnership, constituting ninety-nine and nine-tenths per cent and nine/tenths (99.9%) of the Tax Credits which are projected to be available to the Partnership.

"Property Manager" means the property manager for the Apartment Complex designated pursuant to Section 8.17.

"RB" means Ridgewood Bushwick Senior Citizens Council, Inc., a New York nonprofit corporation and the parent of the General Partner.

"Regulatory Agreement" means, to the extent applicable, and collectively, any regulatory agreements and/or any declaration of covenants and restrictions to be entered into between the General Partner and the Agency or any applicable government agency at or after the Initial Closing, setting forth certain terms and conditions under which the Apartment Complex is to be operated.

"Rent Restriction Test" means the test pursuant to Section 42(g) of the Code whereby the gross rent charged to tenant(s) of the low-income units in the Apartment Complex cannot exceed thirty percent (30%) of the imputed income limitation of the applicable units.

"Reserve Fund for Replacements" means the Reserve for Replacements to be established by the General Partner and administered in accordance with Section 8.10 of this Agreement, including any reserve funds required under the 421-a Agreement.

"SAHP" means SunAmerica Affordable Housing Partners, Inc.

- 11 -

WAS: 100871_1

"SHF" means the Investment Partnership.

"Special Limited Partner" means SLP Housing I, LLC.

"State" means the State of New York.

"State Designation" means, with respect to the Apartment Complex, (i) the allocation by the Agency of Low-Income Housing Tax Credits, as evidenced by the receipt by the Partnership of either a carryover allocation of Tax Credits meeting the requirements of Section 42(h)(1)(E) of the Code and Treasury Regulations or IRS Forms 8609 executed by the Agency as to all buildings in the Apartment Complex or (ii) if the Mortgage Loan is financed by the proceeds of tax-exempt bonds and the Apartment Complex qualifies for the exception described in Section 42(h)(4)(B) of the Code, then "State Designation" means the written determinations by the Agency and/or HFA Lender that the Apartment Complex meets the requirements set forth in Sections 42(m)(1)(D) and 42(m)(2)(D) of the Code and the assignment by the Agency of Tax Credit building identification number(s) with respect to the Apartment Complex.

"Subordinated Loan" means any loan made by a Partner to the Partnership pursuant to Section 8.19.

"Substantial Completion" means the date that the General Partner receives at least temporary certificates of occupancy (or certificates of occupancy which contain conditions or qualifications which are Consented to by the Special Limited Partner) from the applicable governmental jurisdiction(s) or authority(ies) for one hundred per cent (100%) of the apartment units in the Apartment Complex; provided, however, that Substantial Completion shall not be deemed to have occurred if on such date any liens or other encumbrances as to title to the Land and the Apartment Complex arising out of the Contractor's rehabilitation of the Apartment Complex exist, other than those Consented to by the Special Limited Partner.

"Substitute Limited Partner" means any Person admitted to the Partnership as a Limited Partner pursuant to Section 9.03.

"Surplus Cash" means, for the period from and after the Final Closing, any Net Cash Flow which, pursuant to the Project Documents or rules or regulations of the Agency, is permitted to be distributed to the Partners.

"Tax Credit" means the Low-Income Housing Tax Credit.

"Tax Credit Recapture Event" means (a) the filing of a tax return by the Partnership or an amendment to a tax return evidencing a reduction in the qualified basis of the Apartment Complex causing a recapture or disallowance of Tax Credits previously allocated to the Investment Partnership, (b) a reduction in the qualified basis of the

- 12 -

WAS: 100871_1

Apartment Complex following an assessment or an audit by the Internal Revenue Service which results in the assessment of a deficiency by the Internal Revenue Service against the Partnership with respect to any Tax Credits previously claimed in connection with the Apartment Complex, unless the Partnership shall timely file a petition with respect to such deficiency with the United States Tax Court and any other federal tax court of competent jurisdiction and the collection of such assessment shall be stayed pending the disposition of such petition, (c) a decision by the United States Tax Court or any other federal court of competent jurisdiction upholding the assessment of such deficiency against the Partnership with respect to any Tax Credits previously claimed in connection with the Apartment Complex, unless the Partnership shall timely appeal such decision and the collection of such assessment shall be stayed pending the disposition of such appeal, or (d) the decision of a federal court of competent jurisdiction affirming such decision.

"Tax Credit Shortfall" means, as to any period of time the difference between the Certified Credit for such period of time and the Actual Credit.

"Tax Law Change" means any change in the Code which occurs after the date of this Agreement. A Tax Law Change does not include any changes in regulations or interpretative changes.

"Tax Matters Partner" or "TMP" means 420 Stockholm Housing Development Fund Company, Inc., or any other General Partner designated by the Special Limited Partner or the Special Limited Partner acting as the Tax Matter Partner pursuant to Section 11.08.

"Tenant/Community Services Fee" means the annual fee payable to RB by the Partnership in the amount of $28,000 per year, which fee is noncumulative, is payable as specified in Article 11 hereof, and is for services to be provided by RB to the tenants of the Apartment Complex and the adjacent community.

"Title Company" means Commonwealth Land Title Insurance Company.

"Unconditional Guaranty" means the Unconditional Guaranty executed by the Developer in the form set forth in Exhibit H.

- 13 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM INDEX NO. 523152/2018

NYSCEF DOC. NO. 2    Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 35 of 86 PageID #: 46   RECEIVED NYSCEF: 11/19/2018

## ARTICLE III.
## PURPOSE AND BUSINESS OF THE PARTNERSHIP

3.01.  Purpose of the Partnership.  The Partnership has been organized exclusively to acquire the Apartment Complex and to develop, rehabilitate, finance, construct, own, maintain, operate and sell or otherwise dispose of the Apartment Complex, in order to obtain long-term appreciation, cash income, Tax Credits and tax losses.

3.02.  Authority of the Partnership.  In order to carry out its purpose, the Partnership is empowered and authorized to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of its purpose, and for the protection and benefit of the Partnership, including but not limited to the following:

(a)    acquire the Apartment Complex;

(b)    construct, operate, maintain, improve, buy, own, sell, convey, assign, mortgage, rent or lease any real estate and any personal property necessary to the operation of the Apartment Complex;

(c)    provide housing, subject to the Minimum Set-Aside Test and the Rent Restriction Test and consistent with the requirements of the Extended Use Agreement, the Regulatory Agreement and the Loan Agreement so long as the Extended Use Agreement, the Regulatory Agreement and the Loan Agreement, as applicable, remain(s) in force;

(d)    enter into any kind of activity, and perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Partnership;

(e)    borrow money and issue evidences of indebtedness in furtherance of the Partnership business and secure any such indebtedness by mortgage, pledge, or other lien, provided, however, that any mortgage loan, and any evidence(s) of indebtedness thereof and any documents amending, modifying or replacing it shall be subject to the approval of the Special Limited Partner and shall have the legal effect that at and after Final Closing the Partnership and the Partners shall have no personal liability for the repayment of the principal of or payment of interest on the HFA Loan, that the sole recourse of the HFA Lender, with respect to the principal thereof and interest thereon shall be to the property securing the HFA Loan, except that any Partner shall be personally responsible (i) for funds or property of the Apartment Complex coming into such party's hands, which, by the terms of the Loan Agreement it is not entitled to retain, and (ii) for such party's own acts and deeds, or the acts and deeds of others which it has authorized, in violation of the provisions of the Loan Agreement;

- 14 -

WAS: 100871_1

(f) maintain and operate the Apartment Complex from and after Final Closing, including hiring a Property Manager, subject to the approval of the Special Limited Partner, and entering into a Management Agreement;

(g) subject to the approval of the Agency and/or the HFA Lender, if required, and to other limitations expressly set forth elsewhere in this Agreement, negotiate for and conclude agreements for the sale, exchange, lease or other disposition of all or substantially all of the property of the Partnership, or for the refinancing of any mortgage loan on the property of the Partnership;

(h) enter into the Loan Agreement, the Regulatory Agreement and the Extended Use Agreement, providing for regulations with respect to rents, profits, dividends and the disposition of property;

(i) rent dwelling units in the Apartment Complex from time to time, in accordance with the provisions of the Code applicable to Low-Income Housing Tax Credits and in accordance with applicable federal, state and local regulations, collecting the rents therefrom, paying the expenses incurred in connection with the Apartment Complex, and distributing the net proceeds to the Partners, subject to any requirements which may be imposed by the Extended Use Agreement, the Regulatory Agreement and/or the other Project Documents; and

(j) do any and all other acts and things necessary or proper in furtherance of the Partnership business.

3.03.  Overview of Financial Structure.

The Apartment Complex was purchased on December 23, 1998 by the General Partner. The Developer shall oversee rehabilitation of the Apartment Complex using the proceeds of the Construction Loan ($1,700,000), the Bridge Loan ($1,930,877) and the HFA Loan ($620,000).

The Contractor has executed a purchase agreement for the sale of the 421-a Certificates and will assign such agreement to the General Partner prior to the completion of the rehabilitation. Upon completion of the rehabilitation and issuance of the certificate(s) of occupancy, the Developer and the General Partner will submit the necessary documents evidencing completion of the rehabilitation and the meeting of the other requirements as specified in Section 5.01(c)(iii) hereof and in that certain 421-a Affordable Housing Program Agreement between the General Partner and the City of New York dated February 1, 1999 for the issuance of the 421-a Certificates. Upon such issuance and upon the obtaining by RB of the consents of all Authorities required for the General Partner to convey the Apartment Complex to the Partnership, there will occur the Final Closing.

- 15 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 37 of 86 PageID #: 48

At the Final Closing the following events will occur simultaneously: (1) The General Partner will sell the 421-a Certificates and use the proceeds received in such sale to repay the Construction Loan and a portion of the HFA Loan ($443,000). (2) The General Partner will contribute the Project to the Partnership and will receive a Capital Account credit in the amount of the proceeds received for the 421-a Certificates. (3) The Investment Partnership will make the First Additional Capital Contribution in the amount of $2,107,876 which will be used to pay off the balance of the HFA Loan ($177,000) and the Bridge Loan ($1,930,876). To the extent that the Bridge Loan has not been fully drawn down or is otherwise not needed to pay other budgeted project costs as of the Final Closing (such as accrued interest and closing costs), the amount remaining shall be drawn down and paid to the Developer on the date of Final Closing as an Additional Development Fee in accordance with the terms of the Amended and Restated Development Agreement attached hereto as Exhibit A-1.

Upon the issuance of the Form 8609 by the Agency and the satisfaction of the other conditions set forth in Section 5.01(c)(iv), the Investment Partnership will make the Second Additional Capital Contribution of $160,731 which will be used to establish Project reserves and pay a portion of the Development Fee.

Upon the attainment of 95% occupancy and the satisfaction of the other conditions set forth in Section 5.01(c)(v), the Investment Partnership will make the Third Additional Capital Contribution of $160,731, which will be used to pay the remainder of the Developer Fee.

In the event 95% occupancy is achieved prior the receipt of the Form 8609, the Third Additional Capital Contribution will be paid prior to the Second Additional Capital Contribution.

- 16 -

WAS: 100871_1

ARTICLE IV.
REPRESENTATIONS, WARRANTIES AND COVENANTS;
DUTIES AND OBLIGATIONS

4.01. Representations, Warranties and Covenants Relating to the Apartment Complex and the Partnership. As of the date hereof, the General Partner hereby represents, warrants and covenants to the Partnership and to the Partners that:

(a)     the execution and delivery of this Agreement by the General Partner and the performance by the General Partner of the transactions contemplated hereby have been duly authorized by all requisite corporate, partnership or trust actions or proceedings; the General Partner is duly organized, validly existing and in good standing under the laws of the state of its formation with power to enter into this Agreement and to consummate the transactions contemplated hereby;

(b)     the construction and development of the Apartment Complex shall be undertaken and shall be completed in a timely and workmanlike manner in accordance with (i) all applicable requirements of the Construction Loan and the Project Documents, (ii) all applicable requirements of all appropriate governmental entities, the violation of which would have, or would be likely to have, an adverse effect on the Apartment Complex or the Partnership, and (iii) the Plans and Specifications of the Apartment Complex that have been or shall be hereafter approved by the Construction Lender, the Special Limited Partner, and the HFA Lender, if required, and any applicable governmental entities, as such Plans and Specifications may be changed from time to time with the approval of the Construction Lender, and any applicable governmental entities, if such approval shall be required; it shall provide copies of all change orders to the Construction Lender promptly after the preparation and prior to the execution thereof;

(c)     to the best of knowledge after due inquiry, as of the date hereof, at the Initial Closing and at the time of commencement of construction, the Land is and will be properly zoned for the Apartment Complex, all consents, permissions and licenses required by all applicable governmental entities have been obtained, and the Apartment Complex conforms and will conform to all applicable federal, state and local land use, zoning, environmental and other governmental laws and regulations, the violation of which would have, or would be likely to have, an adverse effect on the Apartment Complex or the Partnership;

(d)     all appropriate public utilities, including sanitary and storm sewers, water, gas and electricity, are currently available and will be operating properly for all units in the Apartment Complex at the time of first occupancy of such units;

(e)     mortgagees' title insurance policies of a financially responsible institution and in amounts acceptable to the Construction Lender and an owner's title insurance policy as of the date of the First Additional Capital Contribution of the same

- 17 -

WAS: 100871_1

institution as provided the mortgagee insurance, in the amount of the replacement cost of the Apartment Complex (which amount shall not be less than the aggregate of the principal amount of the Capital Contributions of the General Partner, the Special Limited Partner, and the Investment Partnership), in favor of the Construction Lender will be issued at or prior to the Initial Closing (as to the Construction Lender and the HFA Lender, if applicable) and shall remain in full force and effect, subject only to such easements, covenants, restrictions and such other standard exceptions as are normally included in owner's or mortgagee's title insurance policies and which are acceptable to the Construction Lender, the HFA Lender and the Special Limited Partner, respectively; good and marketable fee simple title to the Land will be held by the General Partner;

(f)     there shall be no direct or indirect personal liability of the Partnership or of any of the Partners for the repayment of the principal of or payment of interest on the HFA Loan, and the sole recourse of the lender under the HFA Loan with respect to the principal thereof and interest thereon shall be to the property securing the indebtedness;

(g)     except as set forth in Exhibit "D", it is not aware of any default under any agreement, contract, lease, or other commitment, or of any claim, demand, litigation, proceedings or governmental investigation pending or threatened against the General Partner, the Apartment Complex, or the Partnership, or related to the business or assets of the Partnership or of the Apartment Complex, which claim, demand, litigation, proceeding or governmental investigation could result in any judgment, order, decree, or settlement which would materially and adversely affect the business or assets of the Partnership or of the Apartment Complex;

(h)     [intentionally omitted]

