# EXHIBIT A

## PART 2 OF 3

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
NYSCEF DOC. NO. 2

INDEX NO. 523152/2018
RECEIVED NYSCEF: 11/19/2018

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN         WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 3/32
         05/21/99  FRI 15:48 FAX                                                                                    003

## ARTICLE XI.
## PROFITS, LOSSES AND DISTRIBUTIONS

11.01. Allocation of Profits, Losses, Credits and Cash Distributions.

(a)     All profits, losses and credits, except those items in Sections 11.03, 11.06 and 11.10 below shall be allocated to the Partners in accordance with their Percentage Interests. Net Cash Flow available after payment of the Development Fee, and the fee payable pursuant to Paragraph 13.04(b)(iii), and the Tenant/Community Services Fee, and following achievement of Breakeven Operations shall be applied and/or distributed on the Payment Date in the following priority:

(i)     first, to the payment of any outstanding Excess IP Loan Amount and then to the payment of any remaining IP Loans;

(ii)     second, (A) if there are any outstanding Operating Deficit Loans, until such Operating Deficit Loans have been paid in full, Net Cash Flow under this clause 11.01(a)(iii) shall be paid and distributed in the following percentages: (A) eighty percent (80%) to the payment of outstanding Operating Deficit Loans, and (B) twenty percent (20%) to be distributed among the Limited Partners pro rata in accordance with their Percentage Interests; and

,     (B) if there no outstanding Operating Deficit Loans,

(1)     if the General Partner's Capital Account is less than or equal to zero, then, until the General Partner has received payments under this clause 11.01(a)(iv)(A) equal to the maximum amount for the preceding fiscal Year, Net Cash Flow under this clause 11.01(a)(iv)(A) shall be paid and distributed in the following percentages: (I) fifty percent (50%) to the General Partner as payment of the Incentive Partnership Management Fee (to a maximum of $25,000 per annum) and (II) fifty percent (50%) to be distributed among the Limited Partners pro rata in accordance with their Percentage Interests; and

(2)     if the General Partner's Capital Account is greater than zero, then until the General Partner's Adjusted Capital Account equals zero, Net Cash Flow under this clause 11.01(a)(iv)(B) shall be distributed in the following percentages: (I) fifty percent (50%) to the General Partner as a distribution; and (II) 49.99 percent (49.99%) to the Investment Partnership and one one-hundredth percent (0.01%) to the Special Limited Partner as a distribution.

Notwithstanding the foregoing, during such time as regulations of the any lender are applicable to the Apartment Complex, the total amount of Net Cash Flow which may be so distributed to the Partners with respect to any fiscal year shall not exceed such amounts as such regulations permit to be distributed.

- 66 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM   INDEX NO. 523152/2018

NYSCEF DOC. NO. 2   Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 3 of 113 PageID #: 100   RECEIVED NYSCEF: 11/19/2018

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN   WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 4/32
05/21/99  FRI 15:49 FAX   @004

(vi)    In the event that the General Partner violates the provisions of Section 5.01(d) (requiring it to make a payment to the Investment Partnership) and/or 8.09, then notwithstanding the foregoing provisions of Section 11.01(a), an amount equal to any such required payment which was not made shall be deducted from any payment or distribution otherwise payable or distributable to the General Partner ~~or the Developer~~ and such amount shall be distributed to the Investment Partnership.

(b)    In any year in which a Partner sells, assigns or transfers all or any portion of an Interest to any Person who during such year is admitted as a substitute Partner, the share of all profits and losses allocated to, and of all Net Cash Flow and of all cash proceeds distributable under Section 11.04 distributed to, all Partners which is attributable to the Interest sold, assigned or transferred shall be divided between the assignor and the assignee ratably on the basis of the number of monthly periods in such year before, and the number of monthly periods on and after, the first day of the month during which such Person is admitted as a substitute Partner.

(c)    The Partnership shall not distribute Net Cash Flow prior to the Final Closing. Thereafter, the Partnership shall, subject to any applicable limitation on the distribution of Net Cash Flow and any required approval by the lender, distribute Net Cash Flow not less frequently than annually in the manner provided in Section 11.01(a).

(d)    In the event that there is a determination that there is any original issue discount or imputed interest attributable to the Capital Contribution of any Partner, or any loan between a Partner and the Partnership, any income or deduction of the Partnership attributable to such imputed interest or original issue discount on such Capital Contribution or loan (whether stated or unstated) shall be allocated solely to such Partner.

(e)    In the event that the deduction of all or a portion of any fee paid or incurred by the Partnership to a Partner or an Affiliate of a Partner is disallowed for federal income tax purposes by the Internal Revenue Service with respect to a taxable year of the Partnership, the Partnership shall then allocate to such Partner an amount of gross income of the Partnership for such year equal to the amount of such fee as to which the deduction is disallowed. Any Partnership depreciation or other cost recovery deductions not otherwise allocated pursuant to Section 11.10(e) hereof shall be allocated among the Partners in accordance with their Percentage Interests.

(f)    If any Partner's Interest in the Partnership is reduced but not eliminated because of the admission of new Partners or otherwise, or if any Partner is treated as receiving any items of property described in Section 751(a) of the Code, the Partner's Interest in such items of Section 751(a) property that was property of the Partnership while such Person was a Partner shall not be reduced, but shall be retained by

- 67 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
NYSCEF DOC. NO. 2

INDEX NO. 523152/2018

RECEIVED NYSCEF: 11/19/2018

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 4 of 113 PageID #: 101

Rcvd 05/21 03:44PM (12:40) on RSPAB_Righ line 03 for FORMAN          WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 5/32
          05/21/99  FRI 15:49 FAX                                                                              Ø 005

the Partner so long as the Partner has an Interest in the Partnership and so long as the Partnership has an Interest in such property.

(g)     In accordance with Section 704(c) of the Code (relating to allocations with respect to appreciated contributed property) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall be allocated, solely for tax purposes, among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its fair market value.  Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.

(h)     The payment by the General Partner of Excess Development Costs (excluding only payments used to fund Operating Deficits) shall not be treated as an item of income or gain to the Partnership.  If the General Partner funds any Operating Deficits Loans pursuant to Section 8.09(b), any deductions or losses of the Partnership attributable to the use of those funds shall be specially allocated to the General Partner and in any year in which the Partnership repays all or a portion of an Operating Deficit Loan, the General Partner shall be specially allocated an item of gross income equal to the amount of such repayment

(i)     If cost savings exists, as set forth in Section 5.01(c)(vi) above, the Partnership shall make a distribution to the Investment Partnership and the General Partner in the amount and if and when required by Section 5.01(c)(vi) and in any year in which the Partnership repays all or a portion of an Operating Deficit Loan, the General Partner shall be specially allocated an item of gross income equal to the amount of such repayment.

(j)     In the event that ~~either~~ the General Partner ~~or RB~~ fails to make a payment to the Investment Partnership under the provisions of Sections 8.09(b) or 8.09(d) then notwithstanding the foregoing provisions of Section 11.01(a), an amount equal to any such required payment which was not made shall be deducted from any fee, payment, or distribution otherwise payable or distributable to the General Partner or RB ~~including~~ the Tenant/Community Services Fee, and such amount shall be distributed to the Investment Partnership.

11.02.  Determination of Profits, Losses and Credits.  Profits, losses and credits for all purposes of this Agreement shall be determined in accordance with the accrual accounting method, except that any adjustments made pursuant to Section 754 of the Code, other than the adjustments made with respect to the admission of the Investment Partnership to the Partnership, shall not be taken into account. Every item of income, gain, loss, deduction, credit or tax preference entering into the computation of such profits or losses, or applicable to the period during which such profits and losses were realized,

- 68 -

WAS: 100871_1

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN          WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 6/32
        05/21/99  FRI 15:50 FAX                                                                            @008

shall be considered allocated to each Partner in the same proportion as profits and losses
are allocated to such Partner.

11.03.  Allocation of Gains and Losses.  Except to the extent provided in Sections
11.06 and 11.10 below, gains and losses recognized by the Partnership upon the sale,
exchange or other disposition of all or substantially all of the property owned by the
Partnership shall be allocated in the following manner:

(a)     gains shall be allocated (i) first, to the Partners with negative
Adjusted Capital Account balances, that portion of gains (including any gains treated as
ordinary income for federal income tax purposes) which is equal in amount to, and in
proportion to, such Partners' respective negative Adjusted Capital Accounts in the
Partnership; provided, that no gain shall be allocated under this Section 11.03(a)(i) to a
Partner once such Partner's Adjusted Capital Account is brought to zero; and (ii) second,
gain in excess of the amount allocated under (i) shall be allocated to the Investment
Partnership in the amount and to the extent necessary to increase the Partners' respective
Adjusted Capital Accounts so that the proceeds distributed under Sections 11.04(d), (e) and
(f) will be distributed in accordance with the Partners' respective Adjusted Capital Account
balances.

(b)     Losses shall be allocated (i) first, to the Partners in the amounts and
to the extent necessary so that the proceeds distributed under Sections 11.04(d), (e) and (f)
will be distributed in accordance with the Partners' respective Adjusted Capital Account
balances, and (ii) second, any remaining loss to the Partners in accordance with the
manner in which they bear the economic risk of loss associated with such loss or, if none, to
the Partners in accordance with their Partnership Interests.

(c)     Any portion of the gains treated as ordinary income for federal income
tax purposes under Sections 1245 and 1250 of the Code ("Recapture Amount") shall be
allocated on a dollar for dollar basis to those Partners to whom the items of Partnership
deduction or loss giving rise to the Recapture Amount had been previously allocated.

11.04.  Distribution of Proceeds from Sale and Liquidation of Partnership Property.
Except as may be required under Section 12.02(b), the proceeds resulting from the
liquidation of the Partnership assets pursuant to Section 12.02, and the net proceeds
resulting from any sale of the property of the Partnership or refinancing of any mortgage
loan or a Capital Transaction, as the case may be, shall be distributed and applied in the
following order of priority:

(a)     to the payment of all matured debts and liabilities of the Partnership
(including all expenses of the Partnership incident to any such sale or refinancing),
excluding (1) debts and liabilities of the Partnership to Partners or any Affiliates, and (2)
all unpaid fees owing to the General Partner under this Agreement;

- 69 -

WAS: 100871_1

Rcvd 05/21 03:44PM (12:40) on RSPAB_Righ line 03 for FORMAN       WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 7/32
     05/21/99  FRI 15:50 FAX                                                                                         007

(b)    to the payment of any debts and liabilities (including unpaid fees) owed to the Partners or any Affiliates by the Partnership for the Partnership obligations; provided, however, that the foregoing debts and liabilities owed to the Partners and their Affiliates shall be paid or repaid, as applicable, in the following order of priority, if and to the extent applicable: (i) first, to the payment of any outstanding Excess IP Loan Amount and then to the payment of any remaining IP Loans and GP Loans pro rata based on their respective outstanding balances; (ii) amounts due under the Development Fee, but, other than in connection with the liquidation of the Partnership, not more than fifty percent (50%) of proceeds then remaining; (iii) in connection with the liquidation of the Partnership only, to amounts due with respect to Operating Deficit Loans; and (iv) in connection with the liquidation of the Partnership only, any other such debts and liabilities;

(c)    to the setting up of any reserves which the Liquidator (or the General Partner if the distribution is not pursuant to the liquidation of the Partnership) deems reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the Partnership;

(d)    to the Investment Partnership in an amount equal to 100% of its Federal, state and local tax liability, after giving effect to the sale of the Apartment Complex or liquidation of the Partnership's assets and the receipt by the Investment Partnership of any proceeds paid to the Investment Partnership pursuant to this Section 11.04;

(e)    to the Investment Partnership of the sum of $200,000 as an exit fee; and

(f)    thereafter, the balance, if any, to the Partners in the following percentages: (i) ninety percent (90%) to the General Partner; and (ii) ten percent (10%) to the Investment Partnership reduced by all distributions previously received by the Investment Partnership, including those set forth in this Section 11.04.

(g)    In the event that ~~either~~ the General Partner ~~or RB~~ fails to make a payment to the Investment Partnership under the provisions of Sections 8.09(b) or 8.09(d) then notwithstanding the foregoing provisions of Section 11.04, an amount equal to any such required payment which was not made shall be deducted from any fee, payment, or distribution otherwise payable or distributable to the General Partner or RB, ~~including~~ [for] the Tenant/Community Services Fee, and such amount shall be distributed to the Investment Partnership.

11.05. **Capital Accounts.**  A separate Capital Account shall be maintained and adjusted for each Partner. There shall be credited to each Partner's Capital Account the amount of its Capital Contribution, the fair market value of any property contributed to the Partnership (net of any liabilities secured by such property) and such Partner's

- 70 -

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN      WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 8/32
        05/21/99  FRI 15:51 FAX                                                                          ☑008

distributive share of the profits for tax purposes of the Partnership; and there shall be charged against each Partner's Capital Account the amount of all Cash Flow distributed to such Partner, the fair market value of any property distributed to such Partner (net of any liabilities secured by such property), the net proceeds resulting from the liquidation of the Partnership's assets or from any sale or refinancing of the Apartment Complex distributed to such Partner, and such Partner's distributive share of the losses for tax purposes of the Partnership.   Each Partner's Capital Account shall be maintained and adjusted in accordance with the Code and the Treasury Regulations thereunder.   The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treas. Reg. §1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations. It is the intention of the Partners that the Capital Accounts maintained under this Agreement be determined and maintained throughout the full term of this Agreement in accordance with the accounting rules of Treas. Reg. §1.704-1(b)(2)(iv).

If a Partner has more than one interest in the Partnership, such Partner shall have a single capital account that reflects all such interest, regardless of the class of interests owned by such Partner and regardless of the time or manner in which such interests were acquired.

If the Partnership is liquidated within the meaning of Treasury Reg. Section 1.704-1(b)(2)(ii)(g), if the General Partner's Capital Account has a deficit balance (after giving effect to all contributions, distributions and allocations), the General Partner shall make Capital Contributions in the amount of such deficit in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(3).   Notwithstanding the foregoing, if the Partnership is liquidated within the meaning of Treas.Reg. Section 1.704-1(b)(2)(ii)(g) but no event has occurred under Section 12.01 to dissolve the Partnership, the Partnership assets shall not be liquidated, the Partnership's liabilities shall not be paid or discharged, and the Partnership's affairs shall not be wound up. Instead, the Partnership shall be deemed to have distributed its assets in-kind to the Partners who shall be deemed to have assumed and taken subject to all Partnership liabilities, all in accordance with their respective Capital Accounts.   Immediately thereafter, the Partners shall be deemed to have recontributed the assets in-kind to the Partnership, which shall be deemed to have assumed and taken subject to all such liabilities

11.06. <u>Authority of the General Partner to Vary Allocations to Preserve and Protect Partners' Intent</u>.

(a)   It is the intent of the Partners that each Partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined and allocated in accordance with this Article XI and Section 5.01 to the fullest extent permitted by Section 704(b) of the Code. In order to preserve and protect the determinations and allocations provided for in this Article XI and Section 5.01, the General Partner hereby is authorized and directed to allocate income, gain, loss, deduction, or credit (or item thereof)

- 71 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
INDEX NO. 523152/2018

NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 11/19/2018

Case 1:18-cv-07261-RJD-JRC Document 1-2 Filed 12/20/18 Page 8 of 113 PageID #: 105

Rcvd 05/21 03:44PM (12:40) on RSPAB_Righ line 03 for FORMAN        WORKSRV2 printed FOR3745823B5324 on 05/21/1999 03:56PM * Pg 9/32
05/21/99  FRI 15:51 FAX                                                                                         @009

arising in any year differently than otherwise provided for in this Article XI and Section 5.01 to the extent that allocating income, gain, loss, deduction or credit (or item thereof) in the manner provided for in Article XI and Section 5.01 would cause the determinations and allocations of each Partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) not to be permitted by Section 704(b) of the Code and Treasury Regulations promulgated thereunder. Any allocation made pursuant to this Section 11.06 shall be deemed to be a complete substitute for any allocation otherwise provided for in this Article XI and Section 5.01 and no amendment of this Agreement or approval of any Partner shall be required.

(b)    In making any allocation (the "new allocation") under Section 11.06(a), the General Partner is authorized to act only after having been advised by the Accountants that, under Section 704(b) of the Code and the Treasury Regulations thereunder, (i) the new allocation is necessary, and (ii) the new allocation is the minimum modification of the allocations otherwise provided for in this Article XI and Section 5.01 necessary in order to assure that, either in the then current year or in any preceding year, each Partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) is determined and allocated in accordance with this Article XI and Section 5.01 to the fullest extent permitted by Section 704(b) of the Code and the Treasury Regulations thereunder.

(c)    If the General Partner is required by Section 11.06(a) to make any new allocation in a manner less favorable to the Limited Partners than is otherwise provided for in this Article XI and Section 5.01, then the General Partner is authorized and directed, only after having been advised by the Accountants that it is permitted by Section 704(b) of the Code, to allocate income, gain, loss, deduction, or credit (or item thereof) arising in later years in such manner so as to bring the allocations of income, gain, loss, deduction, or credit (or item thereof) to the Limited Partners as nearly as possible to the allocations thereof otherwise contemplated by this Article XI and Section 5.01.

(d)    New allocations made by the General Partner under Section 11.06(a) and Section 11.06(c) in reliance upon the advice of the Accountants shall be deemed to be made pursuant to the fiduciary obligation of the General Partner to the Partnership and the Limited Partners, and no such allocation shall give rise to any claim or cause of action by the Limited Partner.

11.07. <u>Designation of Tax Matters Partner</u>.   The General Partner hereby is designated as Tax Matters Partner of the Partnership, and shall engage in such undertakings as are required of the Tax Matters Partner of the Partnership, as provided in regulations pursuant to Section 6231 of the Code. Each Partner, by its execution of this Agreement, Consents to such designation of the Tax Matters Partner and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices (including the Internal Revenue Service) such documents as may be necessary or appropriate to evidence such Consent.

- 72 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM    INDEX NO. 523152/2018

NYSCEF DOC. NO. 2    Case 1:18-cv-07261-RJD-JRC    Document 1-2    Filed 12/20/18    Page 9 of 113 PageID #: 106    RECEIVED NYSCEF: 11/19/2018

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ Line 03 for FORMAN    WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 10/32
    05/21/99  FRI 15:52 FAX                                                                        ☑010

Notwithstanding any other provision of this Agreement, the Special Limited Partner(s) hereby is granted the authority at any time to be admitted as a general partner by converting all or portion of its limited partnership interest to a general partnership interest for the purpose of acting as the TMP General Partner with all the authority and powers given to the General Partner as Tax Matters Partner of the Partnership under the Code and under this Agreement. Unless otherwise specifically provided or agreed, the new TMP General Partner in these circumstances will not be responsible for or have the right to conduct any operational or managerial functions of the Partnership besides those required to discharge its responsibilities as TMP. The Special Limited Partner may exercise its right to assume the TMP responsibilities for the Partnership, as provided herewith, upon ten (10) days notice to the then existing TMP General Partner, and may continue as TMP indefinitely. In the event that the Special Limited Partner exercises its right to become a general partner and to assume duties of the TMP, the pre-existing TMP will resign in accordance with Treas. Reg. § 301.6231(a)(7)-1(i) and will redesignate the new general partner as TMP in accordance with Treas. Reg. § 301.6231(a)(7)-1(e). Each Partner, by its execution of this Agreement Consents to such admission and designation and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such Consent. The Special TMP General Partner shall, upon such admission, replace the General Partner as Tax Matters Partner and shall have thereafter all the authority and powers given to the General Partner as Tax Matters Partner of the Partnership under the Code and under this Agreement.

11.08. <u>Rights and Obligations of Tax Matters Partner</u>.

(a)    The Tax Matters Partner shall have and perform all of the duties required under the Code, including the following duties:

(i)    Furnish the name, address, profits interest, and taxpayer identification number of each Partner to the Internal Revenue Service (the "Service") ; and

(ii)    Within five calendar days after the receipt by the General Partner or an Affiliate thereof or the Partnership of any correspondence or communication relating to the Partnership or a Partner or an Affiliate of a Partner from the Service, the Tax Matters Partner shall forward to each Partner a photocopy of all such correspondence or communication(s). The Tax Matters Partner shall, within five calendar days thereafter, advise each Partner in writing of the substance and form of any conversation or communication held with any representative of the Service.

(b)    The Tax Matters Partner shall, upon request by the Limited Partner(s), permit the Limited Partner(s) to include its attorney in the power of attorney

- 73 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM INDEX NO. 523152/2018
NYSCEF DOC. NO. 2 RECEIVED NYSCEF: 11/19/2018
Case 1:18-cv-07261-RJD-JRC Document 1-2 Filed 12/20/18 Page 10 of 113 PageID #: 107

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN      WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 11/32
      05/21/99  FRI 15:52 FAX                                                                              ⓩ011

(Form 2848) for the Partnership for any taxable years under a tax audit or in a tax administrative Appeals process.

    (c)    The Tax Matters Partner shall not without the Consent of the Limited Partner(s):

    (i)    Extend the statute of limitations for assessing or computing any tax liability against the Partnership (or the amount of character of any Partnership tax items);

    (ii)    Engage an accounting firm or counsel to represent the Partnership before the Internal Revenue Service

    (iii)    Settle any audit with the Service concerning the adjustment or readjustment of any partnership item(s) (within the meaning of Section 6231(a)(3) of the Code);

    (iv)    File a request for an administrative adjustment with the Service at any time or file a petition for judicial review with respect to any such request;

    (v)    Initiate or settle any judicial review or action concerning the amount or character of any partnership tax item(s) (within the meaning of Section 6231(a)(3) of the Code);

    (vi)    Intervene in any action brought by any other Partner for judicial review of a final partnership administrative adjustment; or

    (vii)    Take any other action not expressly permitted by this Section 11.09 on behalf of the Partners of the Partnership in connection with any administrative or judicial tax proceeding.

    (d)    In the event of any Partnership-level proceeding instituted by the Service pursuant to Sections 6221 through 6233 of the Code, the Tax Matters Partner shall consult with the Limited Partners regarding the nature and content of all action and defense to be taken by the partnership in response to such proceeding. The Tax Matters Partner also shall consult with the Limited Partners regarding the nature and content of any proceeding pursuant to Sections 6221 through 6233 of the Code instituted by or on behalf of the Partnership (including the decision to institute proceedings, whether administrative or judicial, and whether in response to a previous Service proceeding against the Partnership or otherwise).

    11.09.    __Expenses of Tax Matters Partner__. The Partnership shall indemnify and reimburse the Tax Matters Partner for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with any administrative or

- 74 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 11 of 113 PageID #: 108

Rcvd 05/21 03:44PM (12:40) on RSPAB_Righ line 03 for FORMAN          WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM • Pg 12/32
        05/21/99  FRI 15:53 FAX                                                                              ☑012

judicial proceeding with respect to the tax liability of the Partners.  The payment of all such expenses shall be made before any distributions are made from Cash Flow or any discretionary reserves are set aside by the General Partner.  The General Partner shall have the obligation to provide funds from Cash Flow for such purpose.  Notwithstanding the foregoing, the provisions on liability and indemnification of General Partners set forth in Section 8.07 of this Agreement shall be fully applicable to the Tax Matters Partner in its capacity as such.

