**GOLDSTEIN HALL PLLC**
Attorneys for Plaintiff
*RiseBoro Community Partnership Inc.,*
*formerly known as Ridgewood Bushwick*
*Senior Citizens Council, Inc.*
80 Broad Street, Suite 303
New York, New York 10004
(646) 768-4100

By:    Brian J. Markowitz (BM-9640)
       Bmarkowitz@Goldsteinhall.com

       David Goldstein (DG-4370)
       Dgoldstein@Goldsteinhall.com

       Daniel Goldenberg (DG-1337)
       Dgoldenberg@Goldsteinhall.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

RISEBORO COMMUNITY PARTNERSHIP INC.,
formerly known as RIDGEWOOD BUSHWICK SENIOR
CITIZENS COUNCIL, INC.,                                                  Docket No. 18-cv-07261 (RJD)

                                                   Plaintiff,

                        -against-

SUNAMERICA HOUSING FUND NO. 682, SLP
HOUSING I, LLC, 420 STOCKHOLM STREET
ASSOCIATES L.P.,

                                                   Defendants.

-------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S LIMITED ISSUE BRIEF
REGARDING THE INTERPRETATION OF
THE RIGHT OF FIRST REFUSAL**

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................I

TABLE OF AUTHORITIES ...................................................................................................II

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND.................................................................................................. 1

OVERVIEW OF FEDERAL HOUSING POLICY UNDER THE LIHTC SYSTEM.................. 8

DISCUSSION OF LAW...................................................................................................... 12

       POINT I ................................................................................................... 12

       RISEBORO'S RIGHT OF FIRST REFUSAL IS
       NOT A CLASSICAL RIGHT OF FIRST
       REFUSAL UNDER COMMON LAW ................................................... 12

         A.  The Right of First Refusal Must be Interpreted
            Within the Parties Intent and In Context Of The
            LIHTC Program................................................................................ 12

         B.  The Right of First Refusal Cannot be Blocked
            by the Investors and Does Not Require a Third-
            Party Offer. ...................................................................................... 18

         C.  New York Common Law Does Not Support
            Investor's Position that the Right of First
            Refusal was Not Properly Triggered. ............................................... 20

         D.  Discovery is Necessary to Determine the
            Parties' Intent when they Entered into the LPA. .............................. 22

CONCLUSION.................................................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*150 Broadway N.Y. Assocs., L.P. v. Bodner,*

    14 A.D.3d 1, 784 N.Y.S.2d 63 (1st Dep't 2004) ...................................................... 19

*American Express Bank, Ltd. v. Uniroyal, Inc.,*

    164 A.D. 2d 275, 562 N.Y.S.2d 613 (1st Dep't) (1990) ........................................... 15

*Corhill Corp. v. S. D. Plants, Inc.,*

    9 N.Y.2d 595, 217 N.Y.S.2d 1 (1961) ..................................................................... 20

*Cruz v. AAA Carting & Rubbish Removal, Inc.,*

    116 F. Supp. 3d 232 (S.D.N.Y. 2015) ...................................................................... 25

*Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.,*

    479 Mass. 741, 99 N.E.3d 744 (2018) ................................................. 4, 15, 18, 21

*Integrated Sales, Inc. v. Maxell Corp. of Am.,*

    94 A.D.2d 221, 463 N.Y.S.2d 809 (1st Dep't 1983) ............................................... 20

*JA Apparel Corp. v Abboud,*

    568 F3d 390 (2d Cir. 2009) ..................................................................................... 24

*LIN Broad. Corp. v. Metromedia, Inc.,*

    74 N.Y.2d 54, 542 N.E.2d 629 (1989) .............................................................. 22, 24

*Metropolitan Transportation Authority v. Bruken Realty Corporation,*

    67 N.Y.2d 156, 492 N.E.2d 379 (1986) ................................................................. 23

*Muzak Corp. v. Hotel Taft Corp.,*

    1 N.Y.2d 42, 133 N.E.2d 688 (1956) ...................................................................... 20

*Revson v. Cinque & Cinque, P.C.,*

    221 F.3d 59 (2d Cir.2000) ....................................................................................... 24

*Two Guys from Harrison-N.Y., Inc. v S.F.R. Realty Assoc.*,

    63 NY2d 396 (1984) ............................................................................... 19

*US Bank Nat'l Assoc. v. Lightstone Holdings LLC*,

    103 A.D.3d 458, 960 N.Y.S.2d 18 (1st Dep't 2013) ............................... 19

**Statutes**

26 U.S.C. § 42 ............................................................................................ passim
26 U.S.C. § 42(h)(6)(F) ..................................................................................... 14
26 U.S.C. § 42(i)(7) ............................................................................... 11, 12, 14
26 U.S.C. § 42(i)(7)(A) ..................................................................................... 13
26 U.S.C. § 42(i)(7)(B) ..................................................................................... 14
28 U.S.C. § 1441 ................................................................................................. 8
Fed. R. Civ. P. 56(d) ......................................................................................... 24

**Treatises**

Brandon M. Weiss*, Residual Value Capture in Subsidized Housing Under Section 42,*

    Harvard Law & Policy Review, 2016 ................................................... 13

Khadduri et al., *What Happens to Low-Income Housing Tax Credit Properties at Year 15 and*

    *Beyond?*,

    U.S. Department of Housing and Urban Development, Office of Policy Development and

    Research 76, 2012 ................................................................................ 10

Rachel G. Bratt, *Rebuilding a Low-Income Housing Policy 101,*

    Temple University Press, 1989 ............................................................... 2

# PRELIMINARY STATEMENT

Plaintiff, RiseBoro Community Partnership Inc., formerly known as Ridgewood Bushwick Senior Citizens Council, Inc., ("RiseBoro"), by its attorneys, Goldstein Hall PLLC, submits this Memorandum of Law to address the interpretation of a contractual Right of First Refusal, as requested by the Court at a Pre-Motion Conference on November 26, 2019 (the "November 26 Conference"). As will be discussed herein, the Right of First Refusal as drafted herein does not require a third party offer nor does it require the consent of any party other than the General Partner to trigger.

