**GOLDSTEIN HALL PLLC**
Attorneys for Plaintiff
*RiseBoro Community Partnership Inc.,*
*formerly known as Ridgewood Bushwick*
*Senior Citizens Council, Inc.*
80 Broad Street, Suite 303
New York, New York 10004
(646) 768-4100

By:   Brian J. Markowitz (BM-9640)
      Bmarkowitz@Goldsteinhall.com

      David Goldstein (DG-4370)
      Dgoldstein@Goldsteinhall.com

      Daniel Goldenberg (DG-1337)
      Dgoldenberg@Goldsteinhall.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
RISEBORO  COMMUNITY  PARTNERSHIP  INC.,
formerly  known  as  RIDGEWOOD  BUSHWICK  SENIOR
CITIZENS COUNCIL, INC.,                                                    Docket No. 18-cv-07261 (RJD)

                                                      Plaintiff,

                    -against-

AIG/SUNAMERICA  HOUSING  FUND  NO.  682,  SLP
HOUSING  I,  LLC,  420  STOCKHOLM  STREET
ASSOCIATES L.P.,

                                                      Defendants.
------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION
TO SUNAMERICA HOUSING FUND NO. 682
AND SLP HOUSING I, LLC'S INITIAL
SUBMISSION AND IN FURTHER SUPPORT
OF PLAINTIFF'S LIMITED ISSUE BRIEF
REGARDING THE INTERPRETATION OF
THE RIGHT OF FIRST REFUSAL**

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................I

TABLE OF AUTHORITIES ...........................................................................................II

PRELIMINARY STATEMENT ...................................................................................... 1

DISCUSSION OF LAW ................................................................................................. 4

      POINT I ............................................................................................................. 4

      RISEBORO'S RIGHT OF FIRST REFUSAL IS
      NOT A CLASSICAL RIGHT OF FIRST
      REFUSAL UNDER COMMON LAW ...................................................... 4

          A.   The LPA does not represent a typical
               commercial transaction and must be construed
               in a manner that reflects the parties' intents ........................................ 4

      POINT II ........................................................................................................... 8

      SECTION 42(i)(7) DEMONSTRATES THAT
      CONGRESS INTENDED TO RECOGNIZE A
      SPECIAL RGHT OF FIRST REFUSAL.................................................. 8

          A.   Defendants hold two irreconcilable statutory
               interpretations ................................................................................... 8

          B.   Defendants' statutory interpretation is wrong
               because the Supreme Court of the United States
               has routinely adopted nonliteral interpretations
               of the Internal Revenue Code .......................................................... 10

          C.   Legislative history is not compelling.................................................. 12

          D.   Defendants' other arguments are equally
               misplaced ......................................................................................... 12

CONCLUSION............................................................................................................. 15

# TABLE OF AUTHORITIES

## Cases

*Bob Jones Univ. v. United States*,

    461 U.S. 574, 103 S. Ct. 2017 (1983) .................................................................................... 10

*Estate of Cowart v. Nicklos Drilling Co.*,

    505 U.S. 469, 112 S.Ct. 2589 (1992) .................................................................................... 12

*Gamble v. United States*,

    139 S. Ct. 1960, 204 L. Ed. 2d 322 (2019) .......................................................................... 12

*Holy Trinity Church v. United States*,

    143 U.S. 457, 12 S. Ct. 511 (1892) ...................................................................................... 11

*Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*,

    479 Mass. 741, 99 N.E.3d 744 (2018) .............................................................................. 6, 8

*Inhabitants of Montclair Twp. v. Ramsdell*,

    107 U.S. 147, 2 S. Ct. 391 (1883) .......................................................................................... 9

*LIN Broad. Corp. v. Metromedia, Inc.*,

    74 N.Y.2d 54, 542 N.E.2d 629 (1989) ................................................................................... 5

*McCarthy v. Bronson*,

    500 U.S. 136, 111 S.Ct. 1737 (1991) ................................................................................... 12

*Metropolitan Transportation Authority v. Bruken Realty Corporation*,

    67 N.Y.2d 156, 492 N.E.2d 379 (1986) ................................................................................. 5

*Mohamad v. Palestinian Auth.*,

    566 U.S. 449, 132 S. Ct. 1702 (2012) ................................................................................. 12

*Paulsen v. Comm'r*, ...........................................................................................................................

