UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RISEBORO COMMUNITY PARTNERSHIP INC., formerly known as RIDGEWOOD BUSHWICK SENIOR CITIZENS COUNCIL, INC., <br><br> Plaintiff, <br><br> - against - <br><br> SUNAMERICA HOUSING FUND 682, A NEVADA LIMITED PARTNERSHIP; SLP HOUSING I LLC; and 420 STOCKHOLM STREET ASSOCIATES LP, <br><br> Defendants. | Case No.: 18-cv-07261-RJD VMS |
| SUNAMERICA HOUSING FUND 682, A NEVADA LIMITED PARTNERSHIP and SLP HOUSING I LLC, <br><br> Third-Party Plaintiffs, <br><br> - against - <br><br> 420 STOCKHOLM CORP., <br><br> Third-Party Defendant. | |

## OPPOSITION TO PLAINTIFF'S LIMITED ISSUE BRIEF
## <u>REGARDING THE INTERPRETATION OF THE RIGHT OF FIRST REFUSAL</u>

**NIXON PEABODY LLP**
Louis E. Dolan, Jr., Esq.*
Tower 46
55 West 46th Street
New York, New York 10036
ldolan@nixonpeabody.com
*Attorneys for Defendants SunAmerica
Housing Fund 682, A Nevada Limited
Partnership and SLP Housing I LLC*

*admitted *pro hac vice*

Page

# **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ........................................................................................... 1

PROCEDURAL HISTORY OF THE CROSS-MOTIONS ............................................... 3

FACTUAL BACKGROUND .............................................................................................. 4

A.     The Material Facts Are Undisputed. .................................................................... 4

B.     Notable Misstatements and Arguments in Riseboro's Factual Background. .................... 5

THE DECLARATION OF J. WILLIAM CALLISON SHOULD BE STRICKEN ..................... 8

RISEBORO'S OVERVIEW OF  FEDERAL HOUSING POLICY UNDER THE LIHTC
SYSTEM ...................................................................................................................... 10

ARGUMENT ..................................................................................................................... 11

A.     The Plain Language of the Partnership Agreement and the Statute Compel the Conclusion
that Riseboro Has Not Validly Exercised the Right of First Refusal. ........................... 11

B.     Riseboro's Arguments Should Be Rejected. ..................................................... 12

      1.     Riseboro's Right of First Refusal Arises from and is Subject to the Common Law
             Requirements Governing Rights of First Refusal in New York. ..................... 13
      2.     The General Partner Cannot Sell the Apartment Complex Against the Wishes of
             the Limited Partners and Against the Interests of the Partnership. .................. 16
      3.     The General Partner Cannot Sell the Apartment Complex without the Consent of
             the Special Limited Partner ........................................................................ 17
      4.     Defendants Bargained for More than Tax Credits. ..................................... 19
      5.     Riseboro's Argument Regarding the Qualified Contract Provision of Section 42 is
             Incorrect. .................................................................................................. 19
      6.     HRI Is Not Binding Authority, and It Supports Defendants on Key Issues. ........ 21
      7.     The Doctrine of Contra Proferentem Does Not Apply Here. ........................ 24
      8.     Discovery is Not Needed to Determine the Parties' Intent Memorialized in an
             Integrated, Unambiguous Agreement. ........................................................ 25

CONCLUSION ................................................................................................................. 25

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
 404 F.3d 566 (2d Cir. 2005)..................................................................................25

*Burzynski v. Travers*,
 636 F. Supp. 109 (E.D.N.Y. 1986) ........................................................................15

*U.S. v. Castleman*,
 572 U.S. 157 (2014)..............................................................................................20

*Catlin Speciality Ins. Co. v. QA3 Fin. Corp.*,
 36 F. Supp. 3d 336 (S.D.N.Y. 2014)......................................................................24

*Marx & Co. v. Diners' Club Inc.*,
 550 F.2d 505 (2d Cir. 1977)....................................................................................9

*Robins v. Zwirner*,
 713 F. Supp. 2d 367 (S.D.N.Y. 2010)....................................................................15

*Senior Hous. Assistance Grp. v. AMTAX Holdings 260, LLC*,
 2019 WL 687837 (W.D. Wash. 2019)....................................................................22

*Soley v. Wasserman*,
 823 F. Supp. 2d 221 (S.D.N.Y. 2011)....................................................................16

**State Cases**

*Birnbaum v. Birnbaum*,
 73 N.Y.2d 461 (1989) ............................................................................................16

*Cipriano v. Glen Cove Lodge No. 1458*,
 1 N.Y.3d 53 (2003) ................................................................................................15

*Clifton Land Co. LLC v. Magic Car Wash, LLC*,
 165 A.D.3d 1455 (N.Y. App. Div. 2018) ...............................................................13

*Finlay v. Huber*,
 47 A.D.3d 883 (2008) ...................................................................................1, 12, 18

*Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*,
 479 Mass. 741 (2018) ........................................................................................21, 22

*LIN Broad. Corp. v. Metromedia, Inc.*,
 74 N.Y.2d 54 (1989). .............................................................................................15

*Old Port Cove Holdings, Inc. v. Old Port Cove Condo. Ass'n One, Inc.*,
    986 So. 2d 1279 (Fla. 2008)..............................................................14

*Quigley v. Capolongo*,
    53 A.D.2d 714 (1976) ...............................................................15, 23

*Rowlee v. Dietrich*,
    88 A.D.2d 751 (1982) ......................................................................14

*Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    25 N.Y.3d 675 (2015) ......................................................................12

*Westchester Fire Ins. Co. v. MCI Commc'ns Corp.*,
    74 A.D.3d 551 (2010) ..................................................................4, 24

**Federal Statutes**

26 U.S.C. § 42(i)(7) ................................................................. *passim*

26 U.S.C. § 42(i)(7)(B) ...................................................................14

26 U.S.C. § 42(h)(6)(F), (I)...........................................................20

**Rules**

Federal Rule of Evidence 403.............................................................9

Federal Rule of Evidence 702.............................................................9

Federal Rule of Evidence 704.............................................................9

## PRELIMINARY STATEMENT

The issue in this case is the meaning of the term "right of first refusal" in the parties' contract and whether the holder of that right may trigger and exercise it when the fundamental preconditions for a right of first refusal have admittedly not been met. The term has a well-known and understood meaning, used and relied on in the common law of New York for many years, and there is nothing about its use by these parties in this context that changes that long-understood meaning. The term as used here is clear and unambiguous, and it should be enforced according to its plain meaning, which was relied upon when the parties negotiated and entered into the contract 20 years ago and has not changed since then.

