UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RISEBORO COMMUNITY PARTNERSHIP INC., formerly known as RIDGEWOOD BUSHWICK SENIOR CITIZENS COUNCIL, INC., <br><br> Plaintiff, <br><br> v. <br><br> SUNAMERICA HOUSING FUND NO. 682; SLP HOUSING I, LLC; and 420 STOCKHOLM STREET ASSOCIATES L.P., <br><br> Defendants. | Case No. 1:18-CV-07261-RJD-VMS <br><br> **BRIEF OF NEW YORK AFFORDABLE HOUSING NONPROFITS AND NATIONAL NONPROFIT ORGANIZATIONS AS AMICI CURIAE IN SUPPORT OF PLAINTIFF'S LIMITED ISSUE BRIEF REGARDING THE INTERPRETATION OF THE RIGHT OF FIRST REFUSAL** |

### I. INTEREST OF AMICI CURIAE

Amici are New York-based nonprofits focused on affordable housing, associations of New York-based nonprofits focused on affordable housing, other regional nonprofits focused on affordable housing, and national organizations committed to promoting the development and maintenance of affordable housing around the country. Amici are listed in the Appendix to this brief. Collectively, these 34 organizations have dedicated countless decades to the development and preservation of affordable housing.[1] They have been responsible for developing or managing tens of thousands of units of affordable housing in New York state alone. Amici file this brief to offer their perspectives on the legal issues before the Court, the longstanding practices and expectations within the industry, and the importance of this issue to the maintenance of affordable housing in New York and nationwide.

---

[1] Hundreds of additional organizations are represented through the associations appearing as amici.

1

Amici submit this brief in support of the nonprofit Plaintiff's Limited Issue Brief Regarding the Interpretation of the Right of First Refusal. Amici also acknowledge the important role that for-profit investors play in the success of the Low Income Housing Tax Credit ("LIHTC") program. To function properly, the LIHTC program requires willing investor partners who benefit financially from supplying development capital necessary to achieve the program's goals. However, the positions advanced by Defendants here (the "Investor Defendants"),[2] and by similarly opportunistic investors in analogous cases around the country, would thwart the proper functioning of the LIHTC program and result in a massive transfer of value from *the public* to investors that have already profited from the tax benefits Congress provided them in the LIHTC statute. The Investor Defendants' positions are contrary to the law, industry practice and expectations, and the public policy that animates the LIHTC statute.

## II.  ARGUMENT

**A.     The LIHTC Statute Exists to Promote the Development and Preservation of Affordable Housing, and Industry Participants Have Long Understood that the Statute's Goals Include Ultimate Nonprofit Ownership of LIHTC Projects**

The LIHTC program, 26 U.S.C. § 42 (the "LIHTC statute" or "Section 42"), is a federal tax credit program designed to promote the development of affordable rental housing for low-income households. *E.g.*, *Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*, 479 Mass. 741, 743 (2018). It is the most important source of financing for affordable housing nationwide. *Id.* LIHTC tax credits are allocated to "qualified low-income housing projects" that are rent restricted and have set aside a minimum share of rental units for low-income households. *Id.*

---

[2] When referring to the Defendants or the Investor Defendants, this brief refers to defendants SunAmerica Housing Fund No. 682 and SLP Housing I.

