UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
RISEBORO COMMUNITY PARTNERSHIP INC.,
formerly known as RIDGEWOOD BUSHWICK
SENIOR CITIZENS COUNCIL, INC.,

                Plaintiff,

      - against –

SUNAMERICA HOUSING FUND 682, A NEVADA
LIMITED PARTNERSHIP; SLP HOUSING I LLC;
and 420 STOCKHOLM STREET ASSOCIATES LP,

                Defendants.
-------------------------------------------------------------------x
SUNAMERICA HOUSING FUND 682, A NEVADA
LIMITED PARTNSHIP and SLP HOUSING I LLC,
        Third-Party Plaintiffs,

      - against –

420 STOCKHOLM CORP.,

        Third-Party Defendant.

-------------------------------------------------------------------x

**CORRECTED MEMORANDUM & ORDER**

18-cv-7261 (RJD) (VMS)

DEARIE, District Judge

    This is a contract dispute in which the parties make several claims, counter-claims, and cross-claims, but at its core, it is a disagreement over the meaning of a "right of first refusal" ("ROFR") held by Plaintiff to purchase an affordable housing property in Brooklyn, New York ("Apartment Complex" or "Complex"). The parties are developing the Apartment Complex under the Low-Income Housing Tax Credits ("LIHTC") Program, 26 U.S.C. § 42. In letters to the Court, Defendants indicated their intent to file a motion for summary judgment and Third-Party Defendant indicated its intent to file a motion to dismiss. See Dkt. No. 33-35. The Court limited all parties' initial briefing to the issue of the meaning of the ROFR granted to Plaintiff.

For the reasons set forth below, the Court holds that Plaintiff's ROFR operates by its definition under New York common law and is not an option to purchase the subject property.

## BACKGROUND

### I.  The Parties and Their Relationship

Defendant 420 Stockholm Street Associates, L.P. ("Partnership") is a limited partnership organized under New York law to develop the Apartment Complex. It was established in December 1998 and is now principally governed by the May 1999 Amended and Restated Agreement of Limited Partnership ("May 1999 Agreement"). See Declaration of Brian J. Markowitz, Exhibit A, Dkt. # 45-1 ("Exhibit A"), at 10. According to the May 1999 Agreement, "[the] Partnership has been organized exclusively to acquire the Apartment Complex and to develop, rehabilitate, finance, construct, own, maintain, operate and sell or otherwise dispose of the Apartment Complex, in order to obtain long-term appreciation, cash income, [LIHTC Program tax credits,] and tax losses." See id. at 29. The May 1999 Agreement requires that the Apartment Complex be "developed in a manner which satisfies, and shall continue to satisfy, all restrictions, including tenant income and rent restrictions applicable to projects generating [LIHTC Program tax credits]." See id. at 34. After a further amendment to the partnership agreement, in August 2000, the Partnership assumed ownership of the Apartment Complex. See id. 1-4.

Defendants SunAmerica Housing Fund No. 682 ("SHF") and SLP Housing I, LLC ("SLP") are Limited Partner and Special Limited Partner, respectively, in the Partnership. Third-Party Defendant 420 Stockholm Corp. ("Stockholm"), a wholly-owned subsidiary of Plaintiff Riseboro Community Partnership, Inc. ("Riseboro"), is the General Partner. Riseboro, a non-

profit entity, is not part of the Partnership, but the agreement governing the Partnership grants Riseboro the ROFR central to this dispute.

## II. The LIHTC Program

To promote the development of low-income housing, the LIHTC Program offers tax credits to taxpayers that develop "qualified low-income housing projects." See 26 U.S.C. § 42(h)(3). A qualified low-income housing project must maintain a certain percentage of its units with certain rent and tenant income restrictions. See 26 U.S.C. § 42(g). Owners of qualified low-income housing projects will receive the maximum available tax credits only if they comply with LIHTC Program rent and tenant income restrictions for fifteen years, called the "Compliance Period." See 26 U.S.C. § 42(a), (c)(2), (f)(1), (i)(1), (j). For any project allocated tax credits after 1989, the rent and income restrictions must remain in place for an "extended use" period of fifteen years after the Compliance Period ends. See 26 U.S.C. § 42(h)(6).