(i)     to the best of knowledge after due inquiry, the execution of this Agreement, the incurrence of the obligations set forth in this Agreement, and the consummation of the transactions contemplated by this Agreement do not violate any provision of law, any order, judgment or decree of any court binding on the Partnership or the General Partner or any Affiliate(s) thereof, any provision of any indenture, agreement, or other instrument to which the Partnership or the General Partner is a party or by which the Partnership or the Apartment Complex is affected, and is not in conflict with, and will not result in a breach of or constitute a default under any such indenture, agreement, or other instrument or result in creating or imposing any lien, charge, or encumbrance of any nature whatsoever upon the Apartment Complex;

(j)     the Construction Contract has been entered into between the Developer on behalf of the General Partner and the Contractor; no other consideration or fee shall be paid to the Contractor in its capacity as the Contractor for the Apartment Complex other than the amounts set forth in the Construction Contract or as evidenced by change orders approved by the Construction Lender; and all change orders to date have

- 18 -

WAS: 100871_1

been paid in full. In addition, no consideration or fee shall be paid to the Developer or General Partner by the Contractor;

(k) to the extent required by the Construction Lender, 100% payment and performance bonds issued by a nationally, financially recognized bonding company, in forms acceptable to the Construction Lender and in amounts satisfactory to the Construction Lender will be obtained by the Contractor at or before Initial Closing and shall remain in full force and effect under terms and conditions as shall be acceptable to the Construction Lender; in the alternative, the obligations of the Contractor will be guaranteed by the Guarantor and secured by cash, letter of credit or other security acceptable to the Construction Lender;

(l) the General Partner will obtain and maintain the insurance policies set forth in Exhibit "J" in accordance with the provisions thereof;

(m) the General Partner has not, either individually, or on behalf of the Partnership, and the Partnership has not incurred any financial responsibility with respect to the Apartment Complex prior to the date of execution of this Agreement, other than (i) that disclosed to the Special Limited Partner, or (ii) obligations which will be fully satisfied at or prior to the Initial Closing;

(n) at Initial Closing and at Final Closing, the Partnership will be and will continue to be a valid limited partnership, duly organized under the laws of the State, and shall have and shall continue to have full power and authority to acquire the Land and to develop, construct, operate and maintain the Apartment Complex in accordance with the terms of this Agreement, and shall have taken and shall continue to take all action under the laws of the State and any other applicable jurisdiction that is necessary to protect the limited liability of the Limited Partners and to enable the Partnership to engage in its business;

(o) no restrictions on the sale or refinancing of the Apartment Complex, other than the restrictions to be set forth in the Extended Use Agreement, the Regulatory Agreement and Section 42 of the Code and except for those restrictions set forth in Exhibit G (including the requirement that the consents of the New York Attorney General and the New York Supreme Court must be obtained prior to the transfer of title from the General Partner to the Partnership), exist as of the date hereof, and no such restrictions shall, at any time while the Special Limited Partner is a Limited Partner, be placed upon the sale or refinancing of the Apartment Complex;

(p) the Apartment Complex is being developed in a manner which satisfies, and shall continue to satisfy, all restrictions, including tenant income and rent restrictions, applicable to projects generating Low-Income Housing Tax Credits under Section 42 of the Code;

- 19 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 41 of 86 PageID #: 52

(q)     the Projected Credits applicable to the Apartment Complex are $82,500 of Low-Income Housing Tax Credits for 2000, $330,000 per year of Low-Income Housing Tax Credits for each of the years 2001 through 2009, and $247,500 of Low-Income Housing Tax Credits for 2010;

(r)     except as set forth in Exhibit "C", to the best of knowledge after due inquiry, at the time of the execution of this Agreement, the General Partner has fully complied with all applicable provisions and requirements of any and all purchase and/or lease agreements, loan agreements, and other agreements with respect to the purchase of the Land and the development, financing and operation of the Apartment Complex; it shall take, and/or cause the Partnership to take, all actions as shall be necessary to achieve and maintain continued compliance with the provisions, and fulfill all applicable requirements, of such agreements;

(s)     by no later than December 31, 2000, the Partnership has received valid State Designation with respect to the Apartment Complex in the amount of $330,000 per annum;

(t)     the only tenant eligibility requirements or rent restrictions with which the Project and the Partnership must comply, including restrictions necessary to receive the full amount of the Projected Credits, are the following:   100% of the 35 units are subject to the rent restrictions and occupancy limitations that apply to residential units that satisfy the 40-60 Set-Aside Test for the term of the Extended Use Agreement, it being understood by the Agency and the parties hereto that one unit shall be occupied by superintendent who is not, or may not be, an eligible tenant.

(u)     the term of the Extended Use Agreement will not exceed 30 years and neither the Extended Use Agreement nor any other document, instrument or agreement to which the Partnership is a party shall restrict, limit or waive the right of the Partnership to cause a termination of the Extended Use Agreement prior to the end of such 30 year term in accordance with Code Section 42(h)(6)(E)(i)(I);

(v)     [intentionally omitted]  *except for the Initial Capital Contribution*

(w)     on each date of funding by the Investment Partnership of a Capital Contribution, the Partnership shall have good and marketable title to the Apartment Complex, subject only to permitted exceptions thereto to which the Investment Partnership has given its Consent. All real estate taxes, assessments, water and sewer charges and other municipal charges, to the extent due and owing, have been paid in full on the Apartment Complex;

(x)     no representation, warranty or statement of the General Partner in this Agreement or in any document, certificate or schedule furnished or to be furnished to any Limited Partner pursuant hereto contains or will contain any untrue statement of a material

- 20 -

fact or omits or will omit to state a material fact necessary to make the statements or facts contained therein not misleading;

(y)     the Developer is a cash basis taxpayer; the Developer shall take such actions as are necessary to assure that at no time during the term of this Agreement shall any depreciation deductions arising with respect to the Development Fee be delayed, suspended or disallowed or deferred because of the application of Code Section 267(a)(2) (or any other provision of the Code dealing with affiliated parties as recipients of fees) to the Partnership;

(z)     prior to Final Closing, the Developer, on behalf of the General Partner, and, after Final Closing, the General Partner shall prevent a default from occurring under the Project Documents resulting from a breach by the General Partner, the Guarantor or their Affiliates of any term, condition or restriction applicable to such parties under the Project Documents, including without limitation, a breach of a restriction on the ownership of the General Partner or the financial condition of the General Partner, the Guarantors or their Affiliates;

*[prior to Final Closing,*

(aa)     the Developer, on behalf of the General Partner, shall keep all sources of funding "in balance" and shall see to it that the General Partner has adequate sources of funds to timely cause Substantial Completion of the Apartment Complex and satisfaction of all other obligations of the General Partner under this Agreement, including repayment of the Construction Loan and the HFA Loan;

(bb)     all of the representations, warranties and covenants contained herein shall survive the date of Final Closing and the funding date of each Capital Contribution made by the Investment Partnership.  The General Partner shall indemnify and hold harmless the Investment Partnership against a breach of any of the foregoing representations, warranties and covenants and any damage, loss or claim caused thereby, including reasonable attorneys' fees and costs and expenses of litigation and collection;

(cc)     to the extent the Apartment Complex received points under the Agency's Low-Income Housing Tax Credit ranking system or otherwise received the allocation of Tax Credits pursuant to representations or commitments made by the Developer, the General Partner, or any Affiliate of either to the Agency for any undertaking with respect to the development and operation of the Apartment Complex, the General Partner shall at no time develop the Apartment Complex or manage the Partnership in a manner which is consistent with the award of the number of points assigned by the Agency or such other representations or commitments as may have been made, except with the prior approval of the Agency and the Investment Partnership; and

(dd)     the General Partner covenants and agrees that it shall contribute the Apartment Complex to the Partnership upon the receipt of all consents of all Authorities required to permit the General Partner to make such contribution and upon the issuance to

- 21 -

WAS: 100871_1

the General Partner of the 421-a Certificates, as issued pursuant to that certain 421-a Affordable Housing Program Agreement dated as of February 1, 1999 between the General Partner and the City of New York. Upon the sale of one or more interests in the 421-a Certificates by the General Partner, all of the proceeds of each such sale or sales shall be applied in accordance with the provisions of this Agreement and the amount thereof credited to the Capital Account of the General Partner.

4.02. <u>Duties and Obligations Relating to the Apartment Complex and the Partnership</u>. The General Partner shall have the following duties and obligations with respect to the Apartment Complex and the Partnership:

(a)     the General Partner shall ensure that all requirements shall be met which are necessary to obtain or achieve (i) compliance with the Minimum Set-Aside Test, the Rent Restriction Test, and any other requirements necessary for the Apartment Complex to initially qualify, and to continue to qualify, for Tax Credits, including all applicable requirements set forth in the Regulatory Agreement and the Extended Use Agreement, (ii) issuance of IRS Forms 8609, (iii) issuance of all necessary permanent, unconditional certificates of occupancy, including all governmental approvals required to permit occupancy of all of the apartment units in the Apartment Complex, (iv) Initial Closing and Final Closing, (v) compliance with all material provisions of the Project Documents , and (vi) compliance with all provisions contained in the application for Tax Credits submitted by the Agency, if any, and with any representations or commitments made to the Agency as to which the Agency awarded points pursuant to its scoring or award procedures or otherwise authorized the allocation of Tax Credits to the Apartment Complex;

(b)     while conducting the business of the Partnership, the General Partner shall not act in any manner which it knows or should have known after due inquiry will (i) cause the termination of the Partnership for federal income tax purposes without the Consent of the Special Limited Partner, or (ii) cause the Partnership to be treated for federal income tax purposes as an association taxable as a corporation;

(c)     the Apartment Complex shall be managed after Final Closing so that (i) no less than 80 percent of the gross income from the Apartment Complex in every year is rental income from or with respect to dwelling units in the Apartment Complex used to provide living accommodations not on a transient basis, and (ii) the rental of all units in the Apartment Complex comply with the tenant income limitations and other restrictions under the Rent Restriction Test and as set forth in the Regulatory Agreement;

(d)     the General Partner shall exercise good faith in all activities relating to the conduct of the business of the Partnership, including the development, operation and maintenance of the Apartment Complex, and the General Partner shall take no action with respect to the business and property of the Partnership which is not reasonably related to the achievement of the purpose of the Partnership;

- 22 -

WAS: 100871_1

(e)     all of (i) the fixtures, maintenance supplies, tools, equipment and the like now and to be owned by the Partnership or to be appurtenant to, or to be used in the operation of the Apartment Complex, as well as (ii) the rents, revenues and profits earned from the operation of the Apartment Complex, will be free and clear of all security interests and encumbrances except for the Construction Mortgage, the HFA Mortgage, and any additional security agreements executed in connection therewith;

(f)     the General Partner will execute on behalf of the Partnership all documents necessary to elect, pursuant to Sections 732, 743 and 754 of the Code, to adjust the basis of the Partnership's property upon the request of the Special Limited Partner, if, in the sole opinion of the Special Limited Partner, such election would be advantageous to any Limited Partner; and

(g)     the General Partner ~~and RB, jointly and severally~~ guarantees payment by the Partnership of the Development Fee.

(h)     the General Partner shall, during and after the period in which it is a Partner, provide the Partnership with such information and sign such documents as are necessary for the Partnership to make timely, accurate and complete submissions of federal and state income tax returns.

(i)     the General Partner shall comply and cause the Partnership to comply with the provisions of all applicable governmental and contractual obligations;

(j)     the General Partner has made (if applicable) and shall make such elections, or refrain from making such elections, with respect to the Low-Income Housing Tax Credits, as are necessary to achieve and maintain the maximum allowable Low-Income Housing Tax Credits to the Limited Partners, unless otherwise directed by the Special Limited Partner; any such elections (including elections made at the direction or with the consent of the Special Limited Partner) shall not reduce the obligations of the General Partner pursuant to Section 5.01(d);

(k)     the General Partner shall be responsible for the payment of any fines or penalties imposed by the Agency or HFA Lender pursuant to the Project Documents and any documents executed in connection with obtaining Tax Credits attributable to any action or inaction of it or its Affiliates.

(l)     the General Partner shall immediately notify the Special Limited Partner of any written or oral notice of (i) any default or failure of compliance with respect to the Construction Loan or any other financial, contractual or governmental obligation of the Partnership or the General Partner, or (ii) any IRS proceeding regarding the Project or the Partnership.

- 23 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 45 of 86 PageID #: 56

(m)     in the event that at any time during the construction or rehabilitation of the Apartment Complex, (i) construction or rehabilitation is, or may be, stopped or suspended for a period of ten (10) consecutive business days, or (ii) construction or rehabilitation has or may be delayed so that in the reasonable determination of the General Partner, (A) Substantial Completion may not be achieved by the date set forth in the Construction Contract or (B) the Projected Credits for any year during the Credit Period may not be achieved, the General Partner shall immediately send Notice of such occurrence, together with an explanation of the circumstances surrounding such occurrence, to the Investment Partnership.

(n)     [intentionally omitted]

(o)     the General Partner shall maintain books, files and records including tenant leasing files in compliance with the Code, the Regulations and which will adequately document the timing, amount and availability of the Tax Credits. The General Partner shall cause construction related files and files which document the initial qualification of apartment units for Tax Credits to be copied and stored off-site at the General Partner's principal place of business or at another location over which the General Partner has control for a period of not less than 21 years. Within one business days' notice from any Limited Partner, the General Partner shall afford that Limited Partner and its agents access to all such files, including files stored off-site during ordinary business hours. All such files are property of the Partnership and not of the General Partner.

4.03.   New General Partner Upon Transfer; Special Purpose Entity. Upon transfer of title to the Apartment Complex to the Partnership following completion of its rehabilitation, the General Partner shall assign and transfer all of its Interest as a general partner of the Partnership to a for-profit corporation (to be formed) which shall also be a wholly-owned subsidiary of RB (the "New GP"). Both the New GP and the current General Partner (which, for purposes of this Section specifically and this Agreement generally as applicable, shall be collectively referred to the "General Partner") shall engage in no other business or activity other than that of being the General Partner of the Partnership and the activities related thereto, as described in part herein. The General Partner was formed, among other reasons, for the purpose of acting as the General Partner of the Partnership and carrying out the purposes thereof as set forth herein and has never engaged in any other activity, business or endeavor. As of the date of this Agreement, the General Partner has no liabilities or indebtedness other than its liability for the loan from the Investment Partnership to purchase the Apartment Complex and as borrower under the Construction Loan, the HFA Loan, and the Bridge Loan, and the General Partner shall not incur any indebtedness other than its liability for the debts of the Partnership, except as may be consented to by the Investment Partnership. If the General Partner determines it needs additional funds for any purpose, it shall obtain such funds solely from capital contributions from ~~its shareholders~~. The General Partner has observed and shall continue to observe all necessary or appropriate corporate formalities in the conduct of its business. The General Partner shall keep its books and records separate and distinct from those of its shareholders

*other sources*

- 24 -

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
NYSCEF DOC. NO. 2
INDEX NO. 523152/2018
RECEIVED NYSCEF: 11/19/2018

and Affiliates. The General Partner shall clearly identify itself as a legal entity separate and distinct from its shareholders and its Affiliates in all dealings with other Persons including, but not limited to, its creditors. The General Partner has been capitalized in the amount of $1,000, which is adequate for the purposes of conducting its business. The General Partner will not make distributions at a time when it would have unreasonably small capital for the continued conduct of its business.