11.10.  <u>Minimum Gain Provisions</u>.

(a)     Notwithstanding any other provision of this Agreement, no allocation of loss or deduction (or item thereof) shall be made by the Partnership to a Partner if such allocation would cause the sum of the deficit capital account balances of the Partner or Partners otherwise receiving such allocation (excluding the portion of such deficit balances that must be restored (or which the Partner is deemed to have to restore) to the Partnership under this Agreement, if any) to exceed the Partners' share of "Partnership Minimum Gain" (as defined in Treas. Reg. § 1.704-2(b)(2) and §1.704-2(d)), and "Partner Nonrecourse Debt Minimum Gain" (as defined in Treas.Reg. §1.704-2(i)(2)), both determined at the end of the Partnership taxable year to which the allocation relates.  Any allocations in excess of the limitation contained in this Section 11.10(a) shall be allocated to the General Partner.

(b)     Notwithstanding any other provision of this Agreement, if there is a net decrease in Partnership Minimum Gain or in Partner Nonrecourse Debt Minimum Gain during a Partnership taxable year, items of income and gain for such year (and if necessary, for future years) shall be allocated to each Partner in an amount equal to the Partner's share of the net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain, as applicable.

(c)     If any Partner unexpectedly receives any adjustments, allocations or distributions described in Treas. Reg. §§1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate (to the extent required by the Regulations under Code Section 704(b)) the deficit balance in each such Partner's Capital Account as quickly as possible, provided that an allocation pursuant to this Section 11.10(c) shall be made if and only to the extent that such Partner would have a deficit Capital Account after all other allocations provided for in this Article XI have been tentatively made as if this Section 11.10(c) were not in the Agreement.

(d)     In the event any Partner has a deficit Capital Account at the end of any fiscal year in excess of the sum of (i) the amount that such Partner must restore to the Partnership upon liquidation, if any, and (ii) the amount such Partner is deemed obligated to restore pursuant to the penultimate sentence of Treas. Reg. §1.704-2(g) and §1.704-2(i)(5), such Partner shall be specially allocated items of Partnership income and gain in

- 75 -

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM

NYSCEF DOC. NO. 2

INDEX NO. 523152/2018

RECEIVED NYSCEF: 11/19/2018

Case 1:18-cv-07261-RJD-JRC  Document 1-2  Filed 12/20/18  Page 12 of 113 PageID #: 109

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ Line 03 for FORMAN          WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 13/32
      05/21/99  FRI 15:53 FAX                                                                                                 ☑013

the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 11.10(d) shall be made if and only to the extent that such Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article XI have been tentatively made as if this Section 11.10(d) and Section 11.10(c) hereof were not in the Agreement.

(e)     "Nonrecourse deductions" (within the meaning of Treas. Reg. §1.704-2(b)(1)) shall be allocated to Partners in accordance with their Percentage Interests. "Partner nonrecourse deductions" (within the meaning of Treas. Reg. §1.704(2)(c)) shall be allocated to the Partner who bears the economic risk of loss associated with such deductions in accordance with Treas. Reg. §1.704(2)(i).

(f)     If income, loss or items thereof are allocated to one or more Partners pursuant to the last sentence of Section 11.10(a) or Sections 11.10(b), (c), (d) or (e), subsequent income, loss or items thereof shall be allocated (subject to the provisions of Sections 11.10(a), (b), (c), (d) or (e)) to the Partners so that, to the extent possible in the judgment of the General Partner, the net amount of allocations shall be equal to the amount that would have been allocated had Sections 11.10(a), (b), (c), (d) and (e) not been applied.  In making such judgment, the General Partner shall be permitted to take into account that allocations made pursuant to Section 11.10(e) are likely to be offset by allocations to be made pursuant to Section 11.10(b).

- 76 -

WAS: 100871_1

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN
    05/21/99  FRI 15:53 FAX          WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 14/32
                                                                              ☑014

## ARTICLE XII.
## SALE, DISSOLUTION AND LIQUIDATION

12.01. <u>Dissolution of the Partnership</u>. The Partnership shall be dissolved upon the earlier of the expiration of the term of the Partnership, or upon:

    (a)    the withdrawal, Bankruptcy, death, dissolution or adjudication of incompetency of the General Partner who is at that time the sole General Partner, subject to the provisions of Section 6.03, unless a majority in Interest of the other Partners, within ninety (90) days after receiving Notice of such withdrawal, Bankruptcy, death, dissolution or adjudication of incompetence elects to designate a successor General Partner(s) and continue the Partnership upon the admission of such successor General Partner(s) to the Partnership;

    (b)    the sale or other disposition of all or substantially all of the assets of the Partnership;

    (c)    the election by the General Partner, with the Consent of a majority in interest of the other Partners; or

    (d)    any other event causing the dissolution of the Partnership under the laws of the State.

12.02. <u>Winding Up and Distribution</u>.

    (a)    Upon the dissolution of the Partnership pursuant to Section 12.01, (i) a Certificate of Cancellation shall be filed in such offices within the State as may be required or appropriate, and (ii) the Partnership business shall be wound up and its assets liquidated as provided in this Section 12.02 and the net proceeds of such liquidation, except as provided in Section 12.02(b) below, shall be distributed in accordance with Section 11.04.

    (b)    It is the intent of the Partners that, upon liquidation of the Partnership, any liquidation proceeds available for distribution to the Partners be distributed in accordance with the Partners' respective Capital Account balances and the Partners believe that distributions under Section 11.04 will effectuate such intent. In the event that, upon liquidation, there is any conflict between a distribution pursuant to the Partners' respective Capital Account balances and the intent of the Partners with respect to distribution of proceeds as provided in Section 11.04, the Liquidator shall, notwithstanding the provisions of Sections 11.01, 11.02 and 11.03, allocate the Partnership's gains, profits and losses in a manner that will cause the distribution of liquidation proceeds to the Partners to be in accordance with the Partners' respective Capital Account balances.

- 77 -

WAS: 100871_1

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ Line 03 for FORMAN    WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM • Pg 15/32
         05/21/99  FRI 15:54 FAX                                                                                ☑015

(c)     The Liquidator shall file all certificates and notices of the dissolution of the Partnership required by law.  The Liquidator shall proceed without any unnecessary delay to sell and otherwise liquidate the Partnership's property and assets; provided, however, that if the Liquidator shall determine that an immediate sale of part or all of the Partnership property would cause undue loss to the Partners, then in order to avoid such loss, the Liquidator may, except to the extent provided by the Act, defer the liquidation as may be necessary to satisfy the debts and liabilities of the Partnership to Persons other than the Partners.  Upon the complete liquidation and distribution of the Partnership assets, the Partners shall cease to be Partners of the Partnership, and the Liquidator shall execute, acknowledge and cause to be filed all certificates and notices required by the law to terminate the Partnership.

(d)     Upon the dissolution of the Partnership pursuant to Section 12.01, the Accountants shall promptly prepare, and the Liquidator shall furnish to each Partner, a statement setting forth the assets and liabilities of the Partnership upon its dissolution. Promptly following the complete liquidation and distribution of the Partnership property and assets, the Accountants shall prepare, and the Liquidator shall furnish to each Partner, a statement showing the manner in which the Partnership assets were liquidated and distributed.

12.03  **Right of First Refusal**.  On and after the end of the 15 year Compliance Period, the RB or its designee, if it is at that time a qualified nonprofit corporation, shall have a right of first refusal to purchase the Apartment Complex for the price equal to the sum of:

(i)     the principal amount of outstanding indebtedness secured by the building (other than indebtedness incurred within the 5-year period ending on the date of the sale);

(ii)    all Federal, State, and local taxes attributable to such sale and to any amounts paid pursuant to subsection (iii) hereof; and

(iii)   any amounts of a Tax Credit Shortfall which have not been paid.

- 78 -

WAS: 100871_1

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN          WORKSRV2 printed FOR375823B5324 on 05/21/1999 03:56PM * Pg 16/32
      05/21/99  FRI 15:54 FAX                                                                                                    Ø016

ARTICLE XIII.
BOOKS AND RECORDS, ACCOUNTING
TAX ELECTIONS, ETC.

13.01. Books and Records. The books and records of the Partnership shall be maintained on an accrual basis in accordance with sound federal income tax accounting principles. These and all other records of the Partnership, including information relating to the status of the Apartment Complex and information with respect to the sale by the General Partners or any Affiliate of goods or services to the Partnership, shall be kept at the principal office of the Partnership and shall be available for examination there by any Partner, or his duly authorized representative, at any and all reasonable times. Any Partner, or his duly authorized representative, upon paying the costs of collection, duplication and mailing, shall be entitled to a copy of the list of names and addresses of the Limited Partners.

13.02. Bank Accounts. All funds of the Partnership not otherwise invested shall be deposited in one or more accounts maintained in such banking institutions as the General Partner shall determine, and withdrawals shall be made only in the regular course of Partnership business on such signature or signatures as the General Partner may, from time to time, determine. No funds of the Partnership shall be deposited in any financial institution in which any Partner is an officer, director or holder of any proprietary interest.

13.03. Accountants. Commencing with the year in which the Partnership acquires fee title to the Apartment Complex, the Accountants shall annually prepare for execution by the General Partner all tax returns of the Partnership, shall annually audit the books of the Partnership, and shall certify, in accordance with generally accepted accounting principles, a balance sheet, a profit and loss statement, and a cash flow statement. With respect to each such fiscal year during the Partnership's operations, at such time as the Accountants shall have prepared the proposed tax return for such year, the Accountants shall provide copies of such proposed tax return to the Investment Partnership for its review and comment. Any changes in such proposed tax return recommended by the Investment Partnership's accountants shall be made by the Accountants prior to the completion of such tax return for execution by the General Partner. The Partnership shall reimburse the Investment Partnership for its reasonable expenses incurred in causing the Partnership's proposed tax return to be reviewed by the Investment Partnership's accountants. A full detailed statement shall be furnished to all Partners, showing such assets, properties, and net worth and the profits and losses of the Partnership for the preceding fiscal year. All Partners shall have the right and power to examine and copy, at any and all reasonable times, the books, records and accounts of the Partnership.

13.04. Reports to Partners.

(a)   The General Partner shall cause to be prepared and distributed to all persons who were Partners at any time during a fiscal year of the Partnership:

- 79 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
INDEX NO. 523152/2018

NYSCEF DOC. NO. 2
Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 16 of 113 PageID #: 113
RECEIVED NYSCEF: 11/19/2018

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ Line 03 for FORMAN       WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 17/32
      05/21/99  FRI 15:55  FAX                                                                                      ✐017

(i)     Commencing with the year in which the Partnership acquires fee title to the Apartment Complex, within 75 days after the close of each fiscal year of the Partnership, audited financial statements prepared by KPMG Peat Marwick (or other independent accountants approved by the Limited Partner) in accordance with generally accepted accounting principles, and such financial information with respect to each fiscal year of the Partnership as shall be reportable for Federal and state income tax purposes.

(ii)    Commencing with the year in which the Partnership acquires fee title to the Apartment Complex, within thirty-five (35) days after the end of each month, a report of operations for such month containing:

(A)     A balance sheet, which may be unaudited; and

(B)     a statement of income and expense and a cash flow statement for the month and the period then ended, which may be unaudited; and

(C)     other pertinent information regarding the Partnership and its activities during the period covered by the report.

(b)     Within seventy-five (75) days after the end of each fiscal year of the Partnership, commencing with the year the Partnership acquires title to the Apartment Complex, the General Partner shall provide to the Limited Partners:

(i)     A certification by the General Partner that (A) all Construction Loan payments and taxes and insurance payments with respect to the Apartment Complex are current as of the date of the year-end report, (B) there is no material default under the Project Documents or this Agreement, or if there is any material default, a description thereof, and (C) it has not received notice of any building, health or fire code violation or similar violation of a governmental law, ordinance or regulation against the Apartment Complex or, if any such notice of any violation has been received, a description thereof;

(ii)    the information specified in Section 13.04(c);

(iii)   a descriptive statement of all transactions during the fiscal year between the Partnership and the General Partner and/or any Affiliate, including the nature of the transaction and the payments involved (including accrued cash or other payments);

(iv)    a Cash Flow and Net Cash Flow statement; and

- 80 -

WAS: 100871_1

Rcvd 05/21 03:44PM (12:40) on RSPAB High line 03 for FORMAN    WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 18/32
        05/21/99  FRI 15:55 FAX                                                                                    018

(v)    a copy of the annual report to be filed with the Agency concerning the status of the Apartment Complex as low-income housing.

(c)    Upon the written request of the Special Limited Partner for further information with respect to any matter covered in items (a) or (b) above, the General Partner shall furnish such information within 30 days of receipt of such request.

(d)    The General Partner, on behalf of the Partnership, shall send to the Limited Partners, on or before July 31 in each year, a report which shall state:

(i)    the then occupancy level of the Apartment Complex;

(ii)    if there are any Operating Deficits or anticipated Operating Deficits, the manner in which such deficits will be funded; and

(iii)    such other matters as shall be material to the operation of the Partnership, including, without limitation, any building, health or fire code violation or similar violation of a governmental law, ordinance or regulation by the Apartment Complex of which the General Partner is aware.

(e)    Commencing with the year in which the Partnership acquires fee title to the Apartment Complex, prior to October 15 of each such year, the General Partner, on behalf of the Partnership, shall send to the Limited Partners an estimate of the Limited Partners' share of the Tax Credits, profits and losses of the Partnership for federal income tax purposes for the current fiscal year.

(f)    Within 15 days after the end of any calendar quarter during which

(i)    there is a material default by the Partnership under the Project Documents or in payment of any mortgage, taxes, interest or other obligation on secured or unsecured debt,

(ii)    any reserve has been reduced or terminated by application of funds therein for purposes materially different from those for which such reserve was established,

(iii)    the General Partner has received any notice of a material fact which may substantially affect further distributions, or

(iv)    any Partner has pledged or collateralized its Interest in the Partnership.

The General Partner shall send the Special Limited Partner a detailed report of such event.

- 81 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM

NYSCEF DOC. NO. 2

INDEX NO. 523152/2018

RECEIVED NYSCEF: 11/19/2018

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 18 of 113 PageID #: 115

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN          WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 19/32
   05/21/99  FRI 15:56 FAX                                                                                                @019

(g)     After the date of Final Closing, the General Partner, on behalf of the Partnership, shall send to the Limited Partners, a copy of all applicable periodic reports covering the status of project as may be required by the Agency or the lender, within 10 days of submission of such reports to the Agency and/or applicable lender.

(h)     (i)     In the event that the reports or information provided for in Sections 13.04(a) and/or (b) above are, at any time, not provided within the time frames set forth therein, the General Partner shall be obligated to pay to the Investment Partnership the sum of $250 per day, as liquidated damages, for each day from the date upon which such reports or information is(are) due pursuant to the provisions of the aforesaid Sections until the date upon which such reports or information is(are) provided; however, that any delays beyond the aforesaid dates in the provision of the applicable reports or information due to factors beyond the control of the General Partner and the Accountants may be a cause for waiver of the aforesaid liquidated damages, but only if the delayed reports or information were supplied by the applicable aforesaid date in a draft or estimated form.

(ii)    In the event that the reporting requirements set forth in any of the above provisions of this Section 13.04 are not met, the Special Limited Partner, in its reasonable discretion, may direct the General Partner to dismiss the Accountants, and to designate successor Accountants, subject to the approval of the Special Limited Partner; provided, however, that if the General Partner and the Special Limited Partner cannot agree on the designation of successor Accountants, the successor Accountants shall be designated by the Special Limited Partner in its sole reasonable discretion, and the fees of such successor Accountants shall be paid by the Partnership.

(iii)   The Partnership shall pay, as an operational expense of the Partnership, an annual fee of Ten Thousand Dollars ($10,000), or such lesser amount which is the maximum amount therefor permitted by the Agency, to SunAmerica Affordable Housing Partners, Inc. (or to such other entity as the Special Limited Partner shall designate), for an annual review of the operations of the Partnership and the Apartment Complex. Such fee shall accrue beginning with the commencement of leasing or marketing activity for the Apartment Complex. Such fee shall be due 90 days after the end of each such fiscal year of the Partnership with respect to the fee earned for such fiscal year. Such fee shall be prorated with respect to any period that is less than one year.

13.05. **Section 754 Elections**. In the event of a transfer of all or any part of the Interest of a General Partner or of a Limited Partner, the Partnership may elect, pursuant to Sections 743 and 754 of the Code (or any corresponding provision of succeeding law), to adjust the basis of the Partnership property if, in the opinion of the Investment Partnership, based upon the advice of the Accountants, such election would be most

- 82 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 19 of 113 PageID #: 116

Rcvd 05/21 03:44PM (12:40) on RSPAB_Righ line 03 for FORMAN
    05/21/99   FRI 15:56 FAX

WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 20/32
                                                          Ø020

advantageous to the Investment Partnership. Each Partner agrees to furnish the Partnership with all information necessary to give effect to such election.

13.06. <u>Fiscal Year and Accounting Method</u>. The fiscal year of the Partnership shall be the fiscal year of the Investment Partnership, which ends at September 30; provided, however, that upon request from the Investment Partnership, the fiscal year of the Partnership shall become the calendar year. All Partnership accounts shall be determined on the accrual basis.

- 83 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
NYSCEF DOC. NO. 2
INDEX NO. 523152/2018
RECEIVED NYSCEF: 11/19/2018

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN
05/21/99  FRI 15:56 FAX
WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 21/32
021

## ARTICLE XIV.
## AMENDMENTS

    14.01. <u>Proposal and Adoption of Amendments</u>. This Agreement may be amended only by a written amendment executed by the General Partner and the Limited Partners. The General Partner agrees to execute amendments proposed by the Special Limited Partner which (a) do not affect the obligations of the General Partner under this Agreement, (b) increases or imposes upon the Investment Partnership the obligation to restore a deficit balance in its Capital Account, or (c) prospectively decreases the obligation of the Investment Partnership to restore a deficit balance in its Capital Account in a subsequent fiscal year of the Partnership. The General Partner agrees to cooperate and to act promptly with respect to amendments proposed by the Special Limited Partner.

- 84 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
NYSCEF DOC. NO. 2

INDEX NO. 523152/2018
RECEIVED NYSCEF: 11/19/2018

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN
    05/21/99  FRI 15:56 FAX          WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 22/32
                                                                                             022

## ARTICLE XV.
## CONSENTS, VOTING AND MEETINGS

15.01. <u>Method of Giving Consent</u>. Any Consent required by this Agreement may be given by a written Consent given by the consenting Partner and received by the General Partner at or prior to the doing of the act or thing for which the Consent is solicited.

15.02. <u>Submissions to Limited Partners</u>. The General Partner shall give the Limited Partners Notice of any proposal or other matter required by any provision of this Agreement or by law to be submitted for consideration and approval of the Limited Partners. Such Notice shall include any information required by the relevant provision or by law.

15.03. <u>Meetings: Submission of Matter for Voting</u>. Subject to the provisions of Section 10.01, a majority in Interest of the Limited Partners shall have the authority to convene meetings of the Partnership and to submit matters to a vote of the Partners. Any such meeting shall take place at the Apartment Complex.

- 85 -

WAS: 100871_1

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN      WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 23/32
      05/21/99  FRI 15:57 FAX                                                                                    ⓐ023

## ARTICLE XVI.
## GENERAL PROVISIONS

16.01. <u>Burden and Benefit</u>.  The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the respective parties hereto.

16.02. <u>Applicable Law</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State.

16.03. <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original copy and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

16.04. <u>Separability of Provisions</u>.  Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

16.05. <u>Entire Agreement</u>.  This Agreement sets forth all (and is intended by all parties to be an integration of all) of the representations, promises, agreements and understandings among the parties hereto with respect to the Partnership, the Partnership business and the property of the Partnership, and there are no representations, promises, agreements or understandings, oral or written, express or implied, among them other than as set forth or incorporated herein.

16.06. <u>Liability of the Investment Partnership</u>.  Notwithstanding anything to the contrary contained herein, neither the Investment Partnership nor any of its partners, general or limited, shall have any personal liability to any of the parties to this Agreement with regard to the representations and covenants extended, or the obligations undertaken, by the Investment Partnership under this Agreement.  In the event that the Investment Partnership shall be in default under any of the terms of this Agreement, the sole recourse of any party hereto for any indebtedness due hereunder, or for any damages resulting from any such default by the Investment Partnership, shall be against the Interest of the Investment Partnership and the capital contributions of the investor limited partners of the Investment Partnership (either directly or through another investment partnership) allocated to, and remaining for investment in, the Partnership; provided however, that under no circumstances shall the liability of the Investment Partnership for any such default be in excess of the amount of Capital Contribution payable by the Investment Partnership to the Partnership, under the terms of this Agreement, at the time of such default, less the value of the Interest of the Investment Partnership, if such Interest is claimed as compensation for damages.

- 86 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 23 of 113 PageID #: 120

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ Line 03 for FORMAN
    05/21/99   FRI 15:57 FAX

WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 24/32
                                                              ☑024

**16.07. Environmental Protection; Earthquake Insurance.**

(a)     The General Partner represents and warrants that (i) it has no knowledge of any deposit, storage, disposal, burial, discharge, spillage, uncontrolled loss, seepage or filtration of any Hazardous Substances at, upon, under or within the Land or any contiguous real estate, and (ii) it has not caused or permitted to occur, and it shall not permit to exist, any condition which may cause a discharge of any Hazardous Substances at, upon, under or within the Land or on any contiguous real estate.

(b)     The General Partner further represents and warrants that (i) neither it nor, to the best of its knowledge, any other party has been, is or will be involved in operations at or, pursuant to the General Partner's best knowledge, near the Land, which operations could lead to (A) a determination of liability under the Hazardous Waste Laws as to the Partnership, or (B) the creation of a lien on the Land under the Hazardous Waste Laws or under any similar laws or regulations; and (ii) the General Partner has not permitted, and will use best efforts not to permit, any tenant or occupant of the Apartment Complex to engage in any activity that could impose liability under the Hazardous Waste Laws on such tenant or occupant, on the Land or on any other owner of the Apartment Complex.

(c)     The General Partner shall comply strictly and in all respects with all material requirements of the Hazardous Waste Laws and related regulations and with all similar laws and regulations.

(d)     It shall at all times indemnify and hold harmless the Limited Partners against and from any and all claims, suits, actions, debts, damages, costs, charges, losses, obligations, judgments, and expenses, of any nature whatsoever, suffered or incurred by the Limited Partners and arising from their investment in the Partnership, under or on account of the Hazardous Waste Laws or any similar laws or regulations, including the assertion of any lien thereunder.

(e)     For purposes of this Section 16.07, "Hazardous Substances" means oil, petroleum or chemical liquids or solids, liquid or gaseous products or any hazardous wastes or hazardous substances, as those terms are used in the Hazardous Waste Laws; and "Hazardous Waste Laws" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, and any other federal, state or local law governing Hazardous Substances, as such laws may be amended from time to time.