# FACTUAL BACKGROUND

The underlying facts in this matter are remarkably simple and largely not in dispute. Plaintiff commenced this action in the Supreme Court of the State of New York, Kings County, seeking a declaratory judgment with respect to the exercise of the parties' Right of First Refusal which is, as will be discussed below, set forth in the parties' Amended and Restated Agreement of Limited Partnership ("LPA") and for related relief.

The project at issue herein is a 35-unit low-income housing development with low-income tenants that is in desperate need of repair (the "Apartment Complex"). Despite Plaintiff's best efforts to reposition the project in order to effectuate these repairs, Defendants, SunAmerica Housing Fund No. 682 ("SunAmerica") and SLP Housing I, LLC ("SLP") (collectively referred to as "Defendants", "AIG/SunAmerica" or "Investors") blocked Plaintiff from securing the prudent and necessary financing[1], solely because of Defendants' desire to maintain an interest in

_____

[1] The Apartment Complex was scheduled to be placed into a multi project restructuring commonly referred to as Casa Pasiva. Because of AIG/SunAmerica's improper attempt to control the Apartment Complex beyond Plaintiff's rightful exercise of the Right of First Refusal, this Apartment Complex was not recapitalized as part of that project, which would have extended out

the Apartment Complex, long after AIG/SunAmerica have reaped the benefit of their Low-Income Housing Tax Credits ("LIHTC") and long after 26 U.S.C. § 42 ("Section 42") contemplated their exit. In short, Defendants want more than the benefit of their original bargain.

Defendants are apparently waiting-out the expiration of the New York State Housing Finance Agency Regulatory Agreement ("Regulatory Agreement" or "LURA"), dated May 24, 1999, which extends the project's rent and income restrictions an additional 15 years beyond the expiration of the Tax Credit Compliance Period in order to enrich themselves by extracting additional undue benefits out of the Apartment Complex, including converting it into unregulated market rate rental units and thus diminishing the available stock of affordable housing from the market. This desire is at the direct expense of the current low-income tenants and at the expense of the affordable housing inventory in The City and State of New York[2] and is inconsistent with the parties' original intent. Likewise, Defendants' desire to wait out the Regulatory Agreement is at direct odds with Section 42's intent for perpetual nonprofit ownership as well as the parties' intent when they entered into the LPA. The LITHC statue provides a preference for projects that maintain low-income restrictions "for the longest period" and for projects to be owned by

_____

the rent and income restrictions, maintained the apartment units as rent regulated under New York Rent Stabilization and would have provided for the necessary capital improvements.

[2] *See, e.g.,* Rachel G. Bratt, *Rebuilding a Low-Income Housing Policy 101,* Temple University Press, (1989) ("This problem of 'expiring use restrictions' has caused a great deal of concern in recent years.") (internal citations omitted).

The Reagan administration and the 101st Congress creatively maximized public benefit through incentivizing private investment by offering tax credits. Allowing deregulation would waste substantial residual value that was intended for low-income housing, not private development. Plainly, Defendants' position would yield federal waste which would be a direct and obvious contradiction to the LIHTC's transparent regime and purpose.

nonprofits. Section 42 (m)(1)(A) –(C). SunAmerica's initial bargained for intent was articulated in the publication National Real Estate Investor by its own Senior Vice President in April 1996:

> "SunAmerica is a direct investor in low income tax credit properties, but we also resell part of our interest to other corporations, so I'm familiar with the other investors out there," says Hasencamp. "The change in the type of investor has been dramatic - even just a couple of years ago, the dominant institutional investor was typically a company that was looking to reduce some of its taxes on a one-shot basis," he says. "Now you have large corporations that have investment subidiaries [SIC] staffed with professionals who do nothing but make tax-advantaged investments for their companies, and they are very interested in the low-income housing tax credits."
>
> According to Hasencamp, most of these companies would never be involved in this business if they thought of it as real estate. "That's the interesting part of this," he says. "The real estate departments of corporations are coming to this very late in the day; with few exceptions, this business has been driven by professional tax-oriented investors." Hasencamp notes this is because the tax credit is the primary benefit of the program. "Investors are not looking at these properties to generate traditional real estate benefits in the same way as conventional multifamily investments - it's not the cash flow they're looking at - but the ability to reduce their federal tax liability," he says.

Laura Ochipinti Zaner, *The Low-Income Housing Tax Credit*, National Real Estate Investor, April 1, 1996, https://www.nreionline.com/mag/low-income-housing-tax-credit (last accessed February 6, 2020.)

The parties' relationship is governed by the 420 Stockholm Street Associates L.P. LPA dated May 1, 1999 and entered into between 420 Stockholm Housing Development Fund Company, Inc., a New York nonprofit corporation (a RiseBoro affiliate), SLP Housing I, LLC, a Nevada limited liability company and SunAmerica Housing Fund 682, a Nevada limited partnership. By way of a first amendment to the LPA dated August 14, 2000, Stockholm Housing Development Fund Company, Inc. transferred its general partner interest to a wholly owned

subsidiary 420 Stockholm Corp. (the "General Partner"). Around 2013, RiseBoro's accountants received notice that control to all or a portion of SLP Housing 1 LLC had transferred its interest in the Partnership to American International Group, Inc. ("AIG"). 420 Stockholm Street Associates L.P. is hereinafter referred to as the "Partnership".