    469 U.S. 131, 105 S. Ct. 627 (1985) .............................................................................. 11, 13

*Robinson v. Shell Oil Co.*,

    519 U.S. 337, 117 S. Ct. 843 (1997) .......................................................................... 12

*United States v. Monia*,

    317 U.S. 424, 63 S.Ct. 409 (1943) ............................................................................. 12

**Statutes**

26 U.S.C. § 42 .................................................................................................................. passim

26 U.S.C. § 42(h)(6)(F) ............................................................................................................ 6

Housing Act of 1949 ............................................................................................................... 13

Low-Income Housing Preservation and Resident Homeownership Act of 1990 ....................... 13

**Treatises**

Brandon M. Weiss, *Residual Value Capture in Subsidized Housing Under Section 42*, Harvard

    Law & Policy Review, 2016 ............................................................................................ 13

Eric Mills Holmes, *Corbin On Contracts* § 11.3 ....................................................................... 5

*Rethinking Rights of First Refusal*, 5 Stan. J.L. Bus. & Fin. 1 (1999) ........................................ 5

*See* Rachel G. Bratt, *Rebuilding a Low-Income Housing Policy 101* (1989) .............................. 13

## PRELIMINARY STATEMENT

Plaintiff, RiseBoro Community Partnership Inc., formerly known as Ridgewood Bushwick Senior Citizens Council, Inc., ("RiseBoro"), by its attorneys, Goldstein Hall PLLC, submits this Memorandum of Law in further support of its initial limited issue brief addressing the interpretation of a contractual Right of First Refusal and in opposition to Defendants, SunAmerica Housing Fund No. 682 ("SunAmerica") and SLP Housing I, LLC ("SLP") (collectively referred to as "Defendants", "AIG/SunAmerica" or "Investors") February 14, 2020 Memorandum of Law (the "Defendants' Memorandum"), specifically to address certain inaccurate and incorrect statements made by Defendants in their limited issue brief.[1]

Defendants have wrongly premised their arguments on the theory that this dispute arises from a typical commercial transaction and is therefore subject to typical commercial parameters. It does not. Also Defendants have made the incorrect conclusion that Congress did not intend to recognize a special right of first refusal in 26 U.S.C. § 42 ("Section 42") when creating its safe harbor., when in fact Congress did just that.

This dispute does not arise from a typical commercial transaction and is therefore not subject to typical commercial parameters. In fact, Defendants removed this dispute to Federal Court precisely because "the issues in this case are unique and specific to the application of federal provisions as they relate to low-income housing developments established pursuant to Section 42 of the Internal Revenue Code." ¶ 22, Notice of Removal, (Docket No. 14).

---

[1] While Defendants style their brief as being for summary judgment, as per this Court's February 19, 2020 Order, Plaintiff's submission is not for summary judgment, but is instead on "on the issue of the construction of the 'right of first refusal.'"

However, now that Defendants are before this Court, Defendants focus on the LPA's[2] term 'right of first refusal' only and assert – in a complete vacuum – that because the term 'right of first refusal' is used, Section 12.03 must be construed in accordance with New York common law and all the requirements therein. Defendants' Memorandum at Pg. 9-10. Defendants' approach runs afoul of the accepted contract interpretation process because it ignores the rest of the contract and the parties' expressed intent, incorporated federal law, and the unique closed-market considerations present here. As will be demonstrated, the New York common law requirements of a right of first refusal are completely inconsistent with the LPA's terms and the parties' expressed intent. Nevertheless, even when viewed according to Defendants' flawed analysis, Defendants are still unable to demonstrate their interpretation to be a reasonable interpretation at all. Section 12.03's right of first refusal cannot be considered a classical right of first refusal because it is the Plaintiff's unique contractual right, derived from a distinct federal regime that incentivized Defendants with a novel form of consideration.

Likewise, Defendants wrongly conclude that Section 42's safe harbor does not recognize a new type of right. On the contrary, Section 42(i)(7) plainly demonstrates that the Congress intended to recognize a special right of first refusal because, otherwise, there would be no reason to create a safe-harbor provision, rendering the section superfluous. In fact, according to Defendants' own arguments, a classical right of first refusal does not implicate ownership principles, but only does so in the Section 42 context. Defendants' Memorandum of Law at Pg. 3-5. Clearly, Congress' creation of a safe harbor for Section 42 rights of first refusal clearly demonstrates that the Section 42 right of first refusal is separate and distinct from those found in a

---

[2] Unless otherwise stated, all capitalized terms share the same definition as Plaintiff designated in its February 14, 2020 Memorandum of Law (the "Plaintiff's Opening Memorandum").

typical commercial context.  As discussed herein and in Plaintiff's initial brief, the plain meaning of Section 42 is that if a LIHTC partnership agrees to provide a right of first refusal consistent with the Section 42 framework, then the partnership's ability to utilize the credits will not be implicated.