Because the contract is unambiguous, extrinsic evidence is neither relevant to, nor admissible in connection with, its interpretation. Nevertheless, Riseboro's brief is almost wholly reliant on extrinsic information that is irrelevant and has no place in this litigation; such information cannot be considered in determining whether there is an ambiguity or in interpreting the meaning of the parties' chosen contractual language. Most notably, Riseboro attaches a declaration from an individual whom Riseboro asserts is an expert from Colorado. That declaration is wholly inappropriate at this stage of the case and should be stricken. The question before the Court is whether the plain language of the Partnership Agreement is unambiguous (it is) and what it means. There is no aspect of that analysis that is appropriate for expert testimony, and expert testimony—which is extrinsic information—cannot create an ambiguity in the agreement.

A "right of first refusal" is a right to purchase property after the owner decides to sell and receives a bona fide offer from a third party it is willing to accept. *See, e.g.*, *Finlay v. Huber*, 47 A.D.3d 883, 851 N.Y.S.2d 607, 608 (2008).  It is distinct from a common law option, which grants the holder an automatic, unilateral right, and which is what Riseboro effectively asks the Court to convert its right of first refusal into. The Court should decline that invitation.  Applying the well-

accepted meaning of "right of first refusal"—the term the parties agreed upon—leads to the unavoidable conclusion that Riseboro cannot exercise its right of first refusal at this time, as a matter of law, because the fundamental conditions have not been met: no third party offer has been received, and the partnership is not willing to sell its property. Further, the Partnership Agreement requires the express written consent of the special limited partner, SLP, in order to sell the property, and SLP has not provided such consent.

Riseboro, faced with the unenviable task of surmounting all of the foregoing, seeks to end-run these hurdles by arguing that it holds a "special" right of first refusal, *i.e.*, a "Section 42 right of first refusal," something it does not define, other than to assert it is not subject to the "willing seller" and "bona fide offer" requirements that are the fundamental characteristics of a right of first refusal under law.  Riseboro also does not identify any cogent basis in the statutory provision (26 U.S.C. § 42(i)(7)) or the Partnership Agreement for its argument that it has some novel, special right here. *See* Riseboro Memo.[1] at 12. Moreover, the Internal Revenue Code is clear that Section 42(i)(7) is only a tax safe harbor: it merely states that a right of first refusal that meets the statutory requirements will not adversely affect the tax benefits to be claimed. It does not create a new type of right of first refusal. Finally, Riseboro makes public policy arguments to the effect that policy and the low-income housing community would be served better if the Court simply allowed the apartment complex to be acquired by Riseboro, a non-profit.  Of course, Riseboro acknowledges, as it must, that non-profits themselves are not required to and do not always maintain these properties as low-income housing after their use restrictions end. Riseboro Memo. at 14 ("[Nonprofits] can . . . continue operating the properties as affordable housing, and they <u>often continue to do so</u> even after the affordability restrictions are lifted.") (emphasis added)). There is

---

[1]       "Riseboro Memorandum" refers to the Memorandum of Law in Support of Plaintiff's Limited Issue Brief Regarding the Interpretation of the Right of First Refusal.

also no assurance, and Riseboro provides none, that simply turning this or any property over to non-profit ownership will actually benefit the residents or the low-income housing community as a whole.  Owners of properties differ greatly in their resources and approach and the mere fact that a non-profit owns a property is no guaranty that the property will better serve the needs of the low-income housing community or the existing residents than if a for-profit entity owns it.

None of Riseboro's arguments changes the plain meaning of the agreement, and Defendants SHF and SLP respectfully submit that the Partnership Agreement should be enforced according to that plain meaning and summary judgment should be entered in their favor.

## PROCEDURAL HISTORY OF THE CROSS-MOTIONS

On October 29, 2019, Defendants SHF and SLP filed a letter requesting "a pre-motion conference to propose filing a motion for partial summary judgment." Letter Request for Pre-Motion Conference (Corrected) (Docket No. 33). In that letter, Defendants explained that summary judgment is appropriate at this time based on the plain language of the parties' contract. At the hearing on November 26, 2019, the Court agreed and directed the parties to file briefs on "the interpretation of the right of first refusal," noting that it was inclined to agree that this case should be decided based on the language of the contract. Nov. 26, 2019, Hr.'g Tr. at 18:12-21; 23:15-21; 25:1-8. A briefing schedule was set by the Court and later amended upon request of the plaintiff. *See* Docket No. 36 (minute entry); Electronic Order dated Jan. 10, 2020.

Accordingly, Defendants served Riseboro with a motion seeking a ruling on the issue the parties had been instructed to brief—the interpretation of the right of first refusal—using the standard procedural vehicle for narrowing the issues: a motion for summary judgment. Riseboro submitted a "limited issue brief" that discusses a number of topics unrelated to the language of the

right of first refusal and also, ultimately, asks the Court to "find that the Right of First Refusal" should be interpreted in a particular way. *See, e.g.*, Riseboro Memo. at 1, 23.

On February 18, 2020, after initial briefs were exchanged, Riseboro filed a Letter Motion to Strike asking the Court to strike Defendants' motion for summary judgment as "premature." Docket No. 41 at 2. The following day, the Court terminated Riseboro's motion to strike by Order, and instructed that the "Court will first address the issue of the construction of the 'right of first refusal'" and that Riseboro may "limit briefing to that question at this time."

## FACTUAL BACKGROUND

### A.   The Material Facts Are Undisputed.

Supporting the conclusion that summary judgment is appropriate, the parties agree that the material facts—the existence and enforceability of the contract between the parties[2] and the efforts undertaken by Riseboro to attempt to exercise the right of first refusal in the contract—are undisputed. *Compare* Defendants' Memo.[3] at 5-8 *with* Riseboro Memo. at 1, 3-6. Defendants disagree with many of Riseboro's characterizations, but Defendants have already provided a statement of the relevant factual background in their motion, and rather than discuss each such mischaracterization, Defendants instead respectfully refer the Court to their motion. *See* Defendants' Memo. at 2-8. A few significant misstatements are discussed below. And as a general matter, the extrinsic evidence submitted by Riseboro in support of its brief should be disregarded by the Court, as it is not admissible unless the agreement is deemed ambiguous. *See, e.g.*, *Westchester Fire Ins. Co. v. MCI Commc'ns Corp.*, 74 A.D.3d 551, 902 N.Y.S.2d 350, 351 (2010). Here, there is no ambiguity and none has even been asserted by Riseboro. Further, the agreement

---

[2]     Defendants agree the First Amendment to Amended and Restated Agreement of Limited Partnership of 420 Stockholm Street Associates LP submitted by Riseboro in connection with its brief forms a part of the Partnership Agreement, but it does not affect any of the provisions at issue here.

[3]     "Defendants' Memorandum" refers to the Memorandum of Law in Support of Motion for Summary Judgment of Defendants SunAmerica Housing Fund 682, A Nevada Limited Partnership and SLP Housing I LLC.

itself is integrated, and the parties previously agreed that no extrinsic materials would be allowed to modify it unless signed by both parties. Partnership Agreement § 16.05.