The tax credits are key to the LIHTC program's success. In conventional market-rate multifamily housing developments, investors expect to achieve returns from three sources: cash flow (from operations after deducting expenses), resale value, and tax benefits (*e.g.*, depreciation). *E.g.*, J. Khadduri, et al., *What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond?*, U.S. Dep't of Hous. and Urban Dev., Office of Policy Dev. and Research ("HUD Report") at 23 (Aug. 2012).[3] In these market-rate multifamily housing developments, the bulk of an investor's profits are expected to come from cash flow and profits on sale. *Id.* at 24. Under the LIHTC program, however, the restricted rents reduce both cash flow and any likely resale value. *Id.* The LIHTC program offsets this by offering large federal tax credits to investors. *Id.* These tax credits—which represent a significant public investment in low-income housing—are *not* available to investors in market-rate housing developments. The LIHTC tax credits last for 10 years and directly reduce—dollar-for-dollar—the federal tax obligations of the investors claiming the credits. *Id.* In the case before the Court, for example, the investors planned to receive total tax credits of $3.3 million over 10 years in exchange for an initial capital contribution of $2,492,305. Dkt. 45-10 ("RiseBoro's Br.") at 9.[4] Tax credits such as these (combined with other project-related tax benefits to the investors) are generous enough—and have attracted enough investors—to result in the development of millions of affordable housing units nationwide. HUD Report at Foreword.

In a typical LIHTC project, an investor enters into a limited partnership agreement with a developer partner. *Homeowner's Rehab*, 479 Mass. at 744. The investor is commonly a limited partner assigned at least a 99 percent interest in the partnership (to ensure it receives a

---

[3] Available at https://www.huduser.gov/publications/pdf/what_happens_lihtc_v2.pdf.
[4] For briefs filed in this action, all page citations are to ECF page numbers, not internal page numbers at the bottoms of the pages of the briefs.

commensurate share of the tax benefits), and the developer is the general partner typically assigned less than a one percent interest in the partnership. *See id.* The general partner is responsible for day-to-day management of the property, and the investor contributes capital in exchange for the tax benefits generated by the project. *Id.*

The general partner in a LIHTC project is often, but not necessarily, a nonprofit or an entity owned by a nonprofit. *See id.* The LIHTC statute encourages nonprofits to serve as general partners in at least two ways. First, Section 42 requires that a minimum percentage of each State's competitively-awarded LIHTC credits be awarded each year to projects involving "qualified" nonprofits that "own an interest" and "materially participate" in the project. *See* 26 U.S.C. § 42(h)(5)(A)-(C).

Second—and most pertinent in this case—the statute authorizes nonprofits to hold a special statutory right to buy the property after all the tax credits have been consumed (and after the close of what the statute calls the "compliance period"). This statutory right includes a low minimum purchase price:

> No Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely be reason of a right of 1st refusal held by . . . a qualified nonprofit organization . . . to purchase the property after the close of the compliance period for a price which is not less than the minimum purchase price.

26 U.S.C. § 42(i)(7)(A). The statute does not otherwise define "right of 1st refusal."[5] *See id.* The statutory "minimum purchase price" is designed to be low—typically below fair market value—

---

[5] The Investor Defendants point out that members of Congress have recently been proposing legislation to replace the term "right of 1st refusal" with "option." *See* Dkt. 44 ("Defs.' Br.") at 22. The Investor Defendants contend this shows the term "right of first refusal" rightly has the restrictive definition proposed by the Investor Defendants. *Id.* The legislation shows no such thing. Nothing in the proposed legislation suggests Congress is doing anything other than responding to recent disputes between investors and nonprofits, and conforming the statute's language to its original intent.

4

and is the sum of the outstanding debt on the property plus any taxes that might be owed by the investor limited partner upon exiting the partnership (a price commonly described as "debt plus exit taxes"). *Homeowner's Rehab*, 479 Mass. at 745 (citing 26 U.S.C. § 42(i)(7)(B)).

Congress authorized this special below-market purchase right (a "Section 42 ROFR") because Congress wanted LIHTC properties to end up in the hands of nonprofits that would keep the units affordable. *Id.* at 754-55. Historically, that effort has succeeded. Partnership agreements have routinely included Section 42 ROFRs for nonprofit participants. *See* HUD Report at 15, 30-31 & n.20. Indeed, the Section 42 ROFR has been such a fundamental component of LIHTC partnerships that, in 2007, the IRS made it a presumptive requirement for any tax-exempt nonprofit participating in a LIHTC project. *See* Memo from Robert S. Choi, Director of EO Rulings and Agreements, Internal Revenue Service, to LIHTC Limited P'ships at § 5(e) (July 30, 2007).[6]

Investors have also expected Section 42 ROFRs to be included in LIHTC project partnership agreements and ultimately exercised. Investors' financial projections (created at the outset of the partnerships) have routinely assumed an ultimate sale of the project at the Section 42 ROFR price. HUD Report at 31 n.20. And investors have generally not intended to maintain a connection with the project after the end of the 15-year compliance period. *See id.* at 29.