The LIHTC Program recognizes that affordable housing development may be furthered by the involvement of both for-profit and non-profit entities. It mandates that in each state, at least 10 percent of LIHTC Program tax credits are set aside for properties owned by a non-profit entity or by a partnership in which a non-profit entity or its subsidiary has a stake. See 26 U.S.C. § 42(h)(5). As is the case here, these partnerships typically consist of a non-profit developer "general partner" (or its subsidiary)—here, Stockholm, Riseboro's wholly-owned subsidiary—and a for-profit investor "limited partner"—here, SHF. In these partnerships, the for-profit developer supplies the funds needed to operate the property and in return receives the LIHTC Program tax credits, and the non-profit entity oversees property management and has only a nominal equity interest in the partnership. See Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P., 479 Mass. 741, 744-45 (Mass. 2018).

The LIHTC Program also makes clear, in the provision central to this dispute, that a taxpayer will not be deprived of its tax benefits merely by a non-profit entity holding a "right of 1st refusal" to purchase an affordable housing property. Under 26 U.S.C. § 42(i)(7):

> No Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely by reason of a right of 1st refusal held by . . . a qualified nonprofit organization . . . to purchase the property after the close of the compliance period for a price which is not less than . . . an amount equal to the sum of—
> (i)   The principal amount of outstanding indebtedness secured by the building . . . and
> (ii)  All Federal, State, and local taxes attributable to such sale.

Notably, the minimum purchase price arrived at using the formula in § 42(i)(7) will very likely be less than market-value. See Homeowner's, 479 Mass. at 745 (citing Khadduri, C. Climaco, & K. Burnett, United States Department of Housing and Urban Development, What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond?, at 31 (2012)[1]).

Section 42(i)(7) recognizes the possibility—and, it is only a possibility—that were a non-profit entity to hold a ROFR to purchase an affordable housing property at a below-market value, the IRS might deem the non-profit entity the "true owner" of the affordable housing property pursuant to the so-called "economic substance doctrine." See Homeowner's, 479 Mass. at 754 (citing Frank Lyon Co. v. United States, 435 U.S. 561, 572-73 (1978)). If the IRS were to conclude that the non-profit ROFR-holder were the "true owner" of an affordable housing property, it could limit, disallow, or redirect the flow of LIHTC Program tax credits. See 26 C.F.R. § 1.42-4(b). And if the flow of LIHTC Program tax credits were to dry up, this would remove the incentive to for-profit entities investing in affordable housing. Section 42(i)(7) protects against this result.

---

[1] Available here: https://www.huduser.gov/portal//publications/pdf/what_happens_lihtc_v2.pdf.

### III. The May 1999 Agreement

The Partnership is structured much like Congress envisioned in § 42(h)(5). General Partner Stockholm has a 0.10% interest in the Partnership; Limited Partner SHF has a 99.89% interest; and Special Limited Partner SLP enjoys a 0.01% interest. See Exhibit A at 41-42. All profits, losses, and credits, including LIHTC Program tax credits, are distributed to each partner in accordance with its percentage interest in the Partnership. See id. at 81.

The May 1999 Agreement allocates among the partners the power to conduct the business of the Partnership. Under Section 8.01, "except as otherwise set forth [elsewhere in the May 1999 Agreement]," General Partner Stockholm has "full, complete and exclusive discretion to manage and control the business of the Partnership." See id. at 64. Section 10.01 limits the powers of the limited partners:

> No Limited Partner shall take part in the management or control of the business of the Partnership nor transact any business in the name of the Partnership. Except as otherwise expressly provided in this Agreement, no Limited Partner shall have the power or authority to bind the Partnership or to sign any agreement or document in the name of the Partnership. No Limited Partner shall have any power or authority with respect to the Partnership except insofar as the consent of any Limited Partner shall be expressly required and except as otherwise expressly provided in this Agreement.