- 25 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 47 of 86 PageID #: 58

ARTICLE V.
PARTNERS, PARTNERSHIP INTERESTS
AND OBLIGATIONS OF THE PARTNERSHIP

5.01.   Partners, Capital Contributions, Bridge Loan and Partnership Interests.

(a)   The General Partner, its principal address or place of business, its Capital Contribution and its Percentage Interest is as follows:

| | | |
|---|---|---|
| 420 Stockholm Housing Development Fund Company, Inc. 217 Wyckoff Avenue, Brooklyn, New York 11237 | $100.00 | 0.10% |

The General Partner represents that as of the date of this Agreement the balance of its Capital Account does not exceed $100.

In the event that the Partnership has not paid all or part of the Development Fee when the final payment is due pursuant to the Development Agreement, the General Partner shall contribute to the Partnership an amount equal to any such remaining principal balance (not including accrued but unpaid interest) (the "General Partner's Special Capital Contribution") and the Partnership shall thereupon make a payment in an equal amount to pay off the balance of the Development Fee.

(b)   The Limited Partners, their principal offices and places of business, their Capital Contribution and their Percentage Interests are as follows:

| | | |
|---|---|---|
| Investment Partnership: | $2,492,205, as more specifically set forth in | 99.89% |
| SunAmerica Housing Fund 682, A Nevada Limited Partnership c/o SunAmerica Inc. SunAmerica Center Century City Los Angeles, CA 90067 | subparagraph (c) immediately below | |

- 26 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 48 of 86 PageID #: 59

| Special Limited Partner: | $100 | 0.01% |

SLP Housing I, LLC
c/o SunAmerica Inc.
SunAmerica Center
Century City
Los Angeles, CA 90067

In the event that the Special Limited Partner becomes a Special General Partner for purposes of acting as the Tax Matters Partner pursuant to Section 11.07, the Percentage Interest of the Special Limited Partner shall not change, nor shall the Special Limited Partners share of any allocations and distributions be changed.

(c)     The aggregate Capital Contributions the Investment Partnership shall make to the Partnership, subject to adjustment as provided in Section 5.01(d), is $2,492,205. The Special Limited Partner shall make its Capital Contribution, equal to $100, upon its admission to the Partnership. Subject to the provisions of this Agreement, including without limitation the provisions of Sections 5.01(d) and 5.03, the Investment Partnership shall be obligated to make Capital Contributions to the Partnership in installments, and to make the Bridge Loan to the General Partner, as follows:

(i)     Initial Capital Contribution.   The Investment Partnership shall make an Initial Capital Contribution (the "Initial Capital Contribution") equal to the sum of (A) the amount necessary to pay fees and costs charged by counsel for the Investment Partnership for legal services rendered to the Limited Partner in connection with this Agreement and related documents in an amount equal to $30,000 (the "Legal Fee Amount"); and (B) the Bridge Loan Fee in the amount of $32,967 payable pursuant to Section 5.01(c)(ii), but in any event the Initial Capital Contribution shall be not less than $62,967.   In the event that the Legal Fee Amount exceeds $30,000, the Investment Partnership shall make an additional Capital Contribution to the Partnership in an amount equal to such excess not later than sixty (60) days after receiving an invoice for the Legal Fee Amount from counsel to the Investment Partnership.  The Partnership shall pay the Legal Fee Amount to counsel for the Investment Partnership promptly after receiving such sum.  The Initial Capital Contribution shall be disbursed after receipt of the legal opinion required pursuant to Section 5.04 and satisfactory completion of the Investment Partnership's due diligence (and/or temporary waiver of certain due diligence items in the sole discretion of the Investment Partnership) as to the Partnership, the General Partner, the acquisition of the Land and the development, financing and future operation of the Apartment Complex.

A further condition of the Initial Capital Contribution shall be the receipt of a final commitment from the New York City Department of Housing Preservation and

- 27 -

WAS: 100871_1

Development for the issuance of the Real Property Tax Law Section 421-a Certificates (the "421-a Certificates") to the Contractor and, if permitted under applicable law, the assignment thereof, or of the beneficial interest therein, to the General Partner. If such assignment is permitted, the General Partner agrees to apply on behalf of the Partnership all of the proceeds of a sale or sales of the 421-a Certificates as follows, and in the following order of priority: (a) repayment of the Construction Loan; and (b) repayment of a portion of the HFA Loan. If the 421-a Certificates, or the beneficial interests therein, cannot be assigned to the General Partner, then the Developer agrees that all proceeds of the sale of the 421-a Certificates shall be paid in cash to the General Partner, who shall then utilize such proceeds for the purposes specified in the immediately preceding sentence. As security for the timely sale of the 421-a Certificates and the application of the proceeds thereof as set forth above, one or more letter(s) of credit in an amount aggregating not less than $2,143,000, in favor of, and in a form acceptable to, the Investment Partnership, shall be posted by the purchaser of the 421-a Certificates and the beneficial interest therein shall be assigned to the Investment Partnership.

(ii) <u>Bridge Loan</u>. Not earlier than the date the Initial Capital Contribution is made and after receipt of the legal opinion required pursuant to Section 5.04 and satisfactory completion of the Investment Partnership's due diligence as to the Partnership, the General Partner, the acquisition of the Land and the development, financing and future operation of the Apartment Complex, the Investment Partnership shall make or cause to be made a Bridge Loan to the General Partner in an amount equal to $1,930,876. The Bridge Loan shall be used to pay for a portion of the costs of rehabilitating the Apartment Complex (but not payment of the Development Fee, except when and as specified under the terms of the Development Agreement). The Partnership shall pay a fee to SunAmerica Affordable Housing Partners, Inc. in an amount equal to $32,967 for its services in arranging for the Bridge Loan (the "Bridge Loan Fee"). The Bridge Loan shall, subject to Section 5.01(c)(viii), be drawn down after the full disbursement of the HFA Loan and Construction Loan proceeds. The Bridge Loan shall be on the following terms and conditions:

(A) the Bridge Loan shall be a recourse obligation of the General Partner; the Bridge Loan shall be advanced in accordance with the procedures set forth in Section 5.01(c)(viii). If made by a third party, the Bridge Loan may be guaranteed (the "Bridge Loan Guarantee") by SunAmerica, Inc. or an Affiliate thereof (the "Bridge Loan Guarantor").

- 28 -

WAS: 100871_1

(B)     The term and interest rate of the Bridge Loan are as follows: (1) no interest will be charged on the principal balance of the Bridge Loan up to $1,495,383; (2) interest shall accrue on the portion of principal disbursed over $1,495.383 at an interest rate equal to the Prime Rate; (3) the Bridge Loan shall mature on the Bridge Loan Maturity Date; and (4) no payment of principal or interest, if any, shall be due until the Bridge Loan Maturity Date.

(C)     Advances of Bridge Loan proceeds shall be made by the Investment Partnership from a facility account maintained by the SunAmerica Inc. or an Affiliate thereof (the "Facility Account"). Payments of principal, interest and other amounts owing on the Bridge Loan shall be made by the General Partner directly to the Facility Account and, from the Facility Account, will be paid to the Investment Partnership. All funds in the Facility Account may be maintained and invested (without obligation to pay interest on any invested funds) in the sole discretion of the Bridge Loan Guarantor, if any.

(D)     a portion of the First Additional Capital Contribution shall be applied to pay the outstanding principal balance of the Bridge Loan;

(E)     The promissory note evidencing the Bridge Loan (the "Bridge Loan Note") shall be substantially in the form attached hereto as Exhibit A-4;

(F)     the proceeds of the Bridge Loan shall be used in accordance with the Development Budget and the terms of this Agreement;

(G)     [intentionally omitted]

(H)     Subject to any required lender consent, the Bridge Loan or the Bridge Loan Guarantee, as applicable shall be secured by a pledge of the General Partner's Partnership Interest and the General Partner hereby grants a security interest in its Partnership Interest to the Investment Partnership and/or to the Bridge Loan Guarantor, as applicable, and shall execute and deliver such further documents, including a Uniform Commercial Code - 1 Financing Statement, in favor of the Investment Partnership, and/or the Bridge Loan Guarantor, as applicable, if requested to do so by the Investment Partnership and/or the Bridge Loan Guarantor, as applicable.

(I)     [intentionally omitted]

(J)     [intentionally omitted]

- 29 -

WAS: 100871_1

     (iii)    <u>First Additional Capital Contribution</u>.  After satisfaction of all of the conditions set forth below, and review and approval by the Special Limited Partner of the items described below, the Investment Partnership shall make the First Additional Capital Contribution:

     (A)    <u>General Partner's Certificate</u>.  The Special Limited Partner shall have received a certificate from the General Partner that the representations, warranties and covenants in Sections 4.01 and 16.07 are true and accurate as of the date proposed for the First Additional Capital Contribution, and that the General Partner and the Partnership are not in default (except such default(s) as have been cured or waived by the SHF) of any of their obligations hereunder and under the Project Documents as of the date proposed for the First Additional Capital Contribution;

     (B)    <u>Bridge Loan</u>.  The Bridge Loan shall have previously been funded, and the General Partner shall have provided evidence satisfactory to the Special Limited Partner that all payments due through the date of funding the First Additional Capital Contribution, including without limitation payment in full of the principal amount of the Bridge Loan and all accrued interest thereon, have either been paid in full or will be paid in full from the proceeds of and immediately upon the funding of the First Additional Capital Contribution;

     (C)    [intentionally omitted]

     (D)    <u>Substantial Completion</u>.  Substantial Completion of the Apartment Complex shall have occurred.

     (E)    <u>Title Policy</u>.  The title insurance company shall have issued the following endorsements to the Partnership's title policy:  (1) an endorsement indicating that the Partnership owns fee simple title to the Apartment Complex; (2) a title continuation as of the date of funding and showing no exceptions to the title other than the exceptions reflected on the title policy as of the date the General Partner acquired title to the Apartment Complex and other than any other exceptions as may be acceptable to the Special Limited Partner; and (3) such other endorsements as the Special Limited Partner may reasonably require.

     (F)    <u>Survey</u>.  The Special Limited Partner shall have received and approved an updated as-built survey satisfactory to the Investment Partnership dated no more than 30 days prior to the date of funding.

- 30 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC    Document 1-1    Filed 12/20/18    Page 52 of 86 PageID #: 63

    (G)    <u>As-Built Plans and Specifications</u>. The General Partner shall have submitted to the Special Limited Partner a written document executed by the General Partner, the architect and the Contractor certifying no material change (other than those changes approved by the SHF) to the approved "for-construction" Plans and Specifications.

    (H)    <u>Permits, Licenses and Certificates of Occupancy</u>. The Special Limited Partner shall have received a copy of any permits and licenses which are required for the operation and use of the Apartment Complex and a copy of the temporary certificate or certificates of occupancy (final certificates of occupancy to be provide to the SHF immediately upon receipt), or the equivalent, issued by the appropriate governmental authorities for the Apartment Complex in its entirety.

    (I)    <u>Environmental Matters</u>. The Special Limited Partner shall have received a report in form satisfactory to the Special Limited Partner showing that radon gas is not present in any of the apartment units at a level above the recommended permitted safe level as determined by the Environmental Protection Agency or any other applicable governmental authority. In addition, the General Partner shall have provided the Special Limited Partner evidence that any actions required by the Special Limited Partner to be taken which were contained in any environment assessment reports prepared in conjunction with the development of the Apartment Complex have been appropriately completed in a manner that fully complies with such requirements and all laws, regulations, ordinances, orders or decrees pertaining to environmental matters.

    (J)    <u>Rent Roll</u>. If there are tenants then under lease for the Apartment Complex, the General Partner shall have delivered to the Special Limited Partner a current rent roll for the Apartment Complex certified to the Limited Partners by the General Partner and in form and substance reasonably satisfactory to the Investment Partnership, together with copies of all tenant leases, if requested by the Special Limited Partner.

    (K)    [intentionally omitted]

    (L)    [intentionally omitted].

    (M)    <u>Architect's Certificate</u>. The General Partner shall have delivered to the Special Limited Partner an architect's certificate in the form requested by the Special Limited Partner.

    (N)    <u>Payment of Taxes</u>. The Special Limited Partner shall have received satisfactory evidence (which may be included in the title policy

- 31 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 53 of 86 PageID #: 64

described in subparagraph (E) immediately above) that all real property taxes and assessments for the Apartment Complex due and payable through the date of funding have been timely and fully paid.

(O)   <u>Legal Opinion</u>.   The Limited Partner shall have received an update of the legal opinion previously delivered to the Investment Partnership in connection with its making the Bridge Loan reconfirming the opinions stated therein.

(P)   <u>Other Documentation</u>.   The Special Limited Partner shall have received such other documentation as it may reasonably request to verify the accuracy of the representations and warranties, and compliance with the covenants, duties and obligations, set forth in Article IV.

(Q)   <u>Completion of Due Diligence</u>.   The Special Limited Partner shall have determined that there has been no material adverse change to the facts disclosed by the prior due diligence it conducted with respect to the Partnership, the General Partner, the Guarantor, the Land and/or the development, financing and operations of the Apartment Complex prior to its admission to the Partnership.

(R)   <u>Receipt of Sales Proceeds of 421-a Certificates</u>.   The Special Limited Partner shall have received satisfactory evidence that the General Partner has received proceeds from the sale of the 421-a Certificates, as issued by the City of New York to the General Partner, and has contributed all of such proceeds to the Partnership or such proceeds have been applied to the repayment of the Construction Loan and the HFA Loan at the Final Closing.   Such proceeds shall be in an amount not less than $2,143,000.

(S)   <u>Transfer of Apartment Complex from General Partner to the Partnership</u>.   The Special Limited Partner shall have received satisfactory evidence that the General Partner has transferred and conveyed fee title to the Apartment Complex to the Partnership following the issuance of the 421-a Certificates, such transfer to be recorded in the appropriate real property records of Kings County, New York.

(T)   Final Closing shall have occurred.

The amount of the First Additional Capital Contribution shall be Two Million One Hundred Seven Thousand Eight Hundred Seventy-Six Dollars ($2,107,876).  The funds contributed as the First Additional Capital Contribution shall be used to repay a portion of the HFA Loan and all amounts due under the Bridge Loan to the extent that same remain unpaid and to pay a portion of the Developer's Fee.