(f)     (i)     After the Partnership acquires title to the Apartment Complex, the Limited Partners shall have the right, but not the obligation, to obtain an initial policy of environmental property liability insurance and subsequent renewals of any such policy (any of which is an "Environmental Policy") with respect to its interest in the Apartment Complex.   If the Limited Partner obtains Environmental

- 87 -

WAS: 100871_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
NYSCEF DOC. NO. 2

INDEX NO. 523152/2018
RECEIVED NYSCEF: 11/19/2018

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ Line 03 for FORMAN     WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 25/32
        05/21/99   FRI 15:57 FAX                                                                          ☑025

Insurance, it will cause the Partnership and the General Partner to be additional insureds under the Environmental Policy.

(ii)   A Limited Partner shall have no claim for a breach of this Section 16.07 if and to the extent that the Limited Partner actually recovers its losses for such claim pursuant to the Environmental Policy.

(iii)   The Limited Partners anticipate that Environmental Policy would cover not only the Apartment Complex, but also a large number of other properties. The Environmental Policy would have a deductible, a per discovery policy limit, and an aggregate policy limit that would apply to all claims made under the Environmental Policy and not only claims made with respect to the Apartment complex. Accordingly, a claim made under the Environmental Policy with respect to an insured property other than the Apartment Complex could adversely effect or eliminate the right of the Partnership and its Partners to recover with respect to an environmental problem affecting the Apartment Complex. Neither the Investment Partnership nor its Affiliates, or the Special Limited Partner, shall have any liability to the Partnership, the General Partner or any other Person based on the failure of the Environmental Policy to provide coverage for any claim or loss for any reason whatsoever.

(iv)   The Partnership shall pay SAHP (or its designee) the actual out-of-pocket costs and expenses incurred by the Investment Partnership, the Special Limited Partner, SAHP or their affiliates in obtaining an Environmental Policy that covers the Apartment Complex ("EI Reimbursements") as reasonably determined by SAHP.   The Partners acknowledge that in making such determination, SAHP may have to allocate the aggregate cost of the Environmental Policy among various properties covered by the Environmental Policy. The Limited Partners project that the EI Reimbursements to be paid by the Partnership for inclusion in an initial Environmental Policy having a term of approximately 5 years will be approximately $1,200 payable in a single installment.

(g)   (i)   After the Partnership acquires title to the Apartment Complex, the Investment Partnership shall have the right, but not the obligation, to obtain an initial policy of earthquake insurance and subsequent renewals of any such policy (any of which is referred to as an "Earthquake Policy") with respect to its interest in the Apartment Complex.  If the Investment Partnership obtains Earthquake Insurance, it will cause the Partnership and the General Partner to be additional insureds under the Earthquake Policy.

(ii)   The Investment Partnership anticipates that Earthquake Policy would cover not only the Apartment Complex, but also a large number of other properties. The Earthquake Policy would have a deductible, a per property policy limit, and an aggregate policy limit that would apply to all claims made under

- 88 -

WAS: 100871_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 25 of 113 PageID #: 122

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN
    05/21/99   FRI 15:58 FAX                      WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 26/32
                                                                                                        ☑ 026

the Earthquake Policy and not only claims made with respect to the Apartment Complex. Accordingly, a claim made under the Earthquake Policy with respect to an insured property other than the Apartment Complex could adversely effect or eliminate the right of the Partnership and its Partners to recover with respect to an earthquake affecting the Apartment Complex. Neither the Investment Partnership nor its Affiliates shall have any liability to the Partnership, the General Partner or any other Person based on the failure of the Earthquake Policy to provide coverage for any claim or loss for any reason whatsoever.

(iii)   The Partnership shall pay SAHP (or its designee) the actual out-of-pocket costs and expenses incurred by the Investment Partnership, SAHP or their affiliates in obtaining an Earthquake Policy that covers the Apartment Complex ("Earthquake Reimbursements") as reasonably determined by SAHP. The Partners acknowledge that in making such determination, SAHP may have to allocate the aggregate cost of the Earthquake Policy among various properties covered by the Earthquake Policy.

16.08. Notices. Any Notice required by the provisions of this Agreement to be given to one or more Partners shall be addressed as follows:

(a)   To the Special Limited Partner:

SLP Housing I, LLC
c/o SunAmerica Inc.
1 SunAmerica Center
Century City
Los Angeles, CA 90067-6022
Attention: Michael Fowler, Vice President
Fax No.:   310-772-6179

(b)   To the Investment Partnership:

SunAmerica, Inc.,
General Partner of SunAmerica Housing
Fund 682, a Nevada Limited Partnership
1 SunAmerica Center
Century City
Los Angeles, CA 90067-6022
Attention: Michael Fowler, Vice President
Fax No.:   310-772-6179

With a copy to:

Peabody & Brown

- 89 -

WAS: 100871_1

Rcvd 05/21 03:44PM (12:40) on RSPAB Righ line 03 for FORMAN          WORKSRV2 printed FOR374582385324 on 05/21/1999 03:56PM * Pg 27/32
       05/21/99  FRI 15:58 FAX                                                                                              ☒027

1255 23rd Street, NW
Washington, DC 20037
Attention: Herbert F. Stevens, Esq.
Fax No.: 202-973-7750

(c)     To the General Partner:

420 Stockholm Housing Development Fund Company, Inc.
c/o Ridgewood Bushwick Senior Citizen Council
217 Wyckoff Avenue
Brooklyn, NY 11237
Attention: Donald Manning

With a copy to:

Gerard A. Walters, Esq.
20 Vesey Street
Suite 700
New York, NY 10007
Fax No.: 212-871-4107

(d)     Until the Partnership acquires title to the Complex, to the Developer:

Sparrow Industries, Inc.
3743 White Plains Road
Bronx, New York 10467
Attention: Randolph Silverstein

With a copy to:

Erica R. Forman, Esq.
Robinson Silverman Pearce Aronsohn & Berman LLP
1290 Avenue of the Americas
New York, New York 10104

16.09. No Continuing Waiver.  The waiver of any party or any breach of this Agreement or of any full or partial condition for performance hereunder shall not operate or be construed to be a waiver of any subsequent breach or condition.

- 90 -

WAS: 100871_1

05/20/99   THU 18:14 FAX                                        ←←← SUNAMERICA CA           ☒002

IN WITNESS WHEREOF, the parties have affixed their signatures and seals to this Amended and Restated Agreement of Limited Partnership of 420 Stockholm Street Associates L.P. as of the date first written above.

GENERAL PARTNER:

420 STOCKHOLM HOUSING
DEVELOPMENT FUND COMPANY, INC.,
a New York nonprofit corporation

WITNESS/ATTEST:

By: _____
Name: _____
Title: _____

SPECIAL LIMITED PARTNER:

SLP HOUSING I, LLC, a Nevada limited
liability company

WITNESS/ATTEST:

By:   SunAmerica Investments, Inc., its
      sole member

By: _____
Michael L. Fowler, Authorized
Agent

INVESTMENT PARTNERSHIP:

SUNAMERICA HOUSING FUND 682,
A NEVADA LIMITED PARTNERSHIP

WITNESS/ATTEST:

By:   SunAmerica Inc., its general partner

By: _____
Michael L. Fowler,
Vice President

WAS: 91407_1

ONLY AS A CONSENTING PARTY WITH
RESPECT TO THE PROVISIONS OF
~~ARTICLE VIII AND SECTION 11.01~~

SPARROW INDUSTRIES, INC.,
a New York corporation

By: _____
Name: _____
Title: _____

WITNESS/ATTEST:

_____

Sections 5.01(c)(viii), 8.09(b),
and 8.09(c), and
representations by developer
in Section 4.01.

- II -

WAS: 100871_1

05/20/99  THU 18:14 FAX                                    →→→ SUNAMERICA CA        ☒003

COUNTY OF LOS ANGELES        )
                             : ss
STATE OF CALIFORNIA          )


        Before me, the undersigned Notary Public in and for the aforesaid County and
State, personally appeared Michael L. Fowler, in his capacity as Vice President of
SunAmerica Inc., as general partner of SunAmerica Housing Fund 682, a Nevada Limited
Partnership, and as the Authorized Agent of SunAmerica Investments, Inc., the sole
member of SLP Housing I, LLC, as Limited Partners of 420 Stockholm Street Associates
L.P., and being duly sworn, acknowledged the execution of the foregoing Amended and
Restated Agreement of Limited Partnership.

        Witness my hand and notarial seal this 20th day of May, 1999.

        ROXANNE CORLEY
        Commission # 1076814
        Notary Public — California
        Los Angeles County
        My Comm. Expires Nov 6, 1999

                                        _____
                                        Notary Public

My Commission Expires: _____, 199_


- III -

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )


On the 24 day of May _____, 1999, before me, the undersigned, a Notary Public in and for said State, personally appeared _Robert a Lowe_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

VICTORIA P. APOSTLE
Notary Public, State of New York
No. 31-4614741
Qualified in New York County
Commission Expires May 31, 1999

EC0712.WPD

## EXHIBITS

A-1    Development Budget

A-2    Development Agreement

A-3    Form of Bridge Loan Note

A-4    Incentive Partnership Management Fee Agreement

B      Description of Property

C      [intentionally omitted]

D      [intentionally omitted]

E      [intentionally omitted]

F      [intentionally omitted]

G      [intentionally omitted]

H      Unconditional Guaranty

I      [intentionally omitted]

J      Schedule of Required Insurance Policies

**420 Stockholm Street**
# SCHEDULE OF DEVELOPMENT COSTS

Rev. 2/26/99

**Project Data:**

| | | |
|---|---|---|
| Total Units | 35 | |
| Total Gross Project Floor Area | 37,600 | |
| Construction Period -months | 18 | |

**Acquisition Cost:**

| | | | |
|---|---|---|---|
| Land Cost | | $35,000 | |
| Building | | $465,000 | $465,000 |
| Relocation Expenses | | $18,800 | |
| Due at Closing | $16,780 | $518,800 | |
| | | | |
| **Construction Cost** | $77,585 | $2,715,489 | |
| Contingency | 3.00% | $81,465 | |
| **Total Construction Costs** | $79,913 | $2,796,954 | $2,796,954 |
| | | | |
| **Soft Costs:** | | | |
| Appraisal | | $7,500 | $7,500 |
| DBT Reports | | $10,000 | |
| Surveys | | $10,000 | $10,000 |
| Soil Borings | | $0 | $0 |
| Environmental Survey and Report | | $6,000 | $6,000 |
| Architect/Engineering Fees | | $180,000 | $180,000 |
| Lender Legal | | $30,000 | $30,000 |
| Developer Legal Fees: | | $65,000 | $65,000 |
| Ridgewood Legal Fees | | $15,000 | |
| Legal 421a Certificates | | $15,000 | |
| 421a Filing Fees | 0.40% | $18,219 | |
| Cost Certification Audit | | $7,500 | $7,500 |
| Insurance | | $22,876 | $22,876 |
| Real Estate Taxes | | $8,000 | $8,000 |
| Construction Lender Fees: Bridge Loan | | $32,967 | $32,967 |
| Construction Loan | 1.00% | $20,307 | |
| HFA Commitment Fees | | $8,300 | |
| Mortgage Recording Tax | 2.75% | $0 | $0 |
| Construction Interest | 9.50% | $169,590 | $169,590 |
| Carryover Interest | 9.00% | $25,000 | |
| Closing Costs: | | | |
| Title Insurance /Recording Fees | | $15,976 | $15,976 |
| Lender Engineer/Inspection | | $8,500 | $8,500 |
| Transfer Fees (State and City) | | $5,000 | $5,000 |
| Other: | | | |
| Tax Abatement Fee | 0.50% | $11,155 | $0 |
| J-51 Consultant | | $10,000 | $0 |
| Water-Sewer Charges | | $3,500 | $3,500 |
| AFC Fee | | $74,763 | |
| **Total Soft Costs** | $20,736 | $725,782 | $522,069 |
| Developer's Fee (+savings, if any...) | | $422,000 | |
| **Total Development Cost** | $127,466 | $4,481,305 | $4,206,022 |
| **Annual Credits - 99%** | | | $470,235 |
| **- @ 4%** | | | $21,943 |
| Initial Operating Deficit/ Maximum credits available | | $25,000 | $320,000 |
| Supplimental Mgt. Fee & Marketing | | $19,000 | $9,429 |
| Purchase Supplies and Equipment | | $2,500 | |
| Total Working Capital | | $46,500 | |
| Special Revenue Account per 421a.. | | $85,500 | |
| Capital Improvement Escrow per 421a | 4% | $42,000 | |
| **Total Project Costs** | $132,427 | $4,635,305 | |
| | | | |
| **Sources of Funds:** | | | |
| *Estimated Tax Credits Proceeds* | 0.755 | $2,492,305 | |
| 421a Certificates (permanent financing) | | $2,143,000 | 34.99 |
| **Total Revenues** | $132,427 | $4,635,305 | |
| | | $0 | |
| | | | |
| *Construction Loan* | | $1,700,000 | |
| *Bridge Loan* | | $1,930,876 | |
| *HFA Construction Loan* | | $620,000 | |
| *Total Construction Loans* | | $4,250,876 | |

Revised 8/27/98

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 33 of 113 PageID #: 130

Rcvd 05/21 04:37PM (13:18) on RSPAB Righ line 07 for FORMAN    WORKSRV2 printed FOR37458EE1146B on 05/21/1999 04:50PM * Pg 11/26
05/21/99  FRI 16:47 FAX    Ø011

## AMENDED AND RESTATED
## DEVELOPMENT AGREEMENT

**THIS AGREEMENT** is made and entered into as of May 1, 1999, by and among **420 STOCKHOLM STREET ASSOCIATES L.P.**, a New York limited partnership, (the "Partnership"); **420 STOCKHOLM HOUSING DEVELOPMENT FUND COMPANY, INC.**, a New York nonprofit corporation and the general partner of the Partnership (the "General Partner"); **RIDGEWOOD BUSHWICK SENIOR CITIZENS COUNCIL, INC.**, a New York nonprofit corporation and the parent corporation of the General Partner ("RB"); **SPARROW INDUSTRIES, INC.**, a New York corporation (the "Developer").

**WHEREAS**, on December 23, 1998, 420 Stockholm Housing Development Fund Company, Inc., a New York nonprofit corporation, as the general partner (the "General Partner"), executed a Certificate of Limited Partnership for the formation of the Partnership pursuant to the terms of the New York Revised Uniform Limited Partnership Act (the "Act"), which Certificate was filed with the Department of State of New York (the "State") on January 12, 1999; and

**WHEREAS**, as of December 23, 1998, the General Partner and SunAmerica Housing Fund 682, a Nevada Limited Partnership, as the limited partner ("SHF" or the "Investment Partnership") executed an Agreement of Limited Partnership (the "Original Partnership Agreement"); and

**WHEREAS**, the General Partner and the Investment Partnership shall enter into an Amended and Restated Agreement of Limited Partnership dated as of the date hereof (the "Partnership Agreement") to (i) continue the Partnership under the Act; (ii) admit the Special Limited Partner to the Partnership as a Limited Partner; and (iii) set forth all of the provisions governing the Partnership. All capitalized terms not otherwise defined herein shall have the definitions given them in the Partnership Agreement; and

**WHEREAS**, the Partnership has been formed to rehabilitate, develop, own, maintain and operate a 35-unit multifamily apartment complex intended for rental to families of low income and located in Brooklyn, New York (collectively, said apartment complex and the real property upon which it is located shall be referred to as the "Apartment Complex"); and

**WHEREAS**, the General Partner acquired fee simple title to the Apartment Complex as December 23, 1998, which title shall be transferred to the Partnership upon completion of the rehabilitation of the Apartment Complex; and

**WHEREAS**, as of May 1, 1998, RB and the Developer entered into that certain Development Agreement (the "Original Development Agreement"); and

**WHEREAS**, the parties hereto desire to amend and restate the Original Development Agreement to assign all rights and obligations of RB thereunder to the

WAS: 100872_1

Rcvd 05/21 04:37PM (13:18) on RSPAB_Righ Line 07 for FORMAN     WORKSRV2 printed FOR37458EE1146B on 05/21/1999 04:50PM * Pg 12/26
05/21/99  FRI 16:48 FAX                                                                                      ☑012

General Partner, and to fully specify the services to be performed by the Developer for the General Partner and the Partnership and the compensation to paid to the Developer therefor.

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the Original Development Agreement and to restate all of its terms and conditions as follows:

1.     <u>Assignment and Appointment</u>.  RB hereby assigns all of its rights and obligations under the Original Development Agreement to the General Partner, and the Developer hereby agrees to and accepts such assignment.  The General Partner and the Partnership hereby appoint Developer to render services for the Partnership, and confirms and ratifies the appointment of Developer with respect to services rendered for RB to date in supervising and overseeing the development of the Apartment Complex as herein contemplated.

2.     <u>Authority and Duties</u>.

(a)     The Developer shall have, and has had, the authority and the obligation to:

(i)     act on behalf of the General Partner and the Partnership in its relation with any governmental agency or authority and any construction and/or other lender with respect to all matters relating to the rehabilitation and development of the Apartment Complex;

(ii)     select the architect, coordinate the preparation of the plans and specifications (the "Plans and Specs") and recommend alternative solutions whenever design details affect construction feasibility or schedules. The Developer has selected the firm of Castro-Blanco Piscioneri and Associates Architects P.C. as the architect for the Apartment Complex ("Architect") pursuant to that certain agreement between Sparrow Construction Corporation (the "Contractor") and the Architect dated as of May 28, 1998 and assigned to Developer on behalf of the General Partner (the "Architect's Contract");

(iii)     on behalf of the General Partner and the Partnership, ensure that, in accordance with the Architect's Contract, the Plans and Specs are in compliance with all applicable codes, laws, ordinances, rules and regulations;

(iv)     negotiate all necessary contracts and subcontracts for the rehabilitation of the Apartment Complex;

2

WAS: 100872_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 36 of 113 PageID #: 133

(v)     in conjunction with the Contractor, choose the products and materials necessary to equip the Apartment Complex in a manner which satisfies all requirements of the Construction Loan and the HFA Loan and the Plans and Specs;

(vi)     monitor disbursements of the Construction Loan, HFA Loan and Bridge Loan and payment of amounts owed Architect, the Contractor and the subcontractors;

(vii)     on behalf of the Partnership and the General Partner and pursuant to the requirements set forth in that certain agreement between the General Partner and the Contractor dated as of May __, 1999 (the "Construction Contract"), insure that the Apartment Complex is rehabilitated free and clear of all mechanics' and materialmen's liens;

(viii)     obtain an Architect's certificate that the work on the Apartment Complex is substantially complete;

(ix)     ensure that the Contractor secures all building code approvals and obtains certificates of occupancy for all of the Residential Units of the Apartment Complex;

(x)     cause the rehabilitation of the Apartment Complex to be completed by the Contractor in a prompt and expeditious manner, consistent with good workmanship, and in compliance with the following:

(1)     the Plans and Specs, as they may be amended by the agreement of the parties hereto and with the consent of the mortgagee under the HFA Loan;

(2)     any and all obligations of the General Partner under the HFA Loan;

(3)     pursuant to the Architect's Contract, any and all zoning regulations, county ordinances, including health, fire and safety regulations, and any other requirements of federal, state and local laws, rules, regulations and ordinances applicable to construction of the Apartment Complex;

(xi)     cause to be performed in a diligent and efficient manner the following:

3

WAS: 100872_1

Rcvd 05/21 04:37PM (13:18) on RSPAB Righ line 07 for FORMAN          WORKSRV2 printed FOR37458EE1146B on 05/21/1999 04:50PM * Pg 14/26
          05/21/99  FRI 16:49 FAX                                                                                            ☑014

    (1)    rehabilitation of the Apartment Complex pursuant to the Plans and Specs, including any required off-site work; and

    (2)    general administration and supervision of rehabilitation of the Apartment Complex, including but not limited to activities of the Contractor, its subcontractors and agents, and others employed by the General Partner as to the Apartment Complex in a manner which complies in all respects with the HFA Loan and the Plans and Specs;

    (xii)    keep, or cause to be kept, such accounts and cost records as to the rehabilitation of the Apartment Complex as are normally kept for such work by developers in the New York Metropolitan area.;

    (xiii)    maintain, or cause to be maintained, at its expense, all office and accounting facilities and equipment necessary to adequately perform the foregoing functions;

    (xiv)    make available to the General Partner, during normal business hours and upon the General Partner's written request, copies of all material contracts and subcontracts;

    (xv)    upon completion of the rehabilitation, deliver to the General Partner and the Partnership a dimensioned as-built survey of the real property (locating only buildings) and as-built drawings of the Apartment Complex rehabilitation;

    (xvi)    provide, and periodically update Apartment Complex rehabilitation time schedule which coordinates and integrates Architect's services with construction schedules;

    (xvii)    coordinate the work of Architect to complete the Apartment Complex in accordance with the objectives as to cost, time and quality, and provide sufficient personnel at the Apartment Complex with authority to achieve such objectives;

    (xviii)    provide a detailed schedule of realistic activity sequences and durations;

    (ixx)    provide regular monitoring of the schedule as rehabilitation progresses, identify potential variances between scheduled and probable completion dates, review the schedule for work not started or incomplete, recommend to the General Partner adjustments in the schedule to meet the

4

WAS: 100872_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 38 of 113 PageID #: 135

Rcvd 05/21 04:37PM (13:18) on RSPAB Righ line 07 for FORMAN        WORKSRV2 printed FOR37458EE1146B on 05/21/1999 04:50PM * Pg 15/26
        05/21/99  FRI 16:50 FAX                                                                                          Ø 015

probable completion date, provide summary reports of such monitoring, and
document all changes in the schedule; *and the Construction Loan Agreement*

(xx)    assume and perform the General Partner's obligations as
specified in the Partnership Agreement which relate to the development
obligations of the Apartment Complex;

(xxi)   develop and implement a system for the review and processing
of change orders as to construction of the Apartment Complex;

(xxii)  develop and implement a procedure for the review and
processing of applications by subcontractors for progress and final payments;

(xxiii) record the progress of the Apartment Complex and submitting
written progress reports to the Partnership and Architect, including the
percentage of completion and the number and amounts of change orders; and

(xxiv)  insure that contractors engaged in hazardous material removal
will name the General Partner as an additional insured on their liability
insurance coverage and provide proof of coverage prior to commencement of
contractor's work.

(b)     In furtherance of the foregoing but not in limitation thereof, the
Developer specifically agrees to undertake and perform the following duties and
obligations:

(i) Developer shall make application and thereafter timely file all
necessary/required documents/information to the New York State
Department of Taxation and Finance to obtain a sales tax exemption for the
General Partner. The parties agree and confirm that Developer has already
obtained and provided same. RB shall cooperate in this process by timely
providing all executed documents and/or supporting information as required
for the application.

(ii) Developer has obtained for the General Partner commitments for
the HFA Loan, the Construction Loan, and the Bridge Loan, all as defined
and specified in the Partnership Agreement. In conjunction with the
General Partner's obligation to rehabilitate the Apartment Complex,
Developer shall coordinate and implement the General Partner's closing
under the foregoing financing commitments. A portion of the loan proceeds
shall be used to repay the financing obtained by the General Partner related
to the acquisition of the Property. The balance of the loan proceeds shall be
used to fund the costs of construction and estimated related development
costs as set forth in the Schedule of Development Costs, attached to this

5

WAS: 100872_1

Rcvd 05/21 04:37PM (13:18) on RSPAB Righ line 07 for FORMAN          WORKSRV2 printed FOR3745BEE1146B on 05/21/1999 04:50PM * Pg 16/26
           05/21/99  FRI 16:50 FAX                                                                                          @018

Agreement as Exhibit A.  The costs itemized on Exhibit A are referred to collectively as the "Apartment Complex Development Costs." The loans from HFA and SunAmerica Investments, Inc. are referred to from time to time in this Agreement collectively as the "Construction Loans", and HFA and SunAmerica are referred to from time to time collectively as the "Lenders". The General Partner shall be the mortgagor under the Construction Loans.