According to the terms of the LPA the Partnership was "formed to own, rehabilitate, develop, maintain, and operate a 35-unit multifamily apartment complex intended for rental to low- and moderate-income families and to be located in Brooklyn, New York." Amended and Restated Agreement of Limited Partnership of 420 Stockholm Street Associates L.P. ("LPA"), at Preamble, attached as Exhibit "A" to the accompanying Affirmation of Brian J. Markowitz ("Markowitz Aff.").

It is important to note that the LPA was drafted by AIG/SunAmerica's counsel, Peabody & Brown, predecessor and legacy firm to Nixon Peabody LLP. As such, any ambiguity in the language of the LPA must be construed as against the AIG/SunAmerica.

The Investors entered into the Partnership for one purpose and one purpose only—to reap the benefits of the Low-Income Housing Tax Credits ("LIHTC") program available under Section 42, plus 99.9% of the project losses, including, depreciation of the Apartment Complex. Section 42 creates tax credits for owners of qualified low-income buildings. *See* Declaration of J. William Callison ("Callison Dec.") at ¶¶ 4-12; *see also Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*, 479 Mass. 741, 99 N.E.3d 744 (2018). These tax credits are nonrefundable, and as such, only taxpayers with tax liabilities can make use of the credits. *See id*. Accordingly, the HDFC here, a nonprofit without tax liabilities, entered into the Partnership with the Investors, affiliates of a large financial institution with significant federal tax liabilities. The Partnership became the owner of the land and improvements located at 420 Stockholm Street in Brooklyn, New York, and the

Investors were allocated 99.90% of the available tax credits and losses, including, depreciation. The parties estimated that, from this project, Investors would be able to claim total tax credits of $3.3 million to offset their tax liabilities over the ten-year period from 2000 through 2010. See LPA at Section 4.01(q). Those tax credits far exceed the Investors' initial capital contribution of $2,492,305. See LPA at Section 5.01.

The Investors are Limited Partners under the LPA and the LPA expressly provides that they shall not "take part in the management or control of the business of the Partnership nor transact any business in the name of the Partnership." *Id.* at Section 10.01. Further, the Investors consent for selling or disposing assets is unnecessary when expressly provided in the LPA, as is the case here. Specifically, in Section 8.01(b)(i) the LPA states "the General Partner shall not, without the consent of Special Limited Partner … have authority to sell or otherwise dispose of … all or any material portion of the assets of the Partnership, **except as expressly provided in this Agreement**," and then in Section 12.03 expressly mandates for a sale or disposition of the Apartment Complex by providing the Right of First Refusal to purchase the Apartment Complex. Section 12.03 requires no consent from Investors because otherwise it would be rendered meaningless and inconsistent with the Limited Partnership Agreement and Section 42, along with the Defendants' own intent, as articulated by Mr. Hasencamp.

In late 2015, near the expiration of the Compliance Period, RiseBoro emailed the Investors to communicate its intent to exercise the Right of First Refusal pursuant to Section 12.03 of the LPA. In an email dated November 2, 2015, RiseBoro's consultant, Peter Brodie, contacted Kevin Day of AIG Affordable Housing to inform AIG, now the holder of SunAmerica's interest in the Partnership, that RiseBoro intends to exercise its Right of First Refusal. *See* Email chain between

Peter Brodie and Kevin Day dated November 2 -3, 2015, attached as Exhibit B to the Markowitz

Aff. The Investors rebuffed RiseBoro's effort in an email stating as follows:

> Under Section 12.03, your client has a right of first refusal to purchase the property. Further under Section 8.02b, SLP consent is required for a sale or disposition of all or any material portion of the Partnership assets.
>
> At this time, the limited partners are not interested in pursuing the sale of the property. Hence, the right of first refusal would not be triggered this coming January, and will not be triggered unless and until the partners decided to sell the property.
>
> Therefore, do not proceed with the course of action described below.

*See* Markowitz Aff. at Exhibit B at p. 3. In response, Mr. Brodie asked about AIG's intentions

and Mr. Day replied, "We like New York City real estate. We are interested in cash flow and

potential future equity." *Id.* at p, 2. However, as explained by Mr. Callison and by Mr. Hasencamp,

cash flow and future equity are not considerations for a LIHTC investor who was compensated

millions of dollars through LIHTCs and specifically through declaring the project's losses and

capital depreciation. This is further interesting as an example of how the Investors desires have

changed over time because this project, a low-income housing complex, does not positively cash

flow, requires significant capital improvements, is subject to another approximate 12 years of

regulatory agreements, and has never turned a profit. Accordingly, the desirability of New York

City real estate, cash flow and potential future equity, could never have formed the basis of the

Investors' intent, as they were never part of the business model for the Apartment Complex.

Indeed, the very inclusion of the provision for the tax credit shortfall (LPA at 12.03(iii)),

guaranteeing the Investors with a minimum amount equal to the expected tax credits, shows that

the Investors were in the deal for the tax credits and not the desirability of New York City real

estate, cash flow or capital appreciation. Again, as Mr. Hasencamp is quoted "investors are not

looking at these properties to generate traditional real estate benefits in the same way as conventional multifamily investments - it's not the cash flow they're looking at - but the ability to reduce their federal tax liability."[3]

In early 2018, after securing the consent of New York State Housing Finance Agency ("NYS HFA") to transfer the Apartment Complex into the Casa Pasiva project[4], RiseBoro renewed its efforts to exercise the Right of First Refusal, but it was again stymied by the Investors. The Investors maintained that the Right of First Refusal would not be triggered until they decided to sell the Apartment Complex and a bona fide third-party offer was made. *See* April 17, 2018 and April 24, 2018 Letters From Le Dolan to David Goldstein, Markowitz Aff. at Exhibit "D" and "E" respectively.