Fundamentally, despite receiving millions of taxpayer dollars over a 10-year period and without regard to any rights of the nonprofit organizations trying to perpetuate affordable housing, Defendants believe that they can take over the Apartment Complex at the end of the Compliance Period for their own financial gain. As argued in Plaintiff's Opening Memorandum, such an understanding did not form the basis of the parties' intent when they formed the deal and did not form the basis of the deal with the city and state regulatory agencies who provided the tax credits and real property tax abatements[3] and provided the regulatory framework under which the tax credits were taken. Indeed, Defendants' offer to invest would not only have been rejected if they had not agreed to an orderly transfer of the Apartment Complex at the expiration of the Compliance Period at the Section 42 minimum purchase price, but their bid would have been ignored in total because an integral part of the bidding competition was for Defendants to agree to transfer the property to RiseBoro upon the expiration of the Compliance Period. The fact that Defendants' counsel unartfully drafted the LPA should not be used as a sword against RiseBoro, but – as the well-established *contra proferentem* doctrine compels – must be construed against Defendants.

---

[3] This project was granted a real estate tax abatement by the City of New York through its Department of Housing Preservation and Development under Real Property Tax law § 420-c, which was enacted to provide tax exemptions for not-for-profit sponsors which developed affordable housing with federal low-income housing tax credits. The 420-c benefits are co-terminus with the expiration of the regulatory agreement.

## DISCUSSION OF LAW

### POINT I

### RISEBORO'S RIGHT OF FIRST REFUSAL IS NOT A CLASSICAL RIGHT OF FIRST REFUSAL UNDER COMMON LAW

**A.     The LPA does not represent a typical commercial transaction and must be construed in a manner that reflects the parties' intents**

Plainly, the typical commercial understandings upon which Defendants rely are inconsistent with the LPA on its face. *See* Defendants' Memorandum at Pgs. 8-11. Defendants ask this Court to conclude that the LPA's single use of the term 'right of first refusal' means that the parties intended to abide by generally accepted right of first refusal requirements. *Id*. Defendants' argument must be rejected because, as a matter of pure contract interpretation, Defendants' argument fails. Within the LPA's four corners, Defendant's interpretation either renders Section 12.03 meaningless or creates an ambiguity that requires review of extrinsic evidence to understand the parties' intent. *See* LPA, Plaintiff's Exhibit A, annexed to the Affirmation of Brian J. Markowitz, dated February 14, 2020 (the "Markowitz Aff.")[4]. Defendants assert that Plaintiff may only purchase the apartment complex if (i) a third party makes a bona fide offer to purchase the apartment complex; (ii) the partnership is willing to sell; and (iii) consent of the Special Limited Partner is obtained. Defendants' Memorandum at Pg. 10. However, as will be discussed, these requirements do not exist in the LPA and do not exist in Section 42, which is incorporated into the LPA. *See* LPA, Exhibit A. In fact, each one of those elements is belied by the LPA's express terms. *See* id.

---

[4] Unless otherwise stated, all referenced exhibits are annexed to Brian Markowitz' February 14, 2020 Affidavit.

As a threshold matter, "it is important to recognize that the labels applied by the parties do not always mirror the economic reality of the instruments involved. A true option that gives the holder a unilateral right to trigger is often labeled a right of first refusal, while a true right of first refusal that grants the holder only a contingent option is sometimes called a first option." *Rethinking Rights of First Refusal*, 5 Stan. J.L. Bus. & Fin. 1, 57 (1999); *see also* Eric Mills Holmes, *Corbin On Contracts* § 11.3, at 484-85 ("Although the [r]ight that it creates may be described by divers[e] terms ["First Right to Buy," "Right of Pre-emption," ... and so on], in no case are the legal relations [between the parties contracting for a right of first refusal] determinable from the name alone. In all cases, interpretation requires knowledge of the entire context, context of facts as well as context of words."). Indeed, besides the fact that none of the decisions upon which Defendants rely involve the LIHTC context, both *LIN Broad. Corp. v. Metromedia, Inc.*, 74 N.Y.2d 54, 542 N.E.2d 629 (1989) and *Metropolitan Transportation Authority v. Bruken Realty Corporation*, 67 N.Y.2d 156, 492 N.E.2d 379 (1986) actually demonstrate the New York Court of Appeals conclusion that bargained-for-rights must be understood with the context that they were agreed to and for the purpose which such bargains were intended to serve.