**B.** **Notable Misstatements and Arguments in Riseboro's Factual Background.**

Although the material facts are undisputed, Riseboro also posits a number of "facts" that are incorrect and presents argument (rather than facts), as discussed below.

First, Riseboro characterizes Defendants as "block[ing] Plaintiff from securing . . . necessary financing" "because of Defendants' desire to maintain an interest in the Apartment Complex." Riseboro Memo. at 2. Even if that statement were true, which it is not, it is utterly irrelevant to the matters at hand. Defendants are entitled to maintain an interest in the partnership that owns the apartment complex, which they have held for 20 years, and it is Riseboro's efforts to force Defendants out of the Partnership for Riseboro's benefit that are unlawful. Indeed, if Riseboro truly had a concern with SHF's conduct in connection with refinancing the property, that surely would be found somewhere in Riseboro's complaint. It is not. This is simply a scurrilous red herring.

Second, Riseboro asserts that Defendants are maintaining their interests in the partnership "long after [Section 42] contemplated their exit" and that Section 42 intends "perpetual nonprofit ownership." Riseboro Memo. at 2. Unsurprisingly, Riseboro identifies no provision of the statute that suggests Defendants are required to forfeit their interest or that requires "perpetual nonprofit ownership." Notably, as discussed below, the statute does <u>not</u> even require a right of first refusal to be given to a nonprofit in the first place, so how Riseboro can read it to mandate that SHF must exit the partnership and that the property must be owned forever by a non-profit is very difficult to understand. The statute is plainly not structured to require "perpetual nonprofit ownership." If the United States Congress wanted to require low-income housing tax credit properties to be forever owned by non-profit organizations after the compliance period, it would have simply

written appropriate language into the statute. It did not—and such language is not even being considered by Congress in the proposed amendments currently under consideration. Similarly, the use restrictions imposed by the statute last 30 years—they are not indefinite. Congress could have easily made those restrictions permanent, but did not do that either. Riseboro's brief posits what Riseboro wishes the situation were, rather than what it actually is.

Third, Riseboro asserts that Defendants "want more than the benefit of their original bargain," which Riseboro asserts is limited to the tax credits. Riseboro Memo. 2. This is a common theme throughout Riseboro's brief. But the Partnership Agreement itself contradicts Riseboro's argument; it states the exact opposite: "The Partnership has been organized exclusively to acquire the Apartment Complex . . . in order to <u>obtain long-term appreciation, cash income</u>, Tax Credits and tax losses." Partnership Agreement § 3.01 (emphasis added). These are to be shared between the partners in accordance with the Partnership Agreement—not a third party non-profit organization.[4] Riseboro asks this Court to simply ignore two of the four economic goals the parties expressly agreed were fundamental to their partnership and accept its version of events.

Failing there, Riseboro next enlists the support of a 1996 magazine from which it quotes an interview with a former employee of SunAmerica Affordable Housing Partners, Inc. as evidence that SHF's "initial bargained for intent" was solely to obtain tax credits. Riseboro Memo. at 2-3. As a threshold matter, the interview lacks foundation, is inadmissible double hearsay, and constitutes extrinsic evidence that is not admissible to vary the terms of the parties' agreement. Substantively, Riseboro does not even suggest the former employee was involved in this partnership or knew anything about it, and the interview took place three years before the

---

[4]      For example, net long term appreciation realized on sale of the property is described in Section 11.04 of the Partnership Agreement, and entitles the limited partner to $200,000 plus 10% of the net sales proceeds. If SHF truly was not entitled to long term appreciation, this provision would not be in the Partnership Agreement.

partnership in this case was even formed. In other words, the statement does not address this partnership at all and has nothing to do with it. There is also no indication that the investment goals discussed in the interview were the same three years later or that they applied to this particular partnership at all—not to mention that between the time of the interview and the formation of the partnership in this case, SunAmerica Inc. was acquired by a separate entity. Moreover, contrary to Riseboro's characterization, the statement is not even about SunAmerica (or SHF). The former employee is discussing investors in low income housing tax credit ("LIHTC") projects in general, not SunAmerica (or SHF) specifically.[5] And he states that the tax credits are the "primary" benefit of the program, not the <u>only</u> benefit.  The fact of the matter is that regardless of what LIHTC investors' general approach to these deals was in 1996 (assuming there was a general approach), SHF and SLP bargained for multiple benefits in this deal in 1999—not just the ones that Riseboro now says they are entitled to have.

Further, Riseboro's broad generalizations are contradicted by the very article they rely upon.  Another LIHTC investor states in the same article: "We look at every single deal as a pure real estate deal . . . . We can underwrite the tax credit side in very little time, but we really spend a great deal of time underwriting the real estate deal, because if it's a good real estate deal, the tax credits are just a bonus." A statement with which the former SunAmerica employee purportedly "agree[d]." In other words, the same article confirms that investors are aware of the potential real estate benefits and specifically seek out those benefits.

---

[5]     Further undercutting any relevance of the article, it appears to be referring to a category of indirect investors, *i.e.*, investors at a tier other than holders of interests in the partnerships that own the LIHTC properties.

## THE DECLARATION OF J. WILLIAM CALLISON SHOULD BE STRICKEN

Riseboro submits a declaration from J. William Callison, in which he purports to be an expert and express expert opinions. *See* Callison Decl.[6] For the reasons set forth below, the Callison Declaration should be stricken.

As a threshold matter, Mr. Callison has not been qualified as an expert in this matter, and his opinions cannot be considered unless that should occur. Equally important, however, expert opinion is irrelevant at this stage of the case. The issue before the Court is the interpretation, as a matter of law, of the right of first refusal contained in the Partnership Agreement. Mr. Callison's opinions regarding LIHTC projects, the Partnership Agreement, and the law of New York are not relevant to the Court's review and legal interpretation of the contract. Indeed, Mr. Callison invades the province of this Court by purporting to advise the Court as to New York law and how the Court should rule in this case.

Mr. Callison's declaration is replete with legal opinions on the law of New York, its application to the parties' dispute, and even the ruling the Court should render in this matter. *See, e.g.*, Callison Decl. ¶¶ 33 ("I have reviewed the New York case cited by Defendant . . . . In my opinion, Plaintiff's counsel's analysis is correct"), 41 ("In my expert opinion this militates against a summary judgment holding for Defendants and in favor of a summary judgment for RiseBoro."). None of this is appropriate here. This Court does not need a purported expert hired by one of the parties to perform the Court's function. And legal argument in this case should be presented through counsel without attempting to clothe that argument in the false garb of expert opinion.