Accordingly, since the LIHTC program's inception, the industry expectation and practice has been that nonprofit partners assume ownership of the LIHTC properties after the end of the compliance period (after all the tax credits have been consumed), usually by exercising their Section 42 ROFRs. *See* HUD Report at 15, 29-31 & n.20. Such transfers to nonprofits have occurred at a very high rate. HUD Report at 29 (describing one estimate that 95 percent of

---

[6] Available at www.novoco.com/sites/default/files/atoms/files/choi_memo_073007.pdf.

properties were "transferred to the original nonprofit developers"). This common pattern of ownership and transfer has long been incorporated into the expectations of parties forming LIHTC partnerships, and is entirely consistent with the historical experience of amici.

### B. The Section 42 ROFR is not a Common Law Right of First Refusal

Notwithstanding these longstanding industry norms, the Investor Defendants are attempting to thwart a transfer of ownership to the nonprofit Plaintiff (RiseBoro Community Partnership Inc. ("RiseBoro")), by claiming that RiseBoro's Section 42 ROFR is a common law right of first refusal that can be exercised only under very limited circumstances. *E.g.*, Defs.' Br. at 6. This position is contrary to industry practice and wrong as a matter of law.

The purchase right authorized by Congress in Section 42 is *not* a common law right of first refusal. A common law "right of first refusal" is "[a] potential buyer's contractual right to *meet the terms* of a third party's higher offer."[7] BLACK'S LAW DICTIONARY (11th Ed. 2019) (emphasis added). That is not the sort of right authorized by Section 42. A Section 42 ROFR is the right of a nonprofit "to purchase" a LIHTC property for a statutorily *pre-established*, *below-market* purchase price untethered to any third-party offer. 26 U.S.C. § 42(i)(7)(A). The language of the provision as a whole suggests an *entitlement* to purchase, and imposes only three preconditions: (1) that the purchase be made by a nonprofit or other specifically-authorized entity; (2) that the purchase occur after the close of the compliance period; and (3) that the purchase be for no less than the established minimum purchase price (making no reference to a price offered by a third party). *Id.* These are not the characteristics of a common law right of first refusal.

---

[7] Individual states, including New York, may have developed different or additional common law requirements surrounding the exercise of a common law "right of first refusal." For purposes of analyzing Section 42's meaning and nationwide application, the definition in Black's Law Dictionary represents a common articulation of the majority rule.

6

In fact, the normal prerequisites for exercising a common law right of first refusal make no sense under Section 42. As a practical matter, no informed third party would go to the expense and effort to make a bona fide, fully negotiated market-rate offer to purchase a property (with all the due diligence such an offer requires), when another entity has a below-market purchase right that would trump it under all circumstances. Under such conditions, RiseBoro would have a right it could never hope to exercise. Such an interpretation of RiseBoro's right is impermissible. *E.g.*, *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., et al.*, 63 N.Y.2d 396, 403 (1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.").

What is more, an *uninformed* third party would be genuinely harmed if a general partner encouraged the third party to incur the expenses associated with making a carefully considered, bona fide market-rate offer when the general partner knew it would only trigger a below-market right to purchase the property. Thus, in the LIHTC context, not only is a third party offer not *needed* (because of the statutorily pre-established purchase price), but requiring a third-party offer could be genuinely *damaging*. By contrast, when a party wants to exercise a common law right of first refusal, the existence of a price-setting, bona fide third-party offer is *essential*.