See id. at 80. Section 8.02(b) grants the Special Limited Partner significant control over the business of the Partnership. It states:

> The General Partner shall not, without the Consent of the Special Limited Partner, which Consent may be withheld in its sole and absolute discretion, have any authority to: (i) sell or otherwise dispose of, at any time, all or any material portion of the assets of the Partnership, except as expressly provided in this Agreement.

See id. at 63.

At the core of this dispute is Section 12.03 of the May 1999 Agreement, which states:

>> Right of First Refusal. On and after the end of the 15 year Compliance Period, [Riseboro] or its designee, if it is at that time a qualified nonprofit corporation, shall have a right of first refusal to purchase the Apartment Complex for the price equal to the sum of:
> (i)      the principal amount of outstanding indebtedness secured by the building (other than indebtedness incurred within the 5-year period ending on the date of the sale);
> (ii)      all Federal, State, and local taxes attributable to such sale and to any amounts paid pursuant to subsection (iii) hereof; and
> (iii)      any amounts of a Tax Credit Shortfall which have not been paid.

See id. at 93. Finally, the May 1999 Agreement states that it "shall be construed and enforced in accordance with the law of the State [of New York]." See id. at 101.

### IV. This Litigation

In November 2015, after the Compliance Period expired, Riseboro notified SHF and SLP that it would soon exercise the Section 12.03 ROFR. See Declaration of Brian J. Markowitz, Exhibit B, Dkt. # 45-2 ("Exhibit B"), at 2-4. In response, SHF and SLP asserted that because SLP consent was required for the Partnership to sell the Apartment Complex and SLP was not interested in selling, Riseboro could not exercise its ROFR. See id. Three years later, in February 2018, Stockholm sought to transfer ownership of the Apartment Complex to Riseboro, its corporate parent, pursuant to Section 12.03 but met with the same result: counsel for SHF and SLP indicated that their clients did not consent to selling the Apartment Complex. See Declaration of Brian J. Markowitz, Exhibit D, Dkt. # 45-4. This litigation followed.

## DISCUSSION

Riseboro asks the Court to hold that there are no conditions precedent to it exercising its ROFR, and that it may exercise its ROFR at any time after the Compliance Period has ended. In other words, Riseboro contends that its ROFR is, in fact, an option to purchase. Defendants counter that Riseboro may exercise its ROFR to purchase the Apartment Complex only after two

6

conditions precedent are satisfied: the Partnership must be willing to sell and a third-party must have made a bona-fide offer to buy.

"The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." Analect LLC v. Fifth Third Bancorp, 636 F.Supp.2d 181, 187-88 (E.D.N.Y. 2008) (quoting Omni Quartz v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002)). "An unambiguous contract contains language that has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Id. at 188 (quoting Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993)). The language of a contract is not made ambiguous simply because the parties urge different interpretations. See Sayers, 7 F.3d at 1095.

The May 1999 Agreement provides that its terms shall be "construed and enforced in accordance with the law of the State [of New York]." See Exhibit A at 101. Under New York law, contracts are "construed in accord with the parties' intent," and "the best evidence of what the parties to a written agreement intend is what they say in their writing," which, here, is the May 1999 Agreement. See Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (N.Y. Ct. App. 2002). This provision also requires the Court to begin its interpretation of "right of first refusal" with the term's definition under New York law.