- 32 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 54 of 86 PageID #: 65

(iv)   Second Additional Capital Contribution.   Following and conditioned upon (A) the occurrence of the conditions for making the Investment Partnership's First Additional Capital Contribution; (B) the last day of the month following receipt of an audited cost certification of Eligible Basis (as defined in Code Section 42(d)) for the Apartment Complex prepared by the Accountants; (C) receipt of the Form(s) 8609 for the entire Apartment Complex executed by the Agency; (D) receipt by the Special Limited Partner of an as-recorded Extended Use Agreement; (E) receipt of a certificate from the General Partner that (1) the representations, warranties and covenants in Sections 4.01, 4.02 and 16.07 continue to be true and accurate through the date of the proposed Second Additional Capital Contribution, and (2) the Partnership and the General Partner are not in default of any of their obligations with respect to the Partnership or the Apartment Complex at such time; (F) the Limited Partners shall have received  an update of the legal opinion previously delivered to the Investment Partnership in connection with its making the Bridge Loan; (G) the Investment Partnership shall have received such other documentation as it may reasonably request to verify the accuracy of the representations and warranties and compliance with the covenants, duties and obligations set forth in Article IV; and (H) the General Partner shall have delivered to the Limited Partners a current rent roll for the Apartment Complex certified to the Special Limited Partner and in form and substance reasonably satisfactory to the Special Limited Partner, together with copies of all tenant leases, if requested by the Special Limited Partner, the Investment Partnership shall make the Second Additional Capital Contribution to the Partnership.

The amount of the Second Additional Capital Contribution shall be One Hundred Sixty Thousand Seven Hundred Thirty-One Dollars ($160,731), subject to reduction as provided in Section 5.01(d)(i).  The Partnership shall use the Second Additional Capital Contribution to pay amounts due under the Development Agreement. ~~to the Developer~~

(v)   Third Additional Capital Contribution.   Following (and conditioned upon) (A) the last day of the month in which at least 95% of the units comprising the Apartment Complex are leased to tenants satisfying the requirements of Section 42 of the Code and in accordance with any additional requirements therefor as specified in the Extended Use Agreement; (B) receipt of a certificate from the General Partner that (1) the representations, warranties and covenants in Sections 4.01, 4.02 and 16.07 are true and accurate as of the date of the proposed Third Additional Capital Contribution, and (2) the Partnership and the General Partner are not in default of any of their obligations with respect to the Partnership or Apartment Complex at such time; (C) the Special Limited Partner shall have received such other documentation as it may reasonably request to verify the accuracy of the representations and warranties and compliance with the covenants, duties and obligations set forth in Article IV; (D) the General Partner shall have delivered to the Special Limited Partner a current rent roll for the

- 33 -

WAS: 100871_1

Apartment Complex certified to the Limited Partners by the General Partner and in form and substance reasonably satisfactory to the Special Limited Partner, together with copies of all tenant leases, if requested by the Special Limited Partner; and (E) receipt by the Limited Partners of a determination in writing by the Accountants of the Certified Credits, the Investment Partnership Special Limited Partner shall make the Third Additional Capital Contribution to the Partnership.

The amount of the Third Additional Capital Contribution shall be equal to One Hundred Sixty Thousand Seven Hundred Thirty-One Dollars ($160,731), subject to reduction as provided in Section 5.01(d)(i) and 5.01(d)(iii). The Partnership shall use the Third Additional Capital Contribution to pay amounts then due under the ~~to developer~~ Development Agreement. If the conditions for making this Third Additional Capital Contribution, are satisfied prior to those for the Second Additional Capital Contribution, then the Third Additional Capital Contribution shall be made prior to the Second Additional Capital Contribution.

(vi)    Cost Savings.    If aggregate savings in costs exist from those costs contained in the Development Budget such that the Bridge Loan has not been fully drawn down or is otherwise not needed to pay other budgeted project costs as of the Final Closing (such as accrued interest and closing costs), the amount remaining shall be paid to the Developer on the date of Final Closing as an Additional Development Fee in accordance with the terms of the Amended and Restated Development Agreement attached hereto as Exhibit A-1.

(vii)    Special Additional Capital Contributions.

If in any fiscal year of the Partnership after the Final Closing the Investment Partnership's Capital Account balance may be reduced to or below zero, the Investment Partnership may, in its sole and absolute discretion, make a Special Additional Capital Contribution to the Partnership, in an amount reasonably required to avoid the reduction of the Investment Partnership's Capital Account balance to or below zero. If the Investment Partnership makes a Special Additional Capital Contribution to the Partnership pursuant to this paragraph, the Investment Partnership shall receive a guaranteed payment pursuant to Section 5.06 for the use of its Special Additional Capital Contribution. Whenever the Investment Partnership makes a Special Additional Capital Contribution to the Partnership pursuant to this paragraph, the General Partner shall have the option, in its sole and absolute discretion, to make Special Additional Capital Contributions to the Partnership, up to the same amount and on the same terms in the aggregate as the Special Additional Capital Contribution made by the Investment Partnership at that time.

(viii)    Bridge Loan Draw Procedures.    The Investment Partnership has designated SAHP as its agent ("Agent") for the purpose of reviewing, on behalf

- 34 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 56 of 86 PageID #: 67

of the Investment Partnership, copies of requests for draws under the Bridge Loan ("Draw") to pay costs of constructing the Project. The Investment Partnership shall have the right, exercisable from time to time as hereinafter provided, to appoint another Person as its agent for such purpose by delivering to the Developer on behalf of the General Partner written notice of the appointment of a successor Agent, in which the Investment Partnership terminates the appointment of the prior Agent.

    (A)    Not less than five (5) business days before the date on which the General Partner desires a Draw to be made, the Developer on behalf of the General Partner shall have delivered to the Agent the following documents (together, the "Draw Documents"):

    (1)    An original Contractor's requisition for payment (the "Contractor's Requisition") in a form reasonably satisfactory to the Agent (American Institute of Architects standard form G-722 or G-702/G-703 shall be deemed satisfactory) certified by the architect for actual improvements in place and for materials securely stored on site through the date of that requisition.

    (2)    An original of Schedule of Values showing costs incurred in the various construction and soft cost categories, in a format approved by the Investment Partnership.

    (3)    Copy of the Owner's and Contractor's Affidavit (construction in progress) in the form utilized for draws under the Construction Loan, duly executed and acknowledged on behalf of the Contractor and the General Partner.

    (4)    Copies of the Partial Waiver of Liens, (subject to retainages) of each subcontractor and material supplier, as to all work performed and materials purchased for which the immediately preceding Draw, if any, had been made, and an accounting prepared by the Contractor of all payments made under the immediately preceding Draw.

    (5)    [intentionally omitted]

    (6)    Copy of project schedule, updated monthly, showing the progress of the work.

    (B)    The Agent shall have five (5) business days after receiving the Draw Documents in which he has the right, exercisable by notice by facsimile transmittal to the Developer, to object to the Draw on the

- 35 -

WAS: 100871_1

basis that the Draw Documents are incomplete or inaccurate. As soon as practical after receipt of such notice, the Developer shall complete the Draw Documents, correct all inaccuracies and resubmit the Draw Documents for approval. If the Agent does not object to the Draw Documents within such five (5) day period, the Draw Documents shall be deemed approved, and the Draw shall be immediately funded.

(d)     Adjustment to Capital Contributions of Investment Partnership.

(i)     After the occurrence of State Designation and the issuance of IRS Forms 8609, and prior to the making of the Third Capital Contribution, the Accountants shall determine the Certified Credits for all of the Credit Period for the Project (the "Aggregate Certified Credits"). If the Aggregate Certified Credits are less than the aggregate amount of the Projected Credits for all of the Credit Period (such difference being referred to as the "Allocation Differential"), then (unless such reduction is a result of the transfer by the Investment Partnership of its Interest) the Capital Contributions of the Investment Partnership shall be reduced by the "Adjustment Amount." The Adjustment Amount shall equal the Allocation Differential multiplied by 75.6%. Any such reduction in Capital Contributions shall be applied to reduce the Second Additional Capital Contribution and, then to the extent necessary, the Third Additional Capital Contribution. If no further Additional Capital Contributions are to be paid, or if the First, Second and/or Third Additional Capital Contribution have not been funded, but the Adjustment Amount is greater than the amount of the unfunded First, Second and/or Third Additional Capital Contribution, then the General Partner shall make a payment to the Partnership equal to the amount by which the Adjustment Amount exceeds the unfunded Capital Contributions of the Investment Partnership, and the Partnership shall immediately distribute such amount to the Investment Partnership as a return of capital. The General Partner's payment required by the preceding sentence shall constitute a non-reimbursable funding by it and shall not give rise to any right of repayment as a loan or credit as a Capital Contribution or any increase in the Capital Account of the General Partner.

(ii)    [intentionally omitted]

(iii)   Upon State Designation and the issuance of IRS Forms 8609, if Aggregate Certified Credits exceed the Projected Credits for all of the Credit Period (the "Upward Allocation Differential"), then the Capital Contributions of the Investment Partnership shall be increased by the "Upward Adjustment Amount." The Upward Adjustment Amount shall be equal to the Upward Allocation Differential multiplied by 75.6%. The Upward Adjustment Amount shall increase the Third Additional Capital Contribution. The Partnership shall use the Upward Adjustment Amount to prepay the Development Fee.

- 36 -

WAS: 100871_1

(iv)        In addition to any other adjustment in Capital Contribution or payment required by this Section 5.01(d), in the event that the Actual Credit for 2000 is less than $82,500, then the Capital Contribution of the Investment Partnership to the Partnership shall be reduced by an amount equal to the sum of (a) $82,500 minus (2) the Actual Credit for 2000, which sum shall be multiplied by 75.6% (the "Timing Reduction Amount"). Any reduction in Capital Contribution caused by the Timing Reduction Amount shall first be applied to reduce the Second Additional Capital Contribution and, if necessary, the Third Additional Capital Contribution. If no Capital Contributions remain to be paid, or if the amount of the Timing Reduction Amount is greater than the Capital Contributions to be made, then the General Partner shall pay the Timing Reduction Amount to the Investment Partnership promptly after demand is made therefor. Any amounts not promptly paid upon demand shall bear interest at the Prime Rate prevailing at the end of the preceding calendar month, plus two percent (2.0%), until paid in full. It is understood and agreed that the provisions of this Section 5.01(d)(iv) are intended to address any reductions in or delays in the delivery of the first year of Credit Period from the Projected Credit amounts during such year where the total Projected Credits for the entire Credit Period is not affected. It is intended that the adjustments and/or payments required by this Section 5.01(d)(iv) are to compensate the Investment Partnership for the delay in the receipt of Tax Credits.

(e)        [intentionally omitted]

(f)        Without the Consent of all of the Partners, no additional Persons may be admitted as additional Limited Partners and Capital Contributions may be accepted only as and to the extent expressly provided for in this Article V.

(g)        The cash portion of the Capital Contributions of each Partner shall be deposited at the General Partner's discretion in a checking, savings and/or money market or similar account, to be established and maintained in the name of the Partnership, or invested in government securities or certificates of deposit issued by any bank. Thereafter, such amounts shall be utilized for the conduct of the Partnership business pursuant to the terms of this Agreement.

(h)        Except as may otherwise be provided under applicable law, no Limited Partner shall be bound by, or personally liable for, the expenses, liabilities or obligations of the Partnership.

5.02.   <u>Return of Capital Contribution</u>. Except as provided in this Agreement, no Partner shall be entitled to demand or receive the return of his Capital Contribution.

5.03.   <u>Withholding of Capital Contribution Upon Default</u>. In the event that: (a) the General Partner shall not have substantially complied with any material provisions under this Agreement, after Notice from the Special Limited Partner of such

- 37 -

WAS: 100871_1

noncompliance and failure to cure such noncompliance within a period of thirty (30) days from and after the date of such Notice, or (b) the Construction Lender shall have declared the Partnership to be in default under the Construction Loan, or (c) foreclosure proceedings shall have been commenced against the Apartment Complex, then the Partnership and the General Partner shall be in default of this Agreement, and the Limited Partners, at their sole election, may cause the withholding of payment of any Additional Capital Contribution otherwise payable to the Partnership.

All amounts so withheld by the Limited Partners under this Section 5.03 shall be promptly released to the Partnership only after the General Partner or the Partnership have cured the default justifying the withholding, as demonstrated by evidence reasonably acceptable to the Special Limited Partner.

5.04. <u>Legal Opinions</u>. As a condition precedent to the Investment Partnership making the Bridge Loan and the First Additional Capital Contribution and Second Additional Capital Contribution, the Investment Partnership shall have received the opinion of ~~Donald Manning~~, Esq., of New York, New York, special counsel to the Partnership and the General Partner, which opinion shall explicitly state that Peabody & Brown, of Washington, D.C., counsel to the Limited Partners, may explicitly rely upon them, that: *Gerard A. Walters*

(a)     the Partnership is a duly formed and validly existing limited partnership under the Act, and the Partnership has full power and authority to own and operate the Apartment Complex and to conduct its business hereunder; the Partnership is duly qualified to transact its business in the State of New York; both the Investment Partnership and the Special Limited Partner have been validly admitted as Limited Partners of the Partnership entitled to all the benefits of a Limited Partner under this Agreement, and the Interests of the Investment Partnership and the Special Limited Partner in the Partnership are the Interests of a limited partner with no personal liability for the obligations of the Partnership;

(b)     the General Partner is duly and validly organized and is validly existing in good standing as a corporation under the laws of the State, with full power and authority to enter into and perform its obligations hereunder; the General Partner is duly qualified to transact its business in the State;

(c)     [intentionally omitted];

(d)     execution of this Agreement by the General Partner has been duly and validly authorized by or on behalf of such General Partner and, having been executed and delivered in accordance with its terms, this Agreement constitutes the valid and binding agreement of the General Partner, enforceable in accordance with its terms and execution by the General Partner is not in violation of any contract, agreement, charter,

- 38 -

WAS: 100871_1

by-law, resolution, judgment, order, decree, law or regulation to which the General Partner is bound or as to which it is subject;

(e)    based solely on the title insurance policy issued to the General Partner and identified in Section 4.01(e), the General Partner owns good and marketable fee simple title to the Apartment Complex, subject only to such other liens, charges, easements, restrictions and encumbrances as are set forth in the title insurance policy issued to the General Partner, none of which materially interfere with or adversely affect the development or operation of the Apartment Complex;

(f)    the General Partner has received a carryover allocation of Low-Income Housing Tax Credit authority for the Projected Credits from the Agency, which is the appropriate state or local credit authority for the jurisdiction in which the Apartment Complex is located and the General Partner owned the Land as of December 31 of the year it received the carryover allocation;

(g)    the Bridge Loan, as made pursuant to the terms of the Bridge Loan Note and the Partnership Agreement, has been duly authorized executed and delivered, is enforceable in accordance with its terms and complies with, or is exempt from applicable state or federal laws, regulations and other requirements pertaining to usury;

(h)    to the best of knowledge after due inquiry, there are no defaults by the General Partner or the Partnership existing with respect to any of the Project Documents; and

(i)    to the best of knowledge after due inquiry, no event of Bankruptcy has occurred with respect to the Partnership or the General Partner.