(iii)  Developer shall provide such equity investment, guarantees and obtain such letters of credit respecting development of the Apartment Complex as may reasonably be required by the Lenders. Developer also shall be responsible for such ancillary tasks in connection with acquisition and construction of the Apartment Complex as are ordinarily attendant to development and construction of a rental housing project for persons and families of low income, as contemplated and intended herein.

(iv)  Developer, on behalf of the General Partner, shall enter into a fixed price construction contract (which contemplates the construction cost contingency itemized in Exhibit A) with Sparrow Construction Corporation, as general contractor, to construct the Apartment Complex ("the "Construction Contract"), on terms agreeable to RB, Developer, the Partnership, and the Lenders.

(v)  The period from the effective date of the Original Agreement through the date a temporary certificate of occupancy is issued respecting the Apartment Complex, is referred to as the "Development Period". Apartment Complex Development Costs incurred during the Development Period and not funded with the proceeds of the Construction Loans or the Bridge Loan, shall be funded by Developer on behalf of the General Partner.

(vi)  During the Development Period Developer seek to obtain from HFA an allocation of Tax Credits to the Apartment Complex and the Developer and RB shall comply with and deliver all required/necessary supporting documentation to qualify for same in a timely manner.

(vii)  During the Development Period, Developer also will make an application to HPD pursuant to the 421-a Certificate Program for Section 421-a Certificates for the Apartment Complex and the Developer and RB shall comply with and deliver all required/necessary supporting documentation to qualify for same in a timely manner (the "421-a Certificates").

(viii)  Developer will undertake to sell (subject to RB's consent and approval) the Tax Credits and the 421-a Certificates and will be responsible for negotiating and preparing the terms of sale of each.  RB understands,

6

WAS: 100872_1

Rcvd 05/21 04:37PM (13:18) on RSPAB Righ Line 07 for FORMAN       WORKSRV2 printed FOR37458EE1146B on 05/21/1999 04:50PM * Pg 17/26
05/21/99   FRI 16:50 FAX                                                                                          @017

however, notwithstanding the provisions of the foregoing sentence, that if the purchaser of the Tax Credits requires modifications to the Partnership Agreement as a condition of the purchase, RB, together with its attorneys, at RB's sole expense, shall be responsible for making such modifications. Any such required modifications shall be negotiated arid implemented promptly and expeditiously by RB and its attorneys provided same are agreed to by the Limited Partner, RB will in all events cooperate with Developer to effectuate the sale of the Tax Credits and the 421-a Certificates, as and if requested by Developer.

(ix)   Failure of RB or Developer to comply with any of its responsibilities pursuant to the foregoing paragraph shall be a default under this Agreement, which default shall entitle the other party, but shall not obligate the other party, to undertake and implement the responsibilities the defaulting party has failed to undertake and implement, at the defaulting party's sole cost and expense, reserving any other rights at equity or law, which rights shall be deemed mutually exclusive and cumulative.

(x)   Developer will cause the proceeds of sale of the Tax Credits and the 421-a Certificates to be used, among other things, to satisfy the Construction Loans. It is the intention of Developer and RB that upon completion of the Apartment Complex, the Construction Loans will be paid off and the Apartment Complex will be free and clear of any and all mortgages and/or other debts relating to the acquisition, construction and related development costs itemized in Exhibit A (as may be amended) and in the event any such other debts exist, they shall be deemed obligation(s) of the Developer, unless incurred as a result of the act(s)/omission(s) of RB and/or the General Partner or otherwise agreed to by the parties hereto in a signed writing.

3.     Obligations of RB.

(a)   Following RB's receipt of the requisite consents to conveyance of the Apartment Complex as described in Section 3(c) below, the General Partner shall convey title to the completed Apartment Complex to the Partnership, and RB agrees to implement this intention. In connection with the conveyance of the Apartment Complex to the Partnership, General Partner shall assign its right, title and interest in, to and under the Construction Contract to the Partnership.

(b)   Notwithstanding anything to the contrary contained in this Agreement, RB, under the direction of the Developer, shall be responsible for renting up the Apartment Complex. In this regard, RB agrees to complete the rent-up preparation process (i.e., advertising, distribution of brochures

7

WAS: 100872_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 41 of 113 PageID #: 138

and other information, deploying or hiring staff, preparation and distribution of applications, etc.), early enough during the Development Period, so that at least sixty (60) days in advance of the date anticipated for Apartment Complex completion (i.e., receipt of temporary certificate of occupancy) RB is equipped to, and begins to accept applications from potential tenants, and upon conclusion of the Development Period, qualified tenants take occupancy of at least 95% of the units in the Apartment Complex. Rent-up shall be in accordance with the tenant income limitations and other requirements of (i) the New York City Department of Housing Preservation and Development ("HPD") promulgated in connection with its Real Property Tax Law Section 421-a Certificate Program (the "421-a Certificate Program"), and (ii) HFA respecting the Federal Low Income Housing Tax Credit Program (the "Tax Credit Program").

(c) Sufficiently in advance of conclusion of the Development Period so that the following is completed prior to conclusion of the Development Period, RB shall make application, at RB's expense, to the New York State Attorney General and the New York State Supreme Court for consent to the conveyance of the Apartment Complex by the General Partner to the Partnership. The Partnership shall be structured with a corporate general partner formed by RB at its sole expense under the New York Business Corporation Law and owned and controlled by RB, and shall otherwise be structured so as to qualify for and be eligible to use (or have its limited partner use), Federal Low Income Housing Tax credits allocated under the Federal Low Income Housing Tax Credit Program ("Tax Credits")

4.     General Understandings.

(a) RB agrees to cooperate with Developer throughout the Development Period in connection with development of the Apartment Complex, including without limitation, carrying out its responsibilities discussed above, completing, preparing and/or executing documents on behalf of itself, the General Partner or the Partnership, attending meetings, participating in conference calls, etc.

(b) Notwithstanding anything to the contrary contained in this Agreement, effective as of the conclusion of the Development Period (i.e., as of issuance of a temporary certificate of occupancy for the Apartment Complex (and provided the Apartment Complex is otherwise tenantable), Developer shall not be responsible for operating or securing the Apartment Complex.

(c) The Developer shall make provision of payment for all Apartment Complex Development Cost overruns and shall likewise provide for a fixed price Construction Contract for the Apartment Complex, subject, however, to the availability of the construction cost contingency itemized an Exhibit A.

8

WAS: 100872_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 42 of 113 PageID #: 139

Rcvd 05/21 04:37PM (13:18) on RSPAB Righ line 07 for FORMAN        WORKSRV2 printed FOR37458EE11468 on 05/21/1999 04:50PM * Pg 19/26
        05/21/99  FRI 16:52 FAX                                                                                              @019

(d)  In the event that this Agreement is terminated, as a result of the failure of the General Partner to acquire the Property or Tax Credits/421-a Certificates as intended hereinabove, any expenses incurred/expended by the parties hereto in conjunction with the Apartment Complex shall be born by said parties, without contribution.

5.     Development Fee and Additional Development Fee.

(a)     For services performed and to be performed pursuant to Sections 1 and 2 of this Agreement, the Partnership agrees to pay Developer a Development Fee in the amount of not less than $422,000, subject to compliance with the terms and conditions of this Agreement.  The Development Fee shall be paid as follows:

(i)     The sum of $100,539 shall be paid upon receipt by the Partnership of the First Additional Capital Contribution and shall be payable solely from Bridge Loan proceeds then remaining undisbursed and unrestricted.

(ii)     The sum of $160,731 shall be paid immediately upon receipt by the Partnership of the Second Additional Capital Contribution.

(iii)     The sum of $160,731 shall be paid immediately upon receipt by the Partnership of the Third Additional Capital Contribution; provided, however, that in the event the Partnership has insufficient available funds (including funds resulting from Cost Savings, as defined in Section 5.01(c)(vi) of the Partnership Agreement) as of the date of the Third Additional Capital Contribution, after payment of all current expenses, including the funding of all reserves required pursuant to the terms of the HFA Loan, for payment in full of Development Fee due under this subparagraph (iii) (the "Development Fee Shortfall"), the General Partner shall provide an Operating Deficit Loan to the Partnership in the amount of the Development Fee Shortfall, which amount shall then be paid by the Partnership to the Developer.

(b)     If, after payment in full of the portion of the Development Fee as set forth in subparagraph (a)(i) above, all remaining Cost Savings, if any, shall be paid to the Developer as an Additional Development Fee on the date of Final Closing in accordance with Section 5.01(c)(vi) of the Partnership Agreement.

6.     Withholding of Fee Payments.  In the event that (i) the Developer shall not have substantially complied with any material provisions under this Agreement , following notice and opportunity to cure or (ii) foreclosure proceedings shall have been commenced against the Apartment Complex during the Development Period, then the Developer shall be in default of this Agreement, and the Partnership may withhold payment of such portion of the fee payable to the Developer pursuant to Section 5 of this Agreement which has not yet been paid.

9

WAS: 100872_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 43 of 113 PageID #: 140

Rcvd 05/21 04:37PM (13:18) on RSPAB Righ line 07 for FORMAN
05/21/99  FRI 16:52 FAX

WORKSRV2 printed FOR37458EE1146B on 05/21/1999 04:50PM * Pg 20/26
Ø 020

All amounts so withheld by the Partnership under this Section 6 shall be promptly released to the Developer after the Developer has cured the default justifying the withholding, as demonstrated by evidence reasonably acceptable to the Investment Partnership.

7.  [Intentionally Omitted]

8.  Construction Warranty.

(a)  Developer hereby warrants to the General Partner, the Partnership, the Special Limited Partner, and to the Investment Partnership that Developer will insure, on behalf of the Contractor that the materials and equipment furnished in accordance with this Agreement and the Construction Contract will be of good quality, that the work to be performed under the Construction Contract will be free from defects, and that the work will conform with the requirements of the Plans and Specifications. Work substantially not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. If requested by the Special Limited Partner or the Construction Lenders, Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment used in the rehabilitation of the Apartment Complex.

(b)  If, within one (1) year after Substantial Completion, any of the structural or non-structural work performed to rehabilitate the Apartment Complex is found to be materially defective or not in accordance in all material respects with the Plans and Specifications and with all applicable building codes, laws, rules and regulations, Contractor shall correct such defect(s) promptly after receipt of written notice from the General Partner to do so. With respect to portions of the work first performed after Substantial Completion, such one (1) year period shall be extended by the period of time between the date of Substantial Completion and the actual performance of the work. The obligation under this Section 6 shall survive acceptance of the work performed to construct the Apartment Complex. The Partnership, the General Partner or the Special Limited Partner shall give such notice promptly after discovery of the condition. In the event a material defect is discovered more than one (1) year after the date of Substantial Completion, as such period may be extended under this Section, and such defect was known to the Contractor and was not disclosed to General Partner or was intentionally concealed by Contractor, then Contractor shall promptly take such action as may be necessary, at Contractor's sole expense, to correct such defective work to the satisfaction of the Partnership and the Investment Partnership. The Partnership or the Special Limited Partner, as applicable, shall report to Developer any defective condition discovered more than one (1) year after the date of Substantial Completion, as such period may be extended under this Section.

10

WAS: 100872_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 44 of 113 PageID #: 141

Rcvd 05/21 04:37PM (13:18) on RSPAB Righ line 07 for FORMAN    WORKSRV2 printed FOR37458EE1146B on 05/21/1999 04:50PM * Pg 21/26
    05/21/99  FRI 16:53 FAX                                                                      Ø021

9.    Construction and Development Guaranty.

(a)    The Developer hereby guarantees:

(i)    achieving completion of rehabilitation and construction of the Apartment Complex on a timely basis in accordance with the Plans and Specifications for the Apartment Complex, and the terms of this Agreement;

(ii)    causing Contractor to meet all requirements for obtaining all necessary permanent, unconditional certificates of occupancy for all the apartment units in the Apartment Complex;

(iii)    meeting all requirements for obtaining One Hundred Seventy-Five (175) 421-a Certificates pursuant to the terms and conditions of that certain 421-a Affordable Housing Program Agreement between the City of New York and the General Partner dated February 1, 1999; and

(iv)    meeting all requirements of the Contractor as the "Seller" under that certain 421-a Purchase Agreement dated September 3, 1998, as amended by that certain letter agreement dated December 17, 1998 and as same may further amended from time to time (collectively, the "Purchase Agreement"), such that Seller is ready, willing and able to perform its obligations under said contract and that therefore Seller shall either receive the sum of $2,143,750 at Closing (as defined in the Purchase Agreement) or shall be entitled to draw down, and shall draw down, the letter of credit of the Purchaser thereunder in the amount of $2,143,750 as delivered to Seller upon closing of the Construction Loan and as specified in Section 5(d) of the Purchase Agreement (the "Letter of Credit"). Developer further agrees that, in addition to the foregoing, it shall be solely responsible and liable for the payment of all costs, including attorneys fees, related to (i) achieving the Closing of the Purchase Agreement; and (ii), if necessary, obtaining the full amount of cash proceeds available from the Letter of Credit.

(b)    The Developer are hereby obligated to pay all Excess Development Costs; the Partnership shall have no obligation to pay any Excess Development Costs, except to the extent same are directly caused by the actions or inactions or requests of the Partnership or RB or the General Partner. "Excess Development Costs" means all Development Costs that are in excess of $4,635,305. "Development Costs" means all of the following: (i) all direct or indirect costs paid or accrued by the General Partner related to the acquisition, development and rehabilitation of the Apartment Complex, including payment of the Development Fee (but excluding the Additional Development Fee), amounts due under the Construction Contract, any construction cost overruns, the cost of any change orders and all costs necessary to achieve Substantial Completion; (ii) all costs to achieve Final Closing, effect the conditions necessary to permit repayment in full of the HFA Loan, the Construction Loan, and the Bridge Loan, and satisfy any escrow deposit requirements which are conditions to the Final Closing; (iii) all costs and expenses relating to remedying any

11

WAS: 100872_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 45 of 113 PageID #: 142

environmental problem or condition or Hazardous Materials that existed on or prior to Final Closing;

       (c)    If the Developer shall fail to pay any such Excess Development Costs, the Special Limited Partner may in its sole discretion cause the Partnership to pay such Excess Development Costs using the Investment Partnership's Capital Contributions in an amount not in excess of the total of any remaining unpaid installments of the Development Fee due pursuant to this Agreement to meet such obligations of the Developer. As a result of such application of funds, the Development Fee shall be treated as having been paid to the Developer, and the Developer as having paid Excess Development Costs to that extent, and the Developer shall take such amount of the Development Fee into income for federal income tax purposes.

       (d)    The Developer shall pay any Excess Development Costs by the earlier of (i) the date required to avoid a default or penalties under General Partner obligations, including without limitation the Construction Loan, (ii) the date required to keep all sources of funding for the Apartment Complex "in-balance" and as adequate sources of funds to timely cause Substantial Completion of the Apartment Complex and satisfaction of other obligations of the General Partner in accordance with this Agreement, or (iii) such earlier date as may be set forth in this Agreement.

      10.    <u>Successors and Assigns, Termination</u>.  This Agreement shall be binding on the parties hereto, their heirs, successors, and assigns.  However, this Agreement may not be assigned by any party hereto without the Consent of the Special Limited Partner, nor may it be terminated without the Consent of the Special Limited Partner; such Consent shall not be unreasonably withheld.  In the event that (i) the Interest of the General Partner as General Partner is converted, transferred or reduced, pursuant to Section 6.01 of the Partnership Agreement, or (ii) the General Partner or its successor(s) is (are) removed from the Partnership pursuant to Section 8.13 of the Partnership Agreement, any further payment of installments of the Development Fee pursuant to Section 3 above shall be governed by such Sections 6.01 and 8.13, as applicable.

      11.    <u>Defined Terms</u>.   Capitalized terms used in this Agreement and not specifically defined herein shall have the same meanings assigned to them as in the Partnership Agreement.

      12.    <u>Separability of Provisions</u>.  Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

      13.    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original and all of which together shall constitute

12

WAS: 100872_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 46 of 113 PageID #: 143

Rcvd 05/21 04:37PM (13:1B) on RSPAB Righ line 07 for FORMAN          WORKSRV2 printed FOR3745BEE1146B on 05/21/1999 04:50PM * Pg 23/26
      05/21/99  FRI 16:53 FAX                                                                            @023

one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

14.  <u>No Continuing Waiver</u>.  The waiver by any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

15.  <u>Applicable Law</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

[REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

13

WAS: 100872_1

Rcvd 05/21 04:37PM (13:18) on RSPAB Righ Line 07 for FORMAN    WORKSRV2 printed FOR37458EE1146B on 05/21/1999 04:50PM * Pg 24/26
      05/21/99  FRI 16:54 FAX                                                                            @024

**IN WITNESS WHEREOF,** the parties have caused this Amended and Restated Development Agreement to be duly executed as of the date first written above.

DEVELOPER:

SPARROW INDUSTRIES, INC.,
a New York corporation

By: _____
    Name: _____
    Title: _____

GENERAL PARTNER:

420 STOCKHOLM HOUSING DEVELOPMENT
FUND COMPANY, INC.,
a New York nonprofit corporation

By: _____
    Name: _____
    Title: _____

[SIGNATURES CONTINUED ON NEXT PAGE]

14

WAS: 100872_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 48 of 113 PageID #: 145

Rcvd 05/21 04:37PM (13:18) on RSPAB Righ line 07 for FORMAN
05/21/99   FRI 16:54 FAX

WORKSRV2 printed FOR37458EE1146B on 05/21/1999 04:50PM * Pg 25/26
025

**PARTNERSHIP:**

420 STOCKHOLM STREET ASSOCIATES L.P.,
a New York limited partnership

By:     420 STOCKHOLM HOUSING
        DEVELOPMENT FUND COMPANY,
        INC., a New York nonprofit corporation

By:     _____
Name:   _____
Title:  _____

**15**

WAS: 100872_1

Rcvd 05/21 04:37PM (13:1B) on RSPAB Righ line 07 for FORMAN
05/21/98  FRI 16:54 FAX
WORKSRV2 printed FOR37458EE11468 on 05/21/1999 04:50PM * Pg 26/26
☑028

# EXHIBIT A

## SCHEDULE OF DEVELOPMENT COSTS

16

WAS: 100872_1

**420 Stockholm St.**
**SCHEDULE OF DEVELOPMENT COSTS**

Rev. 5/20/99

Project Data:
Total Units ................................. 35
Total Gross Project Floor Area.... 37,800
Construction Period -months ...... 15

| | Revised Total Cost | HFA Loan | Construction Loan | Bridge Loan | Initial Draw |
|---|---|---|---|---|---|
| Acquisition Cost: | | | | | |
| Land Cost | $35,000 | $35,000 | | | $35,000 |
| Building | $465,000 | $465,000 | | | $465,000 |
| Relocation Expenses | $16,600 | $4,770 | $11,830 | | $5,400 |
| Due at Closing | $516,600 | $504,770 | $11,830 | $0 | $505,400 |
| | | | | | |
| Construction Cost | $2,715,489 | | $1,372,856 | $1,342,633 | $47,116 |
| Contingency | $81,465 | | | $81,465 | |
| Total Construction Costs | $2,796,954 | $0 | $1,372,856 | $1,424,098 | $47,116 |
| | | | | | |
| Soft Costs: | | | | | |
| Appraisal | $7,500 | $7,500 | | | $8,000 |
| DBT Reports | $10,000 | | | $10,000 | $500 |
| Surveys | $10,000 | | | $10,000 | |
| Soil Borings | $0 | | | | |
| Environmental Survey and Report | $6,000 | $5,186 | $8,959 | $5,000 | $14,145 |
| Architect/Engineering Fees | $130,000 | $88,000 | $21,000 | $21,000 | $88,000 |
| *Lender Legal | $30,000 | | | | |
| Developer Legal Fees | $65,000 | | $54,473 | $10,000 | $54,473 |
| Ridgewood Legal Fees | $15,000 | | $16,055 | | $13,819 |
| Legal 421a Certificates | $15,000 | | $10,000 | $5,000 | $15,000 |
| 421a Filing Fees | $16,219 | | | $16,219 | |
| Cost Certification Audit | $7,500 | | | | |
| Insurance | $22,376 | | $26,500 | | $26,500 |
| Real Estate Taxes | $8,000 | | $3,000 | $2,000 | $3,000 |
| *Construction Lender Fees: Bridge Loan | $32,967 | | | | |
| Construction Loan | $17,000 | | $17,000 | | $17,000 |
| HFA Commitment Fees | $6,200 | | $6,200 | | $6,200 |
| Mortgage Recording Tax | $0 | | | | |
| Construction Interest | $169,650 | | $67,860 | $101,790 | |
| Carryover' Interest | $25,000 | | $17,827 | | $19,500 |
| Closing Costs: | | | | | |
| Title Insurance /Recording Fees | $15,976 | $13,302 | | | $13,302 |
| Lender Engineer/Inspection | $8,500 | | $3,000 | $5,500 | |
| Transfer Fees (State and City) | $5,000 | | | $5,000 | |
| Perm. Lender Financing Fees | $0 | | | | |
| Other : | | | | | |
| Tax Abatement Fee | $11,188 | | | $11,188 | |
| Water-Sewer Charges +misc. | $3,600 | $1,242 | $1,000 | $1,358 | $680 |
| AFC Fee | $74,769 | | $74,769 | | $74,769 |
| Total Soft Costs | $712,445 | $115,230 | $327,643 | $204,055 | $354,888 |
| Developer's Fee (+savings, if any...) | $422,000 | | | | |
| Total Development Cost | $4,447,998 | $620,000 | $1,712,329 | $1,628,153 | $907,404 |
| Annual Credits - @9% | | | | | |
| - @ 4% | | | | | |
| Initial Operating Deficit/ Maximum credits available | $25,000 | | | $25,000 | |
| Supplemental Mgt. Fee & Marketing | $19,000 | | | $19,000 | |
| Purchase Supplies and Equipment | $2,500 | | | $2,500 | |
| Total Working Capital | $46,500 | | | $46,500 | |
| Special Revenue Account for 421a. | $85,500 | | | $85,500 | |
| Capital Improvement Escrow per 421a | $42,000 | | | $42,000 | |
| Total Project Costs | $4,621,998 | $620,000 | $1,712,329 | $1,802,153 | |
| | | | | | |
| Sources of Funds: | | | | $1,930,876 | |
| Estimated Tax Credits Proceeds | $2,492,305 | | | | |
| 421a Certificates (permanent financing) | $2,143,000 | | | | |
| Total Revenues | $4,635,305 | | 4,635,070 | | |
| Sale Value of 421a Certificates | $2,125,000 | | | | |
| Net Profit | ($818,000) | | | | |
| | | | | | |
| Construction Loan | $1,700,000 | | | | |
| Bridge Loan | $1,930,876 | | | | |
| HFA Construction Loan | $620,000 | | | | |
| Total Construction Loans | $4,250,876 | | *Items to be paid from Initial capital Contribution... | | |

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 51 of 113 PageID #: 148

Rcvd 05/21 05:08PM (03:18) on RSPAB Righ line 06 for FORMAN          WORKSRV2 printed FOR374593F32E85 on 05/21/1999 05:12PM * Pg 3/9
05-21-99   17:09   From-                                                                  T-166   P.03/09   F-647

## BRIDGE LOAN PROMISSORY NOTE

$1,936,876                                                                         May 24 1999

### I.   COVENANT TO PAY.

I.1.   Promise to Pay.  FOR VALUE RECEIVED, 420 STOCKHOLM HOUSING DEVELOPMENT FUND COMPANY, INC., a New York nonprofit corporation (herein called "Maker") promises to pay to the order of SUNAMERICA HOUSING FUND 682, a Nevada limited partnership (herein, together with all subsequent holders of this Promissory Note ("Note"), called "Payee"), on or before the Maturity Date (as herein defined), as hereinafter provided, the principal sum of ONE MILLION NINE HUNDRED THIRTY-SIX THOUSAND EIGHT HUNDRED SEVENTY-SIX AND NO/100 DOLLARS ($1,936,876.00), or so much thereof as may actually be outstanding hereunder, together with interest on the unpaid principal balance from time to time outstanding at the rate herein specified and otherwise in strict accordance with the terms and provisions hereof.