In addition to not forming the basis of the Investors' intent with respect to a LIHTC transaction, Mr. Day's statement that the Right of First Refusal "will not be triggered unless and until the partners decide to sell the property" is incorrect and markedly different from Mr. Hasencamp's review of investor intent. As detailed in the Callison Dec., the LPA does not contain any language indicating how the Right of First Refusal is to be triggered and, as such, can only be interpreted in a manner consistent with the LPA and Section 42. As more detailed in the Callison Dec. and below, the Apartment Complex is owned by the Partnership. The Partnership is exclusively managed and controlled by the General Partner, *to wit*, 420 Stockholm Corp., and as such the willingness neither rests with nor was ever intended to rest with AIG and/or SunAmerica,

---

[3] Laura Ochipinti Zaner, *The Low-Income Housing Tax Credit*, National Real Estate Investor, April 1, 1996, https://www.nreionline.com/mag/low-income-housing-tax-credit (last accessed February 6, 2020.)

[4] A copy of the NYS HFA consent to transfer is annexed to the Markowitz Aff. at Exhibit "C". *See also* Fn. 1 above.

but is rather a question before the General Partner if RiseBoro or its designee can exercise the Right of First Refusal, as specifically set forth in 8.02 and 12.03.

Unable to resolve this conflict with the Investors, RiseBoro filed the instant action in the Supreme Court of the State of New York, Kings County, which action Investors removed to this Court. In denying RiseBoro's motion to remand, the court held that "Defendants' removal of this case to federal court was proper under 28 U.S.C. § 1441 because Plaintiffs claims raised a necessary, disputed, and substantial federal issue, which this Court can entertain without disturbing the federal-state balance of judicial responsibilities approved by Congress." Thereafter, Investors filed an answer with counter claims and a third-party complaint. RiseBoro sought permission to move to dismiss several of the counterclaims and the third-party complaint. In response, Investors sought permission to file a motion for summary judgment. At the conference held on November 26, 2019, this Court directed that the parties file briefs addressing whether or not the Right of First Refusal is to be interpreted as anything other than a right of first refusal in the classic sense. As will be discussed further below, the Right of First Refusal cannot be interpreted as a pure traditional right, but rather must be seen through the backdrop of the LIHTC deal and through the parties' contract and intent.

**OVERVIEW OF FEDERAL HOUSING POLICY UNDER THE LIHTC SYSTEM**

National housing policy is a massive undertaking which requires substantial coordination among the federal government, states, cities, nonprofit developers and for-profit developers. The LIHTC program is the single most important federal resource available to support the development and rehabilitation of affordable housing – currently financing about 90 percent of all new

affordable housing development nationally[5].  Most states and some cities are able to supplement LIHTC projects with local subsidies in a project's capital stack, but there are very few examples of states or cities being able to replace the LIHTC subsidy for construction or substantial rehab with local sources.

The United States and, in particular New York City ("NYC"), are in the midst of an affordability crisis with respect to residential rental housing units[6].  "Only 4 million affordable and available rental homes exist nationally for over 11 million of the lowest-income households.  In other words, for every 10 of the lowest income seniors, people with disabilities and families with children, there are fewer than four homes affordable and available to them.[7] "Over 46 percent of all families in NYC spend more than 30 percent of their income on their rent, forcing them to forego other basic needs such as food, clothing and medical care[8]."  "Median rents in NYC have increased on average by 4 percent per year, which resulted in $600 higher median rents for one- and two-bedroom apartments—a 61 percent and 53 percent rent hike between 2005 and 2017, respectively" however, employee wages have not grown proportionally[9].

[5] *See*, https://www.lisc.org/our-resources/resource/low-income-housing-tax-credit?gclid=EAIaIQobChMIxe2g7MvC5wIVy5yzCh3H3Q9gEAAYASAAEgJMQPD_BwE (last visited February 7, 2020)

[6] http://fiscalpolicy.org/new-yorks-rent-affordability-crisis-hits-families-of-color-the-hardest (last visited February 7, 2020)

[7] https://www.washingtonpost.com/outlook/2020/02/12/timely-simple-idea-boost-affordable-housing/, quoting Diane Yentel of the National Low-Income Housing Coalition (last visited February 12, 2020)

[8] *Op cite*

[9]  https://ny.curbed.com/2019/6/20/18691426/nyc-affordable-housing-worsen-comptroller-report (last visited February 7, 2020)

LIHTCs are allocated from the federal government to the states using a formula based on population. Each state designates one or more housing agencies ("HFAs") to administer the distribution of LIHTC to affordable housing developers. The HFAs establish their affordable housing priorities and developers compete for an award of LIHTC based on how well their projects satisfy the state's housing needs. Tax credit investors then compete to become investors in LIHTC projects. The Developers utilize the proceeds of the tax credit equity to build the affordable housing complex, and the investors receive approximately 99.9% of the tax benefits therefrom. The tax credits are claimed over a 10-year period, but the property must be maintained as affordable housing for a minimum of 30 years. [10]

It is commonly understood that the LIHTC "industry has evolved to the point that benefits offered to investors [have] little or no residual value or return of capital.[11]" The creation of Section 42 in the Internal Revenue Code was a deliberate federal policy choice to replace the traditional cash and appreciation of real estate benefits with a statutory structure designed to provide a comparable, and arguably greater, return "almost solely derived from tax benefits.[12]" Specifically, Section 42 provides a general business credit to offset income taxes on a dollar for dollar basis as

---

[10] *See*, https://www.lisc.org/our-resources/resource/low-income-housing-tax-credit?gclid=EAIaIQobChMIxe2g7MvC5wIVy5yzCh3H3Q9gEAAYASAAEgJMQPD_BwE (last visited February 7, 2020)

[11] Khadduri et al., *What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond?*, U.S. Department of Housing and Urban Development, Office of Policy Development and Research 76, August 2012 https://www.huduser.gov/publications/pdf/what_happens_lihtc_v2.pdf (last visited February 7, 2020) (hereinafter Tax Credit Properties at Year 15).