The LPA does not require a third party to make a bona fide offer. *See* LPA, Exhibit A. What does expressly exist, however, is RisBboro's right to exercise its right of first refusal to purchase the Apartment Complex at a below-market price. This language removes the impetus for any third party – let alone a bona fide third party – to make a purchase offer. Plaintiff's ability to purchase the Apartment Complex for a nominal amount is inescapable and completely inconsistent with a typical right of first refusal. Sections 8.02 and 12.03 cannot be construed in accordance with market-rate common law requirements because the threshold need for a bona fide third-party offer is ruled out completely. As stated by the Massachusetts Superior Court, "[w]ith a typical right of

first refusal, a third party can still prevail against the holder by overbidding -- that is, by offering a price so high that it cannot be matched.   But a right of first refusal under Section 42(i)(7) eliminates even that possibility, because the holder need not match the third-party price." *Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*, 479 Mass. 741, 99 N.E.3d 744 (2018). Put differently, Section 12.03's 'right of first refusal' cannot be a typical right "governed by long-standing common-law principles" (Defendants' Memorandum at Pg. 8-10) because such a reading would be inconsistent with the LPA and would render it meaningless.

Conveniently ignored by Defendants is the fact that Congress purposely omitted the need for a third party offer from Section 42(i)(7). In Section 42(h)(6)(F), for example, Congress did contemplate the need for a bona-fide offer and even included fair market value language. Had Congress wanted to include analogous language in Section 42(i)(7) it could have chosen to, but it did not. Accordingly, Defendants' purportedly required third-party bona fide offer analysis directly conflicts with the parties' express intentions and is therefore incompatible with any reasonable interpretation of the LPA.

Second, similarly to how the need for a third-party bona fide offer conflicts with Plaintiff's ability to purchase the property at a below-market price, the purported need for the Partnership to be willing to sell fatally conflicts with Plaintiff's ability to exercise its right whatsoever. Unsurprisingly, this purported requirement does not exist in Section 12.03 or elsewhere in the LPA either. Instead, Section 8.02 provides that the General Partner (not the Investors or the Partnership as a whole) may sell or otherwise dispose of the Apartment Complex if provided elsewhere in the LPA, such as expressly provided for in Section 12.03. *See* LPA, Exhibit A. Adding requirements to the LPA that only AIG/SunAmerica has the right to sell,  where, as here, the LPA expressly grants that right to the General Partner, would leave Plaintiff unable to

exercise its right and thus contradict with the cardinal rule of contract interpretation, to wit, not to interpret a contractual provision that renders it useless.

Moreover, Defendants' reading of Section 42 and the LPA would rewrite the General Partner's expressly provided authority altogether by divesting the General Partner's authority to the Partnership for no reason other than Section 12.03's singular use of 'right of first refusal.' *See* LPA, Exhibit A. In this regard, the only reading of the LPA shows that the LPA granted the General Partner the right to accept RiseBoro's exercise of its right of first refusal. Any other reading, which grants such authority to AIG/SunAmerica, stretches the clear and unambiguous language of Section 8.02 and 12.03 of the LPA beyond their breaking point.

Nonetheless, it is respectfully submitted that if the 'right of first refusal' is contingent on the Investors' decision to sell the Building – which it is clearly not – it would leave AIG/SunAmerica in the sole position to refuse any offer, thus potentially never triggering the right of first refusal and rendering Section 12.03 meaningless, or worse, accept an offer that would destroy the affordability of the Apartment Complex.