The pending cross-motions arose out of Defendants' request to file summary judgment motions based upon the unambiguous plain language of the Partnership Agreement and the Court's

---

[6]     "Callison Declaration" refers to the Declaration of J. William Callison in Support of Plaintiff's Limited Issue Brief Regarding the Interpretation of the Right of First Refusal.

order for the parties to brief that issue. *See* Docket Nos. 33, 36. Defendants filed such a brief, while Riseboro filed a "limited issue brief" that does not identify any ambiguity in the contract language and instead is filled with extrinsic and extraneous information that cannot create an ambiguity in the language and arguments asserting that public policy concerns should supersede the terms of the parties' agreement. None of the foregoing, of which Mr. Callison's declaration is a part, is relevant to the issue before the Court.

Federal Rule of Evidence 702 requires that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Here, the legal meaning of the contract is not a "fact in issue" or a matter of evidence to be understood. It is a legal analysis.

Likewise, expert testimony on the law is generally prohibited by Federal Rule of Evidence 403 as a "waste of time." *See, e.g.*, Fed. R. Evid. 403, 704 at Notes of Advisory Committee ("Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach"); As explained by the Second Circuit:

> expert testimony on law is excluded because the tribunal does not need the witness' judgment. The judge (or the jury as instructed by the judge) can determine equally well. The special legal knowledge of the judge makes the witness' testimony superfluous.

*Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (internal citations omitted) (holding that it was error to permit an expert witness to testify "to the legal obligations of the parties under the contract").

While there is no jury in this matter to be confused by competing statements of the law, Riseboro should not be permitted to proffer its legal argument through a purported expert witness.

9

Counsel are perfectly capable of arguing the law before this Court, and introducing legal argument through a purported expert witness only unnecessarily increases the cost of litigation.  Finally, Riseboro's brief is 24 pages long, and it should not be permitted to submit an additional fifteen pages (the Callison Declaration is fifteen pages long) of argument in support of its brief.

For all of the foregoing reasons, Defendants respectfully submit that the Callison Declaration should be stricken.

**RISEBORO'S OVERVIEW OF**
**FEDERAL HOUSING POLICY UNDER THE LIHTC SYSTEM**

Defendants also provided a summary of the Federal LIHTC program in their motion for summary judgment for background purposes. Rather than restate it here, Defendants respectfully refer the Court to their motion for summary judgment. *See* Defendants' Memo. at 2-5. Two notable misstatements in Riseboro's discussion of the program are discussed below. Other mischaracterizations are addressed in the argument section of this brief.

First, Riseboro devotes considerable time to discussing the current state of affordable housing in the United States. Riseboro Memo. at 8-9, 12. The LIHTC statute and the partnership in this case, however, are more than 20 years old. The current state of affordable housing has no relevance to the interpretation of the Partnership Agreement or the LIHTC statute.  This is nothing more than an obvious attempt to pull at the heartstrings of the Court, rather than focus on the legal principles that face the Court.[7]  Riseboro has a forum in which to make its policy arguments, but it is Congress, not this Court.

Second, Riseboro misleadingly asserts that the $3.3M in low income housing tax credits received by Defendants "far exceed[s]" their $2,492,305 "initial capital contribution" and must,

---

[7]     For point of reference, the affordable housing group of which defendants are a part is one of the nation's largest low-income housing providers; the mere fact that it is a for-profit entity should not sway the Court; it continues to provide a very important service to the nation's housing community regardless of its for profit status.

therefore, be all that Defendants bargained for. This is another recurring theme in Riseboro's brief. But it is wholly misplaced and inapplicable here.  There is nothing in the parties' contract that states that once the Defendants receive a certain return on their investment, they must turn the property over to Riseboro.  Further, Riseboro's math does not add up. The tax credits are not received by the investors all at once such that the savings they generate can be immediately reinvested. The credits are received over the course of ten years. Over that time, the tax credits still generate a return for the investors, but they do not generate the 32% return Riseboro implies is earned annually when it compares the total amount received over all ten years ($3,300,000) against the original investment. Further, these projects have risks. Development, rehabilitation, lease-up, and operation often have unforeseen problems that either increase costs or decrease the amount of tax credits received. And there is no certainty that there will be any upside in these investments for the investors.  In other words, the idea advanced by Riseboro—that the returns from the tax credits are so large that there is no way the investors could plausibly have bargained to remain in the partnership for additional benefits to be derived from the real estate after the tax credit period—is simply a fiction.

Riseboro's position is, effectively, that SHF has made enough on its investment and it should be forced to sell the property, so as to allow Riseboro to enjoy ownership of the apartment complex for its sole benefit because it is a non-profit organization—regardless of what the parties' contract says. That is not the law.

## ARGUMENT

### A.   The Plain Language of the Partnership Agreement and the Statute Compel the Conclusion that Riseboro Has Not Validly Exercised the Right of First Refusal.

The language of the Partnership Agreement is clear and unambiguous. It grants a "right of first refusal" to Riseboro. Partnership Agreement § 12.03. And the common law is clear that a right

11

of first refusal can only be exercised if the owner receives a bona fide offer to purchase the property and the owner is willing to sell the property. *See, e.g.*, *Finlay v. Huber*, 47 A.D.3d 883, 851 N.Y.S.2d 607, 608 (2008). The statute, 26 U.S.C. § 42(i)(7), is also clear that it is a tax safe harbor and does not create a new or novel statutory right of first refusal separate and distinct from the common law. When interpreting "contracts . . . unambiguous provisions . . . must be given their plain and ordinary meaning . . . .'" *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680, 37 N.E.3d 78 (2015). Accordingly, the parties' agreement should be interpreted to mean what it says on its face, Riseboro's extrinsic and policy-based arguments should be rejected, and summary judgment should be granted to Defendants.

## B.   Riseboro's Arguments Should Be Rejected.

Riseboro does not identify any ambiguity in the text that would permit the consideration of extrinsic evidence, and summary judgement in favor of Defendants is, therefore, appropriate and warranted. Riseboro makes brief textual and statutory arguments, discussed below, but primarily relies upon its vague assertion that public policy would be better served by a ruling in Riseboro's favor. Public policy, however, does not operate to vary the terms of contractual agreements, and Riseboro is not entitled to receive more than what it bargained for. Riseboro is asking the Court to convert the right of first refusal into a unilateral option, thereby reforming the parties' contract for Riseboro's betterment. Rather than pointing to any sound legal basis for such a reformation, Riseboro effectively contends that this would be the "better" result from a policy perspective and asserts that is what Congress and state regulators wanted. Those arguments have no place in a Court of law.