The Investor Defendants ask the Court to ignore this crucial distinction, and give the term "right of 1st refusal" its "plain meaning." Defs.' Br. at 17. The Investor Defendants also contend that Section 42 must refer to a common law right of first refusal because, "*absent other indication*, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Id.* (quoting *United States v. Castleman*, 572 U.S. 157, 162 (2014)) (emphasis added, other citations and quotations omitted). But, here, the "plain meaning" of Section 42's "right of 1st refusal" cannot be the Black's Law Dictionary definition of a "right of first refusal," and Section

7

42's text provides ample "other indication" of the right's meaning by setting a pre-established, below-market price at which a nonprofit can purchase a LIHTC property. Indeed, the rules of statutory construction cited by the Investor Defendants do not *confirm* Defendants' interpretation, they *contradict* it.

The Investor Defendants also contend that Section 42(i)(7) is nothing more than a "safe harbor" that describes only the tax consequences of granting of a common law right of first refusal in a LIHTC project. *See* Defs.' Br. at 8-9. The Investor Defendants claim that Section 42(i)(7) exists only because, "[u]nder normal tax principles, the holder of a below-market right to acquire property would be treated as the property owner for tax purposes due to the economic substance doctrine." Defs.' Br. at 8. According to the Investor Defendants, the

> "economic substance" doctrine (also known as the "sham in substance" doctrine) deems the holder of a below-market *right of first refusal* to be the "owner" of the property for tax purposes because it is assumed that the holder of a right to purchase an asset below its fair market value would exercise that right, becoming its owner in fact and realizing the appreciation in value of the property.

*Id.* at 8 n.3 (emphasis added). In other words, the Investor Defendants argue that Section 42(i)(7) exists only because its "safe harbor" ensures the flow of tax credits to the investor, and not to the nonprofit holder of a Section 42 ROFR (which, as a nonprofit, cannot benefit from the tax credits). The Investor Defendants' argument is wrong, and results in a significant misinterpretation of Section 42(i)(7).

The necessary implication of Section 42(i)(7) is that the "right of 1st refusal" described in that section *would* (under normal tax principles) invalidate the investor's tax credits absent the safe harbor provided by Section 42(i)(7). But even the Investor Defendants agree that the safe harbor is necessary only when an eventual sale under the transfer right at issue is "assumed." Defs.' Br. at 8. Indeed, under normal tax principles, a third party's transfer right will invalidate

8

an owner's status only if it is "obvious and natural" or "inevitable" that the holder of the transfer right ultimately can and will "obtain" the property for little to no additional consideration. *Burroughs Adding Mach. Co. v. Bogdon*, 9 F.2d 54, 56 (8th Cir. 1925); *see also* IRS Rev. Rul. 55-540, 1955 WL 10043, at *2-3 (1955)). This principle applies to the holder of a below-market option, for example. IRS Rev. Rul. 55-540, 1955 WL 10043, at *2-3. In such a case, the holder of the below-market transfer right (which the IRS assumes will inevitably be exercised) is treated as the true owner for tax purposes, including tax credit purposes. *See id.* But the Investor Defendants cite **no authority** showing application of this principle to a common law right of first refusal. *See* Defs.' Br. at 8-9. This is not surprising, since a common law right of first refusal does not render ultimate transfer of ownership inevitable. The holder of a common law right of first refusal can exercise it only by meeting or exceeding a third party offer the owner is willing to accept. Therefore, a holder of a common law right of first refusal—which may or may not be exercised—would *not* be considered the owner for tax purposes, and no safe harbor would be required. Section 42(i)(7) contemplates safe harbor for a *different* sort of transfer right—one that makes an eventual sale assumed or inevitable; otherwise, Section 42(i)(7) would have no purpose, contrary to "one of the most basic interpretive canons" of construction. *Corley v. United States*, 556 U.S. 303, 314 (2009) (statutory provisions should not be interpreted to be inoperative or superfluous).