I. **New York Law**

"Right of first refusal" is a legal term of art with a well-established definition in New York. A ROFR "requires [an] owner, when and if he decides to sell, to offer the property first to the party holding the preemptive right so that he may meet a third-party offer or buy the property at some other price set by a previously stipulated method." Metro. Transp. Auth. v. Bruken

7

Realty Corp., 67 N.Y.2d 156, 163 (N.Y. Ct. App. 1986). A "[ROFR] does not give its holder the power to compel an unwilling owner to sell." Id. Rather, a ROFR restricts "the power of one party to sell without first making an offer of purchase to the other party upon the happening of a contingency: the owner's decision to sell to a third party." LIN Broadcasting Corp. v. Metromedia Inc., 74 N.Y.2d 54, 60 (N.Y. Ct. App. 1989). A ROFR thus "bind[s] the party who desires to sell *not* to sell without first giving the other party the opportunity to purchase the property at the specified price." Id. (emphasis in original). A ROFR stands in contrast to an "option" to purchase, which may be triggered unilaterally, even against the owner's unwillingness to sell at the time the option-holder invokes the option. See id.

Defendants argue forcefully that the analysis need go no further. Riseboro, of course, sees it differently. Riseboro and amici argue that when read in conjunction with § 42(i)(7) and the rest of the May 1999 Agreement, Section 12.03 reflects the partners' intent to grant Riseboro a unilateral right, or "option," to purchase the Apartment Complex regardless of the owner's willingness to sell or the availability of a good faith third-party buyer. The Court is not persuaded.

## II.     The Context of § 42(i)(7) and Other Terms In The May 1999 Agreement

As "right of 1st refusal" is a common law term of art, Congress is "presumed, unless the statute otherwise dictates" to have incorporated its common law meaning. See United States ex rel. O'Donnell v. Countrywide Home Loans, Inc., 822 F.3d 650, 657 (2d Cir. 2016) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322 (1992)); accord U.S. v. Castleman, 572 U.S. 157, 162 (2014) ("It is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.").

The presumption that Congress incorporated the common law meaning of ROFR is

confirmed by the legislative history of § 42(i)(7). Where § 42(i)(7) refers to "right of 1st refusal," a pre-enactment draft of the bill originally used the term "option." S. 980, 101st Cong. § 2(y) (1989). The House Report on the law codifying § 42(i)(7) makes clear that when Congress made this change, it grasped the difference between "option" and "right of 1st refusal," stating:

> [t]he bill provides that any determination as to whether Federal income tax benefits are allowable to a taxpayer with respect to a qualified low-income building shall be made without regard to whether the tenants are given the right of first refusal . . . to purchase the building, for a minimum purchase price, *should the owner decide to sell (at the end of the compliance period).*

See H.R. Rep. No. 101-247, 101st Cong., 1st Sess., at 1195 (1989); Homeowner's, 749 Mass. at 756 (holding that H.R. Rep. No. 101-247 supports the conclusion that Congress "understood that a right of first refusal—in contrast to an option to purchase—could not be exercised unilaterally by the holder"). This change and the explanation given in the House Report is a clear indication, not "shoddy evidence," as Riseboro suggests, that § 42(i)(7) refers to a common law ROFR.

Despite this plain text and clear legislative history, Riseboro and amici make several arguments for why § 42(i)(7) and the May 1999 Agreement provide context that shows the partners intended for Riseboro to exercise its ROFR unilaterally. Their first contention is that § 42(i)(7) would be superfluous if it referred to a common law ROFR because "true ownership" of the Apartment Complex does not shift merely as a result of granting Riseboro a common law ROFR. Rather, Riseboro and amici argue, true ownership only shifts when the transfer right makes ownership transfer "obvious and natural" or "inevitable," a standard, they argue, that is unsatisfied by a common law ROFR. For this, they cite Burroughs Adding Machine Co. v. Bogdon, 9 F.2d 54, 56 (8th Cir. 1925), and IRS Revenue Ruling 55-540, 1955 WL 10043, at *2-3 (1955).