5.05.   <u>Repurchase Obligation.</u>

(a)    If (i) the Apartment Complex is not placed in service by December 31, 2000 (or such later date as may be Consented to by the Investment Partnership); (ii) the Partnership has not received State Designation in 1998 or the IRS Forms 8609 are not issued by the State Agency so as to allow the Partnership to claim Tax Credits for the first year of the Credit Period; (iii) the Partnership fails to meet the Minimum Set-Aside Test and the Rent Restriction Test by the close of the first year of the Credit Period (as defined in Section 42(f) of the Code) or at any time thereafter; (iv) the Partnership's basis in the Apartment Complex for federal income tax purposes, as finally determined by the Accountants or pursuant to an audit by the Internal Revenue Service, as of December 31, 1998, shall have been less than 10% of the Partnership's reasonably expected basis in the Apartment Complex, as required pursuant to Section 42(h)(1)(E) of the Code; (v) an event of default described in Section 5.03 shall exist, or (vi) an Extended Use Agreement is not in effect before the end of the first year of the Credit Period, then the General Partner shall, within 15 days of the occurrence thereof, send to the Limited Partners Notice of such event

- 39 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 61 of 86 PageID #: 72

and of its obligation to purchase the Interest of the Investment Partnership hereunder and return to the Investment Partnership its Capital Contributions in the event the Investment Partnership in its sole discretion requires such purchase of the Interest of the Investment Partnership. Thereafter, the General Partner, within 30 days of the mailing date of Notice by the Investment Partnership of such election, shall acquire the entire Interest of the Investment Partnership in the Partnership by making payment to the Investment Partnership, in cash, of an amount equal to the sum of (x) its Capital Contributions, (y) the amount of the Bridge Loan advanced to the Partnership by the Investment Partnership pursuant to Section 5.01(c)(ii) and (z) interest on the sum of the amounts set forth in clauses (x) and (y) at the rate of the Prime Rate plus two percent per annum or ten percent per annum, whichever is greater. In addition, within 15 days of the notice of exercise, the General Partner shall cause the Partnership to effect the release of any letter of credit, guaranty or collateral which the Investment Partnership and its Affiliates may have provided to secure obligations of the Partnership and to reimburse the Investment Partnership and its Affiliates against any loss, damage or liability they may have incurred as a result of providing any such letter of credit, guaranty or collateral.

(b)     Upon receipt by the Investment Partnership of any such payment of its Capital Contributions, the Interest of the Investment Partnership shall terminate, and, to the extent that the Investment Partnership has acted in accordance with the terms of this Agreement, the General Partner shall indemnify and hold harmless the Investment Partnership from any losses, damages, and/or liabilities, to or as a result of claims of Persons other than Partners or Affiliates thereof, to which the Investment Partnership (as a result of its respective participation hereunder) may be subject.

5.06.  Guaranteed Payments.  No later than 90 days after the end of the Partnership's fiscal year, any Partner who has made a Special Additional Capital Contribution pursuant to Section 5.01(c)(vii) shall receive, as a guaranteed payment for the use of its capital, an amount equal to the annual interest earned by the Partnership, if any, on such Special Additional Capital Contributions.  The Partnership shall invest any amounts contributed pursuant to Section 5.01(c)(vii) as reasonably directed by the contributing Partner.  Any guaranteed payment due to a Partner shall be deemed an expense of the Partnership for purposes of determining Net Cash Flow.  Any guaranteed payment which is not paid when due shall remain a liability of the Partnership and shall bear interest as set forth above.

WAS: 100871_1

5.07.    IP Loans and GP Loans.

(a)    GP Loans.    Once the Partnership acquires fee title to the Apartment Complex, the General Partner, subject to the consent of the Special Limited Partner, shall have the right, but not the obligation, after funding all other obligations under this Partnership Agreement, including, without limitation, its obligation to fund Excess Development Costs under its Construction Completion Guaranty under Section 8.09(a) or Operating Deficit under its Operating Deficit Guaranty under Section 8.09(b) hereof, to make "GP Loans" pursuant to this Section 5.07(a) to fund Operating Deficits of the Partnership or to fund other reasonable and necessary obligations of the Partnership; provided, however, that the General Partner shall not have such right to make such GP Loan at any time when it has an unsatisfied obligation to fund Excess Development Costs or to make Operating Deficit Loans or to fund Excess Development Costs as required under this Agreement. GP Loans shall be on the following terms: (i) interest shall accrue on the Excess GP Loan Amount at an annual interest rate of fifteen percent (15%), compounded annually, and on any other GP Loans at an annual interest rate of ten percent (10%), compounded annually; and (ii) GP Loans shall be repayable solely as set forth in Sections 11.01 and 11.04 of this Agreement. By making a GP Loan, the General Partner does not waive any claim of, or remedies with respect to a default, if any, by the Investment Partnership in its obligations under this Agreement.

(b)    IP Loans.    The Investment Partnership, subject to the consent of the Special Limited Partner, shall have the right, but not the obligation, to make "IP Loans" pursuant to this Section 5.07(b) to fund Operating Deficits of the Partnership or to fund other reasonable and necessary obligations of the Partnership. IP Loans shall be on the following terms: (i) interest shall accrue on Default IP Loans at an annual interest rate of twenty percent (20%) compounded annually; (ii) interest shall accrue on the Excess IP Loan Amount (other than Default IP Loans) at an annual interest rate of fifteen percent (15%) compounded annually, and on any other IP Loans at an annual interest rate of ten percent (10%) compounded annually; and (iii) IP Loans shall be repayable solely as set forth in Sections 11.01 and 11.04 of this Agreement. By making an IP Loan, the Investment Partnership does not waive any claim of, or remedies with respect to, a default, if any, by the General Partner in its obligations under this Agreement.

(c)    Notice of Loans.    If the Partnership shall require a Partner Loan to fund Operating Deficits or to satisfy other reasonable and necessary obligations of the Partnership, a Partner (the "Initiating Partner") shall give the other Partners (the "Non-Initiating Partners") notice of the Initiating Partner's intent to fund a Partner Loan, which notice shall state (i) the total amount of Partner Loan proposed to be funded, (ii) the purpose for such Partner Loan, and (iii) the proposed funding date of such Partner Loan, which date ("Contribution Date") shall be not more than thirty (30) days following the date of such notice; provided that the notice requirement shall be shortened to the extent necessary to permit a Partner to fund a Partner Loan for the purpose of curing a default under the Construction Loan. The Non-Initiating Partners shall notify the Initiating Partner at least

- 41 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM          INDEX NO. 523152/2018

NYSCEF DOC. NO. 2          Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 63 of 86 PageID #: 74          RECEIVED NYSCEF: 11/19/2018

five (5) days prior to the Contribution Date whether and in what amount the Non-Initiating Partners intend to make a Partner Loan to the Partnership, which amount may be up to, but not in excess of, fifty percent (50%) of the total proposed Partner Loan. The Initiating Partner and the Non-Initiating Partners shall each fund the portion of the Partner Loan it agreed to make by the Contribution Date. If a Partner fails to make such Partner Loan to the Partnership on or before the Contribution Date, any Partner who makes such Partner's share of the Partner Loan may, at such Partner's option, advance to the Partnership the amount of the non-lending Partner's share of the Partner Loan. No Partner shall have the right to propose and fund a Partner Loan to fund distributions and/or payments to be made pursuant to Sections 11.01, or 11.04.

      (d)    <u>Documentation of Partner Loans</u>. At the request of a Partner, which request may be made quarterly, any Partner Loan shall be evidenced by a non-negotiable promissory note or notes reflecting any such Partner Loans made during the preceding calendar quarter. Each Partner Loan shall be an unsecured loan by such Partner. Partner Loans shall not be considered Capital Contributions, and shall not increase such Partner's Capital Account.

      (e)    <u>Usury Savings Clause</u>. Notwithstanding anything to the contrary herein or in any note evidencing a Partner Loan, in no event shall interest accrue on any Partner Loan at a rate in excess of the highest rate permitted by applicable law.

      (f)    <u>Excess IP Funds</u>. The sum of the Excess IP Loan Amount plus (or minus) the amount by which the Special Limited Partner's Section 5.07 Capital Contributions (hereinafter defined) exceeds (or is less than) the General Partner's Sections 5.07 Capital Contributions shall be known as the "Excess IP Funds." If the Excess IP Funds at any time exceed $5,000, then (i) all references in Section 11.01 and 11.04 to distributions or payments to the General Partner of a specified percentage shall be reduced by five percentage points for each $5,000 (or portion thereof) that the Excess IP Funds exceed $5,000, and (ii) all references in Section 11.01 and Section 11.04 to distributions or payments to the Special Limited Partner of a specified percentage shall be increased accordingly. The resulting percentage to the General Partner shall be referred to as the "Incentive Percentage". For example, in the event the Excess IP Funds exceed $10,000 but do not exceed $15,000, all references in Section 11.01 and 11.04 to distributions or payments to the General Partner which equal 50% shall be reduced to 40% (2 portions of $5,000 x 5 percentage points for each portion = a 10 percentage point reduction).

      (g)    <u>Capital Contribution Alternative</u>. If a Partner which has made or intends to make a Partner Loan (a "Lending Partner") reasonably concludes that the operation of the usury savings clause in Section 5.07(e) will result in a reduction in the interest rate otherwise specified in this Section 5.07, then the Lending Partner may request that its existing or proposed Partner Loans be restructured as Capital Contributions. In such event, all the Partners shall cooperate to negotiate and execute an amendment to this Agreement (the "Amendment"), which shall include the following terms:

- 42 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 64 of 86 PageID #: 75

(i) each of the Special Limited Partner and the General Partner shall have the right to make Capital Contributions pursuant to the Amendment ("Section 5.07 Capital Contributions") either instead of making IP Loans and GP Loans, respectively, or to fund the concurrent repayment by the Partnership of IP Loans or GP Loans, respectively; (ii) with respect to such Section 5.07 Capital Contributions, the Partner(s) making them shall be entitled to receive (A) guaranteed payments or a preferred return in amounts and at times corresponding to interest payments that would have been due had the Section 5.07 Capital Contributions been made as Partner Loans, and (B) distributions as a return of capital in amounts and at times corresponding to principal payments that would have been due had the Section 5.07 Capital Contributions been made as Partner Loans; and (iii) Article 11 shall be revised to the maximum extent feasible to provide that such guaranteed payments or a preferred return and return of capital distributions shall have the same amounts, timing, priority of payment and tax consequences as the corresponding payments of Partner Loans would have had. Notwithstanding the foregoing, the Investment Partnership shall have no obligation to consent to any amendment pursuant this Section 5.07(g), which it concludes could adversely affect the timing or amount of the allocation to the Investment Partnership of tax credits, losses, income or gains.

WAS: 100871_1

ARTICLE VI.
CHANGES IN PARTNERS

6.01.   Withdrawal of the General Partner.

(a)   The General Partner may not withdraw from the Partnership or sell, transfer, pledge, hypothecate or assign his or its Interest as General Partner or any interest in the General Partner without the prior Consent of the Special Limited Partner, which may be withheld in its sole and absolute discretion, and of the Agency, if required, and only after being given written approval by the necessary parties as provided in Section 6.02, and by the Agency if required, of the General Partner(s) to be substituted for him or it or to receive all or part of his or its Interest as General Partner.

(b)   In the event that a General Partner withdraws from the Partnership or sells, transfers or assigns his or its entire Interest pursuant to Section 6.01(a), he or it shall be and shall remain liable for all obligations and liabilities incurred by him or it as General Partner before such withdrawal, sale, transfer or assignment shall have become effective (unless and until such obligations and liabilities are assumed in full and in writing by a successor general partner), but shall be free of any obligation or liability incurred on account of the activities of the Partnership from and after the time such withdrawal, sale, transfer or assignment shall have become effective.

6.02.   Admission of a Successor or Additional General Partner.   A Person shall be admitted as a General Partner of the Partnership only if the following terms and conditions are satisfied or waived by the Special Limited Partner:

(a)   the admission of such Person shall have been Consented to by the General Partner or its successor and the Special Limited Partner, and consented to by the Agency, if required;

(b)   the successor or additional Person shall have accepted and agreed to be bound by (i) all the terms and provisions of this Agreement, by executing a counterpart thereof, and (ii) all the terms and provisions of the Loan Agreement and the Regulatory Agreement, by executing counterparts thereof, if required by the HFA Lender, and (iii) all the terms and provisions of such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a General Partner, and this Agreement evidencing the admission of such Person as a General Partner shall have been filed and all other actions required by Section 1.05 in connection with such admission shall have been performed;

(c)   if the successor or additional Person is a corporation, it shall have provided the Partnership with evidence satisfactory to counsel for the Partnership of its

- 44 -

WAS: 100871_1

authority to become a General Partner, to do business in the State and to be bound by the terms and provisions of this Agreement; and

(d)  Counsel for the Partnership shall have rendered an opinion that the admission of the successor or additional Person is in conformity with the Act and that none of the actions taken in connection with the admission of the successor Person will cause the termination or dissolution of the Partnership or will cause it to be classified other than as a partnership for federal income tax purposes.

6.03.  Effect of Bankruptcy, Death, Withdrawal, Dissolution or Incompetence of a General Partner.

(a)  In the event of the Bankruptcy of a General Partner or the withdrawal, death or dissolution of a General Partner or an adjudication that a General Partner is incompetent (which term shall include, but not be limited to, insanity) the business of the Partnership shall be continued by the other General Partner(s); provided, however, that if the withdrawn, Bankrupt, deceased, dissolved or incompetent General Partner is then the sole General Partner, or if such General Partner withdraws from the Partnership in contravention of the provisions of Section 6.01(a) of this Agreement, then the Partnership shall be dissolved, unless within ninety (90) days after receiving Notice of such Bankruptcy, withdrawal, death, dissolution or adjudication of incompetence, a majority in interest of the other Partners elect to designate a successor General Partner and continue the Partnership upon the admission of such successor General Partner to the Partnership.