### II.   INTEREST RATE COMPUTATION.

II.1.   Interest Rate.  Pursuant to the terms of this Promissory Note, the indebtedness evidenced hereby shall bear no interest on the principal balance advanced up to and including $1,495,383, and shall bear interest on the portion advanced above $1,495,383 at the Prime Rate per year.  Under no circumstances shall the Interest Rate hereunder at any point in time exceed the Maximum Lawful Rate.

II.2.   Default Rate.  Upon the occurrence and during the continuation of a default in the payment of any principal or interest obligations hereunder or, otherwise, upon the occurrence and during the continuation of any Event of Default (as defined herein), at the option of the Payee, the principal balance of this Note then outstanding above $1,495,383 shall bear interest for the period beginning with the date of occurrence of such default at the Default Rate (as defined herein).

II.3.   Definitions.  As used in this Note, the following terms shall have the respective meanings indicated below:

"Advances" shall mean advances made by Payee to Maker pursuant to the Partnership Agreement.

"Business Day" shall mean any day on which commercial banks are not authorized or required to close in New York, New York.

1

WAS: 100873_1

Rcvd 05/21 05:08PM (03:18) on RSPAB Righ Line 06 for FORMAN        WORKSRV2 printed FOR374593F32E85 on 05/21/1999 05:12PM * Pg 4/9
       05-21-99   17:09    From-                                         T-166   P 04/09   F-647

"Charges" shall mean all fees, charges and/or any other things of value, if any, contracted for, charged, received, taken or reserved by Payee in connection with the transactions relating to this Note and the indebtedness evidenced hereby which are treated as interest under applicable law.

"Default Rate" shall mean the Maximum Lawful Rate or, if no Maximum Lawful Rate exists, eighteen percent (18%) per annum.

"Event of Default" shall have the same meaning as that indicated for such term in that certain Construction Loan Agreement of Borrower dated as of the date hereof.

"Maturity Date" shall mean the earlier to occur of December 31, 2000 or the date of Final Closing, as that term is defined in the Partnership Agreement.

"Maximum Lawful Rate" shall mean the maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Payee in accordance with the applicable laws of the State of New York (or applicable United States federal law to the extent that it permits Payee to contract for, charge, take, receive or reserve a greater amount of interest than under New York law), taking into account all Charges made in connection with the loan evidenced by this Note and the Other Loan Documents.

"Partnership Agreement" shall mean the Amended and Restatement Partnership Agreement of 420 Stockholm Street Associates L.P. dated may 1, 1999.

"Prime Rate" shall mean the prime commercial lending rate as published from time to time by Chase Manhattan Bank of New York.

II.4.    Interest Limitation Recoupment.  Notwithstanding anything in this Note to the contrary, if at any time (i) interest at the Interest Rate specified above, (ii) interest at the Default Rate, if applicable, and (iii) the Charges computed over the full term of this Note, exceed the Maximum Lawful Rate, then the rate of interest payable hereunder, together with all Charges, shall be limited to the Maximum Lawful Rate.

II.5.    Computation Period.  Except for the computation of the Maximum Lawful Rate which shall be undertaken on the basis of a 365 or 366-day year, as the case may be, interest on the indebtedness evidenced by this Note subject to interest shall be computed on the basis of a 360-day year and shall accrue on the actual number of days any principal balance hereof subject to interest is outstanding.

III.    PAYMENTS.

III.1.    Payment Schedule.  This Note shall be due and payable as follows:

2

WAS: 100873_1

Rcvd 05/21 05:08PM (03:18) on RSPAB Righ line 06 for FORMAN      WORKSRV2 printed FOR374593F32EB5 on 05/21/1999 05:12PM * Pg 5/9
      05-21-99   17:09   From-                                        T-166   P 05/09   F-647

The outstanding principal balance hereof and any and all accrued interest thereon shall be due and payable in full on the Maturity Date or upon earlier maturity hereof, whether by acceleration or otherwise.

III.2.  Application.  All payments on this Note shall, at the sole option of Payee, be applied at any time and from time to time and in any order, to the following: (i) the payment of accrued but unpaid interest hereon, (ii) the payment or reimbursement of any expenses, costs or obligations (other than the principal hereof and interest hereon) for which Maker shall be obligated or Payee entitled pursuant to the provisions hereof, and (iii) the payment of all or any portion of the principal balance then outstanding hereunder.

III.3.  Place.  All payments hereunder shall be made to Payee, to the attention of Danica Djujich, Vice President, at its offices located in Los Angeles, California, at the address of Payee as specified herein or as Payee may from time to time designate in writing to Maker.

III.4.  Business Days.  If any payment of principal or interest on this Note shall become due and payable on any day which is not a Business Day, such payment shall be made on the next succeeding Business Day. Any such extension of time for payment shall be included in computing interest which has accrued and shall be payable in connection with such payment.

III.5.  Legal Tender.  All amounts payable hereunder are payable in lawful money or legal tender of the United States of America.

III.6.  Prepayment.  Subject to the subsequent provisions of this Note, Maker shall have the right to prepay, at any time and from time to time without premium or penalty, the entire unpaid principal balance of this Note or any portion thereof, but must also pay the amount of then accrued but unpaid interest on the amount of principal being so prepaid; provided, Maker shall give Payee at least five (5) Business Days prior written notice of such prepayment.  Any partial prepayments of principal shall be applied in inverse order of maturity to the last maturing installment(s) of principal.

IV.    DEFAULT AND REMEDIES.

IV.1.  Default.  Maker shall be in default hereunder immediately upon the occurrence of an Event of Default.

IV.2.  Remedies.  If an Event of Default shall occur, then Payee may, at its option, without notice or demand, declare the unpaid principal balance of, and the accrued but unpaid interest on, this Note immediately due and payable, foreclose all liens and security interests securing payment hereof, if any, pursue any and all other rights, remedies and recourses available to Payee or pursue any combination of the foregoing.  All remedies hereunder, and at law or in equity shall be cumulative.

3

WAS: 100873_1

Rcvd 05/21 05:08PM (03:18) on RSPAB Righ line 06 for FORMAN          WORKSRV2 printed FOR374593F32E85 on 05/21/1999 05:12PM * Pg 6/9
05-21-99  17:10   From-
T-166  P.06/08  F-647

IV.3. <u>Waiver</u>. Maker and any endorsers or guarantors hereof severally waive presentment and demand for payment, notice of intent to accelerate maturity, notice of acceleration of maturity, protest and notice of protest and non-payment, bringing of suit and diligence in taking any action to collect any sums owing hereunder or in proceeding against any of the rights and collateral securing payment hereof. Maker and any endorsers or guarantors hereof agree (i) that the time for any payments hereunder may be extended from time to time without notice and consent, (ii) to the acceptance of further collateral, and/or (iii) the release of any existing collateral for the payment of this Note, all without in any manner affecting their liability under or with respect to this Note. No extension of time for the payment of this Note or any installment hereof shall affect the liability of Maker under this Note or any endorser or guarantor hereof even though the Maker or such endorser or guarantor is not a party to such agreement.

IV.4. <u>No Waiver</u>. Failure of Payee to exercise any of the options granted herein to Payee upon the happening of one or more of the events giving rise to such options shall not constitute a waiver of the right to exercise the same or any other option at any subsequent time in respect to the same or any other event. The acceptance by Payee of any payment hereunder that is less than payment in full of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any of the options granted herein to Payee at that time or at any subsequent time or nullify any prior exercise of any such option without the express written acknowledgment of the Payee.

IV.5. <u>Collection Costs</u>. Maker agrees to pay all costs of collection hereof when incurred, including reasonable attorneys' fees, whether or not any legal action shall be instituted to enforce this Note.

V. <u>MISCELLANEOUS</u>.

V.1. <u>Security</u>. This Note is secured by a guaranty dated of even date herewith, executed by Sparrow Industries, Inc. for the benefit of Payee.

V.2. <u>Notices</u>. All notices or other communications required or permitted to be given pursuant hereto shall be in writing and shall be deemed properly given if (i) mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested, (ii) by delivering same in person to the intended addressee, or (iii) by delivery to an independent third party commercial delivery service for same day or next day delivery and providing for evidence of receipt at the office of the intended addressee. Notice so mailed shall be effective upon its deposit with the United States Postal Service or any successor thereto; notice sent by such a commercial delivery service shall be effective upon delivery to such commercial delivery service; notice given by personal delivery shall be effective only if and when received by the addressee; and notice given by other means shall be effective only if and when received at the designated address of the intended addressee. Either party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days notice to the other party in the

4

WAS: 100573_1

Rcvd 05/21 05:08PM (03:18) on RSPAB Righ line 06 for FORMAN          WORKSRV2 printed FOR374593F32E85 on 05/21/1999 05:12PM * Pg 7/9
05-21-99   17:10   From-                                                                    T-166   P 07/09   F-647

manner set forth herein.  For purposes of such notices, the addresses of the parties shall be as follows:

Payee:  SunAmerica Housing Fund 682, a Nevada limited partnership
1 SunAmerica Center
Century City
Los Angeles, California  90067-6022
Attention:  Michael Fowler

Maker:  420 Stockholm Housing Development Fund Company, Inc.
c/o Sparrow Industries, Inc. *and %cRidgewood Bushwick Senior Citizens Counsel, Inc.*
3743 White Plains Road   *217 Wyckoff Ave.*
Bronx, New York  10467   *Brooklyn NY 11237*
Attention:  Randolph Silverstein   *ATTN: Donald Manning*

**V.3.   GOVERNING LAW.  THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.  THIS NOTE IS PERFORMABLE IN KINGS COUNTY, NEW YORK.** Any action or proceeding under or in connection with this Note against Maker or any other party ever liable for payment of any sums of money payable on this Note may be brought in any state or federal court in Kings County, New York.  Maker and each such other party hereby irrevocably (i) submits to the nonexclusive jurisdiction of such courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.

V.4.   Interest Provisions.

(a)   Savings Clause.  It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply strictly with the applicable New York law governing the maximum rate or amount of interest payable on this Note ~~or the Related Indebtedness~~ (or applicable United States federal law to the extent that it permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under New York law).  If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, (ii) contracted for, charged or received by reason of Payee's exercise of the option to accelerate the maturity of this Note, or (iii) Maker will have paid or Payee will have received by reason of any voluntary prepayment by Payee of this Note, then it is Maker's and Payee's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Payee shall be credited on the principal balance of this Note, and the provisions of this Note immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of

5

WAS: 100873_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
NYSCEF DOC. NO. 2
INDEX NO. 523152/2018
RECEIVED NYSCEF: 11/19/2018

Rcvd 05/21 05:08PM (03:18) on RSPAB Righ line 06 for FORMAN        WORKSRV2 printed FOR374593F32EB5 on 05/21/1999 05:12PM * Pg 8/9

05-21-99   17:11   From-                                                                          T-166   P 08/09   F-647

the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then Maker and Payee agree that Payee shall, with reasonable promptness after Payee discovers or is advised by Maker that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Maker and/or credit such excess interest against this Note then owing by Maker to Payee.  Maker hereby agrees that as a condition precedent to any claim seeking usury penalties against Payee, Maker will provide written notice to Payee, advising Payee in reasonable detail of the nature and amount of the violation, and Payee shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Maker or crediting such excess interest against this Note then owing by Maker to Payee.  All sums contracted for, charged or received by Payee for the use, forbearance or detention of any debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note for so long as debt is outstanding. Notwithstanding anything to the contrary contained herein, it is not the intention of Payee to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

(b)     Ceiling Election. To the extent United States federal law permits Payee to contract for, charge, take, receive or reserve a greater amount of interest than under New York law, Payee will rely on United States federal law instead of New York law for the purpose of determining the Maximum Lawful Rate.  Additionally, to the extent permitted by applicable law now or hereafter in effect, Payee may, at its option and from time to time, utilize any other method of establishing the Maximum Lawful Rate under applicable law by giving notice, if required, to Maker as provided by applicable law now or hereafter in effect.

V.5.     Captions.  The article and section headings used in this Note are for convenience of reference only and shall not affect, alter or define the meaning or interpretation of the text of any article or section contained in this Note.

V.6.     Joint and Several Liability.  If this Note is executed by more than one party, each such party shall be jointly and severally liable for the obligations of Maker under this Note.  If Maker is a partnership, each general partner of Maker shall be jointly and severally liable hereunder, and each such general partner hereby waives any requirement of law that in the event of a default hereunder, Payee exhaust any assets of Maker before proceeding against such general partner's assets.

V.7.     **WAIVER OF RIGHT TO TRIAL BY JURY.    MAKER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM THAT**

6

WAS: 100873_1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM    INDEX NO. 523152/2018
NYSCEF DOC. NO. 2    Case 1:18-cv-07261-RJD-JRC    Document 1-2    Filed 12/26/18    Page 58 of 113 PageID #: 155    RECEIVED NYSCEF: 11/19/2018

RELATES TO OR ARISES OUT OF THE ACTS OR FAILURE TO ACT OF OR BY PAYEE IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS NOTE.

V.8. **NO ORAL AGREEMENTS**. THIS NOTE EMBODIES THE AGREEMENT OF MAKER AND PAYEE AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF MAKER AND PAYEE. THERE ARE NO ORAL AGREEMENTS BETWEEN MAKER AND PAYEE. The provisions of this Note may be amended or revised only by an instrument in writing signed by the Maker and Payee.

EXECUTED to be effective as of the date first above written.

MAKER:

420 STOCKHOLM HOUSING DEVELOPMENT FUND COMPANY, INC., a New York corporation

By: _____
[name & title]    *Robert A Lane*
    *Treasurer*

7

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
NYSCEF DOC. NO: 2

## INCENTIVE PARTNERSHIP MANAGEMENT FEE AGREEMENT

**THIS INCENTIVE PARTNERSHIP MANAGEMENT FEE AGREEMENT** (the "Agreement") is entered into as of May 24, 1999 by and between 420 Stockholm Street Associates L.P., a New York limited partnership (the "Partnership"), and 420 Stockholm Housing Development Fund Company, Inc., a New York nonprofit corporation, and any assignee or successor thereof, as the General Partner of the Partnership ("General Partner").

**WHEREAS**, the General Partner and SunAmerica Housing Fund 682, A Nevada Limited Partnership ("SHF" or the "Investment Partnership"), as the Limited Partner; have formed or, simultaneously herewith, are forming the Partnership; and

**WHEREAS**, the Partnership has been formed to rehabilitate, own, maintain and operate a 35-unit multifamily apartment complex intended for rental to families of low and moderated income and located in Brooklyn, New York (the "Apartment Complex"); and

**WHEREAS**, the Partnership desires that the General Partner provide certain management services with respect to the business of the Partnership for the period commencing as of the date hereof and continuing throughout the term of the Partnership.

**NOW, THEREFORE,** in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties agree as follows:

1.      <u>Appointment</u>. The Partnership hereby appoints the General Partner to render services in managing and administering the Partnership during the term of the Partnership as herein contemplated.

2.      <u>Authority</u>. In conformity with the provisions of the Partnership Agreement, throughout the term of the Partnership, the General Partner shall have the authority and the obligation, which authority and obligation may, subject to the provisions of the Partnership Agreement, be exercised by the General Partner to:

(i)      administer, manage and direct the business of the Partnership, and take such further action as it may deem necessary or desirable to further the interest of the Partnership in accordance with the provisions of the Partnership Agreement;

(ii)      monitor the day-to-day operations of the Apartment Complex and make recommendations with respect thereto;

WAS: 99043_1

(iii)    investigate and make recommendations with respect to the selection and conduct of relations with consultants and technical advisors (including, without limitation, accountants and other similar advisors, attorneys, corporate fiduciaries, escrow agents, depositaries, custodians, agents for collection, insurers, insurance agents and banks) and persons acting in any other capacity, in connection with the Partnership;

(iv)    maintain appropriate books and records of the Partnership in accordance with sound federal income tax accounting principles and in conformity with the requirements of the Lender, including information relating to the sale by the General Partner or any Affiliate of goods or services to the Partnership;

(v)    be responsible for the safekeeping and use of all funds and assets of the Partnership, including the maintenance of bank accounts in accordance with Section 13.02 of the Partnership Agreement;

(vi)    prior to November 30 of every year, furnish or cause to be furnished to all Persons who were Partners at any time during the Partnership's fiscal year, preliminary tax information regarding the Partnership and its operations during the current fiscal year;

(vii)    on or before March 15 of every year, furnish or cause to be furnished to all Persons who were Partners at any time during the Partnership's prior fiscal year, all tax information regarding the Partnership and its operation during the prior fiscal year which is reasonably necessary to the Partners for their preparation of their tax returns;

(viii)    provide reports to Partners required pursuant to Section 13.04 of the Partnership Agreement;

(ix)    furnish or cause to be furnished to the Partners copies of any and all financial reports that may be requested by any party(ies) to any of the Project Documents or any governmental agencies having jurisdiction, including copies of any financial statements required by the Lender;

(x)    furnish or cause to be furnished to the Partners and/or any party(ies) to any of the Project Documents all such information as they may reasonably request from time to time with respect to the financial and administrative conditions of the Apartment Complex and the Partnership; and

(xi)    provide office space, support staff and administrative services as required by the Partnership.

3.    _Fees_. For services to be performed under this Incentive Partnership Management Fee Agreement, the Partnership shall pay the General Partner, solely

2

WAS: 99043_1

from the Net Cash Flow of the Partnership available pursuant to Section 11.01(a) of the Partnership Agreement, an annual Incentive Partnership Management Fee. Such annual fee shall be in an amount as set forth in Sections 8.12 and in the priority set forth in Section 11.01(a) of the Partnership Agreement, commencing after the events described in Section 8.12 have occurred, but in no event greater than $25,000 per annum.

4.   Withholding of Fee Payments.   In the event that (i) the General Partner or any successor General Partner shall not have substantially complied with any material provisions under this Agreement and the Partnership Agreement, or (ii) the General Partner shall have been removed pursuant to Section 8.16 of the Partnership Agreement, then such General Partner shall be in default of this Agreement, and the Partnership shall withhold payment of all or any installment of fees payable to such General Partner pursuant to Section 3 of this Agreement and Section 8.13 of the Partnership Agreement.

All amounts so withheld by the Partnership under this Section 4 shall be promptly released to the General Partner, only after the General Partner has cured the default justifying the withholding, unless the General Partner shall have been removed pursuant to the Partnership Agreement.

5.   Successors and Assigns; Termination.   This Agreement shall be binding on the parties hereto, their heirs, successors and assigns.   In the event that the Interests of a General Partner as General Partner are transferred pursuant to Section 6.01 of the Partnership Agreement, further payment of the Incentive Management Fee from the Partnership to such General Partner pursuant to Section 3 above shall be governed by such Section 6.01.   The parties hereto may terminate this Agreement upon mutual consent to do so.

6.   Defined Terms.   Capitalized terms used in this Agreement and not specifically defined herein shall have the same meanings assigned to them as in the Partnership Agreement.

7.   Separability of Provisions.   Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

8.   Counterparts.   This Agreement may be executed in several counterparts, each of which shall be deemed to be an original copy and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

9.   No Continuing Waiver.   The waiver of any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

3

WAS: 99043_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 63 of 113 PageID #: 160

10.   <u>Applicable Law</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

**IN WITNESS WHEREOF**, the parties have caused this Incentive Partnership Management Fee Agreement to be duly executed as of the date as first written above.

**PARTNERSHIP:**

420 STOCKHOLM STREET ASSOCIATES L.P.,
a New York  limited partnership

By:   420 Stockholm Housing Development Fund
      Company, a New York nonprofit
      corporation,   its general partner

By: _____
    Name: _____
    Title: _____

**GENERAL PARTNER:**

420 STOCKHOLM HOUSING
DEVELOPMENT FUND COMPANY,
INC., a New York nonprofit corporation

By: _____
    Name: _____
    Title: _____

4

WAS: 99043_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 64 of 113 PageID #: 161

## INSURANCE REQUIREMENTS

Immediately upon purchase of the Land, and throughout the term of this Agreement, Managing GP shall obtain, and maintain in full force and effect, the following policies of insurance:

" Commercial General Liability insurance, insuring for legal liability of the Partnership, and caused by bodily injury, property damage, personal injury or advertising injury, arising out of the ownership or management of the Land and including the costs to defend such actions brought against the Partnership. The policy shall include endorsements adding the Investment Partnership, SunAmerica Inc. and SunAmerica Affordable Housing Partners, Inc. as additional insureds, and shall be primary coverage for the additional insureds, without contribution from other valid insurance policies which may be carried directly by the additional insureds. Limits of the policy shall be at least $1 million per occurrence and $2 million in the aggregate.

" Automobile Liability insurance, insuring for legal liability of the Partnership, and caused by bodily injury, property damage, or personal injury arising out of the ownership or use of motor vehicles, including vehicles not owned by the Partnership, and including the costs to defend such actions brought against the Partnership. The policy shall include endorsements adding the Investment Partnership, SunAmerica Inc. and SunAmerica Affordable Housing Partners, Inc. as additional insureds, and shall be primary coverage for the additional insureds, without contribution from other valid insurance policies which may be carried directly by the additional insureds. Limits of the policy shall be at least $1 million combined single limits per accident.

" Worker's Compensation insurance, insuring for occupational disease or injury and employer's liability, and covering the Partnership's full liability for statutory compensation to any person or persons who perform work for the Partnership or perform duties on the site of the Apartment Complex, and liability to the dependents of such persons. The policy will be in a form which complies with the worker's compensation acts and safety laws of the state in which the Apartment Complex is located. Worker's Compensation limits shall be statutory; Employer's Liability limits shall be at least $1 million per occurrence.