[12] Kaye, Sheltering Social Policy in the Tax Code: The Low-Income Housing Credit, 38 Villanova L. Rev. 871, 898 (1993) (hereinafter Sheltering Social Policy).

a means to encourage private investment in affordable housing development[13]. In addition to business tax credits, investors typically enjoy the benefits of depreciation and other tax deductions including accelerated depreciation, interest on amortizing first mortgage debt, interest on non amortizing deferred debt, general operating losses and other taxes deductions under the Code. Accordingly, it is the tax incentives, "not economic cash flow or appreciation" that provide the return on an investor's investment[14].

Typically, the right of first refusal in a LIHTC transaction is exercised at a price well below fair market value. *See* Callison Dec. at ¶8. This is consistent with and advances the primary goal of the LIHTC program—to ensure long-term affordable housing. After the fifteen-year Compliance Period, investors have received the benefit of their bargain in the form of tax credits, project losses and depreciation of the asset. The pattern and practice is for a LIHTC property to be transferred to the holder of a Section 42(i)(7) Right of First Refusal holder (a nonprofit, governmental agency or tenant association) at the expiration of the compliance period. In NYC, the buyers then work with NYC housing agencies to develop strategies to finance capital needs over the long term while maintaining affordable rent levels.

Accordingly, on or around the time that Project was awarded tax-credits, the tax-exempt Plaintiff, through its affiliates, estimated that, from this project, AIG/SunAmerica would be able to claim total tax credits of $3.3 million to offset their tax liabilities over the ten-year period from 2000 through 2010. *See* Markowitz Aff. at Exhibit "A", LPA Section 4.01(q). Those tax credits

---

[13] Low-Income Housing Tax Credit: The Role of Syndicators, U.S. Government Accountability Office, GAO-17-285R, February 16, 2017 (http://www.gao.gov/assets/690/682890.pdf) (last visited February 7, 2020)

[14] Sheltering Social Policy, at 898.

far exceed AIG/SunAmerica' initial capital contribution of $2,492,305. *See* Markowitz Aff. at Exhibit "A", LPA at Section 5.01.

Based on the LIHTC structure, and as more fully discussed in the Callison Dec., if AIG/ SunAmerica is successful in its arguments, then AIG/ SunAmerica will be in a position to require a far greater purchase price to exit the Partnership. In turn, that would exhaust the funds needed to conduct rehabilitation and maintenance needs. The tenants, who are the indirect beneficiaries of Section 42 would suffer, and the State and City of New York would be required to contribute tax payer funded subsidies to address the property's physical needs. Given the national affordable housing crisis and the scarce public dollars available for affordable housing capital needs, a ruling in favor of AIG/ SunAmerica would have a chilling effect on nonprofits, governments and their citizens.

## DISCUSSION OF LAW

### POINT I

### RISEBORO'S RIGHT OF FIRST REFUSAL IS NOT A CLASSICAL RIGHT OF FIRST REFUSAL UNDER COMMON LAW

**A.     The Right of First Refusal Must be Interpreted Within the Parties Intent and In Context Of The LIHTC Program.**

RiseBoro's right of first refusal is not a classical right of first refusal, i.e., one which is a fair market value based right of first refusal, but rather it must be interpreted within the context of the LIHTC program. In a Section 42 right of first refusal, the below-market price and/or the purchaser are predetermined.

The Section 42(i)(7) ROFR was enacted as part of 1989 and 1990 amendments designed to improve the LIHTC program. The LIHTC program leverages private sector investment to develop and perpetuate low-income housing. *See* Brandon M. Weiss, *Residual Value Capture in*

*Subsidized Housing Under Section 42,* Harvard Law & Policy Review, 2016. Tax credits are allocated to each state: In New York, the New York State Division of Housing and Community Renewal ("HCR"), or, with respect to The City of New York, the New York City Division of Housing Preservation and Development ("HPD"), who then allocates the credits to specific projects. *See* Callison Dec. at ¶¶4-6. For LIHTC projects in New York, owners enter into a Regulatory Agreement with the NYS HFA, New York City Housing Development Corporation, HCR and/or HPD as appropriate, requiring, among other things, that the projects comply with affordability restrictions for at least thirty years. *Id.*

Non-profit organizations use the tax credits under the LIHTC program to attract capital from private investors. *Id.* at ¶¶ 4-12. However, at the end of the fifteen-year compliance period, a general partner or its affiliate(s) has the ability to purchase the interests of an investor partner or the entire apartment complex. *Id.* In fact, Section 42 contemplates such sales, and was modified to specifically to allow the nonprofit organization to hold a right of first refusal to purchase the property at the end of the Compliance Period without jeopardizing the investor's ability to claim the tax credits. *Id.* Specifically, Section 42(i)(7)(A) states as follows:

> No federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely by reason of a right of 1st refusal held . . . by a qualified nonprofit organization . . . to purchase the property after the close of the compliance period for a price which is not less than the minimum purchase price determined under subparagraph (B).

26 U.S.C. § 42(i)(7)(A). The statutory "minimum purchase price" is defined in Section 42 as the sum of the "(i) principal amount of outstanding indebtedness secured by the building (other than indebtedness incurred within the 5-year period ending on the date of the sale to the tenants), and (ii) all Federal, State, and local taxes attributable to such sale." 26 U.S.C. § 42(i)(7)(B).