However, AIG/SunAmerica's consent is not required by the clear, unambiguous express terms of the LPA. *See* Defendants' Memorandum at Pg. 10. As AIG/SunAmerica are Limited Partners under the LPA and the LPA expressly provides that they shall not "take part in the management or control of the business of the Partnership nor transact any business in the name of the Partnership" Section 10.01, LPA, Exhibit A, exercising such consent (if it existed) would jeopardize their limited liability status. Further, AIG/SunAmerica's consent for selling or disposing assets is expressly made unnecessary in the LPA, as is the case here. Specifically, in Section 8.02(b)(i) the LPA states "the General Partner shall not, without the consent of Special Limited Partner … have authority to sell or otherwise dispose of … all or any material portion of

the assets of the Partnership, except as expressly provided in this Agreement," and then in Section 12.03 expressly provides for a sale or disposition of the Apartment Complex by providing the Right of First Refusal to purchase the Apartment Complex. Section 8.02 expressly permits the General Partner to authorize the sale pursuant to Section 12.03, which requires no consent from AIG/SunAmerica.

Read together, it is impossible ignore that the LPA is bereft of any elements that would evidence the parties' intent to be beholden to typical requirements of a right of first refusal. There is no written evidence to support this conclusion because the opposite is true. As demonstrated, Section 12.03 only makes sense when understood as a policy driven right memorialized to incentivize the inexpensive transfer of property to a not for profit organization. Efforts to untether this transaction from its mission-driven objective by latching on to nomenclature is unpersuasive, not sensible, and an interpretive method that must be rejected. Even more transparently than in Massachusetts, Section 12.03 is not a "typical right of first refusal," but is rather its own singular contractual right that the parties fashioned to comport with the unique realities of the LIHTC industry. *See Homeowner's Rehab, Inc.* 479 Mass. 741, 99 N.E.3d 744 (2018).

## POINT II

## SECTION 42(i)(7) DEMONSTRATES THAT CONGRESS INTENDED TO RECOGNIZE A SPECIAL RGHT OF FIRST REFUSAL

### A.    Defendants hold two irreconcilable statutory interpretations

It is important to realize that Defendants have argued two irreconcilable statutory interpretations, both of which must fail. In any event, this dispute rests on the interpretation of the LPA and not on the distinct interpretation of Section 42.

On the one hand, Defendants argue that Section 42's right of first refusal is a completely typical right of first refusal subject to traditional interpretations. However, this reasoning fails as it would otherwise interfere with rights of ownership. Defendants' Memorandum of Law at Pg. 14; On the other hand, Defendants list requirements that govern Section 42's right of first refusal that have never been required of a typical right of first refusal and thereby render the Section 42's right of first refusal not typical at all. *Id* at Pg. 12. Both positions yield only one sensible conclusion: Section 42(i)(7) recognizes a special right of first refusal that is subject to its own singular requirements and policy objectives.

For the majority of their position, Defendants argue that Section 42's right of first refusal must be a typical right of first refusal because such a right would not interfere with principles of true ownership and Congress wanted to avoid such a result. Indeed, Defendants' position is that Section 42's right of first refusal cannot be deemed an option (or anything but a typical right of first refusal) because an option – unlike a right of first refusal – undermines true ownership, as contemplated by tax law. This is an illogical argument because if the Section 42 right of first refusal is a typical right of first refusal, then there is no point to provide it with a safe harbor through Section 42(i)(7). In other words, there is no need to provide a Section 42 right of first refusal with a safe harbor unless it is a distinct right with distinct characteristics, different from a common law right of first refusal. Accordingly, Section 42(i)(7) either provides a safe harbor to a unique right or is impermissibly superfluous because it provides safe harbor that is not needed. Because a statutory provision cannot be superfluous, Section 42(i)(7) must be recognizing a unique right of first refusal. *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152, 2 S. Ct. 391, 395 (1883).

Despite the foregoing position, Defendants completely undermine themselves by arguing that unless the parties agree to a right of first refusal that satisfies three unique LIHTC requirements, such a right would not be protected by Section 42(i)(7)'s safe harbor. Indeed, while simultaneously arguing that the Section 42 right of first refusal must be typical to avoid interfering with ownership rights, Defendants also argue that the Section 42 right of first refusal consists of unique LIHTC characteristics such as (i) the right only being active after tax credits are generated, (ii) an ability to purchase the Apartment Complex for a nominal amount and is *not* beholden to a third party offer, and (iii) that the right of first refusal holder be a qualified not-for-profit organization. In other words, AIG/SunAmerica demonstrates that Section 42 provides a safe harbor only to a uniquely LIHTC created right of first refusal – totally different from a typical common law right of first refusal. Defendants should not be allowed to straddle these irreconcilable positions. Accordingly, by Defendants' own admission, Section 42's right of first refusal exhibits special qualities that make it severely distinct from a typical right of first refusal.