1.    **Riseboro's Right of First Refusal Arises from and is Subject to the Common Law Requirements Governing Rights of First Refusal in New York.**

For the reasons explained in Defendants' motion for summary judgment, the right of first refusal in the Partnership Agreement arises from and is a common law right of first refusal that can only be triggered after receipt by the owner of a bona fide offer from a third party that the owner is willing to accept once the owner has decided to sell. *See, e.g.*, Defendants' Memo. at 9-10 (citing cases). Riseboro asserts that the phrase "right of first refusal" in the Partnership Agreement should be read to mean something other than a right of first refusal, in other words, that the language of the contract means something other than what it says on its face. Riseboro's position should be rejected.

First, Riseboro claims that its right of first refusal is distinguishable from common law rights of first refusal because it does not expressly state its "triggering mechanism," *i.e.*, it does not state that the partnership must be willing to sell or that a bona fide offer must be received. Riseboro Memo. at 20. Including such language in this right of first refusal was unnecessary, as these are the fundamental characteristics of rights of first refusal established under centuries of common law. *See, e.g.*, *Clifton Land Co. LLC v. Magic Car Wash, LLC*, 165 A.D.3d 1455, 1456, 86 N.Y.S.3d 233, 235 (N.Y. App. Div. 2018); footnote 7, *infra*.

Second, Riseboro claims that its right of first refusal is distinguishable from rights of first refusal in the common law because of its fixed, below-market price. Riseboro Memo. at 20. But Riseboro identifies no authority supporting its position that a fixed price, below-market right of first refusal can be triggered without the necessary common law conditions of a willing seller and a bona fide offer being in place. *Id.* Again, abrogating that requirement would convert the right of first refusal into an option, which is a type of right that already exists. Moreover, fixed price, below-market rights of first refusal indisputably exist at common law and have the common law

13

conditions. *See, e.g.*, *Rowlee v. Dietrich*, 88 A.D.2d 751, 752, 451 N.Y.S.2d 467 (1982) ("right of first refusal" for which "current market value of the property is significantly greater than the price fixed in the agreement" treated no differently); *Old Port Cove Holdings, Inc. v. Old Port Cove Condo. Ass'n One, Inc.*, 986 So. 2d 1279, 1285 (Fla. 2008) ("[r]ights of first refusal are also known as preemptive rights. . . . some require offering the property at a fixed price (or some price below market value)" and they require a "bona fide offer" to exercise). Merely because the instrument here has a fixed price does not render it something other than a contractual right that is based on the common law.

Third, Riseboro argues as a matter of policy that because the right of first refusal is below-market, a third party is unlikely to make an offer and thus Riseboro is unlikely to be able to exercise its right of first refusal. Riseboro Memo. at 19-20. As an initial matter, when the parties agreed on the right of first refusal exercise price at "debt plus taxes" as allowed in Section 42(i)(7) some 20 years ago, they had no way to know how the fair market value of the property would compare to the debt plus taxes price now, 20 years later, or how likely it was to be a more- or less-valuable right at that time. That does not render the instrument invalid.

It may be the case that no third party will make an offer for the property, but that is in the nature of a right of first refusal—*i.e.*, it may never be exercised. Riseboro also could have bargained for a fair market value right of first refusal if it thought its below market right of first refusal was likely to deter offers. The tax advantages afforded by Section 42(i)(7) apply to any right of first refusal that is equal to or above the "minimum purchase price"—there is no price ceiling—as long as the other conditions set forth therein are satisfied. 26 U.S.C. § 42(i)(7)(B). Further, whether rights of first refusal have a deterrent effect on third-party offers is dependent on the facts of any given situation, but the very nature of the instrument is that the right holder has

14

only a conditional right that may or may not come to fruition. Because the right of first refusal may never be exercisable does not render it an empty promise.

Fourth, Riseboro spends considerable effort trying to distinguish the facts of specific authorities cited by Defendants for the proposition that a "right of first refusal" means a preemptive right to purchase the property in the event the owner is willing to sell and receives a bona fide offer from a third party, such as *LIN Broad. Corp. v. Metromedia, Inc.*, 74 N.Y.2d 54, 542 N.E.2d 629 (1989). Riseboro Memo. at 20-22. But that is the fundamental definition of a "right of first refusal" and it appears over and over again, not just in the one or two cases previously cited by Defendants.[8]

Finally, Riseboro concludes that "a common law right of first refusal is a total creature of circumstance, completely reliant upon the circumstances of a bargain." Riseboro Memo. at 22. That position is belied by the overwhelming number of contrary authorities, cited above, all holding that a "right of first refusal" means a preemptive right to purchase the property in the event the owner is willing to sell and receives a bona fide offer from a third party. The words "right of first refusal" are not meaningless, as Riseboro now suggests.

---

[8]     *See, e.g.*, *Burzynski v. Travers*, 636 F. Supp. 109, 112 (E.D.N.Y. 1986) ("[plaintiff's] right of first refusal entitled him to meet any bona fide third party offer . . . that was acceptable to the defendants"), *aff'd,* 833 F.2d 1002 (2d Cir. 1986); *Robins v. Zwirner*, 713 F. Supp. 2d 367, 376 (S.D.N.Y. 2010) ("A right of first refusal "requires [an] owner, when and if he decides to sell, to offer the property first to the party holding the preemptive right so that he may meet a third-party offer or buy the property at some other price set by a previously stipulated method") (citing *Metro. Transp. Auth. v. Bruken Realty Corp.,* 67 N.Y.2d 156, 501 N.Y.S.2d 306, 492 N.E.2d 379, 382 (1986); *McCormick v. Bechtol,* 68 A.D.3d 1376, 891 N.Y.S.2d 188, 191 (3d Dep't 2009)); *Quigley v. Capolongo*, 53 A.D.2d 714, 715, 383 N.Y.S.2d 935, 936 (1976) ("A right of first refusal is . . . conditioned on the seller's willingness to sell. It is . . . an agreement that should the owner receive a bona fide offer to purchase . . . he will not accept the offer without giving the [holder] the right to buy it . . . .") (citing *R.I. Realty Co. v. Terrell*, 254 N.Y. 121, 172 N.E. 262 (1930); *Amco Plastic Materials, Inc. v. Slone*, 5 A.D.2d 817, 170 N.Y.S.2d 618 (N.Y. App. Div. 1958); *London v. Joslovitz*, 279 A.D. 252, 252, 110 N.Y.S.2d 56 (App. Div. 1952))), *aff'd sub nom. Quigley v. Ithaca Coll.*, 43 N.Y.2d 748, 372 N.E.2d 797 (1977); *Cipriano v. Glen Cove Lodge No. 1458*, 1 N.Y.3d 53, 60, 801 N.E.2d 388, 392 (2003) (same).