For Section 42(i)(7) to have any meaning, it must offer safe harbor for transfer rights that will almost inevitably result in ownership being transferred to the holder of that right. With that safe harbor, investors and developers—such as the parties here—are free to include such rights in their contracts. A common law right of first refusal is not such a right, and the purchase right described in Section 42(i)(7) bears none of the other characteristics of a common law right of

9

first refusal. The Court should reject the Investor Defendants' attempts to analyze a Section 42 ROFR as a common law right of first refusal—an interpretation that would be contrary to both the statute itself and the long industry experience applying Section 42 ROFRs in practice.

### C. The Court's Interpretation Should Be Guided by the LIHTC Statute's Purposes

Because a Section 42 ROFR is not a common law right of first refusal and does not include all the restrictions that accompany the exercise of a common law right of first refusal, the Court should interpret RiseBoro's right of first refusal in light of the contract's terms, the parties' intent, and Section 42's purposes. Particularly if the Court concludes an ambiguity exists, the Court should interpret a Section 42 ROFR in favor of advancing the public policies the LIHTC statute exists to promote: the preservation of low income housing and eventual nonprofit ownership of LIHTC properties.

When interpreting a statute, a court must consider not just "a single sentence or member of a sentence," but the "whole law" along with its "object and policy." *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 94-95 (1993). Courts interpret statutory text, whenever possible, "to give effect to congressional purpose." *Johnson v. United States*, 529 U.S. 694, 710 n.10 (2000). Here, as described above, the LIHTC statute exists to promote the development and preservation of low-income housing, including through ultimate nonprofit ownership. The Court should interpret Section 42(i)(7) and Section 42 ROFRs to achieve those ends.

Similarly, "contractual language must be considered from the viewpoint of one cognizant of the customs, practices, usages and terminology as understood in the particular trade or business." *Sarmiento v. United States*, 678 F.3d 147, 153 (2d Cir. 2012) (quotations and citations omitted). This includes interpreting contractual language in light of existing law, *e.g.*, 11

10

Williston on Contracts § 30:19 (4th ed. 2019) (contracts must be interpreted in light of existing law), and giving contractual terms their technical meanings when used in a particular technical context, *e.g.*, Restatement (Second) of Contracts § 202(3)(b) (1981) (technical terms should be given their technical meanings when used within their technical field). The parties here granted RiseBoro a right of first refusal under Section 42, and the Court should interpret that right with reference to the customs, practices, and purposes of the LIHTC industry. RiseBoro's right, and any ambiguities, should be interpreted in favor of the preservation of low-income housing and nonprofit ownership, consistent with the policies underlying the LIHTC statute.

The Investor Defendants bristle at the notion that they "should give up the property willingly for no value," Defs.' Br. at 5, but the Court has no basis to interpret RiseBoro's right, or Section 42(i)(7), in a manner that maximizes return to investors. That is not the purpose of the LIHTC statute. In the LIHTC scheme, investors are fairly compensated through the generous tax benefits funded by the nation's taxpayers. Those tax credits have been sufficiently compensatory to produce millions of units of affordable housing nationwide. Whatever value now exists in those millions of affordable housing units should accrue to the benefit of the *public*, and not be transferred to investors who have already received the benefits of their bargains in these projects. RiseBoro's interpretation of its Section 42 ROFR is consistent with the purposes of the LIHTC statute; the Investor Defendants' interpretation is at odds with it.