In Burroughs, a purported lease agreement granted the lessee a "right of option" to

9

purchase certain property at any time either during the lease term, for a price equal to the remaining monthly payments plus one extra monthly payment; or, after all lease payments were made, for a price equal to one monthly payment. The Eighth Circuit held that this agreement made the eventual sale to the lessee the "obvious and natural, if not the inevitable result," which, it wrote, effectively amounted to a "conditional sale." See Burroughs Adding Machine Co., 9 F.2d at 56. IRS Revenue Ruling 55-540 identifies the agreement in Burroughs as an "example" of a "transaction warranting treatment . . . as a purchase and sale rather than as a lease or rental agreement." IRS Revenue Ruling 55-540, 1955 WL 10043, at *2-3 (1955).

  Burroughs and Revenue Ruling 55-540 do not support the proposition that only purchase rights that make ownership transfer "obvious and natural" or "inevitable" result in a shift in true ownership. Rather, Burroughs and Revenue Ruling 55-540 identify but one "example" of a purchase right that shifts true ownership. Absent controlling authority or consistent IRS findings that a common law ROFR at a purchase price very likely to be below market value does not shift true ownership, the Court declines Riseboro's invitation to conclude that § 42(i)(7) is superfluous if it refers to a common law ROFR.

  Next, Riseboro and amici contend that § 42(i)(7) and Section 12.03 would be senseless if they refer to a common law ROFR because the condition precedent of a third-party offer will remain stubbornly unsatisfied, leaving Riseboro forever unable to exercise its ROFR. As they see it, no third-party in their right mind will go through the process of making an offer knowing that Riseboro, with its ROFR purchase price set below market-value, will very likely exercise its superior purchase right. They submit that Congress could not have chosen to set up a safe harbor for granting a non-profit a right it could not exercise, and that the partners could not have chosen to grant Riseboro a right it could not exercise. And they argue that Riseboro's inability to

10

exercise its ROFR frustrates the goal of smoothing the path to non-profit ownership of the Apartment Complex. To avoid this outcome, Riseboro and amici urge that § 42(i)(7) and Section 12.03 are properly understood to refer to a right Riseboro may exercise absent a third-party offer.

Riseboro and amici may be right that a third-party offer is unlikely to materialize, but their conclusion that this leads to a senseless statute or contract provision is wrong. Regardless of whether a third-party offer materializes, the fact that Riseboro holds a ROFR secures its right to purchase the Apartment Complex at the stipulated price. The Partnership need not wait for a third-party offer to materialize before it simply offers the Apartment Complex to Riseboro at the stipulated price. In this scenario, Riseboro's ROFR has effectively cleared the field for Riseboro to decide whether to buy the Apartment Complex at the stipulated price.

Or, in the unlikely event the Partnership is a willing seller and happens to receive a third-party offer it would accept, the Partnership will be bound by the ROFR to offer the Apartment Complex to Riseboro at the stipulated price, and Riseboro will then be free to exercise its right or not. Lastly, in the event the Partnership attempts a sale to a third-party without first offering the Apartment Complex to Riseboro, the ROFR provides a contractual basis for Riseboro to defeat such a sale. So, quite to the contrary of Riseboro's and amici's argument, holding that § 42(i)(7) and Section 12.03 refer to a common law ROFR does not block Riseboro from buying the Apartment Complex at the stipulated price. No, all roads from the Partnership becoming a willing seller still lead first to Riseboro, which, if it chooses, may purchase the Complex at the stipulated price.

Turning to other terms in the May 1999 Agreement, Riseboro submits that a common law ROFR is inconsistent with how the May 1999 Agreement allocates the power to conduct the business of the Partnership. Section 8.01 of the May 1999 Agreement grants Stockholm, as