(b)  Upon the Bankruptcy, death, dissolution or adjudication of incompetence of a General Partner, such General Partner shall immediately cease to be a General Partner and its Interest shall without further action be converted to a Limited Partner Interest; provided, however, that if such Bankrupt, dissolved, incompetent or deceased General Partner is the sole remaining General Partner, such General Partner shall cease to be a General Partner only upon the expiration of ninety (90) days after Notice to the Special Limited Partner of the Bankruptcy, death, dissolution or declaration of incompetence of such General Partner.

Except as set forth above, such conversion of a General Partner Interest to a Limited Partner Interest shall not affect any rights, obligations or liabilities (including without limitation, any of the General Partner's obligations under Section 8.09 herein) of the Bankrupt, deceased, dissolved or incompetent General Partner existing prior to the Bankruptcy, death, dissolution or incompetence of such person as a General Partner (whether or not such rights, obligations or liabilities were known or had matured).

(c)  If, at the time of the withdrawal, Bankruptcy, death, dissolution or adjudication of incompetence of a General Partner, the Bankrupt, deceased, dissolved or incompetent General Partner was not the sole General Partner of the Partnership, the

- 45 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM    INDEX NO. 523152/2018

NYSCEF DOC. NO. 2    Case 1:18-cv-07261-RJD-JRC    Document 1-1    Filed 12/20/18    Page 67 of 86 PageID #: 78    RECEIVED NYSCEF: 11/19/2018

remaining General Partner or General Partners shall immediately (i) give Notice to the Limited Partners of such Bankruptcy, death, dissolution or adjudication of incompetence, and (ii) make such amendments to this Agreement and execute and file such amendments or documents or other instruments as are necessary to reflect the conversion of the Interest of the Bankrupt, deceased, dissolved or incompetent General Partner and his having ceased to be a General Partner. Such action or actions by the remaining General Partner or General Partners shall, in the event that permission of a bankruptcy court is necessary, be deemed to have been taken subject to the provisions of paragraph 6.03(d) below. The remaining General Partner or General Partners are hereby granted an irrevocable power of attorney, coupled with an interest, to execute any or all documents on behalf of the Partners and the Partnership and to file such documents as may be required to effectuate the provisions of this Section 6.03.

(d)    The General Partners, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agrees that in the event a General Partner should make application for or seek protection or relief under any of the Sections or Chapters of the United States Bankruptcy Code (the "Code"), or in the event that any involuntary petition is filed against a General Partner, then, in such event, any other Partner shall thereupon be entitled to immediate relief from any automatic stay imposed by Section 362 of the Code, or otherwise, on or against the exercise of the rights and remedies available to such Partner pursuant to this Agreement, or otherwise. The foregoing shall in no way preclude, restrict or prevent the General Partner from filing for protection under the Code.

(e)    The Partners acknowledge and agree that this Agreement is a contract under which a Limited Partner is excused from accepting performance from the General Partners, its assignee or trustee, in the event that a General Partner makes application for or seeks protection under any of the Sections or Chapters of the Code, or in the event that an involuntary petition is filed against such General Partner. The effect of this paragraph shall be that this Agreement is hereby deemed to be subject to the exceptions to assumption and assignment of contracts set forth in Sections 365(c)(1) and 365(e)(2)(A) of the Code and that a Limited Partner, by its refusal to consent to an assumption or assignment of this Agreement by the General Partners, shall be able to prevent such assumption or assignment.

(f)    In the event that a General Partner makes application for or seeks relief or protection under any of the Sections or Chapters of the Code, or in the event that any involuntary petition is filed against said General Partner, then, in such event, any Partner may apply or move to the bankruptcy court in which such petition is filed for a change of venue to the bankruptcy court where the Partnership has its principal place of business, and the General Partners hereby agree not to oppose or object to such application or motion in any way.

- 46 -

WAS: 100871_1

## ARTICLE VII.
## ASSIGNMENT TO THE PARTNERSHIP

As a condition precedent to the First Additional Capital Contribution, the General Partner shall transfer and assign to the Partnership all of its right, title and interest in and to the Apartment Complex, including the following:

(i) all contracts with architects, contractors and supervising architects with respect to the development of the Apartment Complex;

(ii) all plans, specifications and working drawings, heretofore prepared or obtained in connection with the Apartment Complex and all governmental approvals obtained, including planning, zoning and building permits;

(iii) any and all commitments with respect to the Construction Loan and the Tax Credits;

(iv) any and all rights under and pursuant to the Project Documents; and

(v) any other work product of the General Partner related to the Apartment Complex.

- 47 -

WAS: 100871_1

ARTICLE VIII.
RIGHTS, OBLIGATIONS AND POWERS
OF THE GENERAL PARTNER

8.01.  Management of the Partnership.

(a)     Except as otherwise set forth in this Agreement, the General Partner, within the authority granted to it under this Agreement, shall have full, complete and exclusive discretion to manage and control the business of the Partnership for the purposes stated in Article III, shall make all decisions affecting the business of the Partnership and shall manage and control the affairs of the Partnership to the best of ability and use best efforts to carry out the purpose of the Partnership.  In so doing, the General Partner shall take all actions necessary or appropriate to protect the interests of the Limited Partners and of the Partnership.  The General Partner shall devote such time as is necessary to the affairs of the Partnership.

(b)     Except as otherwise set forth in this Agreement and subject to the applicable lender, and/or Agency rules and regulations and the provisions of the Loan Agreement, the General Partner (acting for and on behalf of the Partnership), in extension and not in limitation of the rights and powers given by law or by the other provisions of this Agreement, shall, in its sole discretion, have the full and entire right, power and authority in the management of the Partnership business to do any and all acts and things necessary, proper, convenient or advisable to effectuate the purpose of the Partnership. All decisions made for and on behalf of the Partnership by the General Partner shall be binding upon the Partnership.  No person dealing with the General Partner shall be required to determine its authority to make any undertaking on behalf of the Partnership, nor to determine any facts or circumstances bearing upon the existence of such authority.

8.02.  Limitations Upon the Authority of the General Partner.

(a)     The General Partner shall not have any authority to:

(i)     perform any act in violation of any applicable law or regulation thereunder;

(ii)     perform any act in violation of the provisions of the Regulatory Agreement, the Extended Use Agreement, the Loan Agreement, or any other Project Documents;

(iii)     do any act required to be approved or ratified in writing by the Limited Partners under the  Act unless the right to do so is expressly otherwise given in this Agreement;

- 48 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 70 of 86 PageID #: 81

(iv)     knowingly rent apartments in the Apartment Complex such that the Apartment Complex would not meet the requirements of the Rent Restriction Test or Minimum Set-Aside Test; or

(v)     borrow from the Partnership or commingle Partnership funds with funds of any other Person.

(b)     The General Partner shall not, without the Consent of the Special Limited Partner which Consent may be withheld in its sole and absolute discretion, have any authority to:

(i)     sell or otherwise dispose of, at any time, all or any material portion of the assets of the Partnership, except as expressly provided in this Agreement;

(ii)     increase or make application(s) for an increase or increases in the HFA Loan (the Special Limited Partner does not have any present intent to Consent to an increase in the maximum principal amount of the HFA Loan);

(iii)     borrow in excess of $10,000 in the aggregate at any one time outstanding on the general credit of the Partnership, except borrowings constituting Subordinated Loans, and except as and to the extent provided for in an approved budget pursuant to Section 8.21;

(iv)     following Final Closing, construct any new or replacement capital improvements on the Apartment Complex which substantially alter the Apartment Complex or its use or which are at a cost in excess of $10,000 in a single Partnership fiscal year, except (a) replacements and remodeling in the ordinary course of business or under emergency conditions, or (b) reconstruction paid for from insurance proceeds, or (c) as and to the extent provided for in an approved budget pursuant to Section 8.21;

(v)     acquire any real property in addition to the Apartment Complex other than easements reasonable and necessary for the operation of the Apartment Complex;

(vi)     [intentionally omitted]

(vii)     enter into the Construction Loan or a commitment therefor, or agree to any amendment or alteration of the Construction Loan, including without limitation, any extension of the term of the Construction Loan;

- 49 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 71 of 86 PageID #: 82

(viii)   execute or deliver any general assignment for the benefit of the creditors of the Partnership or file a petition or acquiesce in the filing of a petition for Bankruptcy or consent to the lifting of the automatic stay;

(ix)   make any modification to the Development Budget or make any expenditure which is not consistent with the Development Budget (the Special Limited Partner's Consent to such modifications or inconsistent expenditures not to be unreasonably withheld or delayed, provided that adequate funds are available for such purpose); or

(x)   consent to the resolution (including any settlement) of any lawsuit or any other legal or administrative proceeding involving the Partnership as a party.

(c)   Notwithstanding the foregoing, at any time after the fourteenth (14th) anniversary of the first day of the first taxable year of the applicable Tax Credit compliance period, the Special Limited Partner may request that the Partnership do one of the following:  (i) sell the Apartment Complex subject to the Extended Use Agreement (a "Continued Compliance Sale"); or (ii) request that the Agency arrange for the sale of the Apartment Complex after submission of a "Qualified Contract" (as defined in Section 42(h)(6)(F) of the Code) (a "Compliance Termination Sale").

(i)   After receipt of a request for a Continued Compliance Sale,  the General Partner shall use its best efforts to find a third party purchaser for the Apartment Complex and to cause the Partnership to consummate a sale of the Apartment Complex subject to the Extended Use Agreement and on terms Consented to the Investment Partnership. If such efforts are not successful on terms reasonably satisfactory to the Special Limited Partner within six (6) months, the Special Limited Partner shall have the right thereafter to locate a purchaser for the Apartment Complex.  If the Special Limited Partner locates such a purchaser, the General Partner shall be given a right of first refusal to purchase the Apartment Complex on the same terms and conditions as would be applicable to such purchaser; if such right of first refusal is not exercised by the General Partner within thirty (30) days, then the General Partner shall be obligated to consent to the sale to such purchaser so long as the purchase price and other terms offered by such purchaser are at least as favorable to the Partnership as the best offer, if any, located by the General Partner.

(ii)   After receipt of a request for a Compliance Termination Sale, the General Partner shall make a request to the Agency to obtain a buyer who is willing to operate the low-income units of the Apartment Complex as a qualified low-income building and who will submit a Qualified Contract for the Apartment Complex, and if no Qualified Contract is submitted within one year of the date of the General Partner's request to the Agency, the General Partner shall use its best efforts to find a third party purchaser and to cause the Partnership to consummate a sale of the Apartment Complex to such purchaser on terms Consented by the Special Limited Partner and free of the restrictions imposed by the

- 50 -

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM INDEX NO. 523152/2018

NYSCEF DOC. NO. 2    Case 1:18-cv-07261-RJD-JRC    Document 1-1    Filed 12/20/18    Page 72 of 86 PageID #: 83    RECEIVED NYSCEF: 11/19/2018

Extended Use Agreement. If such efforts are not successful on terms reasonably satisfactory to the Special Limited Partner within six (6) months, the Special Limited Partner shall have the right thereafter to locate a purchaser for the Apartment Complex. If the Special Limited Partner locates such a purchaser, the General Partner shall be given a right of first refusal to purchase the Apartment Complex on the same terms and conditions as would be applicable to such purchaser; if such right of first refusal is not exercised by the General Partner within thirty (30) days, then the General Partner shall be obligated to consent to the sale to such purchaser so long as the purchase price and other terms offered by such purchaser are at least as favorable to the Partnership as the best offer, if any, located by the General Partner. If the Special Limited Partner requests that the Compliance Termination Sale be conducted in a manner that would result in the conversion of the Apartment Complex to a condominium regime of ownership and the sale of individual condominium units, the General Partner shall use diligent efforts to accomplish such conversion on such terms which are reasonably satisfactory to the Special Limited Partner.

8.03. <u>Management Purposes</u>. In conducting the business of the Partnership, the General Partner shall be bound by the Partnership's purposes set forth in Article III.

8.04. <u>Delegation of Authority</u>. The General Partner may delegate all or any of its powers, rights and obligations hereunder, and may appoint, employ, contract or otherwise deal with any Person for the transaction of the business of the Partnership, which Person may, under supervision of the General Partner, perform any acts or services for the Partnership as the General Partner may approve.

8.05. <u>General Partner or Affiliates Dealing with Partnership</u>.

(a) The General Partner or any Affiliate may act as Property Agent on such terms and conditions permitted by any applicable lender regulations, and may receive compensation at the highest rates approved and permitted by the Special Limited Partner at any time, subject to the provisions of Section 8.17.

(b) The General Partner or any Affiliates thereof shall have the right to contract or otherwise deal with the Partnership for the sale of goods or services to the Partnership in addition to those set forth herein, if (A) compensation paid or promised for such goods or services is reasonable (i.e., at fair market value) and is paid only for goods or services actually furnished to the Partnership, (B) the goods or services to be furnished shall be reasonable for and necessary to the Partnership, (C) the fees, terms and conditions of such transaction are at least as favorable to the Partnership as would be obtainable in an arm's-length transaction, (D) no agent, attorney, accountant or other independent consultant or contractor who also is employed on a full-time basis by the General Partner shall be compensated by the Partnership for its services and (E) the Special Limited Partner shall have given its Consent to a particular contract or other dealings between the Partnership and the General Partner or its Affiliates.

- 51 -

WAS: 100871_1

Any contract covering such transactions shall be in writing and shall be terminable without penalty on sixty (60) days Notice. Any payment made to the General Partner or any Affiliate for such goods or services shall be fully disclosed to all Limited Partners in the reports required under Section 13.04. Neither the General Partner nor any Affiliate shall, by the making of lump-sum payments to any other Person for disbursement by such other Person, circumvent the provisions of this Section 8.05(b).

8.06.   Other Activities.  Subject to the provisions of Section 8.09(b), this Agreement shall not prohibit any Affiliate of the General Partner from engaging in or possessing interests in other business ventures of every kind and description for their own account, including, without limitation, serving as general partner of other partnerships which own, either directly or through interests in other partnerships, government-assisted housing projects similar to the Apartment Complex. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement in or to such other business ventures or to the income or profits derived therefrom. The General Partner, however, shall be bound by the restrictions set forth in this Agreement, including Section 4.03 hereof.

8.07.   Liability for Acts and Omissions.  No General Partner or Affiliate thereof shall be liable, responsible or accountable in damages or otherwise to any of the Partners for any act or omission performed or omitted by him or it, or any of them, in good faith on behalf of the Partnership and in a manner reasonably believed by him or it or any of them to be within the scope of the authority granted to him or it or any of them by this Agreement and in the best interest of the Partnership, provided that the protection afforded the General Partner pursuant to this Section 8.07 shall not apply in the case of negligence, misconduct, fraud or any breach of fiduciary duty as General Partner with respect to such acts or omissions. Any loss or damage incurred by any General Partner or Affiliate thereof by reason of any act or omission performed or omitted by him or it or any of them in good faith on behalf of the Partnership and in a manner reasonably believed by him or it or any of them to be within the scope of the authority granted by this Agreement and in the best interests of the Partnership (but not, in any event, any loss or damage incurred by the General Partner or Affiliate thereof by reason of negligence, misconduct, fraud or any breach of fiduciary duty as General Partner with respect to such acts or omissions) shall be paid from Partnership assets to the extent available (but the Limited Partners shall not have any personal liability to the General Partner or Affiliate(s) thereof under any circumstances on account of any such loss or damage incurred by the General Partner or Affiliate(s) thereof or on account of the payment thereof).