" Umbrella/Excess Liability insurance, with the Commercial General Liability, Automobile Liability and Employers Liability policies scheduled as underlying policies. Limits of the policy shall be at least $4 million per occurrence and in the annual aggregate.

" Other forms or types of insurance which the Investment Partnership may now or hereafter require.

Prior to any occupancy of the Apartment Complex, the Managing GP shall obtain, and shall maintain in full force and effect throughout the term of this Agreement, the following policies of insurance:

Property Damage insurance, insuring for all risks of physical loss of or damage (excluding the perils of earthquake and flood, unless specifically required by the Investment Partnership) to the real property comprising the Apartment Complex, personal property of the Partnership used to maintain or service the Apartment Complex, and new construction, additions, alterations and repairs to structures. Policy shall provide for claims to be paid based upon replacement cost of the lost or damaged property without deduction for depreciation; loss payment shall be to the Partnership. Limits of policy will be at least the replacement value of the Apartment Complex (excluding the value of the Land, site utilities, foundations and architectural and engineering expenses). The policy shall have a deductible of no greater than $10,000 per occurrence. The policy shall carry no coinsurance provisions. Coverage and limits shall be extended to include the actual loss of rents sustained due to an insured loss, for a period of at least twelve months from the date of such loss. Coverage shall be further extended to include debris removal, outdoor trees, shrubs, plants and lawns, and Ordinance or Law coverage for the increased costs of construction caused by the enforcement of building, zoning or land use law. The policy shall include an endorsement naming the Investment Partnership as Loss Payee, as its interests may appear, and as an additional insured, and shall allow the Investment Partnerships to be associated in the adjustment of any claim.

Evidence of Worker's Compensation insurance from any contractor performing work for the Partnership, insuring for occupational disease or injury and employer's liability, and covering the Contractor's full liability for statutory compensation to any person or persons who perform work in, on, or about the Apartment Complex, including the employees of subcontractors of any tier, and liability to the dependents of such persons. The policy will be in a form which complies with the worker's compensation acts and safety laws of the state in which the Apartment Complex is located. Worker's Compensation limits shall be statutory; Employer's Liability limits shall be at least $1 million per occurrence.

All such policies shall be underwritten by companies licensed to write such insurance in the state in which the Apartment Complex is located, and shall be rated in the latest A.M. Best's Insurance Rating Guide with a rating of at least A-, and be in a financial category of at least X. The Administrative GP shall furnish to the Investment Partnerships a complete copy of each such policy of insurance. If the policy is not available prior to Final Completion, then certificates of insurance detailing the policy terms and conditions as noted above shall be provided, but the policies must then be provided within sixty days. All such policies shall include endorsements requiring at least 30 days prior written notice to the Investment Partnerships of any cancellation, termination or reduction of coverage therein. Notice of the renewal of any policy shall be made at least 10 days prior to the scheduled date of such renewal, and shall be in the form of endorsement to the policy. Notice to the Investment Partnerships of any replacement of any policy shall be made at least 10 days prior to such replacement, and shall be in the form of a copy of the replacement policy, or by certificate, as noted above.

The Managing GP hereby releases and relieves the Investment Partnerships, SunAmerica Inc. and SunAmerica Affordable Housing Partners, Inc. for any and all liability, and waives its entire right of recovery against them, with respect to any loss or damage of property or for property damage, bodily injury or personal injury to third-parties arising out of or

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 67 of 113 PageID #: 164

incident to any loss or peril insured against under any for the foregoing policies, and any other perils for which the Managing GP has arranged insurance.

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
INDEX NO. 523152/2018

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 11/19/2018

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 68 of 113 PageID #: 165

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM INDEX NO. 523152/2018

NYSCEF DOC. NO. 2    Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 69 of 113 PageID #: 166   RECEIVED NYSCEF: 11/19/2018

EXHIBIT F

REPLACEMENT RESERVE ITEMS

The Reserve for Replacements may be used for the following items and/or other items proposed by the Managing General Partner with the Consent of the Investment Partnerships:

— Additions of the newest amenity to stay competitive (e.g., the equivalent of fitness centers, business centers, expanded children's facilities, etc.)

— Roof replacements

— Painting and siding rehab

— HVAC and appliance replacements

— Wood replacement due to dry or wet rot or termites

— Security enhancements as neighborhoods change and properties age (e.g., fencing and controlled access gates or improved exterior lighting)

— The addition of facilities that will improve operations or cut costs such as maintenance garage or trash compactor

— Opportunities for remarketing of utilities (sub-metering water and sewer and possibly gas and electric)

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 70 of 113 PageID #: 167

## UNCONDITIONAL GUARANTY

**FOR VALUE RECEIVED**, and to induce SunAmerica Housing Fund 682, A Nevada Limited Partnership (the "Investment Partnership"), to make a loan to 420 Stockholm Housing Development Fund Company, Inc. (the "General Partner") in the amount of $1,930,876 and to induce SunAmerica Investments, Inc. ("SunAmerica") to make a loan to the General Partner in the amount of $1,700,000 the undersigned (hereinafter referred to as the "Guarantor") jointly and severally, if more than one, unconditionally and irrevocably guarantees the payment in full of all of the payment obligations of the General Partner, under the following: (i) the Promissory Note of the General Partner to SunAmerica dated as of May 1999 in the principal amount of $1,700,000 (the "Construction Loan Note"), and (ii) the Promissory Note of the General Partner to the Investment Partnership dated as of May 1999 in the principal amount of $1,930,876 (the "Bridge Loan Note").

Guarantor covenants and agrees that neither its obligations to make payment in accordance with the terms of this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of the General Partner resulting from the operation of any present or future provision of the Bankruptcy Reform Act of 1978 or other statute, or from the decision of any court, nor shall such obligation of Guarantor be impaired, modified, changed, released or limited in any manner by such event of bankruptcy.

Guarantor further covenants and agrees that the execution and delivery and the observance and performance of this Guaranty by said Guarantor does not and will not conflict with or result in a breach of the terms or provisions of any existing rule, regulation or order of any court or governmental body or of any indenture, agreement or instrument to which Guarantor is party, or by which it is bound, or to which it is subject, or constitute a default thereunder, and that this Guaranty has been duly executed and delivered by Guarantor and constitutes a valid and binding Guaranty enforceable in accordance with its terms.

This Guaranty is a guaranty of payment and not of collection. SunAmerica or the Investment Partnership, as applicable, shall first proceed against the General Partner and against or exhaust any security held by the General Partner before proceeding against Guarantor on this Guaranty, provided, however, that if the General Partner declares bankruptcy or is involuntarily in bankruptcy, SunAmerica or the Investment Partner may proceed directly against the Guarantor. Guarantor waives all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty. Guarantor shall be jointly and severally liable for the obligations hereunder with any other guarantor thereof. Notwithstanding the foregoing, Guarantor shall be promptly provided with copies of any notices of default and/or demands for payment delivered to the General Partner by the Investment Partnership respecting the Bridge Loan Note and by SunAmerica under the construction loan agreement governing payment of the Construction Loan Note (the "Construction Loan Agreement").

It is expressly understood and agreed that this is a continuing guaranty, and that any claim made by SunAmerica or the Investment Partnership against Guarantor pursuant to this Guaranty shall not preclude SunAmerica or the Investment Partnership from making a claim against Guarantor for future payments respecting the Construction Loan Note or Bridge Loan Note, respectively. Any payment made by Guarantor pursuant to this Guaranty shall satisfy the

WAS: 100244_1

obligation of the General Partner to make such payment, as if the General Partner had made such payment itself.

It is understood and agreed that the benefits under this Unconditional Guaranty shall run solely to the Investment Partnership with respect to the Bridge Loan Note and SunAmerica with respect to the Construction Loan Note, and that this Unconditional Guaranty is not intended to create a third party beneficiary relationship with any other party.

All rights, powers and remedies of SunAmerica and the Investment Partnership hereunder shall be cumulative and not alternative and shall be in addition to all rights, powers and remedies given to SunAmerica and the Investment Partnership by law or in equity.

Guarantor represents that it has read such of the documents given in connection with the Construction Loan Note and the Bridge Loan Note as it or he deems it necessary or desirable to read and that it or he understands the terms of this Guaranty and is competent to execute this Guaranty. If any provision of this Guaranty shall be held to be invalid or unenforceable either generally or as to any particular set of circumstances, all other provisions hereof shall nevertheless remain valid and enforceable in accordance with their terms.

If any clause or provision herein contained operates or would prospectively operate to invalidate this Guaranty in whole or in part, then such clauses and provisions only shall be held for naught as though not contained herein, and the remainder of the Guaranty shall remain operative and in full force and effect.

This Guaranty shall be construed and enforced in accordance with the laws of the State of New York.

**IN WITNESS WHEREOF,** the undersigned Guarantor has executed this Unconditional Guaranty as of May __, 1999.

WITNESS:

_____

SPARROW INDUSTRIES, INC. ,
a New York corporation

By: _____
Randolph Silverstein, President

-2-

WAS: 100244_1

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 73 of 113 PageID #: 170

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 74 of 113 PageID #: 171

EXHIBIT G

Management Agreement

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM          INDEX NO. 523152/2018

NYSCEF DOC. NO. 2          Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 75 of 113 PageID #: 172          RECEIVED NYSCEF: 11/19/2018

*Final*

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

### 420 Stockholm Street Associates L.P.

**As of December 21, 1998**

WAS: 86412_1 7930.376

Final

## TABLE OF CONTENTS

1.  FORMATION OF LIMITED PARTNERSHIP ................................................ 2

2.  NAME AND PLACE OF BUSINESS ............................................................ 2

3.  PURPOSES ...................................................................................................... 2

4.  TERM OF PARTNERSHIP; AGENT FOR SERVICE OF PROCESS .......... 2
    (a)  Term ..................................................................................................... 2
    (b)  Agent for Service of Process ............................................................. 2

5.  DEFINITIONS ................................................................................................ 2

6.  CAPITAL CONTRIBUTIONS AND LOANS ................................................ 6
    (a)  Initial Capital Contributions. .......................................................... 6
    (b)  General Partner Contribution of the Land ..................................... 6
    (c)  Interest on Contributions ................................................................. 6
    (d)  Use of Capital Contributions ........................................................... 6
    (e)  Limited Liability of Limited Partner/Additional Capital Contributions ....... 6
    (f)  Return of Capital ............................................................................... 6

7.  ACQUISITION, FINANCING AND SALE OF THE LAND ......................... 6
    (a)  Purchase of the Land ........................................................................ 6
    (b)  Financing of the Land Purchase ...................................................... 7
    (c)  No Fiduciary Relationship ................................................................ 8
    (d)  Development of LIHTC Project ......................................................... 9
    (e)  Sale of Land ....................................................................................... 9
    (f)  Sale of Land ....................................................................................... 9

8.  ALLOCATIONS AND DISTRIBUTIONS ..................................................... 10
    (a)  Allocations .......................................................................................... 10
    (b)  Distribution of Distributable Cash .................................................. 10
    (c)  General Provisions ............................................................................ 11
    (d)  Special Provisions ............................................................................. 11

9.  COMPENSATION OF PARTNERS. ............................................................... 13

10. RIGHTS, POWERS AND DUTIES OF THE GENERAL PARTNER ........... 13
    (a)  Powers of General Partner ............................................................... 13
    (b)  Acts Requiring Special Approval ..................................................... 13
    (c)  Information Relating to Partnership ............................................... 14
    (d)  Tax Matters Partner .......................................................................... 14

WAS: 86412_1 7930.376

i

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM INDEX NO. 523152/2018

NYSCEF DOC. NO. 2 Case 1:18-cv-07261-RJD-JRC Document 1-2 Filed 12/20/18 Page 77 of 113 PageID #: 174 RECEIVED NYSCEF: 11/19/2018

|  |  |  | Final |
|---|---|---|---|
| (e) | Independent Activities of Partners | | 14 |
| (f) | Execution of Documents | | 14 |
| **11.** | **TRANSFERS** | | **14** |
| (a) | General Partner | | 15 |
| (b) | Assignability by Limited Partners | | 15 |
| (c) | Substitution of Assignee as Limited Partner | | 15 |
| **12.** | **DISSOLUTION AND WINDING UP OF THE PARTNERSHIP** | | **15** |
| (a) | Dissolution of Partnership | | 15 |
| (b) | Continuation of Partnership | | 16 |
| (c) | Winding Up of the Partnership | | 16 |
| **13.** | **WITHDRAWAL, ADDITION AND REMOVAL OF THE GENERAL PARTNER** | | **16** |
| (a) | Withdrawal of the General Partner | | 16 |
| (b) | Addition of a General Partner | | 16 |
| (c) | Cause for Removal of the General Partner | | 16 |
| (d) | Procedure for Removal | | 17 |
| **14.** | **BOOKS AND RECORDS** | | **17** |
| (a) | Books of Account | | 17 |
| (b) | Banking | | 18 |
| (c) | Accountants | | 18 |
| **15.** | **ADJUSTMENT OF BASIS ELECTION** | | **18** |
| **16.** | **WAIVER OF ACTION FOR PARTITION** | | **18** |
| **17.** | **AMENDMENTS** | | **18** |
| **18.** | **EQUITABLE RELIEF** | | **18** |
| **19.** | **NOTICES** | | **18** |
| **20.** | **ATTORNEYS' FEES** | | **19** |
| **21.** | **REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE GENERAL PARTNER** | | **19** |
| **22.** | **INDEMNIFICATION** | | **21** |
| **23.** | **MISCELLANEOUS** | | **22** |
| (a) | Opinion of General Partner's Counsel | | 22 |
| (b) | Applicable Law | | 22 |

WAS: 86412_1 7930.376

ii

|  |  |  | Final |
|---|---|---|---|
| (c) | Severability | | 22 |
| (d) | Successors and Assigns | | 23 |
| (e) | Entire Agreement | | 23 |
| (f) | Waivers | | 23 |
| (g) | Counterparts | | 23 |
| (h) | Captions | | 23 |
| (i) | Exhibits | | 23 |
| (j) | Parties in Interest | | 23 |

## EXHIBITS

EXHIBIT A   Description of the Land
EXHIBIT B   Unconditional Guaranty
EXHIBIT C   Pledge and Security Agreement
EXHIBIT D   Mortgage
EXHIBIT E   Promissory Note
EXHIBIT F   Acquisition Proposal and Agreement

WAS: 86412_1 7930.376

iii

Final

## AGREEMENT OF LIMITED PARTNERSHIP
## OF
## 420 STOCKHOLM STREET ASSOCIATES L.P.,
## A NEW YORK LIMITED PARTNERSHIP

THIS **AGREEMENT OF LIMITED PARTNERSHIP** (this "Agreement") is made as of December 21, 1998 by and among **420 STOCKHOLM HOUSING DEVELOPMENT FUND COMPANY, INC. ("HDFC")**, a New York nonprofit corporation (the "General Partner") and **SUNAMERICA HOUSING FUND 682**, a Nevada Limited Partnership (the "Limited Partner"), with reference to the following facts:

A.     The General Partner, on behalf of the Partnership has executed and filed a Certificate of Limited Partnership with the Department of State (the "Department") of the State of New York (the "State") on December 21, 1998.

B.     Ridgewood Bushwick Senior Citizens Council, Inc. ("RB"), as buyer and Wyckoff Heights Medical Center, as seller have entered into a certain Purchase and Sale Agreement (the "Purchase Agreement") pursuant to which RB has the right to purchase certain land and improvements located in Brooklyn, New York, as more particularly described on Exhibit A hereto RB (the "Land") for a purchase price of approximately $500,000 (the "Contract"). RB will assign the Contract to General Partner. The closing of the Contract is to occur on or about December 23, 1998.

C     The Limited Partner is willing to loan to the General Partner the funds necessary to purchase the Land on the condition that the General Partner agrees to contribute the Land to the Partnership no later than the completion of the rehabilitation of the Land.

D.     The General Partner was formed to develop and rehabilitate the Land so that it will become a 35-unit multifamily apartment complex to be known as 420 Stockholm Street Apartments, and to be located in Brooklyn, New York (the "Apartment Complex"), and the Partnership is being formed to own and operate the Apartment Complex.

E.     The parties hereto desire to enter into this Agreement to: (i) provide for the formation of the Partnership pursuant to the New York Revised Uniform Limited Partnership Act (the "Act"); and (ii) set forth all of the provisions governing the Partnership.

**NOW, THEREFORE**, in consideration of the foregoing, of mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereby agree to enter into this Agreement and

WAS: 86412_1 7930.376

1

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM    INDEX NO. 523152/2018

NYSCEF DOC. NO. 2    Case 1:18-cv-07261-RJD-JRC    Document 1-2    Filed 12/26/18    Page 80 of 113 PageID #: 177    NYSCEF: 11/19/2018

<u>Final</u>

to form the Partnership pursuant to the Act, as set forth in this Agreement, which reads in its entirety as follows:

1.  <u>FORMATION OF LIMITED PARTNERSHIP</u>.  The General Partner and the Limited Partner hereby form the Partnership as a limited partnership pursuant to the provisions of the Act.  If necessary, upon execution of this Agreement, the General Partner shall promptly prepare, execute and file an amendment to the Certificate of Limited Partnership with the State Commission.  The Partnership shall be responsible for all filing costs.

2.  <u>NAME AND PLACE OF BUSINESS</u>.  The business of the Partnership shall be conducted under the name of 420 Stockholm Street Associates L.P.; provided, however, that the General Partner may, in its absolute and sole discretion, change the name of the Partnership at any time and from time to time, except that in no event shall the name of the Partnership include the name or initials of the Limited Partner or any name or initials which are substantially similar thereto.  The principal office of the Partnership shall be 217 Wyckoff Avenue, Brooklyn, New York 11237.  The principal office of the Partnership may be changed by the General Partner by giving written notice to the Limited Partner of any change in location not less than ten (10) days preceding any such change.

3.  <u>PURPOSES</u>.  The principal purpose of the Partnership is to acquire, hold and, if applicable, sell the Land in accordance with the terms of this Agreement, finance the acquisition of the Land as contemplated hereby, and to develop, rehabilitate, own, maintain, operate, and sell the Apartment Complex on the Land. Unless the General Partner and the Limited Partner agree in their sole respective discretion, the Partnership shall engage in no other business other than that set forth in this Paragraph 3.

4.  <u>TERM OF PARTNERSHIP: AGENT FOR SERVICE OF PROCESS</u>.

(a)  <u>Term</u>.  The Partnership shall continue until December 31, 2048, unless sooner terminated as herein provided or by operation of law.

(b)  <u>Agent for Service of Process</u>. The agent for service of process of the Partnership will be selected, and may be changed from time to time, by the General Partner in its sole and absolute discretion, subject to applicable law.  The agent for service of process shall promptly deliver to the General Partner copies of any documents served on him.

5.  <u>DEFINITIONS</u>.  When used in this Agreement, the following terms shall have the meanings set forth below:

(a)  <u>Act</u>.  The New York Revised Uniform Limited Partnership Act, as amended from time to time.

WAS: 86412_1 7930.376

2

(b)    Affiliate.   Any Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the General Partner, the Limited Partner or with another designated Person, as the context may require.

(c)    Affiliate Offer.   As defined in Section 7(f) of this Agreement.

(d)    Affiliate Right of First Refusal.   As defined in Section 7(f)(2) of this Agreement.

(e)    Agreement.   This Agreement of Limited Partnership of 420 Stockholm Street Associates.

(f)    Adjusted Capital Account Deficit.   With respect to any Limited Partner, the deficit balance, if any, in such Limited Partner's Capital Account as of the end of any Fiscal Year after giving effect to the following adjustments:   (a) credit to such Capital Account the sum of (i) any amount which such Limited Partner is obligated to restore to such Capital Account pursuant to any provision of the Agreement, plus (ii) an amount equal to such Limited Partner's share of Partnership Minimum Gain as determined under Regulation Section 1.704-2(g)(1) and such Limited Partner's share of Partner Nonrecourse Debt Minimum Gain as determined under Regulation Section 1.704-2(i)(5), plus (iii) any amounts which such Limited Partner is deemed to be obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and (b) debit to such Capital Account the items described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

(g)    Authorities and Authority.   "Authorities and Authority" shall mean all nations or governments, all states or other political subdivisions thereof and quasi-governmental entities, and all entities exercising their executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, having jurisdiction over the Land, including, but not limited to, all federal, state or municipal departments, commissions, boards, bureaus, agencies, courts, tribunals or instrumentalities. "Authority" means any of the Authorities.

(h)    Capital Account.   An account maintained for each Partner in accordance with Regulations §§1.704-1(b) and 1.704-2.

(i)    Capital Contributions.   The amount of money and agreed upon fair market value of any other property contributed to the Partnership by a Partner with respect to such Partner's interest in the Partnership.

(j)    Closing Date.   The date upon which the Partnership acquires the Land pursuant to the Purchase Agreement. The Closing is anticipated to occur on or about December 21, 1998.

WAS: 86412_1 7930.376

3

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM INDEX NO. 523152/2018

NYSCEF DOC. NO. 2    Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 82 of 113 PageID #: 179   RECEIVED NYSCEF: 11/19/2018

Final

(k)    Code. The Internal Revenue Code of 1986, as amended from time to time.

(l)    Consent. The prior written consent or approval of a Person to do the act or thing for which consent is solicited.

(m)    Developer. Sparrow Industries, Inc.

(n)    Distributable Cash. For the period in question, the excess of (a) gross receipts of the Partnership from whatever source, including operating cash flow, proceeds of a sale or other disposition of some or all of the assets of the Partnership and proceeds of a refinancing of some or all of the assets of the Partnership, over (b) the cash expenditures of the Partnership for such period and reserves for the payment of Partnership indebtedness, liabilities and contingencies as established by the General Partner.

(o)    First Deed of Trust. As defined in Section 7(b)(2) of this Agreement.

(p)    Fiscal Year. The taxable year of the Partnership for federal income tax purposes in compliance with Code §706 and the Regulations thereunder.

(q)    General Partner. 420 Stockholm Housing Development Fund Company, Inc. ("HDFC"), and any other Person or entity admitted to the Partnership as an additional or a substituted general partner in accordance with this Agreement.

(r)    Governmental Regulations. All applicable present and future statutes, regulations, rules, ordinances, codes, licenses, requirements, resolutions, policy statements and orders (including without limitation, those relating to land use, subdivision, zoning, environmental, toxic or hazardous waste, occupational health and safety, water, earthquake hazard reduction and building and fire codes) of any Authority, and all applicable judicial, administrative and regulatory decrees, judgments and orders relating to the ownership, construction, alteration, rehabilitation, maintenance, use, operation, sale or other disposition of the Land.

(s)    Guarantor. Ridgewood Bushwick Senior Citizens Council, Inc.

(t)    Land. That certain tract of land located in Brooklyn, New York, as more particularly described on Exhibit A hereto.

(u)    Limited Partner. SunAmerica Housing Fund 682, a Nevada Limited Partnership, and any other Person from time to time admitted to the Partnership as an additional or substituted limited partner(s) in accordance with the terms of this Agreement.

WAS: 86412_1 7930.376

4

<u>Final</u>

(v)    <u>LP Loan</u>.  The term "<u>LP Loan</u>" shall include the "<u>Initial LP Loan</u>." as defined in Section 7(b)(1) and shall have the meaning given such term in Section 7(b)(1).