Section 42(i)(7) <u>does not</u> require either a bona fide offer or the payment of fair market value, to trigger its "right of 1st refusal." In contrast, Section 42(h)(6)(F) regarding the "qualified contract" provision <u>does</u> contain a bona fide contract and fair market value language. Clearly, if Congress wanted to include analogous language in Section 42(i)(7) that it included in Section 42(h)(6)(F) it certainly could have. However, it purposely chose not to.

Typically, the right of first refusal in a LIHTC project is exercised at a price well below fair market value. *See* Callison Dec. at ¶8. This is consistent with and advances the primary goal of the LIHTC program—to ensure long-term affordable housing. After the 15 year Compliance Period, investors have received the benefit of their bargain in the form of tax credits and depreciation. The pattern and practice is thus for the investors to then exit the partnership and transfer the property or is interests to their nonprofit general partners (or affiliates) for a nominal amount. *Id.* at 8-12. The nonprofits will finance the minimum purchase price along with costs of any improvements needed with the municipal agency at below market rates, in exchange for entering into an extended regulatory agreement, thus preserving affordable housing. They can then use the funds they saved on the purchase to continue operating the properties as affordable housing, and they often continue to do so even after the affordability restrictions are lifted. *Id. See also Homeowner's Rehab, Inc.,* at 753.

Under the backdrop of the LIHTC program, 420 Stockholm (and its predecessor-in-interest, the HDFC) and the Investors entered into the LPA. The language of the LPA reflects the mutual interest of the General Partner and the Investors to enter an agreement under which the Investors would receive tax credits and other losses (including depreciation) in exchange for their investment in a low-income housing project. The LPA provides that the Investors have a limited role in the Partnership, thus allowing the General Partner to have exclusive management and

control of the project, subject to limited exceptions  As compensation, the Investors would receive nearly all of the available tax credits in exchange for their capital contribution.  Accordingly, the LPA must be construed so that it is consistent with the parties' mutual intent to enter an agreement within the context of the LIHTC program.   "In interpreting a contract, the intent of the parties governs.   A contract should be construed so as to give full meaning and effect to all of its provisions."  *American Express Bank, Ltd. v. Uniroyal, Inc.*, 164 A.D. 2d 275, 562 N.Y.S.2d 613 (1st Dep't) (1990) (citations omitted).

Here, the interpretation taken by AIG/SunAmerica runs contrary to the express language contained in the LPA and would completely vitiate several provisions of the LPA.  Therefore, such an interpretation is abhorrent to New York's construction of contracts.   As discussed herein and in the Callison Dec. the LPA sets forth specific obligations of the General Partner, *to wit,* Article VIII states in pertinent part:

> the General Partner, within the authority granted to it under this Agreement, shall have full, complete and exclusive discretion to manage and control the business of the Partnership for the purposes stated in Article III, shall make all decisions affecting the business of the Partnership and shall manage and control the affairs of the Partnership ...

LPA at Article 8.01(a).  The LPA further provides in pertinent part:

> the General Partner (acting for and on behalf of the Partnership), in extension and not in limitation of the rights and powers given by law or by the other provisions of this Agreement, shall, in its sole discretion, have the full and entire right, power and authority in the management of the Partnership business to do any and all acts and things necessary, proper, convenient or advisable to effectuate the purpose of the Partnership. All decisions made for and on behalf of the Partnership by the General Partner shall be binding upon the Partnership.

LPA at Article 8.01(b),

The General Partner's authority is limited by Article 8.02, which provides in pertinent part:

> (a) The General Partner shall not have any authority to:
>
> ***
>
> (iii) do any act required to be approved or ratified in writing by the Limited Partners under the Act unless the right to do so is expressly otherwise given in this Agreement;
>
> ***
>
> (b) The General Partner shall not, without the Consent of the Special Limited Partner which Consent may be withheld in its sole and absolute discretion, have any authority to:
>
> (i) sell or otherwise dispose of, at any time, all or any material portion of the assets of the Partnership, **except as expressly provided in this Agreement**;

LPA at 8.02 (Emphasis added.)

Contrary to AIG/SunAmerica's position, exercising the Right of First Refusal is an act that is expressly provided for in the Agreement and thus, does not require the Investors' consent under Article 8.02. The Right of First Refusal is stated in Article 12.03 which states:

> Right of First Refusal. On and after the end of the 15 year Compliance Period, the RB or its designee, if it is at that time a qualified nonprofit corporation, shall have a right of first refusal to purchase the Apartment Complex for the price equal to the sum of:
>
> (i) the principal amount of outstanding indebtedness secured by the building (other than indebtedness incurred within the 5-year period ending on the date of the sale);
>
> (ii) all Federal, State, and local taxes attributable to such sale and to any amounts paid pursuant to subsection (iii) hereof; and
>
> (iii) any amounts of a Tax Credit Shortfall which have not been paid.

LPA at 12.03.  Critically, as can be seen on the face of Article 12.03, the LPA sets the price at which that Right of First Refusal shall be exercised, i.e., the principal amount of outstanding indebtedness secured by the building plus all Federal, State, and local taxes attributable to such sale plus any amounts of a shortfall between the projected and actual tax credits which have not been paid. Id.  This formula mirrors Section 42's minimum purchase price with the exception of the addition of the tax credit shortfall provision (12.03(iii)), and provides the RiseBoro or its designee with a below market right to continue ownership of the Apartment Complex and to ensure perpetual housing affordability.  More crucially, the tax credit shortfall provision shows the parties intent that the Investors were to be compensated through the tax credits and provides a safeguard for them to receive these bargained for sums.