Taking both points together, the only sensible conclusion that can be made is Congress recognized and requires a unique right that is distinct from both a typical option and right of first refusal. Congress recognized a new mechanism altogether which is exercised in a unique manner for a unique purpose, untethered to classical contractual understandings.

**B.    Defendants' Statutory Interpretation is wrong because the Supreme Court of the United States has routinely adopted nonliteral interpretations of the Internal Revenue Code**

"It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute." *Bob Jones Univ. v. United States*, 461 U.S. 574, 586, 103 S. Ct. 2017, 2025 (1983). Indeed, *Bob Jones Univ.* is one of many Supreme Court decisions which adopted a nonliteral interpretation of the Internal Revenue Code (the "IRS Code"). For instance, in *Paulsen v. Comm'r.*,

the Supreme Court construed the IRS Code in a nonliteral manner in order to further the purpose

of the statute and to allow the taxpayer to defer recognition of any realized gain in a reorganization.

*Paulsen v. Comm'r*, 469 U.S. 131, 136, 105 S. Ct. 627, 630 (1985). There, the Court ruled that

"satisfying the literal terms of the reorganization provisions, however, is not sufficient to qualify

for nonrecognition of gain or loss. The purpose of these provisions is 'to free from the imposition

of an income tax purely "paper profits or losses" wherein there is no realization of gain or loss in

the business sense but merely the recasting of the same interests in a different form.'" *Id*.

Accordingly, the Supreme Court departed from the literal terms and fashioned an interpretation

that met the overriding purpose of the statute. *Id*.

Indisputably,

> it is a familiar rule that a thing may be within the letter of
> the statute and yet not within the statute, because not within
> its spirit nor within the intention of its makers. This has
> been often asserted, and the Reports are full of cases
> illustrating its application. This is not the substitution of the
> will of the judge for that of the legislator; for frequently
> words of general meaning are used in a statute, words broad
> enough to include an act in question, and yet a
> consideration of the whole legislation, or of the
> circumstances surrounding its enactment, or of the absurd
> results which follow from giving such broad meaning to
> the words, makes it unreasonable to believe that the
> legislator intended to include the particular act.

*Holy Trinity Church v. United States*, 143 U.S. 457, 459, 12 S. Ct. 511, 512 (1892). Identically,

Justice Frankfurter famously concluded,

> the notion that because the words of a statute are plain, its
> meaning is also plain, is merely pernicious
> oversimplification. It is a wooden English doctrine of
> rather recent vintage to which lip service has on occasion
> been given here, but which since the days of Marshall this
> Court has rejected, especially in practice. A statute, like
> other living organisms, derives significance and sustenance
> from its environment, from which it cannot be severed
> without being mutilated.

*United States v. Monia*, 317 U.S. 424, 431, 63 S.Ct. 409, 412 (1943) (dissenting opinion). With the foregoing in mind, "the plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 846 (1997). *See also Estate of Cowart v. Nicklos Drilling Co*., 505 U.S. 469, 477, 112 S.Ct. 2589, 2594–2595 (1992); *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 1740 (1991).

Here, "statutory context makes [Congress'] intent clear, because [Defendants'] reading of [Section 42(i)(7)] would lead to an absurd result Congress could not plausibly have intended." *Mohamad v. Palestinian Auth*., 566 U.S. 449, 455, 132 S. Ct. 1702, 1707 (2012). It is not enough for Defendants to merely state that the use of 'right of first refusal' justifies its entire position.

## C.     Legislative history is not compelling

As for Defendants' argument concerning Congressional intent to add certain language, the Supreme Court of the United States has steadfastly ruled that "the private intent behind a drafter's rejection of one version of a text is shoddy evidence of the public meaning of an altogether different text." *Gamble v. United States*, 139 S. Ct. 1960, 1965, 204 L. Ed. 2d 322 (2019). As argued, Defendants' binary interpretation of the text is simply unpersuasive. Accordingly Congress' decision to not use the term "option" is insignificant according to the *Gamble* Court. Further, using the term "option" serves no purpose because Section 42(i)(7), as written, contemplates a right that is distinct from common law understandings in the first place. Congress recognized a special right that incentivized the inexpensive transfer of property to a not for profit organization and protect the residual value created at the taxpayers' cost.