15

2.      **The General Partner Cannot Sell the Apartment Complex Against the Wishes of the Limited Partners and Against the Interests of the Partnership.**

The general partner cannot agree to sell the apartment complex because it is against the wishes of the limited partners and against the interests of the Partnership. The limited partners, SLP and SHF, own 99.99 percent of the partnership interests in the Partnership. The general partner cannot simply ignore their wishes and interests in conducting the business of the partnership and it plainly cannot ignore their contractual entitlement to consent to a transaction if they so desire. These were the terms the partners agreed on 20 years ago—there is no basis to change them now.

As a matter of common law, the general partner owes fiduciary duties to the limited partners to conduct business in a manner that advances their interests. *See, e.g.*, *Soley v. Wasserman*, 823 F. Supp. 2d 221, 232 (S.D.N.Y. 2011) ("under New York law . . . general partners owe a fiduciary duty to the limited partners of the partnership."); *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 539 N.E.2d 574, 576 (1989) ("a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect . . . [The] fiduciary . . . is bound to single-mindedly pursue the interests of those to whom a duty of loyalty is owed").

Not just a matter of common law, this obligation is also an express contractual obligation under the Partnership Agreement: "the General Partner shall take all actions necessary or appropriate to protect the interests of the Limited Partners and of the Partnership." Partnership Agreement § 8.01. Agreeing to sell the apartment complex to an affiliated third party knowing that the limited partners do not want to sell the property and knowing that Riseboro intends to exercise a right of first refusal and purchase it at a price that would generate minimal or no value for the partnership and the limited partners does not protect their interests.

Furthermore, Section 8.03 of the Partnership Agreement provides that "[i]n conducting the business of the Partnership, the General Partner shall be bound by the Partnership's purposes set

forth in Article III." And those purposes include "obtain[ing] long-term appreciation, [and] cash income," both of which the general partner may be ignoring were it to agree to sell the apartment complex at this time.

**3.      The General Partner Cannot Sell the Apartment Complex without the Consent of the Special Limited Partner.**

The Partnership Agreement also prohibits the sale of the apartment complex without SLP's prior written consent:

> (b) The General Partner shall not, without the Consent [defined to mean "prior written consent"] of the Special Limited Partner which Consent may be withheld in its sole and absolute discretion, have any authority to: (i) sell or otherwise dispose of, at any time, all or any material portion of the assets of the Partnership, except as expressly provided in this Agreement; . . . .

Riseboro argues that the general partner is not required to obtain the consent of SLP to sell the apartment complex on the basis that the right of first refusal falls within the "except as expressly provided in this Agreement" language of the provision. Riseboro Memo. at 16. But Riseboro's interpretation conflicts with the plain language of the agreement. The right of first refusal provision of the contract does not authorize the general partner to accept an offer from, or otherwise be willing to sell to, a third party, and it does not authorize a sale to anyone or require that the apartment complex be sold to Riseboro. It provides only that Riseboro "shall have a right of first refusal to purchase the Apartment Complex." Partnership Agreement § 12.03. That does not mean that the Partnership has decided to sell the property, must sell the property, or that SLP consents (or has given up its consent rights) to any such sale. In short, it does not "expressly provide" that the general partner shall sell the apartment complex, and SLP's consent is required.

Riseboro argues that reading the contract such that the right of first refusal is not an express authorization to the general partner to sell the property would render the "except as expressly provided in this Agreement" language meaningless. Riseboro Memo. at 5. Riseboro's position,

however, is contradicted by the fact that other provisions of the Partnership Agreement do instruct the general partner to sell "all or any material portion of the assets of the Partnership," and thus fall within the "except as expressly provided" clause, thereby giving that clause meaning.

For example, pursuant to Section 8.16(c)(ii), if the general partner is to be removed from the Partnership, it must first make a contribution to the Partnership in the amount of the outstanding Development Fee (which is at least $422,000 under Section 8.11, and thus a material portion of the assets of the Partnership), and cause the Partnership to then pay off the outstanding Development Fee to the third-party developer.[9] Likewise, Section 12.02 requires the general partner to distribute all of the Partnership's assets if the Partnership is to be dissolved.[10] Both provisions expressly require a disposition of a "material portion of the assets of the Partnership" by the general partner, and thus do not require consent from SLP under Partnership Agreement § 8.02(b). Those provisions alone plainly give meaning to the exception in 8.02(b).

Finally, Riseboro argues that if the investor must provide consent before a sale occurs, the investor could ensure the right of first refusal is never triggered. Riseboro Memo. at 20.  But that is the nature of a right of first refusal—it is only a preemptive right and it cannot be used to compel an unwilling owner to sell its property. *See, e.g., Finlay v. Huber*, 47 A.D.3d 883, 851 N.Y.S.2d 607, 608 (2008). Any number of rights of first refusal in real property have expired unexercised over the years.  In that respect, the right of first refusal is distinct from an option, a unilateral right to acquire property. The parties here did not agree to grant Riseboro an option, and they would not have, as the safe harbor protections of Section 42(i)(7) would not apply to one.

---

[9]     "(ii)     If the General Partner is removed as Partner of the Partnership then, immediately prior to removal, the General Partner shall make a Capital Contribution to the Partnership in an amount equal to any remaining . . . Development Fee, and the Partnership shall thereupon . . . pay off . . . the Development Fee. . . ."
[10]     "Upon the dissolution of the Partnership . . . . the . . . Liquidator [defined as the General Partner, if one exists] shall . . . sell and otherwise liquidate the Partnership's property and assets . . . . Upon the complete liquidation and distribution of the Partnership assets, the Partners shall cease to be Partners of the Partnership."

4.     **Defendants Bargained for More than Tax Credits.**

Riseboro asserts that SHF and SLP are not entitled to cash flow or long-term appreciation of the value of the real estate. *See* Riseboro Memo. Riseboro's position is directly contradicted by the plain language of the Partnership Agreement and amounts to little more than Riseboro and its affiliates not liking the deal struck with the Defendants in hindsight and asking the Court to rewrite the parties' contract.

Section 3.01, "Purpose of the Partnership," provides: "The Partnership has been organized exclusively to acquire the Apartment Complex and to develop, rehabilitate, finance, construct, own, maintain, operate and sell or otherwise dispose of the Apartment Complex, in order to **obtain long-term appreciation, cash income**, Tax Credits and tax losses." (Emphasis added). (That this objective is plainly spelled out in the agreement makes Riseboro's characterization of Defendants acknowledgment of it as a "glaring moment of candor" and a "conce[ssion]" rather strange. Riseboro Memo. at 17.) Likewise, Section 11.01 provides for the distribution of net cash flow from property operations to SHF and SLP. And Section 11.04 expressly provides that if the apartment complex is sold, the first $200,000 and 10% of the balance of the net proceeds are to be paid to Defendants.

In other words, there was a clearly-memorialized expectation in the Partnership Agreement that Defendants would receive both cash flow and proceeds from the sale of the apartment complex. Riseboro's narrative that the investors only bargained to receive tax credits is a fiction.