    **D.**    **Continued Nonprofit Control Over LIHTC Projects is Essential to Addressing the Affordable Housing Crisis in New York and Beyond**

        **1.**    **New York is experiencing a severe affordable housing crisis**

The Investor Defendants' position—particularly when adopted by other investors—threatens to thwart the purpose of the LIHTC statute and exacerbate the critical shortage of affordable housing at a time when it is needed most. There is a severe affordable housing crisis

11

nationwide, and the need for affordable housing is particularly great in high-cost areas such as the New York City metropolitan area.[8]

New York's challenges with income inequality drive a significant need for affordable housing. Well over half the New York City metropolitan area's household population qualifies as Low Income,[9] Very Low Income,[10] or Extremely Low Income.[11] *See* AMI Cheat Sheet. Most of these households fall into the latter two categories, meaning 41 percent of the metropolitan area's households survive at just 50 percent or less of the Area Median Income (AMI).

Meanwhile, rental costs in the area are soaring. The median asking rent for a vacant unit in the City in 2017 was $1,875, which may or may not include utilities. E. Gaumer, *Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey*, New York City Dep't of Housing Preservation and Development, at 5 (Feb. 9, 2018)[12] (hereinafter "HVS 2017"). This cost represents a *30 percent increase* from 2014 in inflation-adjusted terms. *Id.* Middle Income Households paying over double that amount—up to $3,786—may still be classified as having "affordable" rent. *See* AMI Cheat Sheet. These high rental prices are coupled with a lack of availability, particularly for the lowest income households. The overall vacancy rate for City rentals in 2017 was 3.63 percent. HVS 2017 at 2-4. Low rent units were even scarcer in 2017, with availability in only 1.15 percent of units asking rents less than $800. *Id.*

---

[8] This includes all five boroughs of New York City, along with surrounding Westchester, Putnam, and Rockland counties. *See* Lucy Block, *Summertime Gladness: Your AMI Cheat Sheet is Here*, available at https://anhd.org/blog/summertime-gladness-your-ami-cheat-sheet-here (July 11, 2019) (collecting and citing data from the U.S. Department of Housing and Urban Development) (hereinafter "AMI Cheat Sheet").

[9] Defined as 51-60 percent Area Median Income (AMI). Note that data cited from this source represents 3-person households.

[10] 31-50 percent AMI. AMI Cheat Sheet.

[11] 0-30 percent AMI. AMI Cheat Sheet.

[12] Available at https://www1.nyc.gov/assets/hpd/downloads/pdfs/about/2017-hvs-initial-findings.pdf.

The New York City area's rental housing crisis does not affect all populations equally. In addition to experiencing a greater scarcity of available rental units, lower-income individuals who are lucky enough to find rental housing tend to be more rent-burdened. While the typical renter pays one third of their household income toward gross rent—the threshold above which a household is considered to be "rent burdened"—lower income households tend to pay a greater proportion of their incomes to meet their rental housing needs. HVS 2017 at 6. Taken together, Extremely Low Income and Very Low Income households (earning less than $50,000 per year for a three-person household) make up nearly 95 percent of the City's severely rent-burdened populations. *See* AMI Cheat Sheet. "Extremely Low-Income households make up about a quarter of the City's overall population but over half of its rent-burdened population and more than three-quarters of its severely rent burdened population." *Id.* This means that 453,000 New York City households earn less than $28,830 per year, yet are spending more than half of that income on housing. The problem is compounding, as the City's rent-burdened population has increased in the last decade. *Id.*

Housing and affordability deficits have severe consequences. A record number of New Yorkers are experiencing homelessness. Statewide, more than 92,000 New Yorkers are homeless, and approximately 4,000 of them are unsheltered. M. Henry, et al., *The 2019 Annual Homeless Assessment Report (AHAR) to Congress*, U.S. Dep't of Hous. and Urban Dev., Office of Cmty. Planning & Dev. at 13 (Jan. 2020).[13] Recognizing the magnitude of the housing crisis, Mayor Bill de Blasio introduced the Housing New York plan in 2014, a ten year, $41 billion dollar plan to build or preserve 200,000 affordable units in New York City.[14] Losing affordable

---

[13] Available at https://files.hudexchange.info/resources/documents/2019-AHAR-Part-1.pdf.
[14] An overview of the plan is available at https://www1.nyc.gov/assets/housing/downloads/pdf/housing_plan.pdf.