11

General Partner, the power to conduct all business of the Partnership, subject only to any exceptions enumerated elsewhere in the May 1999 Agreement. Riseboro rightly concedes that Section 8.02(b)(i) is one such exception—it grants SLP veto power over the sale of certain assets of the Partnership. But, Riseboro highlights, Section 8.02(b)(i) also states that the General Partner may sell assets of the Partnership without SLP consent where "expressly provided by [the May 1999] Agreement." Riseboro argues that its purchase pursuant to the ROFR in Section 12.03 falls within this carve out from the requirement that SLP consent to the sale of the assets of the Partnership. If so, then Stockholm could express the Partnership's willingness to sell the Apartment Complex under Section 12.03. Stockholm, of course, is Riseboro's wholly owned subsidiary. It follows that if Stockholm may indicate the Partnership's willingness to sell the Apartment Complex to Riseboro under the Section 12.03 ROFR, and Stockholm is controlled by Riseboro, then Riseboro effectively has the power to express a willingness to sell to itself. This ostensible power, Riseboro argues, shows the partners intended for Riseboro to be able to exercise its ROFR unilaterally.

Circular, indeed, but this argument defies the text of Section 12.03. Section 12.03 does not "expressly provide[]" that the General Partner may sell the Apartment Complex pursuant to the ROFR without SLP's consent. Rather, it grants a ROFR to Riseboro, a non-party to the Partnership. Accordingly, the allocation of which partner may conduct the business of the Partnership does not show the partners intended for Riseboro to be able to exercise its ROFR unilaterally.

Riseboro levels several other arguments, but all are easily dispensed. It contends that the absence in Section 12.03 of any enumerated conditions to Riseboro exercising its ROFR shows the parties intended there to be no conditions precedent. But with ROFR being a well-established

term of art, enumerated conditions would be superfluous and their absence is no indication that the partners intended to do anything other than grant Riseboro a common law ROFR. See Madison Ave. Leasehold, LLC v. Madison Bentley Associates LLC, 30 A.D.3d 1, 8 (1st Dep't. 2006) (holding that where a contract term "has attained the status of a term of art and is used in a technical context . . . the technical meaning is preferred").

Next, Riseboro argues that the limits in § 42(i)(7) on who may hold the ROFR, when the ROFR may be exercised, and what minimum price the ROFR-holder may pay reveal Congress's intent to refer to a right that operates differently than a common law ROFR. On the contrary, these qualifiers do nothing more than limit the applicability of § 42(i)(7) to certain ROFRs. They do not show an intent to alter the fundamental nature of ROFR so that it operates as an entirely different sort of property right.

Riseboro also submits that the phrase "right of 1st refusal . . . *to purchase the property*" somehow suggests "an entitlement" to purchase even against an unwilling seller. The well-established meaning of a ROFR and the significant and instructive legislative history of § 42(i)(7) lend no support for this assertion.

Finally, Riseboro argues that by setting a formula to determine its purchase price under Section 12.03, the parties showed their intent to do away with the third-party offer requirement. In Riseboro's view, a ROFR purchase price formula eliminates the need for the third-party offer to serve as a benchmark price for Riseboro to match. True enough, Riseboro will not have to match a third-party offer. But New York's definition of ROFR contemplates the possibility that a ROFR purchase price may be set "by a previously stipulated method" instead of using the third-party offer as the benchmark to be matched by the ROFR-holder. See Metro. Transp. Auth., 67 N.Y.2d at 163. Thus, that a third-party offer will not serve as a benchmark for Riseboro to match

does not require the Court to give the Section 12.03 ROFR a meaning different from the common law.

## CONCLUSION

In Section 12.03 of the May 1999 Agreement, the partners granted Riseboro a right of first refusal, not an option. Nothing in § 42(i)(7), its legislative history, or any provision in the May 1999 Agreement shows the partners intended Riseboro to be able to exercise its ROFR absent the common law conditions precedent. For the foregoing reasons, the "right of first refusal" in Section 12.03 of the May 1999 Agreements operates by the New York common law definition of right of first refusal.

SO ORDERED.

                                                                                        /s/ Raymond J. Dearie

Dated: August 28, 2020                                      Raymond J. Dearie
Brooklyn, NY                                              United States District Judge