8.08.   Net Worth of General Partner.  The General Partner shall maintain a net worth of not less than $1,000.

- 52 -

WAS: 100871_1

8.09.   Construction of the Apartment Complex, Construction Cost Overruns, Operating Deficits; Other General Partner Guarantees.

(a)   Construction Completion Guaranty.

(i)   The Developer on behalf of the General Partner has entered into the Construction Contract and a true and correct copy thereof has been provided to the Special Limited Partner.  The Developer shall be responsible for ensuring the Contractor's performance under the Construction Contract, including the following:

(A)   achieving completion of construction of the Apartment Complex on a timely basis in accordance with the Plans and Specifications for the Apartment Complex, the terms of this Agreement and the Project Documents; and

(B)   meeting all requirements for obtaining all necessary permanent, unconditional certificates of occupancy for all the apartment units in the Apartment Complex.

(ii)   The Developer hereby is obligated to pay all Excess Development Costs; the Partnership shall have no obligation to pay any Excess Development Costs.

(iii)   If the Developer shall fail to pay any such Excess Development Costs within five business days after written notice from the Partnership that the same are due and payable, the Special Limited Partner may in its sole discretion cause the Partnership to pay such Excess Development Costs using the Investment Partnership's Capital Contributions in an amount not in excess of the total of any remaining unpaid installments of the Development Fee due pursuant to Section 8.11 to meet such obligations of the Developer.  As a result of such application of funds, the Development Fee shall be treated as having been paid to the Developer, and the Developer as having paid Excess Development Costs to that extent, and the Developer shall take such amount of the Development Fee into income for federal income tax purposes.

(iv)   The Developer shall pay any Excess Development Cost pursuant to this Section 8.09(a) by the earlier of (A) the date required to avoid a default or penalties under the Construction Loan, (B) the date required to keep all sources of funding for the Apartment Complex "in-balance" and as adequate sources of funds to timely cause Substantial Completion of the Project and satisfaction of other obligations of the General Partner in accordance with this Agreement, or (C) such earlier date as may be set forth in the Development Agreement.

- 53 -

WAS: 100871_1

(b)    Operating Deficit Guaranty. In the event that, at any time during the period ending on the fifth anniversary of the achievement of Breakeven Operations (the "Initial Period"), an Operating Deficit shall exist, the General Partner, as Guarantor, shall provide such funds to the Partnership as shall be necessary to pay such Operating Deficit(s) not later than sixty (60) days after the occurrence of such Operating Deficit, up to an amount which shall not exceed at any time $122,500. Any such funds provided after the achievement of Breakeven Operations shall be in the form of a loan to the Partnership (the "Operating Deficit Loan(s)"). An Operating Deficit Loan shall be a Subordinated Loan in accordance with the provisions of Section 8.19; provided, however, that an Operating Deficit Loan shall bear no interest. If on or before expiration of the Initial Period, the General Partner ~~or any affiliate~~ of the General Partner constructs or participates in a project (the "New Project") which qualifies for Tax Credits within a one (1) mile radius of the location of the Apartment Complex (the "Radius"), then the obligation of the General Partner to make Operating Deficit Loans shall continue until six (6) years from the date the last certificate of occupancy for the New Project is issued by the applicable Authority (the "Issuance Date"). If the General Partner ~~or any Affiliate~~ of the General Partner, constructs or otherwise participates in a New Project within the Radius after the Initial Period, then the General Partner shall provide Operating Deficit Loans for a period of six (6) years commencing on the Issuance Date. ~~In the event that the General Partner shall fail to pay~~ any such Operating Deficits, RB, as the initial Property Manager under the Management Agreement, ~~shall~~ deduct the amount of such ~~unpaid~~ Operating Deficits from the amount otherwise payable to RB ~~as its monthly management~~ fee and shall pay such amount to Partnership (on behalf of the General Partner) as an ~~Operating Deficit~~ Loan which ~~shall~~ be used to pay such Operating Deficits. For the purpose of this Section 8.09(b), ~~all expenses shall be paid on a sixty (60) day current basis.~~

(c)    Guaranty of Bridge Loan. The Developer hereby irrevocably and unconditionally guaranties to the Investment Partnership the full and timely repayment of and the performance of all obligations of the General Partner under the Bridge Loan and the Bridge Loan Note ~~issued by the Partnership~~ in connection therewith. The foregoing is referred to hereinafter as the "Bridge Loan Guaranty". *[made by the General Partner]*

(d)    Tax Credit Compliance Guaranty.

(i)    If with respect to any fiscal year of the Partnership after the Final Closing there is a Tax Credit Shortfall, the General Partner shall on the following Payment Date pay the Investment Partnership an amount equal to (i) the amount of the Tax Credit Shortfall for the fiscal year immediately preceding the Payment Date, (ii) all penalties and interest imposed by the Code and assessed against the Investment Partnership by the Internal Revenue Service with respect to any Tax Credit Shortfall, and (iii) an amount sufficient to pay any tax liability owed by the Investment Partnership resulting from the receipt of the amounts specified in the foregoing clauses (i), (ii) and this clause (iii) (such calculation to be made assuming the Investment Partnership is subject to the highest federal and California state rate imposed on corporate taxpayers under the Code at that time and

- 54 -

WAS: 100871_1

applicable state law for the taxable year of the Investment Partnership in which such payment is taken into income by the Investment Partnership) together with interest on such amounts at the AFR accruing from such Payment Date.

(ii)     The General Partner irrevocably and unconditionally guarantees payments specified in this paragraph to the Investment Partnership if there is a Tax Credit Recapture Event.  The payments required by this Section shall be the sum of the following amounts:  (A) the amount of Tax Credits previously allocated to the Investment Partnership and subsequently disallowed because of such Tax Credit Recapture Event; (B) the "credit recapture amount" (as defined in Code Section 42(j)(2)) allocated to the Investment Partnership because of such Tax Credit Recapture Event; (C) all penalties and interest imposed by the Code and assessed against the Investment Partnership by the Internal Revenue Service with respect to such Tax Credit Recapture Event; (D) an amount sufficient to pay any tax liability owed by the Investment Partnership resulting from the receipt of the amounts specified in the foregoing clauses (A), (B), (C), and this clause (D) (such calculation to be made assuming the Investment Partnership is subject to the highest federal and California state rate imposed on corporate taxpayers under the Code at that time and applicable state law for the taxable year of the Investment Partnership in which such payment is taken into income by the Investment Partnership) together with interest on such amounts at the AFR accruing from the date the Investment Partnership remits funds to a taxing authority with respect to a Tax Credit Recapture Event; and (E) if the cause of the Tax Credit Recapture Event will in the determination of the Investment Partnership decrease the maximum amount of Tax Credits that will be available to the Partnership and allocated to the Investment Partnership during the remainder of the Compliance Period assuming full compliance with Code Section 42, then an amount equal to the total amount of such decrease.  The General Partner shall make such payment to the Investment Partnership within seventy-five (75) days of the Tax Credit Recapture Event.

(iii)     Moreover, if the Investment Partnership receives a payment under the Tax Credit Compliance Guaranty and the Partnership has appealed the issue giving rise to such payment (but has not caused a stay of enforcement with respect to such payment), and if the Partnership prevails on such appeal based on a final ruling by a federal court of competent jurisdiction, then the Investment Partnership shall refund the excess payment under the Tax Credit Compliance Guaranty which it had received.

(iv)     If there is a Tax Law Change, the General Partner shall use its good faith, reasonable efforts to comply with such Tax Law Change and to avoid a Tax Credit Shortfall or Tax Credit Recapture Event based on such Tax Law Change.  If despite the General Partner's good faith, reasonable efforts to comply with the Tax Law Change, such Tax Law Change results in a claim under Section 8.09(d)(i) or 8.09(d)(ii) (a "Limited Recourse Liability"), then the sole recourse of the Investment Partnership with respect to the Limited Recourse Liability shall be to the GP Pledged Payments (excluding only payments of the Development Fee) and the General Partner shall have no personal liability for the payment of such Limited Recourse Liability (unless and to the extent it wrongfully received GP

- 55 -

WAS: 100871_1

Pledged Payments that should have been made to the Investment Partnership in satisfaction of the Limited Recourse Liability).

8.10.  Reserve For Replacements.  On the first day of each calendar month commencing after Final Closing, the Partnership shall fund a Reserve For Replacements in accordance with the requirements of the agreement governing the issuance of the 421-a Certificates.  With the Consent of the Special Limited Partner, the General Partner may make withdrawals from the Reserve For Replacements, solely for the purpose of paying the cost of capital items, which shall consist of the acquisition or replacement of property expected to have a useful life of three years or more and the cost of repairs to property that will extend the useful life of such property by three years or more.  Reserve For Replacements which examples of such capital items and repairs are outlined in Exhibit O attached hereto.

8.11.  Development Fee.  The General Partner and the Partnership have entered into a Development Agreement with the Developer for its services in connection with the development and construction of the Apartment Complex.  In consideration for such services, a Development Fee in a total amount equal to at least $422,000 shall be payable by the Partnership, in accordance with the terms of the Development Agreement and this Agreement.

8.12.  Incentive Partnership Management Fee.  The Partnership has entered into an Incentive Partnership Management Fee Agreement with the General Partner of even date herewith for its services in managing the business of the Partnership for the period from the date hereof throughout the term of the Partnership.  Such agreement includes provisions to the effect that in return for its services in administering and directing the business of the Partnership, maintaining appropriate books and records relating to all financial affairs of the Partnership, and reporting periodically to the Partners and the Agency with respect to the financial and administrative affairs of the Partnership and the Apartment Complex, the Partnership shall pay to the General Partner, solely from the Net Cash Flow of the Partnership available for distribution and in accordance with Section 11.01(a), and only after the Development Fee has been paid in full, and any operating deficit loans have been repaid, an annual Incentive Partnership Management Fee in the amount as set forth in Section 11.01(a).  In no event shall the Incentive Partnership Management Fee exceed $25,000 per year, and such fee shall not be cumulative.  Payment of such fee shall be in accordance with any applicable requirements of the lender.

8.13.  Withholding of Fee Payments.  In the event that (a) the General Partner or any successor General Partner shall not have substantially complied with any material provisions under this Agreement, after Notice from the Special Limited Partner of such noncompliance and failure to cure such noncompliance within a period of thirty (30) days from and after the date of such Notice, or (b) the Construction Lender shall have declared the Partnership to be in default under the Construction Loan, or (c) foreclosure proceedings shall have been commenced against the Apartment Complex, then (i) the General Partner

- 56 -

WAS: 100871_1

shall be in default of this Agreement, and the Partnership shall withhold payment of any installment of fees and/or allowance payable pursuant to Sections 8.11 and/or 8.12, and (ii) the General Partner shall pay immediately any and all unpaid installments of the Development Fee,  and such payment by the General Partner shall discharge the Partnership's obligation to make such payment, as and to the extent provided in Section 8.11.

All amounts withheld by the Partnership under this Section 8.13 shall be promptly released to the payees thereof only after the General Partner has cured the default justifying the withholding, as demonstrated by evidence reasonably acceptable to the Special Limited Partner.  The General Partner shall not pledge, assign or otherwise encumber any fee or any distribution of cash or other property made or to be made pursuant to this Agreement or any rights with respect thereto without the prior Consent of the Special Limited Partner.

8.14.   Environmental Assessment Consultant's Fee.

The General Partner acknowledges that, on behalf of the Investment Partnership, SAHP has retained an environmental consultant (the "Environmental Consultant") to review and give recommendations related to environmental reports that are provided to the Investment Partnership by the Developer on behalf of the General Partner (including, but not limited to, Phase I and Phase II environmental assessments, wetlands reports, lead and asbestos reports, abatement reports and other environmental reports required by the Environmental Consultant, to the reasonable satisfaction of the Environmental Consultant) for the Land or the rehabilitation of existing buildings.  The General Partner shall be solely liable for the payment of fees charged by the Environmental Consultant up to a maximum of $4,800.00.  All remaining fees charged by the Environmental Consultant shall be paid by the Partnership from an additional Capital Contribution by the Investment Partnership in the same amount of such remaining fees.

8.15.   GP Pledged Payments.  To secure the payment and performance by the General Partner to the Investment Partnership of the performance of the General Partner's obligations under this Agreement, the General Partner hereby collaterally assigns, pledges and grants a security interest to the Investment Partnership in all right, title and interest the General Partner has in its Interest hereunder and in the right to receive any distributions and payments under this Agreement, including without limitation, any payments with respect to Operating Deficit Loans and GP Loans and distributions of Net Cash Flow and Cash from Capital Event ("GP Pledged Payments"). The General Partner irrevocably directs the Partnership to pay to the Investment Partnership any GP Pledged Payments at any time that there is an unsatisfied obligation secured by the GP Pledged Payments.  The Partnership and the Partners shall treat any GP Pledged Payments made by the Partnership to the Investment Partnership as a payment by the Partnership to the General Partner of the particular GP Pledged Payment. If there is more than one type of outstanding obligation secured at the time a GP Pledged

- 57 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 79 of 86 PageID #: 90

Payment is made to the Investment Partnership, the Investment Partnership in its sole discretion shall decide to which secured obligation the GP Pledged Payments shall be applied. This Section 8.13 shall constitute a security agreement under the laws of the state of New York. In addition, the General Partner grants the Investment Partnership a right of offset against GP Pledged Payments with respect to all amounts due to the Investment Partnership from the General Partner under the Agreement.