(w)    <u>LP Loan Note</u>.  As defined in Section 7(b)(1) of this Agreement.

(x)    <u>Maximum Rate</u>.  The maximum non-usurious rate of interest per annum permitted by whichever of applicable United States federal law or New York law permits the higher interest rate, including, to the extent permitted by such applicable law, any amendments thereof or any new law hereafter coming into effect to the extent a higher maximum non-usurious rate of interest is permitted thereby.  The Maximum Rate shall be applied by taking into account all amounts characterized by applicable law as interest on the debt evidenced by the LP Loan Note, so that the aggregate of all interest does not exceed the maximum non-usurious amount permitted by applicable law.

(y)    <u>Non-Purchasing Partner</u>.  As defined in Section 7(f)(1) of this Agreement.

(z)    <u>Partners</u>.  Collectively, the General Partner and the Limited Partner.

(aa)    <u>Partnership</u>.    420 Stockholm Street Associates L.P., a New York limited partnership.

(bb)    <u>Partnership Interest</u>.  As to any Partner, his or its Capital Account, right to distributions, and profits and losses and any other rights which such Partner has in the Partnership as a Partner.

(cc)    <u>Person</u>.  An individual or an entity, such as, but not limited to, a corporation, general partnership, joint venture, limited partnership, trust or business association.  When a Person is an entity, the words "he", "him" and "his" and similar words shall include or refer to "it" and "its" and similar words.

(dd)    <u>Prime Rate</u>.  A variable interest rate equal to the per annum rate of interest publicly announced as the "<u>Prime Rate</u>" from time to time in the Western Edition of the *Wall Street Journal*.

(ee)    <u>Restated Agreement</u>.  As defined in Section 7(d) of this Agreement.

(ff)    <u>Right of First Refusal</u>.    As defined in Section 7(e)(2) of this Agreement.

(gg)    <u>Security Agreement</u>.  As defined in Section 7(b)(2) of this Agreement.

(hh)    <u>Sharing Percentage</u>.  The Sharing Percentage of the General Partner shall be .1% and the Sharing Percentage of the Limited Partner shall be 99.9%.

WAS: 86412_1 7930.376

5

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/26/18   Page 84 of 113 PageID #: 181

(ii)   <u>SunAmerica</u>.  All references herein to "SunAmerica" shall mean SunAmerica, Inc., or its successors or assigns.

(jj)   <u>Third Party Offer</u>. As defined in Section 7(e) of this Agreement.

WAS: 86412_1 7930.376

6

Final

6.     <u>CAPITAL CONTRIBUTIONS AND LOANS.</u>

    (a)     <u>Initial Capital Contributions.</u>   By January 31, 1999 each of the Partners shall make a Capital Contribution in cash or immediately available funds in the amount of One Hundred Dollars ($100.00). On the Closing Date, the General Partner and the Guarantor shall each contribute interest which it has in (i) the binding loan commitment or loan from Empire Housing Fund (the "HFA Loan"), and (ii) the Low Income Housing Tax Credit Binding Agreement and any Carryover Allocation to be issued, with respect to the Apartment Complex by the New York State Housing Finance Agency.

    (b)     <u>General Partner Contribution of the Land.</u> At a time selected by the Limited Partner after the Closing Date and before completion of the Rehabilitation, the General Partner shall contribute the Land and rehabilitation work already done to the Partnership.

    (c)     <u>General Partner Additional Capital Contribution.</u> If, upon sale of the Land to a third party pursuant to Section 7(e) or upon maturity of the LP Loan, the Partnership has insufficient funds to pay all amounts due under the LP Loan, including, but not limited to, the outstanding principal balance and interest accrued on such LP Loan, the Guarantor shall make a Capital Contribution in an amount sufficient to provide the Partnership with the funds necessary to pay all amounts due and owing under the LP Loan.

    (d)     <u>Interest on Contributions.</u>   No interest shall be paid by the Partnership on any Capital Contribution made by any Partner to the Partnership.

    (e)     <u>Limited Liability of Limited Partner / Additional Capital Contributions.</u> Except as may otherwise be provided under applicable law, no Limited Partner shall be bound by, or personally liable for, the expenses, liabilities or obligations of the Partnership. No Partner shall be permitted to make any Capital Contribution other than those required by this Agreement without the unanimous Consent of the Partners.

    (f)     <u>Return of Capital.</u> Except as otherwise provided in this Agreement, no Partner shall have the right to withdraw or reduce such Partner's Capital Contribution or to receive any distribution. Except as otherwise provided in this Agreement, no Partner shall have the right to demand or receive property other than cash in return for such Partner's Capital Contributions, or have priority over any other Partner, either as to the return of Capital Contributions or as to profits, losses or distributions of Distributable Cash.

7.     <u>ACQUISITION, FINANCING AND SALE OF THE LAND</u>

    (a)     <u>Purchase of the Land.</u>   By approximately December 23, 1998, the General Partner shall acquire the Land pursuant to the Purchase Agreement.

WAS: 86412_1 7930.376

7

Final

    (b)   <u>Financing of the Land Purchase</u>.  The General Partner shall finance the acquisition of the Land with the proceeds of the LP Loan, as described below.

    (1)   <u>LP Loan</u>.  On or before the Closing Date, and provided the General Partner has provided the Limited Partner with the security documents described in Section 7(b)(2), if required by the Limited Partner, and such other due diligence as to the General Partner, the Land and the acquisition of the Land required by the Limited Partner, the Limited Partner shall, in its sole discretion, make a land loan (the "<u>Initial LP Loan</u>") to the General Partner on the following terms:

    (i)   the Initial LP Loan shall be in the principal amount of approximately $525,000;

    (ii)   the General Partner shall pay to the Investment Partnership interest on the Initial LP Loan at the rate equal to the Prime Rate plus one percent (1%) per annum, which interest shall run from the date of funding of the Initial LP Loan to the extended maturity date of the Initial LP Loan Note;

    (iii)   the maturity date of the Initial LP Loan shall be the earlier of the closing of the Restated Agreement or March 31, 1999, provided that the Construction Loan Closing shall occur contemporaneously therewith.

    (iv)   no payment of principal or interest shall be due on the Initial LP Loan until its maturity date;

    (v)   the Initial LP Loan shall be secured as described in Section 7(b)(2) hereof;

    (vi)   the Initial LP Loan shall be evidenced by a promissory note from the General Partner in favor of the Limited Partner (the "<u>Initial LP Loan Note</u>", and collectively with any additional LP Loan Notes, the "LP Loan Note") in the form attached hereto as <u>Exhibit E</u>;

    (vii)   the Initial LP Loan and any subsequent LP Loans made hereunder shall be a full recourse obligation of the General Partner and the Guarantor.  If made by a third party lender, the LP Loan shall be guaranteed (the "<u>Bridge Loan Guaranty</u>") by SunAmerica, Inc., or an affiliate thereof (the "<u>Bridge Loan Guarantor</u>");

    (viii)   the Limited Partner may make additional LP Loans to the General Partner or Partnership (each, an "<u>Additional LP Loan</u>" and collectively with the Initial LP Loan, the "<u>LP Loan</u>") on similar terms as the Initial LP Loan, as set forth herein, or on such terms and in such amount(s) as the Limited Partner shall determine, in its sole discretion;

WAS: 86412_1 7930.376

8

<u>Final</u>

(ix)     The General Partner shall execute and deliver the First Deed of Trust (defined below) in favor of the Limited Partner, and shall obtain a mortgagee's policy of title insurance in favor of the Limited Partner in an amount equal to any outstanding LP Loans, in form and substance acceptable to the Limited Partner; and.

(x)     The General Partner and/or the Guarantor shall pay all fees, costs and expenses charged by counsel for the Limited Partner for legal services rendered in connection with preparation of documentation relating to the LP Loan subject to the limit on such fees set forth in Acquisition Proposal and Agreement attached hereto as Exhibit F. In the event the Limited Partner employs counsel to collect on the Initial LP Loan Note, or any additional LP Loan Notes, or any additional loans made or caused to be made by the Limited Partner hereunder, or otherwise to exercise its remedies, including without limitation filing a claim in connection with any bankruptcy or insolvency proceedings, the General Partner and/or the Guarantor shall pay the reasonable fees, costs and expenses of the Investment Partnership, including without limitation attorneys' fees, whether or not suit is brought.

(2)     <u>Security Documents for LP Loan</u>. Concurrently with the execution of this Agreement and as security for the Initial LP Loan Note, the General Partner shall deliver, or shall cause to be delivered to the Limited Partner fully executed originals of each of the following: (i) a Guaranty Agreement given by the Guarantor for the benefit of the Limited Partner, in the form attached hereto as <u>Exhibit B</u> (the "<u>Guaranty</u>"); (ii) a security agreement fully executed by the General Partner pursuant to which it pledges its General Partner interest in the Partnership, in the form attached hereto as <u>Exhibit C</u> (the "<u>Security Agreement</u>"); (iii) a first lien Deed of Trust on the Land given by the General Partner for the benefit of the Limited Partner to secure the Partnership's obligation under any subsequent LP Loan Note, as applicable, and as required by the Partnership (the "<u>First Deed of Trust</u>"); (iv) a UCC-1 financing statement given by the General Partner for the benefit of the Limited Partner and suitable for filing in the State of New York with respect to the Collateral (as defined in the Security Agreement); and (v) an opinion of counsel to the Partnership, the General Partner and the Guarantor in form and substance satisfactory to the Limited Partner regarding the Guaranty, the Security Agreement, the First Deed of Trust, if applicable, and the LP Loan Note.

(c)     <u>No Fiduciary Relationship</u>. The General Partner acknowledges and agrees as follows with respect to the LP Loan:  (i) the relationship between the Limited Partner and the General Partner with respect to the LP Loan is that of a debtor and creditor notwithstanding that the Limited Partner is also a limited partner of the Partnership; (ii) that the Limited Partner owes no fiduciary duty to the Partnership or the General Partner with respect to or in connection with the LP Loan; and (iii) that the Limited Partner has no duties or obligations to the Partnership or the General Partner arising from the fact that the Limited Partner shall have the right to exercise all of its rights and remedies under the LP Loan Note, the security documents described in Section 7(b)(2) and this Agreement with regard to the LP Loan in its sole and absolute

WAS: 86412_1 7930.376

9

discretion without regard to its affiliation with the Partnership and the General Partner. The Partnership and the General Partner waive and release any and all claims they may now or hereafter have against the Limited Partner based on any theory or cause of action that conflicts with the agreements of the parties set forth in this Section 7(c).

(d) <u>Development of LIHTC Project.</u> The Partners have entered into this Agreement with the expectation that on or before March 31, 1999 they shall enter into an Amended and Restated Agreement of Limited Partnership (the "Restated Agreement") which will continue the Partnership's purpose and will further set forth the schedule of capital contributions of the Limited Partner, the obligations of the General Partner and Guarantor, the expected financing of the rehabilitation, the sharing of profits, losses, credits and cash distributions, and other items as set forth in the Acquisition Proposal and Agreement attached hereto as Exhibit F. The failure of any Partner to agree on a plan for the development of the Land or to enter into an amendment to this Agreement for any reason or for no reason shall not relieve any Partner of any of its duties, rights or obligations hereunder or in connection herewith.

(e) <u>Sale of Land to a Third Party.</u>

(1) If the Partners fail to execute a Restated Agreement for any reason or for no reason on or before March 31, 1999, the General Partner will begin actively marketing the Land and shall use its best efforts to obtain a bona-fide written offer (a "<u>Third Party Offer</u>") from a Person not an Affiliate of any Partner to purchase the Land from the General Partner, which offer must include the following terms: (a) an all cash purchase price; (b) property sold in its as-is, where-is condition without any representation or warranty other than those customary for the sale of undeveloped land; (c) the buyer shall be obligated to post cash earnest money in an amount not less than $100,000; and (d) the right to purchase the Land shall expressly be subject to the Right of First Refusal set forth in Section 7(e)(2) hereof and such other terms and conditions as are reasonable and customary in the New York City metropolitan area. The General Partner shall send a copy of the Third Party Offer to the Limited Partner no later than two (2) days after its receipt thereof via overnight courier service. If the Limited Partner fails to timely exercise the Right of First Refusal, then the General Partner shall use its best efforts to sell the Land in accordance with the Third Party Offer. Notwithstanding the above, the date of March 31, 1999 may be extended in the Limited Partner's reasonable discretion for circumstances outside of the control of the parties hereto for so long as the General Partner, Guarantor and Developer are using their best efforts to execute such Restated Agreement.

(2) The Limited Partner shall have the right to purchase the Land (the "<u>Right of First Refusal</u>") on the identical terms set forth in the Third Party Offer. To exercise the Right of First Refusal, the Limited Partner must give written notice of exercise no later than ten (10) days after its receipt of the Third Party Offer. If the Limited Partner timely exercises the Right of First Refusal, then the Limited Partner shall be obligated to

WAS: 86412_1 7930.376

10

Final

buy and the Partnership shall be obligated to sell the Land on the terms and subject to the conditions set forth in the Third Party Offer, provided that the closing date for the transaction shall be the date 30 days after the date on which the Partnership receives the Limited Partner's exercise of the Right of First Refusal or such other date designated by the Limited Partner.

      (f)     <u>Sale of Land to a Partner</u>.

      (1)     The Limited Partner, the General Partner and their respective Affiliates each shall, on or after March 31, 1999, have the right to offer in writing (an "<u>Affiliate Offer</u>") to purchase the Land from the Partnership at any time, which offer must include the following terms: (a) an all cash purchase price; (b) property sold in its as-is, where-is condition without any representation or warranty other than those customary for the sale of undeveloped land; (c) the net proceeds of the transaction to the Partnership must be sufficient to allow the Partnership to pay the LP Loan, including all principal, accrued but unpaid interest and any and all fees or other amounts due thereunder; and (d) the right to purchase the Land shall expressly be subject to the right of first refusal set forth in Section 7(f)(2) hereof and such other terms and conditions as are reasonable and customary in the New York City metropolitan area. The Person making such offer shall simultaneously send a copy of the Affiliate Offer to the Partnership and each Partner not offering to purchase the Land (or to the Partner whose Affiliate is not offering to purchase the Land) (the "<u>Non-Purchasing Partner</u>") via overnight courier service. If the Non-Purchasing Partner fails to timely exercises the Affiliate Right of First Refusal, then the General Partner shall cause the Partnership to sell the Land in accordance with the Affiliate Offer and the Person making the Affiliate Offer shall be obligated to purchase the Land.

      (2)     The Non-Purchasing Partner shall have the right to purchase the Land (the "<u>Affiliate Right of First Refusal</u>") on the identical terms set forth in the Affiliate Offer. To exercise the Affiliate Right of First Refusal, the Non-Purchasing Partner must give written notice of exercise no later than five (5) days after its receipt of the Affiliate Offer. If the Non-Purchasing Partner timely exercises the Affiliate Right of First Refusal, then the Non-Purchasing Partner shall be obligated to buy and the Partnership shall be obligated to sell the Land on the terms and subject to the conditions set forth in the Affiliate Offer, provided that the closing date for the transaction shall be the date 30 days after the date on which the Partnership receives the Non-Purchasing Partner's exercise of the Affiliate Right of First Refusal or such other date designated by the Limited Partner, but in no event later than 180 days after the date on which the Partnership receives the Non-Purchasing Partner's exercise of the Affiliate Right of First Refusal.

    8.     <u>ALLOCATIONS AND DISTRIBUTIONS</u>

WAS: 86412_1 7930.376

11

Final

(a)      Allocations.  Subject to Section 8(d) all items of Partnership profits, losses, income, gain, loss, deduction, credit shall be allocated to the Partners in accordance with the terms of the Acquisition Proposal and Agreement attached hereto as Exhibit F.

(b)      Distribution of Distributable Cash.  The Partnership shall not make any distributions of Distributable Cash to the Partners except in connection with the liquidation of the Partnership, except as provided in subsections (i) and (ii) immediately below.  In connection with the liquidation of the Partnership, all Distributable Cash and any other assets of the Partnership shall be distributed as set forth in Section 12(c) of this Agreement.

(i)      There shall be no distributions of Distributable Cash to the Partners before March 31, 1999.

(ii)      In the event that the Partners agree to distribute Distributable Cash available on or after March 31, 1999, Distributable Cash shall be distributed in accordance with the terms of the Acquisition Proposal and Agreement attached hereto as Exhibit F..

(c)      General Provisions.

(1)      Except as otherwise provided in this Agreement, the Partners' distributive shares of all items of Partnership income, gain, loss, and deduction are the same as their distributive shares of Partnership profits and losses.

(2)      The General Partner shall allocate all items properly allocable to any period using any method permitted by Code §706 and the Regulations thereunder.

(3)      To the extent permitted by Regulations §1.704-2(i)(6) and §1.704-2(h), the General Partner shall endeavor to avoid treating distributions of Distributable Cash as being from the proceeds of a Nonrecourse Liability (as defined under Regulation Section 1.704-2(b)(3)) or a Partner Nonrecourse Debt (as defined under Regulation Section 1.704-2(b)(4).

(4)      If there is a change in any Partner's interest in the Partnership during a Fiscal Year, each Partner's distributive share of profits, losses, income gains, deductions, losses, credits or any item thereof for such Fiscal Year, shall be determined by any method prescribed by Code §706(d) or the Regulations thereunder that takes into account the varying interests of the Partners in the Partnership during such Fiscal Year.

(5)      The Partners agree to report their shares of income and loss for federal income tax purposes in accordance with the provisions of this Section 8.

WAS: 86412_1 7930.376

12

Final

(d)     Special Provisions.

(1)     Minimum Gain Chargeback.     Notwithstanding any other provision of Section 8, if there is a net decrease in Partnership Minimum Gain (as defined in Regulation §1.704-2(d)) during any Partnership Fiscal Year, then each Partner shall be allocated such amount of income and gain for such year (and subsequent years, if necessary) determined under and in the manner required by Regulation §1.704-2(f) as is necessary to meet the requirements for a minimum gain chargeback as provided in that Regulation.

(2)     Partner Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of Section 8 except Section 8(d)(1), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain (as defined in accordance with Regulation §1.704-2(i)(3)) attributable to a Partner Nonrecourse Debt (as defined in Regulation §1.704-2(b)(4) during any Partnership Fiscal Year, any Partner who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt determined in accordance with Regulation §1.704-2(i)(5), shall be allocated such amount of income and gain for such year (and subsequent years, if necessary) determined under and in the manner required by Regulation §1.704-2(i)(4) as is necessary to meet the requirements for a minimum gain chargeback as is provided in that Regulation.

(3)     Qualified Income Offset.     If a Limited Partner unexpectedly receives any adjustment, allocation or distribution described in Regulation §1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Partnership income and gain shall be specially allocated to such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Adjusted Capital Account Deficit of such Limited Partner as quickly as possible, provided that an allocation pursuant to this paragraph shall be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in Section 8(a) and this Section 8(d) of this Agreement tentatively have been made as if this paragraph (3) were not in the Agreement.

(4)     Limitation on Losses.     Not withstanding anything else contained in this Agreement, losses allocated to any Limited Partner pursuant to Section 8(a) of this Agreement shall not exceed the maximum amount of losses that may be allocated without causing such Limited Partner to have a deficit balance in its Adjusted Capital Account at the end of the Fiscal Year for which the allocation is made. Any losses that cannot be allocated to a Limited Partner as a result of the limitation contained in this paragraph (4) shall be allocated to the General Partner.

(5)     Code §754 Adjustment.     To the extent that an adjustment to the basis of any asset pursuant to Code §734(b) or Code §743(b) is required to be taken into account in determining Capital Accounts as provided in Regulation §1.704-1(b)(2)(iv) (m), the adjustment shall be treated (if an increase) as an item of gain or (if a decrease) as an
WAS: 86412_1 7930.376

13

item of loss, and such gain or loss shall be allocated to the Partners consistent with the allocation of the adjustment pursuant to such Regulation.

(6)    Nonrecourse Deductions.    Nonrecourse Deductions (as determined under Regulation §1.704-2(c) for any Fiscal Year shall be allocated among the Partners in proportion to their Sharing Percentages.

(7)    Partner Nonrecourse Deductions.    Any Partner Nonrecourse Deduction (as defined in Regulation §1.704-2(i)(2)) shall be allocated pursuant to Regulation §1.704-2(i) to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which it is attributable.

(8)    Purpose and Application.    The purpose and the intent of the special allocations provided for in this Section 8(d) are to comply with the provisions of Regulations §1.704-1(b) and §1.704-2, and such special allocations are to be made so as to accomplish that result. However, to the extent possible, the General Partner in allocating items of income, gain, loss, or deduction among the Partners shall take into account the special allocations in such a manner that the net amount of allocations to each Partner shall be the same as such Partner's distributive share of profits and losses would have been had the events requiring the special allocations not taken place. The General Partner shall apply the provisions of this Section 8(d) in whatever order he reasonably believes will minimize any economic distortion that otherwise might result from the application of the special allocations.

9.    COMPENSATION OF PARTNERS.    No Partner shall be entitled to any fee or compensation from the Partnership without the Consent of all of the other Partners, which consent may be withheld in such other Partner's sole and absolute discretion.

10.    RIGHTS, POWERS AND DUTIES OF THE GENERAL PARTNER

(a)    Powers of General Partner. Subject to the provisions of Section 10(b), the General Partner is authorized on behalf of the Partnership to make all decisions with respect to the Partnership's business, including the execution of all documents and performance of all things necessary to purchase the Land in accordance with the terms of the Purchase Agreement and this Agreement by the Closing Date (including, entering into each of the transfer documents contemplated by the terms of the Purchase Agreement and each of the loan documents relating to the financing of the purchase of the Land, including the LP Loan, which loan documentation is more particularly described in Section 7 of this Agreement).

(b)    Acts Requiring Special Approval.    Notwithstanding anything to the contrary contained herein, the General Partner shall not do any of the following unless the Limited Partner has given its Consent:

WAS: 86412_1 7930.376

14

(1)      Sell all or substantially all of the Partnership's assets (except as contemplated by Sections 7(e) and 7(f) hereof);

(2)      Obtain a loan or any financing other than the LP Loan and the HFA Loan or modify any of the documents executed in connection with any such loan;

(3)      Enter into any contract or agreement on behalf of the Partnership with the General Partner or any Affiliate thereof;

(4)      Confess a judgment against the Partnership;

(5)      File a petition of bankruptcy on behalf of the Partnership;

(6)      Make an assignment of the Partnership's assets for the benefit of creditors;

(7)      Make loans on behalf of the Partnership or cause the Partnership to guarantee the obligations of others;

(8)      Purchase or enter into a contract for the purchase of any real property or the sale of partnership property (except as permitted under the terms of in this Agreement); or

(9)      Expand the purpose of the Partnership beyond the purpose outlined in Section 3.

(c)      __Information Relating to Partnership__. Upon request, the General Partner shall supply to any Partner any information reasonably requested regarding the Partnership or its activities, provided that obtaining the information is not unduly burdensome to the General Partner. During ordinary business hours any Partner or its authorized representative shall have access to all books, records and materials in the General Partner's offices regarding the Partnership or its activities.