With an eye to what the parties intended when they entered into the LPA, the right of first refusal cannot be considered a classical fair market value based Right of First Refusal.  Confronted with a similar scenario, the Supreme Judicial Court of Massachusetts held that a right of first refusal was not purely a creation of the common law but "must be understood in the context of agreements designed to secure tax credits under the LIHTC program." *Homeowner's Rehab, Inc.* at 753.  Here, Section 12.03 specifically references elements of the LIHTC program such as the "15 year Compliance Period," "qualified nonprofit corporation[s]," and the statutory minimum price.  It also emphasizes the critical importance of the tax credits to the Partnership's structure by including in the purchase price "any amounts of a Tax Credit Shortfall which have not been paid." LPA at Section 12.03(iii).

The Investors received the tax credits and any depreciation losses that they were expecting under the LPA, but now they want more.  In a glaring moment of candor, the Investors' attorney conceded at the November 26 Conference that the Investors are looking "to realize, if it happens,

as sometimes it does in these projects, appreciation in the value of the underlying real estate." Transcript from November 26 Conference at 12, attached to the Markowitz Aff. at "F". The fact is that the Apartment Complex is located in Bushwick, Brooklyn, which has undergone rapid gentrification in the past decade. Although the Apartment Complex and Partnership is subject to an extended low-income housing commitment under Section 42, that commitment will expire in approximately twelve years. *See* New York State Housing Finance Agency Regulatory Agreement, dated May 24, 1999, at Section 3.2(b), attached to the Markowitz Aff. at Exhibit "G" ("The [extended low income housing commitment within the meaning of Section 42 of the Code] shall begin on the first day of the Compliance Period and remain in effect until 15 years after the end of the Compliance Period ('Extended Use Period')"). RiseBoro is gravely concerned that the Investors would attempt to wrest control of the Apartment Complex and Partnership from RiseBoro by claiming, *inter alia*, that RiseBoro has breached the LPA, and convert the Apartment Complex to market-rate housing once the Extended Use Period expires.

**B.** **The Right of First Refusal Cannot be Blocked by the Investors and Does Not Require a Third-Party Offer.**

By seeking to interpret RiseBoro's right of first refusal under New York common law principles, the Investors would render that right of first refusal meaningless. New York law makes clear that "in construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless." *Two Guys from Harrison-N.Y., Inc. v S.F.R. Realty Assoc.*, 63 NY2d 396, 403 (1984); *US Bank Nat'l Assoc. v. Lightstone Holdings LLC*, 103 A.D.3d 458, 459, 960 N.Y.S.2d 18 (1st Dep't 2013), *quoting 150 Broadway N.Y. Assocs., L.P. v. Bodner,* 14 A.D.3d 1, 6, 784 N.Y.S.2d 63 (1st Dep't 2004) ("It is a cardinal rule of contract construction that a court should avoid an interpretation that would leave contractual clauses meaningless. Stated otherwise, [c]ourts are obliged to interpret a contract so as to give meaning to all of its terms.").

*See also Corhill Corp. v. S. D. Plants, Inc.*, 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1 (1961) (It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract ... without force and effect'") *citing Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 133 N.E.2d 688 (1956), 46; *Integrated Sales, Inc. v. Maxell Corp. of Am.*, 94 A.D.2d 221, 227, 463 N.Y.S.2d 809 (1st Dep't 1983) ("Each provision of a contract should be read, where possible, to give meaning and effect to the other parts.")

The express terms of the LPA do not provide the Investors with consent rights to the exercising of the Right of First Refusal. Here, again, AIG/SunAmerica's position runs contrary to the LPA's express terms. Indeed, even a cursory reading of Article 12.03 shows that RiseBoro is vested in a Right of First Refusal, that is unencumbered by the Investors' desire to consent or not ("…shall have a right of first refusal…"). General Partner is given the exclusive management and control of the Apartment Complex, and is vested with the right to dispose of the assets of the Partnership if it is provided for in the LPA, which Article 12.03 expressly provides. Any other interpretation of the Right of First Refusal here would wipe out whole cloth portions of Article VIII and XII, and render these sections completely meaningless.

Further, to require a bona fide third-party offer as part of RiseBoro's right of first refusal – a condition that is not provided for in the LPA – would leave RiseBoro with no way to ever exercise that right. As this Court has correctly pointed during the hearing of the Motion to Remand, no purchaser would spend the time and money necessary to make an offer, knowing that the right of first refusal at the predetermined price would undercut any amount the purchaser could offer, especially where here the underlying project has negative cash flow and is in need of capital improvements. The Supreme Judicial Court of Massachusetts agreed and declined to interpret the agreements before it in a way that would contravene the purpose of Section 42. *See Homeowner's*

*Rehab, Inc.* at 757. Specifically, it stated as follows: "Because a right of first refusal granted under § 42(i)(7)—like the one here—allows the nonprofit organization to purchase the property at a below-market price, even if it is lower than the price offered by the third party, it is difficult to imagine why a third party would make a bona fide offer for the property, knowing that the nonprofit organization has this right and is likely to exercise it." *Id.*

Furthermore, if the right of first refusal is contingent on the Investors' decision to sell the Building – which it is clearly not – it would leave the Investor in the sole position to refuse any offer, thus never triggering the right of first refusal. However, Sections 8.02 and 12.03 exclusively grant that right to 420 Stockholm and not to the Investors, and specifically sets the purchase price for such a transaction. Accordingly, 420 Stockholm as the general partner was empowered to authorize a sale pursuant to the Right of First Refusal —which it did. *See Homeowner's Rehab, Inc.* at 761 (holding that "general partner is authorized to trigger the nonprofit developer's right of first refusal").

## C. New York Common Law Does Not Support Investor's Position that the Right of First Refusal was Not Properly Triggered.