## D.     Defendants' other arguments are equally misplaced

Incredibly, Defendants argue that there is no basis for the assertion that "the safe harbor provision is to ensure that these properties are used indefinitely as affordable housing." Defendants' Memorandum at Pg. 19. This argument is nothing more than a hail-mary attempt and is plainly wrong.

First, as discussed, it is well established that a statute must be read in its context and, here, the context of the Section 42(i)(7) safe harbor is Section 42 – as a whole. *Paulsen*, 469 U.S. at 131, 105 S. Ct. at 627. In turn, the context of Section 42 is Congress' answer to the failed Housing Act of 1949:

> The policy to be followed in attaining the national housing objective hereby established shall be: (1) private enterprise shall be encouraged to serve as large a part of the total need as it can; (2) governmental assistance shall be utilized where feasible to enable private enterprise to serve more of the total need . . . .

Housing Act of 1949, Pub. L. No. 81-171, § 2, 63 Stat. 413, 413 (codified as amended in scattered sections of 12 U.S.C. and 42 U.S.C.). Several decades after its enactment, the nation was faced with what is now known as the "expiring use crisis" when more than 300,000 housing units were lost due to expired restrictions. *See* Rachel G. Bratt, *Rebuilding a Low-Income Housing Policy 101* (1989). It was a calamity and after several more failed policy initiatives, Congress finally passed § 42. *See* Low-Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, §§ 601–05, 104 Stat. 4079, 4249–78. It would be the height of inefficiency and willful blindness to characterize Section 42 as anything but a federal attempt to finally avoid having another housing crisis in the 21st century, after decades of homelessness and failed initiatives. *See* Brandon M. Weiss, *Residual Value Capture in Subsidized Housing Under Section 42*, Harvard Law & Policy Review, 2016.

Housing affordability is at a crisis point right now. The Association for Neighborhood & Housing Development ("ANHD") reports that 234,500 units are at risk between 2017-2037. *See* https://anhd.org/report/maximizing-public-value-new-york-city-financed-affordable-housing, last visited on March 13, 2020. Many of those units are controlled by not-for-profits, but – like here – cannot exercise their rights of first refusal due to investors' obstinately literal interpretations and indefinite funding to engage in litigation. Those units are at risk of falling out of affordability unless this dispute recognizes the unique LIHTC purpose. This action has supreme impact on New York's affordable housing stock.

It is important to note that Plaintiff and likewise not-for-profits are mission driven entities as set forth within their certificates of incorporation. As such, not-for-profit entities are not driven by the bottom line, but by providing services to their community. In this case, RiseBoro provides affordable housing to low-income tenants. It is RiseBoro's intent to preserve this Apartment Complex as affordable housing.  However, unlike RiseBoro, the Defendants, are driven by bottom-line economics, and seek to undermine RiseBoro's mission to preserve the Apartment Complex, and such flies in the face of the LIHTC program and the deal which the parties made here. In return for securing more than a decade of tax credits and losses (greater in value than the value of the Apartment Complex), the deal was for Defendants to exit the partnership and allow RiseBoro to maintain affordable housing.

There is no reason for Defendants to remain in the Partnership, unless Defendants are seeking to undo the deal and bargain it made at the expense of the low-income housing. If this Court rules in favor of the Defendants in this case, what would stop Defendants from a similar approach in this case as in the other investments to vitiate the nonprofits rights to exercise the right of first refusal. By extension, other investors would follow the Defendants' course of action and

take similar steps to estop nonprofits from exercising their rights under a right of first refusal. If nonprofits such as Plaintiff cannot exercise their rights under the right of first refusal, this could lead to a potential long-term affordability crisis.

**<u>CONCLUSION</u>**

For all of the reasons set forth herein, this Court must find that the Right of First Refusal was not a classical right of first refusal, i.e., one which is a fair market value based right of first refusal, but rather it must be interpreted within the context of the LIHTC program and in accordance with the parties agreement did not require Investors' consent to exercise.

Dated:          New York, New York
                March 13, 2020

**GOLDSTEIN HALL PLLC**


By:     S/ *Brian J. Markowitz*
        **BRIAN J. MARKOWITZ, ESQ.**
        **DANIEL R. GOLDENBERG, ESQ.**