5.     **Riseboro's Argument Regarding the Qualified Contract Provision of Section 42 is Incorrect.**

The LIHTC statute provides that the extended use period for a LIHTC project will terminate early if the building is acquired by foreclosure or if the taxpayer asks the applicable housing agency to find a buyer to buy out the taxpayer and the housing agency is "unable to present

19

. . . a qualified contract" within one year. 42(h)(6)(E), (I). The statute defines "qualified contract" to mean "a bona fide contract to acquire (within a reasonable period after the contract is entered into) the nonlow-income portion of the building for fair market value and the low-income portion of the building for an amount" dictated by the statute. 42(h)(6)(F). The relevant statutory language is as follows:

> **(F) Qualified contract.**--For purposes of subparagraph (E), the term "qualified contract" means a bona fide contract to acquire (within a reasonable period after the contract is entered into) the nonlow-income portion of the building for fair market value and the low-income portion of the building for an amount not less than the [statutory minimum price] . . . .
> **(I) Period for finding buyer**
> The period referred to in this subparagraph is the 1-year period beginning on the date (after the 14th year of the compliance period) the taxpayer submits a written request to the housing credit agency to find a person to acquire the taxpayer's interest in the low-income portion of the building.

26 U.S.C. § 42(h)(6)(F), (I) (emphasis in original).

Riseboro argues that because the term "qualified contract" is defined in the statute to mean a "bona fide contract to acquire" and the statute does not define "right of 1st refusal" to require a bona fide offer, there is an implication that a bona fide offer is not required to trigger the right of first refusal. Riseboro Memo. at 14. Riseboro's argument, however, does not make sense. The term "qualified contract" has no common law meaning and is a term created by and defined in the statute to mean a "bona fide contract to acquire." In contrast, "right of 1st refusal" is not defined in the statute, so there is no reason to expect its meaning to be spelled out there. Moreover, "right of 1st refusal," has a well-known and understood meaning at common law, which includes a requirement that the owner receive a bona fide offer to purchase the property before the right can be triggered, so there is no need for the statute to define "right of 1st refusal." "[A]bsent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'" *E.g.*, *U.S. v. Castleman*, 572 U.S. 157, 162 (2014) (quoting *Sekhar v. U.S.*, 570 U.S. 729, 732 (2013)).

Riseboro's position would require the Court to conclude that the phrase "right of 1st refusal" has no independent meaning outside the statute. That is obviously incorrect.

**6.      *HRI*[11] Is Not Binding Authority, and It Supports Defendants on Key Issues.**

Riseboro refers to a state court case from Massachusetts known as *HRI* several times in its brief. *See generally* Riseboro Memo. at ii (Table of Authorities). *HRI* concerned a LIHTC partnership and a dispute over when and how a right of first refusal could be exercised. As a threshold matter, *HRI* is not binding authority on this Court. Nevertheless, *HRI* actually supports Defendants on numerous key issues.

Riseboro cites *HRI* to support its position that consent of the investors is not required for a sale under the right of first refusal to occur. Riseboro Memo. at 20. Riseboro's reliance is misplaced. The *HRI* court concluded that the general partner did not need investor consent to accept a third-party offer based upon the language of the partnership agreement in that case, which was the *exact opposite* language from that in the Partnership Agreement in this case.  In *HRI*, the limited partner expressly disavowed any consent rights in connection with the exercise of the right of first refusal; here, the limited partner expressly retained consent rights. Specifically, the partnership agreement in *HRI* provided, in relevant part:

> except for a sale pursuant to the Option Agreement [which contained the right of first refusal at issue as well as an option], the terms of any such sale . . . must receive the Consent of the Special Limited Partner before such transaction shall be binding on the Partnership."

*HRI*, 479 Mass. at 760. And the court in *HRI* ruled as follows:

> [The parties] may include language in their agreements requiring the consent of the investor limited partners before any right of first refusal is triggered. The parties here did not include any such language in their agreements, and we must enforce the language they chose.

---

[11]      "HRI" refers to *Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*, 479 Mass. 741, 760, 99 N.E.3d 744, 760 (2018).

*HRI*, 479 Mass. at 763. In other words, the partnership agreement in *HRI* expressly provided that investor consent was not required for a sale under the right of first refusal, and the court in *HRI* ruled based on that fact. Here, however, the Partnership Agreement requires SLP's consent to any sale. Applying the reasoning in *HRI* to this case would compel the conclusion that the general partner here must obtain the consent of SLP. The Court cannot disregard this important requirement, as Riseboro would have it do.

Supporting other positions of Defendants in this case, the court in *HRI* also acknowledged that "although § 42(i)(7) permits a nonprofit organization to hold a right of first refusal, it does not mandate such a right." *HRI*, 479 Mass. at 757, 99 N.E.3d at 758. And it "conclude[d] that the right of first refusal here cannot be exercised unless the partnership decides to accept an offer from a third party," reversing the trial court on that issue. *HRI*, 479 Mass. 741, 758–59, 99 N.E.3d 744, 759 (2018).

The only part of *HRI* that supports Riseboro is the court's conclusion that although an enforceable offer is required before the right of first refusal could be exercised, it does not have to be bona fide. *HRI*, 479 Mass. 741, 758, 99 N.E.3d 744, 758. The *HRI* court identified no specific basis for its conclusion. It did not identify any language of the parties' agreement or any language in the statute that would lead to the conclusion it reached, and there is none. Instead, the court reasoned only that a third party would be unlikely to make an offer to purchase the property if it knew there was a right of first refusal and interpreting the agreements to require one would "contravene the purpose of § 42(i)(7)."

Notably, the U.S. District Court for the Western District of Washington reached the opposite conclusion, holding that a right of first refusal in a LIHTC partnership agreement can only be exercised if the partnership receives a "bona fide third party offer[]." *Senior Hous.*

*Assistance Grp. v. AMTAX Holdings 260, LLC*, 2019 WL 687837, at *7 (W.D. Wash. 2019) (holding that the "ROFR requires [the non-profit] to meet the ordinary definition of a right of first refusal" and discussing whether a bona fide third party offer had been received such that it could be exercised), *appeal dismissed,* 2019 WL 5576461 (9th Cir. 2019).