9405519.1

LIHTC units will only work against the gains achieved under the Mayor's housing plan and further exacerbate the affordability and homelessness crisis facing the most vulnerable New Yorkers.

> 2. **Continued nonprofit control over LIHTC projects protects the public's investment in affordable housing in a manner consistent with Congressional purpose, industry practice, and parties' intents**

In the midst of this rental housing affordability crisis—particularly in high-cost areas such as New York City—private investors such as Defendants threaten to exacerbate the problem by thwarting nonprofits' rights to acquire LIHTC properties at the end of the compliance period, flying the face of Congressional purpose, industry practice, and parties' original intents. As an increasing number of LIHTC properties reach the expiration of their compliance periods and extended use restrictions, it is critical that nonprofit organizations continue to maintain these properties as affordable.

Congress's preference for nonprofit control of LIHTC properties has proven beneficial to serving low-income housing needs, including in New York. Unlike for-profit developers, nonprofit organizations are driven by a mission to promote affordable housing, rather than a focus on bottom-line economic interests. Stephanie Sosa-Kalter, *Maximizing the Public Value of New York City-Financed Affordable Housing*, Association for Neighborhood & Housing Development (Oct. 10, 2019)[15] ("Maximizing the Public Value"). Mission-driven nonprofit organizations tend to promote greater services for their residents and serve populations at deeper levels of affordability. *Id.* The latter is particularly important because housing development in

---

[15] Available at https://anhd.org/report/maximizing-public-value-new-york-city-financed-affordable-housing.

9405519.1

New York City, even among affordable units with City-backed financing, has proceeded in a manner that is inverse to the actual city-wide need.[16]

Continued nonprofit involvement in LIHTC properties is essential to protect the public's substantial investment in affordable housing. In New York, the public has invested in affordable housing in its neighborhoods not only through the millions of dollars in tax credits awarded to LIHTC projects, but also through a robust program of city-backed financing to promote the development of hundreds of thousands of affordable housing units. *See generally* Maximizing the Value; *see also Low Income Housing Tax Credit Overview*, Local Housing Solutions (last visited March 17, 2020), https://www.localhousingsolutions.org/act/housing-policy-library/low-income-housing-tax-credit-overview/low-income-housing-tax-credit/ (discussing the need for funding in addition to LIHTC awards—sometimes called "gap funding"—to help make low-income housing projects financially feasible).

While certain use restrictions may require LIHTC properties to maintain affordable rents for periods beyond the fifteen-year compliance period, those restrictions alone are not sufficient to protect the public investment in affordable housing. Nearly 5,000 units in buildings receiving low income housing tax credits in New York City's five boroughs are eligible to expire within the next four years. *2019 Risk Chart*, Association for Neighborhood & Housing Development (last visited March 17, 2020), https://anhd.org/sites/default/files/2019_risk_chart_final.pdf. Throughout the City, there are over 234,000 units of affordable housing backed by city financing

---

[16] "42% of the total units developed to date were for Low-Income households; 25% were developed for Very Low-Income households; and 17% were built to Extremely Low-Income households. However, these numbers are the inverse of the actual city-wide need. Very Low- and Extremely Low-Income households make up 41.4% of the City's population, while Low-Income households only make up 16.3% of the City's population." Maximizing the Public Value.

that will reach expiration of their initial affordability between 2017 and 2037—and over 18,500 of those units will expire in this year alone. Maximizing the Public Value.