8.16.   Removal of the General Partner

(a)   The Special Limited Partner, so long as it is a Partner, shall have the right to remove the General Partner:

(i)   for any intentional misconduct or failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Apartment Complex or assets of the Partnership), or

(ii)   upon the occurrence of any of the following:

(A)   the General Partner or the Partnership shall have violated any material provisions of the Regulatory Agreement, the Extended Use Agreement and/or the Loan Agreement, or any material provisions of any other Project Document or other document required in connection with Agency requirements applicable to the Apartment Complex, which violation has not been explicitly waived in writing by the Agency;

(B)   the General Partner shall have violated any material provision of this Agreement including, without limitation, any of its guaranties pursuant to Sections 5.01(d), 5.05 and/or 8.09, or violated any material provision of applicable law;

(C)   the Construction Loan or any mortgage loan shall have gone into default, which default remains uncured after the expiration of any applicable cure period; or

(D)   the General Partner shall have conducted their own affairs or the affairs of the Partnership in such manner as would:

(1)   cause the termination of the Partnership for federal income tax purposes; or

(2)   cause the Partnership to be treated for federal income tax purposes as an association, taxable as a corporation; or

- 58 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
INDEX NO. 523152/2018

NYSCEF DOC. NO. 2
Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 80 of 86 PageID #: 91
RECEIVED NYSCEF: 11/19/2018

        (E)    the amount of Actual Credits for any year are, or are projected by the Accountants after State Designation to be, less than 85% of the Certified Credits for that year;

        (F)    cause for removal of a general partner of an Affiliated Partnership shall exist pursuant to the corresponding "Removal of the General Partner" provisions of the partnership agreement of an Affiliated Partnership; or

        (G)    the making of a general assignment by a Guarantor for benefit of its creditors, the filing by Guarantor with any bankruptcy court of competent jurisdiction of a voluntary petition under Title 11 of U.S. Code, as amended from time to time, the filing by a Guarantor of any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, Guarantor being the subject of any order for relief issued under such Title 11 of the U.S. Code, as amended from time to time, or the dissolution or liquidation of Guarantor.

        (b)    The Special Limited Partner shall give Notice to all Partners of its determination that the General Partner shall be removed. The General Partner shall have thirty (30) days after receipt of such Notice to cure any default or other reason for such removal, in which event it shall remain as General Partner. If, at the end of thirty (30) days, the General Partner has not cured any default or other reason for such removal, it shall cease to be General Partner and the powers and authorities conferred on it as General Partner under this Agreement shall cease and the Interests of such General Partner shall be transferred to a designee of the Special Limited Partner which, without further action, shall become the General Partner; in such event, upon becoming the General Partner, such designee shall be bound by all applicable terms and conditions of this Agreement and of the Project Documents.

        (c)    (i)    In the event that the General Partner is removed as aforesaid, the General Partner shall be and shall remain liable for all obligations and liabilities incurred by it as General Partner of the Partnership, including but not limited to the obligations and liabilities of the General Partner with respect to its obligations set forth in Sections 5.01(d) and 8.09 of this Agreement (including without limitation the payment of all Excess Development Costs necessary to achieve Substantial Completion) provided however, that if amounts otherwise payable to the General Partner as fees are applied to meet the obligations of the General Partner as stated in Sections 5.03 and 8.09 of this Agreement, such application shall serve to reduce any such liabilities of the General Partner or any successor, except for any liability incurred as the result of his or its negligence, misconduct, fraud or breach of his or its fiduciary duties as General Partner of the Partnership.

- 59 -

WAS: 100871_1

If the General Partner is removed as Partner of the Partnership, the General Partner shall not be entitled to payment of any further installments of the Incentive Partnership Management Fee.

(ii)     If the General Partner is removed as Partner of the Partnership then, immediately prior to removal, the General Partner shall make a Capital Contribution to the Partnership in an amount equal to any remaining balance (including accrued but unpaid interest) on the Development Fee, and the Partnership shall thereupon make a payment in an equal amount to pay off such amount of the Development Fee. Upon any such removal of the General Partner, no further installments of the Incentive Partnership Management Fee shall be paid which are attributable to any period after such removal and the Partnership shall not be obligated to repay any Operating Deficit Loans or GP Loans made by the removed General Partner. In the event that the General Partner fails to make the Capital Contribution as set forth in this clause (ii), the Development Fee shall take such Development Fee into income for federal income tax purposes.

(d)     The Special Limited Partner hereby is granted an irrevocable power of attorney, coupled with an interest, to execute any and all documents on behalf of the Partners and the Partnership as shall be legally necessary and sufficient to effect all of the foregoing provisions of this Section 8.16. The election by the Special Limited Partner to remove the General Partner under this Section shall not limit or restrict the availability and use of any other remedy which the Special Limited Partner or any other Partner might have with respect to the General Partner in connection with its undertakings and responsibilities under this Agreement.

8.17.   Selection of Property Manager; Management Agreement.

(a)     The General Partner shall cause the Partnership at all times during which the Partnership owns the Apartment Complex to engage a Property Manager to provide property management services for the Partnership with respect to the Apartment Complex pursuant to a Management Agreement meeting the requirements of this Agreement. Ridgewood Bushwick Management Corp., a wholly-owned subsidiary of RB is approved by the Partners as the initial Property Manager.

(b)     The General Partner shall at least once each fiscal year review the performance of the Property Manager and recommend to the Special Limited Partner in writing whether to continue the Management Agreement with the then current Property Manager or whether to replace such Property Manager. The recommendation of the General Partner shall be implemented by the General Partner, provided that the General Partner has obtained the Consent of the Special Limited Partner, which Consent shall not be unreasonably withheld, except as provided in Section 8.17(d).

- 60 -

WAS: 100871_1

(c)     Unless the Special Limited Partner otherwise Consents, any Management Agreement must satisfy the following terms  and conditions:  (i) the Partnership shall pay the Property Manager a monthly management fee not to exceed eight percent (8%) of the gross operating revenues of the Apartment Complex for the month preceding payment; (ii) the Management Agreement shall be cancelable upon thirty (30) days' prior notice from the Partnership without cause  and without the payment of any fee, penalty, premium or additional charge; (iii) if the Property Manager is an Affiliate of the General Partner, the Property Manager will accrue the management fee to the extent necessary at any time to prevent a default under the provisions of Sections 8.09(b) and 8.09(c) hereof; (iv) all security deposits shall be maintained in a segregated account for the benefit of the Partnership; and (v) the Management Agreement shall be in the form of Exhibit L hereto with only such changes to which the General Partner and the Special Limited Partner have given their respective Consent.

(d)     Notwithstanding anything to the contrary herein, no Affiliate shall act as the Property Manager without the prior written Consent of the Special Limited Partner which may be withheld in its sole discretion.  The Consent to the use of an Affiliate Property Manager as to the initial Property Management Agreement or any renewal thereof shall not prevent the Special Limited Partner from withholding its Consent in connection with a periodic performance review pursuant to Section 8.17(b).

8.18.   Removal of the Property Manager.  At the request of the Special Limited Partner, the General Partner shall cause the Partnership to terminate the Management Agreement then in place and appoint a replacement Property Manager and execute a new Property Management Agreement in accordance with Section 8.16 if any of the following events occur: (i) if the Property Manager becomes Bankrupt; (ii) if the Property Manager defaults in its obligations under the Management Agreement and fails to cure such default within any applicable cure period provided therein; or (iii) if the Investment Partnership is the holder of any outstanding IP Loans which IP Loans were made during the period that such Property Manager was engaged by the Partnership.  The General Partner shall cause such replacement to occur on the date designated by the Special Limited Partner in such written request, which date must be not less than 45 days from the date of such written request. *and which were caused by the Acts or omissions of the Property Manager*

8.19.   Loans to the Partnership.  The Partnership is authorized to receive Operating Deficit Loans, IP Loans and GP Loans on the terms set forth in this Agreement.  In addition, if (A) additional funds are required by the Partnership for any purpose relating to the business of the Partnership or for any of its obligations, expenses, costs or expenditures, and (B) the Partnership has not received an Operating Deficit Loan, IP Loan or GP Loan to pay such amounts, then the Partnership may borrow such funds as are needed from a Person or organization other than a Partner in accordance with the terms of this Section 8.18, for such period of time and on such terms as the General Partner and the Special Limited Partner may agree; provided, however, that no such additional loans shall be secured by any

- 61 -

WAS: 100871_1

mortgage or other encumbrance on the property of the Partnership without the prior approval of the Special Limited Partner except that such approvals shall not be required in the case of the hypothecation of personal property purchased by the Partnership and not included in the security agreements executed by the Partnership at the time of Initial Closing. Nothing in this Section 8.18 shall modify or effect the obligation of the General Partner to make Operating Deficit Loans and to perform its obligations when and as required by this Agreement.

8.20.   Unconditional Guaranty.  Concurrently with the execution of this Agreement, the General Partner shall deliver to the Special Limited Partner (A) the Unconditional Guaranty fully executed by each Guarantor, (B) a UCC-1 Financing Statement perfecting the security interest granted under Section 8.15, and (C) an opinion of counsel to the Guarantors in form satisfactory to the Special Limited Partner regarding the Unconditional Guaranty and the perfection of such security interest and the pledge and security agreement.

8.21.   Operating and Capital Budgets.  Not less than seventy-five (75) days prior to the commencement of each fiscal year, beginning with the year in which the Partnership acquires title to the Apartment Complex, the General Partner shall submit to the Special Limited Partner for its review and approval (which approval shall not be unreasonably withheld), proposed operating and capital budgets for the Apartment Complex and the Partnership for the next fiscal year. Such budgets shall specifically list all budgeted expenses in all major categories including, but not limited to, administration, operation, repairs and maintenance, utilities, taxes, insurance, interest, capital improvements, and all budgeted expenses which are to be paid to the General Partner or its Affiliates. The Special Limited Partner shall submit its response to such proposed budgets to the General Partner within forty-five (45) days after its receipt of such proposed budgets; such response shall either evidence its approval of the proposed budgets or shall contain specific comments and recommendations with respect thereto. If no such response is submitted to the General Partner within such period, the Special Limited Partner will be deemed to have approved such budgets.

- 62 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 84 of 86 PageID #: 95

## ARTICLE IX.
## TRANSFERS OF, AND RESTRICTIONS ON TRANSFERS
## OF INTERESTS OF LIMITED PARTNERS

9.01.   [Reserved.]

9.02.   Restrictions on Transfer of Limited Partners' Interests.

(a)     Under no circumstances will any offer, sale, transfer, assignment, hypothecation or pledge of any Limited Partner Interest be permitted unless the General Partner and, during the period the General Partner owns the Apartment Complex, the Developer, in their sole discretion, shall have Consented thereto, and the lender, if required, also shall have Consented thereto.

(b)     The Limited Partner whose interest is being transferred shall pay such reasonable expenses as may be incurred by the Partnership in connection with such transfer.

(c)     Nothing in this Section 9.02 shall limit the authority of the Investment Partnership to sell, transfer and/or assign interests within the Investment Partnership, in the sole discretion of the Investment Partnership.

9.03.   Admission of Substitute Limited Partners.

(a)     Subject to the other provisions of this Article IX, an assignee of the Interest of a Limited Partner (which shall be understood to include any purchaser, transferee, donee, or other recipient of any disposition of such Interest) shall be deemed admitted as a Substitute Limited Partner of the Partnership only upon the satisfactory completion of the following:

(i)     Consent of the General Partner (which may be withheld in its reasonable discretion), and the consent of the lender, if required, shall have been given; such Consent of the General Partner may be evidenced by the execution by the General Partner and Developer, when applicable, of an amended Agreement and/or Certificate evidencing the admission of such Person as a Limited Partner pursuant to the requirements to the Act;

(ii)    the assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement by executing a counterpart thereof or an appropriate amendment hereto, and such other documents or instruments as the General Partner or Developer may require in order to effect the admission of such Person as a Limited Partner;

- 63 -

WAS: 100871_1

(iii)   an amended Agreement and/or Certificate evidencing the admission of such Person as a Limited Partner shall have been filed for recording pursuant to the requirements to the Act;

(iv)   if the assignee is a corporation, the assignee shall have provided the General Partner and Developer, where applicable, with evidence satisfactory to Counsel for the Partnership of its authority to become a Limited Partner under the terms and provisions of this Agreement; and

(v)   the assignee or the assignor shall have reimbursed the Partnership for all reasonable expenses, including all reasonable legal fees and recording charges, incurred by the Partnership in connection with such assignment.

(b)   For the purpose of allocation of profits, losses and credits, and for the purpose of distributing cash of the Partnership, a Substitute Limited Partner shall be treated as having become, and as appearing in, the records of the Partnership as a Partner upon his signing of an amendment to this Agreement, agreeing to be bound hereby.

(c)   The General Partner shall cooperate with the Person seeking to become a Substitute Limited Partner by preparing the documentation required by this Section and making all official filings and publications.  The Partnership shall take all such action, including the filing, if required, of any amended Agreement and/or Certificate evidencing the admission of any Person as a Limited Partner, and the making of any other official filings and publications, as promptly as practicable after the satisfaction by the assignee of the Interest of a Limited Partner of the conditions contained in this Article IX to the admission of such Person as a Limited Partner of the Partnership.  Any cost or expense incurred in connection with such admission shall be borne by the Substitute Limited Partner.

9.04.   Rights of Assignee of Partnership Interest.

(a)   Except as provided in this Article and as required by operation of law, the Partnership shall not be obligated for any purpose whatsoever to recognize the assignment by any Limited Partner of his (its) Interest until the Partnership has received actual Notice thereof.

(b)   Any Person who is the assignee of all or any portion of a Limited Partner's Interest, but does not become a Substitute Limited Partner and desires to make a further assignment of such Interest, shall be subject to all the provisions of this Article IX to the same extent and in the same manner as any Limited Partner desiring to make an assignment of his (its) Interest.

- 64 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-1   Filed 12/20/18   Page 86 of 86 PageID #: 97

## ARTICLE X.
## RIGHTS AND OBLIGATIONS
## OF LIMITED PARTNERS

10.01. <u>Management of the Partnership</u>. No Limited Partner shall take part in the management or control of the business of the Partnership nor transact any business in the name of the Partnership. Except as otherwise expressly provided in this Agreement, no Limited Partner shall have the power or authority to bind the Partnership or to sign any agreement or document in the name of the Partnership. No Limited Partner shall have any power or authority with respect to the Partnership except insofar as the consent of any Limited Partner shall be expressly required and except as otherwise expressly provided in this Agreement and provided that any such power or authority, if exercised, would be deemed or construed under the laws of the State in a manner which would subject the Limited partners to loss of their limited liability or their status as Limited Partners. Not

10.02. <u>Limitation on Liability of Limited Partners</u>. The liability of each Limited Partner shall be limited to its Capital Contribution as and when payable under the provisions of this Agreement, and as provided under the Act. No Limited Partner shall have any other liability to contribute money to, or in respect of the liabilities or obligations of, the Partnership, nor shall any Limited Partner be personally liable for any obligations of the Partnership, except as and to the extent provided in the Act. No Limited Partner shall be obligated to make loans to the Partnership.

10.03. <u>Other Activities</u>. Any Limited Partner may engage in or possess interests in other business ventures of every kind and description for its own account, including without limitation, serving as general or limited partner of other partnerships which own, either directly or through interests in other partnerships, government-assisted housing projects similar to the Apartment Complex. Neither the Partnership nor any of the Partners shall have any right by virtue of this Agreement in or to such other business ventures to the income or profits derived therefrom.

- 65 -