(d)      __Tax Matters Partner__. The General Partner is hereby designated the Tax Matters Partner (as defined in the Code). The costs incurred by the Tax Matters Partner for retaining accountants and/or lawyers on behalf of the Partnership in connection with any Internal Revenue Service audit of the Partnership shall be expenses of the Partnership.

(e)      __Independent Activities of Partners__. Except as provided elsewhere herein, any of the Partners may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage, and development of real property. The Partnership and each of the other Partners hereby

WAS: 86412_1 7930.376

15

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 94 of 113 PageID #: 191

expressly waives, relinquishes and renounces any such right by virtue of this Agreement in and to such independent ventures of any Partner or to the income or profits derived therefrom.

(f)  **Execution of Documents**.  Except as otherwise specifically provided by this Agreement, or as otherwise authorized by the General Partner, each check, contract, deed, lease, promissory note, deed of trust, escrow instruction, bond, release or any other documents of any nature whatsoever, in any way pertaining to this Partnership or on behalf of the Partnership, may be signed by the General Partner.

11.  **TRANSFERS**.

(a)  **General Partner**.  Without the prior written Consent of all the Partners, which Consent may be given or withheld in such Partners' sole discretion, the General Partner shall not substitute a general partner in its stead or offer for sale, sell, transfer, assign, hypothecate, pledge or otherwise encumber its Partnership Interest. No additional General Partner shall be admitted to the Partnership without the Consent of all Partners, which Consent may be given or withheld in such Partners' sole discretion.

(b)  **Assignability by Limited Partners**.  A Limited Partner may not offer for sale, sell, transfer, assign, hypothecate, pledge or otherwise encumber its Partnership Interest without the prior written Consent of all Partners, which Consent may be given or withheld in such Partners' sole discretion; provided however, that no Partner shall unreasonably withhold its Consent to the pledge by the Limited Partner of its Partnership Interest or a transfer of its right to receive distributions hereunder, so long as no pledgee or transferee shall have any right to become a Partner in the Partnership or exercise any voting rights of the Limited Partner.

(c)  **Substitution of Assignee as Limited Partner**.  As conditions to accomplish the transfer of the interest of a Partner (without implying an obligation to Consent to any transfer prohibited herein) (a) any assignee, legatee, distributee, transferee or successor of a Partner shall execute and deliver such instruments, in form and substance satisfactory to the other Partners, as the other Partners shall deem necessary, and (b) such assignee, legatee, distributee, transferee or successor shall pay all reasonable expenses in connection with his admission as a substituted Partner.

12.  **DISSOLUTION AND WINDING UP OF THE PARTNERSHIP**.

(a)  **Dissolution of Partnership**.  The Partnership shall be dissolved upon the occurrence of any of the following events:

(1)   The vote or written consent of the Limited Partner together with the written consent of the General Partner;

WAS: 86412_1 7930.376

16

Final

(2)     A sale or other disposition by the Partnership of all, or substantially all, of the Partnership's property;

(3)     The bankruptcy, dissolution, removal or withdrawal in accordance with this Agreement of the last General Partner, unless, within sixty (60) days after the occurrence of any such event, the Limited Partner elects a successor General Partner and elects to continue the business of the Partnership. In the event of the election of a successor General Partner, an amended Certificate of Limited Partnership shall be filed in the manner required by law; or

(4)     Expiration of the term of the Partnership as set forth in Paragraph 4(a) hereof.

(b)     <u>Continuation of Partnership</u>. Except as provided in Section 13(d) hereof, if the Limited Partner elects a successor General Partner and elects to continue the business of the Partnership in accordance with Section 12(a)(3), the successor General Partner shall assume the obligations of the predecessor General Partner and shall indemnify the predecessor General Partner and hold it harmless from and against any and all loss, damage, liability and expense, including costs and reasonable attorneys' fees, to which the predecessor General Partner may be put or which it may incur by reason of or in connection with any of the debts, obligations or liabilities of the Partnership thereafter made, incurred or created.

(c)     <u>Winding Up of the Partnership</u>. Upon dissolution of the Partnership, the General Partner shall wind up the affairs and liquidate the assets of the Partnership in accordance with the provisions of this Paragraph. Profits, losses, gains from capital events, Nonrecourse Deductions and Partner Nonrecourse Deductions of the Partnership shall be allocated until the liquidation is completed in the same ratio as such items were allocated prior thereto. The proceeds from liquidation of the Partnership when and as received by the Partnership shall be utilized, paid and distributed in the following order:

(1)     First, (A) to pay expenses of liquidation, then (B) to pay the secured debts of the Partnership, including the payment of the LP Loan, whether the creditor is a Partner, a former Partner or a third party other than a Partner or a former Partner, and then (C) to pay the unsecured debts of the Partnership;

(2)     Next, to the establishment of any cash reserves which the General Partner may deem reasonably necessary to meet contingent or unforeseen liabilities of the Partnership;

(3)     Thereafter, to the Partners, in accordance with their positive Capital Account balances, as determined by taking into account all Capital Account adjustments required by this Agreement.

WAS: 86412_1 7930.376

17

Final

13.  WITHDRAWAL, ADDITION AND REMOVAL OF THE GENERAL PARTNER.

(a)  Withdrawal of the General Partner.  The withdrawal of the General Partner shall require the written consent of the Limited Partner (which may be granted or withheld in the Limited Partner's sole and absolute discretion).

(b)  Addition of a General Partner.  The addition of a new General Partner shall require the written consent of the Limited Partner (which may be granted or withheld in the Limited Partner's sole and absolute discretion).

(c)  Cause for Removal of the General Partner.  The General Partner may be removed and cease to be a general partner of the Partnership only upon the following events:

(1)  Upon the General Partner's filing of a voluntary petition in bankruptcy;

(2)  Upon the commencement of a bankruptcy or insolvency proceeding against the General Partner (unless stayed or dismissed within 45 days); or

(3)  Upon the occurrence of any of the following:

(i)  The filing by the General Partner of an assignment for the benefit of creditors; or

(ii)  The attachment, execution or judicial seizure, whether by enforcement of money judgment, writ or warrant of attachment or any other process, of all or substantially all of the assets of the General Partner which is not released within sixty (60) days after such action.

(d)  Procedure for Removal.  The Limited Partner shall give written notice to all Partners of its determination that the General Partner shall be removed and the date on which such removal shall be effective.  As of such date, (i) the General Partner shall cease to be a Partner and the powers and authorities conferred on it as a Partner under this Agreement shall cease, (ii) the General Partner shall forfeit any and all right, title and interest in and to its Partnership Interest, and such Partnership Interest shall be transferred to a Person designated by the Limited Partner, (in such event, upon becoming a general partner, such designee shall be bound by all applicable terms and conditions of this Agreement), and (iii) the General Partner shall forfeit any and all right title and interest in and to any distributions, Capital Contribution or any other payments due to the General Partner pursuant to this Agreement or contemplated hereby.  If the General Partner is removed as aforesaid, it shall be and shall remain liable for all obligations and

WAS: 86412_1 7930.376

18

Final

liabilities incurred by it as a general partner and in accordance with the terms of this Agreement.

The Limited Partner hereby is granted an irrevocable power of attorney, coupled with an interest, to execute any and all documents on behalf of the Partners and the Partnership as shall be legally necessary and sufficient to effect all of the foregoing provisions of this Section 13(d). The election by the Limited Partner to remove the General Partner under this Section shall not limit or restrict the availability and use of any other remedy which the Limited Partner or any other Partner might have with respect to the General Partner in connection with its undertakings and responsibilities under this Agreement.

14.   BOOKS AND RECORDS.

(a)   Books of Account. The General Partner shall, at the Partnership's sole cost and expense, keep adequate books of account of the Partnership wherein shall be recorded and reflected, in accordance with generally accepted accounting principles, all of the Capital Contributions and all of the income, expenses and transactions of the Partnership and a list of the names and addresses, and interests held by the Partners in alphabetical order. The income and expenses of the Partnership shall be accounted for on an accrual basis.

(b)   Banking. All funds of the Partnership shall be deposited in a separate bank account or accounts as shall be determined by the General Partner. All withdrawals therefrom shall be made upon checks signed by the General Partner.

(c)   Accountants. The accountants for the Partnership shall be Koch and Geringer & Co.

15.   ADJUSTMENT OF BASIS ELECTION. At the request of the Limited Partner, the General Partner shall file an election, in accordance with Section 754 of the Code and applicable Treasury Regulations, to cause the basis of the Partnership's property to be adjusted for Federal income tax purposes, as provided in Sections 734, 743 and 754 of the Code.

16.   WAIVER OF ACTION FOR PARTITION. Each of the Partners hereby irrevocably waives, during the term of the Partnership, any right such Partner may have to maintain any action for partition with respect to any property of the Partnership, including without limitation, the Land.

17.   AMENDMENTS. Any amendment to this Agreement shall be effective only if approved in writing by each Partner.

WAS: 86412_1 7930.376

19

<u>Final</u>

18.    <u>EQUITABLE RELIEF</u>.  It is agreed that the rights granted to the parties hereunder are of a special and unique kind and character and that, if there is a breach by any party of any material provision of this Agreement, the other parties would not have an adequate remedy at law.  It is expressly agreed, therefore, that the rights of the parties hereunder may be enforced by equitable relief as is provided under the laws of the State of New York.

19.    <u>NOTICES</u>.  Any and all notices, demands or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly given or made to another party only (a) if served personally, (b) if deposited in the United States first class mail, certified or registered, postage prepaid, or (c) if sent by overnight delivery service and a confirmation of receipt is obtained.  If such notice, demand or other communication is served personally, service shall be conclusively deemed made at the time of such personal service.  If such notice, demand or other communication is given by mail, such shall be conclusively deemed given seventy-two (72) hours after the deposit thereof in the United States mail addressed to the party to whom such notice, demand or other communication is to be given at the following address set forth below.  If such notice, demand or other communication is sent by overnight delivery service, such shall be conclusively deemed given at the time confirmation of receipt is obtained, provided the overnight delivery is addressed to the party to whom such notice, demand or other communication is to be given at the address set forth below.

|  |  |
|---|---|
| If to the Partnership: | 420 Stockholm Street Associates L.P.<br>c/o Ridgewood Bushwick Senior Citizen Council<br>217 Wyckoff Avenue<br>Brooklyn, NY 11237 |
| With a copy to: | Gerard A. Walters, Esq.<br>20 Vesey Street<br>Suite 700<br>New York, NY 10007<br>Telecopier: 212/871-4107 |
| If to the Limited Partner: | SunAmerica Housing Fund 682<br>A Nevada Limited Partnership<br>c/o SunAmerica Inc.<br>1 SunAmerica Center, Century City<br>Los Angeles, California 90067-6022<br>Attention:  Mr. Michael L. Fowler<br>Telecopier: 310/772-6179 |
| With a copy to: | Peabody & Brown<br>1255 23rd Street, NW<br>8th Floor |

WAS: 86412_1 7930.376

20

Final

Washington, DC 20037
Attention: Herbert F. Stevens, Esq.
Telecopier: 202/973-7750

Any party hereto may change its address for the purpose of receiving notices, demands and other communications as herein provided by a written notice given in the manner aforesaid to the other party or parties hereto.

20.     ATTORNEYS' FEES.   Should any party hereto institute any action or proceeding at law or in equity to enforce any provision hereof, including an action for declaratory relief or for damages by reason of an alleged breach of any provision of this Agreement, or otherwise in connection with this Agreement, or any provision hereof, the prevailing party shall be entitled to recover from the losing party or parties reasonable attorneys' fees and costs for services rendered to the prevailing party in such action or proceeding.

21.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE GENERAL PARTNER.   With respect to the following representations and warranties, the General Partner hereby represents and warrants as of the date hereof, and with respect to the following covenants, the General Partner covenants from and after the date of this Agreement, the following to the Limited Partner, the veracity of which was a material factor in the Limited Partner's entering into this Agreement and becoming a Limited Partner:

(a)     Formation.   The Partnership is and will continue to be a valid limited partnership, duly organized and validly existing under the laws of the State of New York and duly qualified to transact business and own real property in the State of New York, and has (and shall continue to have) full power and authority to acquire and own, the Land in accordance with the terms of this Agreement.

(b)     General Partner.   The General Partner is a New York nonprofit corporation duly formed, validly existing and in good standing under the laws of the State of New York and has the power and authority to own its assets and to act as the general partner of the Partnership. The General Partner is duly qualified to transact business in the State of New York.

(c)     Compliance with Contractual Obligations.   The Partnership has performed all material obligations that are required to be performed by it, and is not in default under, or in breach of, or in receipt of any claim of default under, any contract or obligation.

(d)     Litigation.   There are no pending or, to the best knowledge of the General Partner, overtly threatened adverse actions, suits, arbitrations, claims or proceedings, at law or in equity, (collectively, "Actions") affecting the Land or in which the

WAS: 86412_1 7930.376

21

<u>Final</u>

Partnership is a party, including, but not limited to, judicial, municipal or administrative proceedings in eminent domain, unlawful detainer or tenant-evictions, collections, alleged building code, health and safety or zoning violations, employment discrimination or unfair labor practices, or worker's compensation, personal injuries or property damages alleged to have occurred at the Land or by reason of the condition or use of the Land. There are no pending or, to the best knowledge of the General Partner, overtly threatened Actions against the General Partner, the Guarantor, any Affiliate of the General Partner or the Guarantor or any of the assets of any such party which if adversely determined against such party would materially adversely affect the ability of such party to perform its obligations hereunder or any agreement or instrument contemplated hereby;

        (e)   <u>Bankruptcy</u>. No attachments, execution proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings are pending or, to the best knowledge of the General Partner, overtly threatened against the Partnership, the General Partner, the Guarantor or any Affiliate of any such party.

        (f)   <u>Governmental Actions</u>.  To the best of the General Partner's knowledge, there is not any plan, study or effort of any Authority which in any way would materially adversely affect the use of the Land for its intended uses or which involves any intended public improvements which will result in any material charge being levied against, or any material lien assessed upon, the Land. Except as have been disclosed in writing by the General Partner to the Limited Partner, to the best knowledge of the General Partner, there is not any existing, proposed or contemplated, plan to widen, modify or realign any street or highway contiguous to the Land.

        (g)   <u>Moratoria; Assessments; Dedications</u>.  To the best knowledge of the General Partner, there is no reassessment, (except for real estate property taxes) reclassification, rezoning or other statute, law, judicial or administrative decision, proceeding, ordinance or regulation (including amendments and modifications of any of the foregoing) pending or, proposed to be imposed, by any Authority or any public or private utility having jurisdiction over the Land which would materially adversely affect the use or occupancy of the Land.  To the best knowledge of the General Partner, no special assessments have been levied against the Land.

        (h)   <u>Violation of Laws</u>.  To the best knowledge of the General Partner, there are no violations of any Governmental Regulations which would materially adversely affect the Land.

        (i)   <u>Title</u>. The Partnership is or will be the legal fee simple titleholder of the Land, and has or will have good, marketable and insurable title to the Land, free and clear of all liens (showing all then due special and general real property taxes paid in full), encumbrances, claims, covenants, conditions, restrictions, easements, rights of way, options, judgments, special assessments or other matters, except such liens as are

WAS: 86412_1 7930.376

22

Final

contemplated by this Agreement or such matters as are shown on the survey and/or title commitment provided by the Partnership to the Limited Partner.

(j)  <u>Rights of First Refusal; Options</u>.  The Partnership has not entered into any other contracts for the sale of the Land or any interest in the Partnership, other than this Agreement, nor do there exist any rights of first refusal or options to purchase the Land, other than the Purchase Agreement, the Right of First Refusal and the Affiliate Right of First Refusal.

22.  <u>INDEMNIFICATION</u>.

(a)  <u>Indemnification of Limited Partner</u>.  The General Partner shall at all times indemnify and hold harmless the Limited Partner against and from any and all claims, suits, actions, debts, damages, costs, charges, losses, obligations, judgments and expenses, of any nature whatsoever, suffered or incurred by the Limited Partner and arising from its investment in the Partnership or by reason of this Agreement, other than any such claims, suits, actions, debts, damages, costs, charges, losses, obligations, judgments and expenses, caused by the wrongful act or omission of the Limited Partner or any of its Affiliates.

(b)  <u>Liability for Acts and Omissions of General Partner</u>.  No General Partner or Affiliate thereof shall be liable, responsible or accountable in damages or otherwise to any of the Partners for any act or omission performed or omitted by him or it, or any of them, in good faith on behalf of the Partnership and in a manner reasonably believed by him or it or any of them to be within the scope of the authority granted to him or it or any of them by this Agreement and in the best interest of the Partnership, provided that the protection afforded the General Partner pursuant to this Section 22(b) shall not apply in the case of negligence, misconduct, fraud or any breach of fiduciary duty as General Partner with respect to such acts or omissions.  Any loss or damage incurred by any General Partner or Affiliate thereof by reason of any act or omission performed or omitted by him or it or any of them in good faith on behalf of the Partnership and in a manner reasonably believed by him or it or any of them to be within the scope of the authority granted by this Agreement and in the best interests of the Partnership (but not, in any event, any loss or damage incurred by the General Partner or Affiliate thereof by reason of negligence, misconduct, fraud or any breach of fiduciary duty as General Partner with respect to such acts or omissions) shall be paid from Partnership assets to the extent available (but the Limited Partners shall not have any personal liability to the General Partner or Affiliate(s) thereof under any circumstances on account of any such loss or damage incurred by the General Partner or Affiliate(s) thereof or on account of the payment thereof).

23.  <u>MISCELLANEOUS</u>.

WAS: 86412_1 7930.376

23

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 102 of 113 PageID #: 199

Final

(a)     Opinion of General Partner's Counsel.  As a condition precedent to all of the Limited Partner's obligations hereunder, the Limited Partner shall have received the opinion of Gerard A. Walters, Esq., counsel to the Partnership and the General Partner, which opinion shall explicitly state that Peabody & Brown of Washington, DC, counsel to the Limited Partner, may rely upon it in form and substance acceptable to the Limited Partner and its counsel, including, but not limited to, the following in addition to those opinions required by Section 7(b) hereof: (i) the General Partner and the Partnership are each duly formed and validly existing under the Act; (ii) the General Partner has full power and authority to own and operate the Land and to conduct its business hereunder; (iii) the Limited Partner has been validly admitted as a Limited Partner; and (iv) the Partnership Interest of the Limited Partner is the interest of a limited partner with no personal liability for the obligations of the Partnership.

(b)     Applicable Law.  This Agreement shall, in all respects, be governed by the laws of the State of New York.

(c)     Severability.  Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provisions contained herein and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail; but the provision of this Agreement which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.  If any provision of this Agreement shall be held to be invalid, the same shall not affect the validity, legality or enforceability of the remainder of this Agreement.

(d)     Successors and Assigns.  All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.

(e)     Entire Agreement.  This Agreement constitutes the entire understanding and agreement of the parties with respect to the subject matter hereof and any and all prior agreements, understandings or representations with respect to the subject matter hereof are hereby terminated and cancelled in their entirety and are of no further force or effect.

(f)     Waivers.  No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof.  All waivers shall be in writing and signed by the party making the waiver.

(g)     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

WAS: 86412_1 7930.376

24

     (h)    <u>Captions</u>.  The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

     (i)    <u>Exhibits</u>.  All exhibits attached hereto are hereby incorporated by reference.

     (j)    <u>Parties in Interest</u>.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

WAS: 86412_1 7930.376

25

rcvd 12/23 04:08PM (01:20) on RSPAB Righ Line 06 for FORMAN
23-DEC-98 15:58 FROM:PEABODY & BROWN     WORKSRV2 printed FOR368115E019DA on 12/23/1998 04:13PM * Pg 2/-
                                          ID:2029737750                        PAGE    2/4

**IN WITNESS WHEREOF**, the parties have executed this Agreement of Limited Partnership of 420 Stockholm Street Associates L.P. as of the date first hereinabove mentioned.

**GENERAL PARTNER:**

420 STOCKHOLM HOUSING DEVELOPMENT FUND COMPANY, INC., a New York nonprofit corporation

By: _____
Name: _____
Title: _____

**LIMITED PARTNER:**

SUNAMERICA HOUSING FUND 682,
a Nevada limited partnership

By:     SUNAMERICA INC., a Maryland
        corporation, General Partner

        By: _____
            Michael L. Fowler
            Vice President

WAS: 86412_1 7930.376

25

**IN WITNESS WHEREOF**, the parties have executed this Agreement of Limited Partnership of 420 Stockholm Street Associates L.P. as of the date first hereinabove mentioned.

### GENERAL PARTNER:

420 STOCKHOLM HOUSING DEVELOPMENT FUND COMPANY, INC., a New York nonprofit corporation

By: _____

Name: _____

Title: _____

### LIMITED PARTNER:

SUNAMERICA HOUSING FUND **682**, a Nevada limited partnership

By:   SUNAMERICA INC., a Maryland corporation, General Partner

By: _____

Michael L. Fowler
Vice President

WAS: 86412_1 7930.376

25

STATE OF NEW YORK                                    ):

STATE OF ⟨⟨⟨⟩⟩ ⟨                                     ):ss
                                                     ):

    Before me, the undersigned Notary Public in and for the aforesaid County and State, personally appeared ⟨⟨⟨⟨⟨⟨⟨⟨⟩⟩⟩ in his capacity as ⟨⟨⟨⟨⟨⟩ of    420 Stockholm Housing Development Fund Company, Inc., a New York nonprofit corporation, as the General Partner of 420 Stockholm Street Associates, and being duly sworn, acknowledged the execution of the foregoing Agreement of Limited Partnership.

    Witness my hand and notarial seal this ___ day of ⟨⟨⟨⟨⟨⟩, 1998.

                                        _____
                                                Notary Public

My Commission Expires:

                                        **JOSEPH GREENE**
                                        NOTARY PUBLIC, STATE OF NEW YORK
                                        NO. 31-01GR4522135
                                        ⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟩⟩⟩
                                        ⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟩⟩⟩

STATE OF CALIFORNIA        )
                           ) SS.
COUNTY OF LOS ANGELES      )

On December 21, 1998, before me, Roxanne Corley, a Notary Public, personally appeared MICHAEL L. FOWLER, personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

Witness my hand and official seal.

_____
Notary Public

ROXANNE CORLEY
Commission #1076814
Notary Public — California
Los Angeles County
My Comm. Expires Nov 6, 1999

(Seal)

27

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 108 of 113 PageID #: 205

Final

## EXHIBIT A

### Description of the Land

WAS: 86412_1 7930.376

Final

## EXHIBIT B

### Unconditional Guaranty

WAS: 86412_1 7930.376

FILED: KINGS COUNTY CLERK 11/15/2018 04:06 PM
INDEX NO. 523152/2018
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 11/19/2018

Final

## EXHIBIT C

### Pledge and Security Agreement

WAS: 86412_1 7930.376

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 111 of 113 PageID #: 208

Final

# EXHIBIT D

## Mortgage

WAS: 86412_1 7930.376

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 112 of 113 PageID #: 209

Final

## EXHIBIT E

### Promissory Note

WAS: 86412_1 7930.376

Case 1:18-cv-07261-RJD-JRC   Document 1-2   Filed 12/20/18   Page 113 of 113 PageID #: 210

Final

## EXHIBIT F

## Acquisition Proposal and Agreement

WAS: 86412_1 7930.376