In their October 29, 2019 letter to the Court, Investors rely on *LIN Broad. Corp. v. Metromedia, Inc.*, 74 N.Y.2d 54, 542 N.E.2d 629 (1989) and a definition of a Right of First Refusal drawn from Black's Law Dictionary (10th Ed. 2014) for the position that New York common law requires that the seller has a desire to sell, that a bona fide offer must be given, and that the offer must be accepted before a Right of First Refusal can be triggered. However, neither *Lin* nor its predecessors is on point with the scenario set forth herein, i.e., where the right of first refusal does not contain any triggering mechanism, the purchase price is predetermined and below market value, and where, as here, the project is a LIHTC project where the stated governmental goal is perpetuality of affordable housing. Moreover, Investor's argument completely neglects the point

that RiseBoro and its designee, are the parties that have the exclusive right to trigger the Right of First Refusal, not the Investors.

Defendants cite *LIN* for the proposition that a right of first refusal grants only a preemptive right because its holder may exercise only after certain preconditions are satisfied. The question in *LIN* was whether a contractual right of first refusal, which had been triggered by a contract to sell to a third party, could be exercised during the specified duration of the right but after the third-party transaction had been abandoned. The court held that abandonment of the underlying offer allowed revocation of the right of first refusal. In *LIN* the right of first refusal was a right to match the price and terms in a third-party offer; therefore, it was essential as a factual matter that there was a third party offer to match. The case does not state that there are what Defendants call common law "preconditions or pre-requisites that must be satisfied" before a right of first refusal can be exercised; instead, the contract set forth the triggering mechanism, namely a desire to transfer an ownership interest.

The *LIN* Court defined "right of first refusal" by reference to *Metropolitan Transportation Authority v. Bruken Realty Corporation*, 67 N.Y.2d 156, 492 N.E.2d 379 (1986)[15], a rule against perpetuities case in which the right was triggered by MTA's determination that the property "was no longer necessary for [its] transportation operations." Indeed, in *Metropolitan Transportation Authority* the Court ruled that "when an owner attempts to exert control over the transferability of his property for too long a time [as the Defendants do here], the courts will step in, invalidate the restricting provisions, and permit transfer to take effect uninhibited by the restraint." *Id*. at 161,

---

[15] While *Metropolitan Transportation Authority* defines a common law right of first refusal, the New Yok Court of Appeals – more importantly – determined that bargained-for-rights must be understood within the context that they were agreed to and the purpose which such bargains were intended to serve, untethered to appellation.

308. Further, there were no other preconditions, including receipt of a third party offer or those cited by Defendants. Since a third-party offer was not needed as a benchmark for the right of first refusal price or terms, none was essential.

Finally, *LIN* involved cellular telephone partnerships and not LIHTC transactions, and thus the context was entirely different, where, as here, there is a governmental policy to continue not-for-profit ownership of LIHTC projects.

Defendants also cite to Black's Law Dictionary 10th Edition as support for its position concerning the meaning of a right of first refusal. It must be noted that that Black's definition is neither binding, definitive, nor fixed, and rather has changed over time. It is also important to note that Black's Law Dictionary has no precedential value and is not based on applying the term to the facts and circumstances at hand, to wit, a predefined below market value Right of First Refusal that, by its very terms, does not require a triggering third party or acceptance of an offer. In other words, the predicate Right of First Refusal is a separate and distinct term, subject to circumstances entirely at odds with right of first refusal arising from a normal, free market, commercial transaction.

In sum, Defendant's purported authority demonstrates that a common law right of first refusal is a total creature of circumstance, completely reliant upon the circumstances of a bargain. Our circumstances are unique and must be interpreted as such, regardless of nomenclature.

**D.  Discovery is Necessary to Determine the Parties' Intent when they Entered into the LPA.**

Although RiseBoro believes the clear language of the LPA supports its interpretation of the Right of First Refusal, the Investors disagree. Parole evidence is thus necessary to resolve a "latent ambiguity." *JA Apparel Corp. v Abboud*, 568 F3d 390, 404 (2d Cir 2009); *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir.2000) ("[a]mbiguous language is language that is 'capable

of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'").

Such ambiguity, as to what the parties intended when the agreement was drafted, and what the term Right of First Refusal actually means within this context requires discovery before the parties can proceed to the summary judgment phase. *See* Fed. R. Civ. P. 56(d) (time may be allowed to take discovery where party opposing motion of summary judgment "cannot present facts essential to justify its opposition."); *Cruz v. AAA Carting & Rubbish Removal, Inc.,* 116 F. Supp. 3d 232 (S.D.N.Y. 2015) (same). RiseBoro believes that the evidence will wholly dispute Investors' interpretation of the LPA's Right of First Refusal. The Investors' interpretation boils down to the following: despite receiving millions of taxpayer dollars over a 10-year period and without regard to any rights of the nonprofit organizations trying to perpetuate affordable housing, the Investors can take over the project at the end of the Compliance Period for their own financial gain. Such an understanding did not form the basis of the parties' intent (as Mr. Hasencamp expressly states) when they formed the deal and did not form the basis of the deal with the City/State regulatory agencies who extended loans and provided the regulatory framework under which the tax credits were taken. 420 Stockholm would have rejected the Investors' offer to invest in the Apartment Complex if they had not agreed to an orderly transfer of the Apartment Complex at the expiration of the Compliance Period at the Section 42 minimum purchase price.

## CONCLUSION

For all of the reasons set forth herein, in the Callison Dec. and the Markowitz Aff., this Court must find that the Right of First Refusal was not a classical right of first refusal, i.e., one which is a fair market value based right of first refusal, but rather it must be interpreted within the

context of the LIHTC program and in accordance with the parties agreement did not require Investors' consent to exercise.

Dated:  New York, New York
     February 14, 2020

          **GOLDSTEIN HALL PLLC**

      By:  S/ *Brian J. Markowitz*
          **BRIAN J. MARKOWITZ, ESQ.**