For this Court to adopt the *HRI* court's reasoning would mean disavowing the fundamental principles of New York law on rights of first refusal and to determine that the highest court in New York would overturn years of jurisprudence on this issue. New York law is plain that a right of first refusal can only be triggered if the "owner receive[s] a bona fide offer to purchase the property . . . ." *E.g.*, *Quigley v. Capolongo*, 53 A.D.2d 714, 715, 383 N.Y.S.2d 935, 936 (1976), *aff'd sub nom.* 43 N.Y.2d 748, 372 N.E.2d 797 (1977). Nothing in the statute modifies that or should be construed as a reason to overturn that. Further, Section 42(i)(7) does not require the owner to grant a nonprofit a right of first refusal; it is only a safe harbor that modifies the tax consequences that would otherwise apply if the owner decides to grant one, and that safe harbor applies to any right of first refusal that meets the statutory requirements, including rights of first refusal at fair market value. In other words, Section 42 does not require a right of first refusal at all, so if the parties include one that is less likely to be exercised, that could not contravene the purpose of the statute. Furthermore, the nonprofit's affiliate controls the operation of the project, and the right of first refusal ensures that the project cannot be sold to anyone without offering it first to the nonprofit. Accordingly, even if the right of first refusal is not exercised, it ensures oversight of the project by the nonprofit and/or its affiliate. In that regard, it can be seen as a defensive right held by the non-profit to ensure the property is not sold to a third party without Riseboro's knowledge and participation.

23

7.     **The Doctrine of *Contra Proferentem* Does Not Apply Here.**

Riseboro asserts that the Partnership Agreement was drafted by SHF's counsel and that, therefore, "any ambiguity in the language of the [Partnership Agreement] must be construed" against SHF. Riseboro Memo. at 4. First, *contra proferentum* only applies if the contract language is ambiguous. *See, e.g.*, *Westchester Fire Ins. Co. v. MCI Commc'ns Corp.*, 74 A.D.3d 551, 902 N.Y.S.2d 350, 351 (2010) ("Absent ambiguity, extrinsic evidence is inadmissible. Nor is there a need to resort to contra proferentum").

Second, *contra proferentum* "does not apply where contracts are negotiated by sophisticated parties of equal bargaining power." *E.g.*, *Catlin Speciality Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 342 (S.D.N.Y. 2014), *aff'd sub nom.* 629 F. App'x 127 (2d Cir. 2015) (citing *Cummins, Inc. v. Atl. Mut. Ins. Co.,* 56 A.D.3d 288, 867 N.Y.S.2d 81 (2008); *Westchester Fire Ins. Co. v. MCI Commc'ns Corp.,* 74 A.D.3d 551, 902 N.Y.S.2d 350 (2010) (contra proferentem was "inapplicable to this sophisticated policyholder"); *United States Fire Ins. Co. v. Gen. Reinsurance Corp.,* 949 F.2d 569, 574 (2d Cir.1991)). The Partnership Agreement was heavily negotiated— this is even visible on the face of the document, which bears handwritten changes to its terms. *See* Partnership Agreement at 23, 54, 68, 70 (internal pagination). And all parties involved in the negotiation were represented by sophisticated counsel. *See id.* at 89-90 (identifying Gerard A. Walters, Esq. as counsel for the general partner).

Third, *contra proferentum* only applies as a "last resort" in the event that extrinsic evidence has already been considered and was unable to resolve the ambiguity. *See, e.g.*, *Catlin Speciality Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 342 (S.D.N.Y. 2014), *aff'd sub nom.* 629 F. App'x 127 (2d Cir. 2015) (citing cases). At this preliminary stage, no extrinsic evidence has or should be considered and there is no basis to apply *contra proferentum*.

24

**8.    Discovery is Not Needed to Determine the Parties' Intent Memorialized in an Integrated, Unambiguous Agreement.**

The Partnership Agreement is clear that it is the complete agreement between the parties:

16.05.  <u>Entire Agreement.</u> This Agreement sets forth all (and is intended by all parties to be an integration of all) of the representations, promises, agreements and understandings among the parties hereto with respect to the Partnership, the Partnership business and the property of the Partnership, and there are no representations, promises, agreements or understandings, oral or written, express or implied, among them other than as set forth or incorporated herein.

Further, the terms of the Partnership Agreement are unambiguous, and extrinsic evidence is not admissible when an agreement is unambiguous. Accordingly, discovery is not required and the parties' intent should be ascertained from the terms of their agreement. Riseboro asserts that it "believes the clear language of the LPA supports its interpretation . . . the Investors disagree. Parole [sic] evidence is thus necessary to resolve a 'latent ambiguity.'"[12] Riseboro Memo. at 22. New York law, however, is crystal clear that disagreement between the parties as to the meaning of the contract does <u>not</u> create ambiguity or permit the introduction of extrinsic evidence: "the language of a contract is not made ambiguous simply because the parties urge different interpretations." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 598 (2d Cir. 2005) (internal citation omitted) (applying New York law).

## <u>CONCLUSION</u>

For all of the foregoing reasons, and for the reasons set forth in the Motion for Summary Judgment of Defendants SHF and SLP, Defendants SHF and SLP respectfully request that summary judgment be granted in their favor.

---

[12]    While Riseboro asserts discovery is needed, it has not issued any discovery requests, nor indicated what it wants to discover, even though this Court ordered that requests must be issued by November 8, 2019. *See* Order dated September 26, 2019. Having failed to issue discovery in the time set by the Court, Riseboro cannot now object to summary judgment on the basis that it requires discovery. Riseboro has also not responded to e-mails from Defendants' counsel inquiring what discovery Riseboro believes it needs, further undercutting Riseboro's claimed need for discovery.

Dated: March 13, 2020                              Respectfully submitted,
       New York, New York

                                                   **NIXON PEABODY LLP**


                                                   By:  ____/s/ Shelby K. Nace_____
                                                        Shelby K. Nace, Esq.
                                                        Tower 46
                                                        55 West 46th Street
                                                        New York, New York 10036
                                                        Tel: 212-940-3064
                                                        Fax: 855-396-6293
                                                        snace@nixonpeabody.com

                                                        and

                                                        Louis E. Dolan, Jr., Esq.
                                                        799 9th Street, N.W., Suite 500
                                                        Washington, DC 20001
                                                        Tel: 202-585-8818
                                                        Fax: 866-947-3760
                                                        ldolan@nixonpeabody.com
                                                        *Admitted Pro Hac Vice*

                                                        *Attorneys for Defendants and Third-Party*
                                                        *Plaintiffs SunAmerica Housing Fund 682,*
                                                        *A Nevada Limited Partnership and SLP*
                                                        *Housing I LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on the 13th day of March a copy of the foregoing Opposition was served upon the following via email:

Brian J. Markowitz
Goldstein Hall PLLC
80 Broad Street, Suite 303
New York, NY 10004
bmarkowitz@goldsteinhall.com

**NIXON PEABODY LLP**

By:  ____*/s/ Shelby K. Nace*_____
Shelby K. Nace, Esq.
Tower 46
55 West 46th Street
New York, New York 10036
Tel: 212-940-3064
Fax: 855-396-6293
snace@nixonpeabody.com
*Attorneys for Defendants and Third-Party Plaintiffs SunAmerica Housing Fund 682, A Nevada Limited Partnership and SLP Housing I LLC*

27