In the City's experience with properties reaching this expiration point to date, the nonprofit status of the developer is a key factor in whether the properties will continue to serve low-income tenants in need. While nonprofit developers generally continue operating rental units at affordable levels and renew affordability restrictions, for-profit developers tend to opt out of continued affordability restrictions. Maximizing the Public Value. According to the Association for Neighborhood & Housing Development, one of the undersigned amici, many of the housing units built during the early years of the LIHTC program are coming up for expiration, and "[h]ousing in neighborhoods where LIHTC-level rents are significantly below market-rate is in serious danger of losing its affordability restriction. This is most likely to happen if the developer is a for-profit seeking to maximize their bottom line." Maximizing the Public Value. Continued nonprofit involvement therefore plays an important role in maintaining affordability restrictions and protecting the public's significant investment in affordable housing in New York.

For LIHTC properties, the continued involvement of nonprofits—and, therefore, the continued preservation of affordability and protection of public investment—turns on the parties' exit rights at the end of the compliance period. With Section 42 ROFRs, Congress made available to nonprofit organizations an important right to acquire affordable housing properties at the end of the compliance period at a cost that is generally less than what the market might otherwise require. This exit right is key to preserving and protecting the substantial investment in affordable housing, particularly in neighborhoods where market prices have soared (making the demand for affordable housing even greater, and diminishing the feasibility of developing new sources of affordable housing).

16

At a time when the need for affordable housing in New York is critical, investors such as Defendants should not be permitted to reap the economic benefit of the government's massive public investment into affordable housing at the expense of nonprofits and the public, all in contravention of Congress's purpose of promoting affordable rental housing and preserving nonprofit involvement.

### III.  CONCLUSION

A Section 42 ROFR is not a common law right of first refusal. Neither the statutory language nor the industry practice supports that conclusion. Indeed, the LIHTC statute's purposes are thwarted—not advanced—by interpreting Section 42 ROFRs as common law rights of first refusal. The Court should decline to interpret them as common law rights of first refusal, and should interpret them instead in a manner consistent with industry practice and the LIHTC statute's policy priorities.

Dated:  New York, New York
March 20, 2020

      CARTER LEDYARD & MILBURN LLP

By:      /s/  Judith A. Lockhart
Judith A. Lockhart
2 Wall Street
New York, New York 10005
Telephone:    (212) 238-8603
Facsimile:    (212) 732-3232
lockhart@clm.com

HILLIS CLARK MARTIN & PETERSON P.S.

Jake Ewart, WSBA #38655
Jessica Kerr, WSBA #49866
999 Third Avenue, Suite 4600
Seattle, Washington  98104
Telephone:    (206) 623-1745
Facsimile:    (206) 623-7789

jake.ewart@hcmp.com
jessica.kerr@hcmp.com

*Attorneys for Amici Curiae New York Affordable Housing Nonprofits and National Nonprofit Organizations*

9405519.1

# APPENDIX

## LIST OF AMICI

1. MHANY Management Inc.

2. Gateway Housing

3. The Joint Ownership Entity New York City Corp.

4. Banana Kelly Community Improvement Association, Inc.

5. Fifth Avenue Committee, Inc.

6. Pratt Area Community Council, Inc.

7. Project Find, Inc.

8. Bedford Stuyvesant Restoration Corporation

9. Ascendant Neighborhood Development Corporation

10. Association for Neighborhood & Housing Development

11. The Supportive Housing Network of New York, Inc.

12. The Corporation for Supportive Housing, Inc.

13. Brooklyn Bureau of Community Service dba Brooklyn Community Services

14. West Side Federation for Senior and Supportive Housing

15. Housing Visions

16. YM & YWHA of Washington Heights and Inwood

17. Providence House

18. ACMH, Inc.

19. The Fortune Society

20. Lantern Community Services

21. Southside United HDFC — Los Sures

9405519.1

22. National Housing Trust

23. National Housing Law Project

24. The Women's Housing & Economic Development Corporation

25. Samaritan Daytop Village

26. WellLife Network

27. Phipps Houses

28. Breaking Ground

29. Regional Housing Legal Services

30. Harlem United

31. Selfhelp Community Services

32. Hudson River Housing

33. Services for the UnderServed Inc.

34. St. Nicks Alliance

9405519.1